DARREN T. BRENNER, ESQ.
Nevada Bar No. 8386
WILLIAM S. HABDAS, ESQ.
Nevada Bar No. 13138
AKERMAN LLP
1160 Town Center Drive, Suite 330
Las Vegas, Nevada 89144
Telephone:  (702) 634-5000
Facsimile:  (702) 380-8572
Email:  darren.brenner@akerman.com
Email:  william.habdas@akerman.com

*Attorneys for Defendants Bank of America, N.A.
And Federal Home Loan Mortgage Corporation*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS DEVELOPMENT GROUP, LLC, a limited liability company,<br><br>                    Plaintiff,<br><br>        v.<br><br>COLFIN AI-NV 2, LLC, a Delaware limited liability company; BANK OF AMERICA, N.A. a National Banking Association, as successor by merger to BAC HOME LOANS SERVICING, LP; MTC FINANCIAL INC., a California corporation; JOHN VIDA, an individual; FEDERAL HOME LOAN MORTGAGE COPORATION, a federally chartered corporation; ELMER S. CASTRO, an individual; JFK FINANCIAL, INC.,  a Nevada Corporation; DOE individuals I through XX; and ROE CORPORATIONS I through XX,<br><br>                    Defendants. | Case No.: 2:15-cv-01394-RFB-CWH<br><br>**DEFENDANTS FEDERAL HOME LOAN MORTGAGE CORPORATION'S AND BANK OF AMERICA'S MOTION FOR LEAVE TO FILE UNDER SEAL** |

Defendants Federal Home Loan Mortgage Corporation (**Freddie Mac**) and Bank of America (**BANA**), by and through their counsel of record, Akerman LLP, move for leave to file Exhibits A and B to Federal Home Loan Mortgage Corporation's Declaration in Support of Bank of America, N.A. and Federal Home Loan Mortgage Corporation's Motion for Summary Judgment under seal pursuant to LR 10-5(b).

"Every court has supervisory power over its own records and files. . . ." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598, 98 S. Ct. 1306, 1312, 55 L. Ed. 2d 570 (1978). "[T]he common-

law right of inspection has bowed before the power of a court to insure that its records" do not serve as a source of "business information that might harm a litigant's competitive standing" by releasing trade secrets. *Id.* Judicial records attached to dispositive motions can be sealed given compelling reasons to support the secrecy, as in this case. *See Kamakana v. City & Cty. of Honolulu,* 447 F.3d 1172, 1180 (9th Cir. 2006). BANA and Freddie Mac hereby request that certain exhibits to Freddie Mac's declaration in support of it and BANA's motion for summary judgment be sealed because the documents contain confidential and proprietary commercial terms and business information.

Freddie Mac does not originate mortgage loans. Instead, it purchases mortgage loans on the secondary mortgage market from loan originators and other entities who own mortgage loans (collectively, "Lenders"). With regard to certain loan purchases, Freddie Mac will purchase mortgage loans in bulk from an approved Lender. For certain bulk purchases, Freddie Mac acquires mortgage loans by the use of contracts known as Master Agreements along with corresponding Master Commitments which approve Lenders to sell certain types of loans to Freddie Mac and establish the terms under which such loans may be sold.

On or about February 25, 2005, Countrywide Home Loans, Inc. and Freddie Mac entered into Master Agreement No. MA04120883 and also entered into a corresponding Master Commitment No. T05012783, dated as of February 1, 2005, which incorporates the terms of Master Agreement No. MA04120883. A copy of Master Agreement No. MA04120883 is being provided under seal as Exhibit A. A copy of Master Commitment No. T05012783 is being provided under seal as Exhibit B.

Master Agreement No. MA04120883 and Master Commitment T05012783 do not specify any individual mortgage loans that Freddie Mac will purchase from BANA but rather establish the general terms for future sales of mortgage loans from BANA to Freddie Mac. These documents, which evidence the terms upon which Freddie Mac purchased a particular loan or groups of loans, contain proprietary business and commercial information of Freddie Mac and BANA, including, but not limited to, the pricing of various mortgage loans by type and other factors on the secondary mortgage market. This information is extremely sensitive given Freddie Mac's significant role in the secondary mortgage market and should such information be publicly disclosed, will most

certainly have a detrimental impact on Freddie Mac's mortgage business and the secondary mortgage market in general.

Furthermore, Master Agreement No. MA04120883 and Master Commitment T05012783 provide that the business terms contained therein are confidential information and that the parties will not release or disclose, nor permit the release or disclosure of, such confidential information for any purposes, except as provided for in the Freddie Mac Seller and Servicer Guide (the "Guide").

The Guide in turn requires that a Seller/Servicer treat all confidential information as strictly confidential and proprietary and precludes BANA from disclosing the business terms contained in Master Agreement No. MA04120883 and Master Commitment T05012783 unless agreed to by Freddie Mac or ordered by a court or administrative agency.  The Guide explicitly authorizes Freddie Mac to take any action it deems necessary to prevent or limit the release or disclosure of confidential information.  Guide, section 1201.8.

Given the nature of the confidential and proprietary information contained in Exhibits A and B, compelling reasons exist for filing the documents under seal.  Accordingly, BANA and Freddie Mac respectfully request that the Court order that the documents be filed under seal pursuant to LR 10-5(b).

**AKERMAN LLP**

DATED:  April 20, 2016

By:/s/ *William S. Habdas*

IT IS SO ORDERED:

_____
RICHARD F. BOULWARE, II
United States District Judge

DATED this 3rd day of May, 2016.

DARREN T. BRENNER, ESQ.
Nevada Bar No. 8386
WILLIAM S. HABDAS
Nevada Bar No. 13138
1160 Town Center Drive, Suite 330
Las Vegas, Nevada 89144
Telephone:  (702) 634-5000
Facsimile:  (702) 380-8572

*Attorneys for Defendants Bank of America, N.A.*
*And Federal Home Loan Mortgage Corporation*

**CERTIFICATE OF SERVICE**

Pursuant to F.R.C.P. 5(b) and Electronic Filing Procedure IV(B), I certify that on the 20th day of April 2016, a true and correct copy of the **DEFENDANTS FEDERAL HOME LOAN MORTGAGE CORPORATION'S AND BANK OF AMERICA'S MOTION FOR LEAVE TO FILE UNDER SEAL**, was delivered by sending a paper copy via U.S. Mail.

Roger P. Croteau, Esq.
Timothy E. Rhoda, Esq.
ROGER P. CROTEAU &ASSOCIATES, LTD.
9120 West Post Road, Suite 100
Las Vegas, Nevada 89148

*Attorneys for Plaintiff*

Neal D. Gidvani, Esq.
Phillip A. Silvestri, Esq.
SILVESTRI GIDVANI, P.C.
400 South 4th Street, Suite 500
Las Vegas, Nevada 89101

*Attorneys for Defendant MTC Financial, Inc.*

Richard Reynolds, Esq.
BURKE,WILLIAMS &SORENSEN, LLP
1851 East First, Suite 1550
Santa Ana, California 92705

*Attorneys for Defendant MTC Financial, Inc.*

John T. Steffen, Esq.
Michael S. Kelley, Esq.
Joshua O. Igeleke Jr.
HUTCHINSON &STEFFEN, LLC
10080 West Alta Drive, Suite 200
Las Vegas, Nevada 89145

*Attorneys for Defendant Colfin A1-NV2, LLC*

/s/ Allen G. Stephens
An employee of AKERMAN LLP

# EXHIBIT A

February 25, 2005


Mr. Gregory Togneri
Senior Vice President
Countrywide Home Loans, Inc.
4500 Park Granada, MS CH-58
Calabasas, CA 91302

RE:    Master Agreement #: MA04120883
       Seller/Servicer #: 204305

Dear Mr. Togneri:

Enclosed are two originals of your Master Agreement, which amend and restate the Master
Agreement you executed on January 13, 2005.  At your request, we modified a number of the
provisions.  Additionally, we reordered many of the paragraphs to group similar concepts; we
hope you will find these changes useful.  Your Senior Customer Relations Representative,
Laurene Loo, will be able to provide you with more specific information about the modifications
to certain provisions and the reordering of some of the paragraphs.

In order to accept and confirm the terms of Freddie Mac's offer, you must sign both Master
Agreement originals in the space provided.  Retain one signed original for your records.  Return
one signed original in its entirety by **March 11, 2005** to:

              Federal Home Loan Mortgage Corporation
              Attention: Ms. Cindy Abad, Contract Specialist
              21700 Oxnard Street, Suite 1900
              Woodland Hills, CA 91367-3621


If this letter is not executed and returned by the date specified, then Freddie Mac's offer
contained in this Amendment, at Freddie Mac's option, will be null and void.

Countrywide Home Loans, Inc.
MA04120883
Page 2 – February 25, 2005

If you have any questions, please contact your Account Manager, Mr. James Hunter at 703-918-5893 or your Senior Customer Relations Representative, Ms. Laurene Loo at 818-710-3056.

Sincerely,

David H. Stevens
Senior Vice President
Single Family Sourcing

Enclosures

cc:     Mr. David Marusa
        Ms. Michele Sjolander
        Mr. George Lopez

rdk/204305_MA04120883/LMLO-68DNMS/JH/2005-05

# MASTER AGREEMENT

This Master Agreement #MA04120883 (this "Agreement") dated as of February 22, 2005, (the "Agreement Date") is made by and between the Federal Home Loan Mortgage Corporation ("Freddie Mac") and Countrywide Home Loans, Inc., Seller/Servicer #204305 ("Seller").

Unless otherwise specified, the terms and conditions described in this Agreement shall apply to Mortgages sold by Seller under a Master Commitment that incorporates this Agreement by reference.  This Agreement does not entitle Seller to sell or obligate Freddie Mac to purchase Mortgages unless they have entered into a Master Commitment incorporating the terms of this Agreement.

**Master Agreement Amount:**  $40 billion

**Effective Date for Delivery:**  January 1, 2005

**Required Delivery Date:**  December 31, 2005

**Overpurchase Tolerance:**  10 percent

**Discretionary Provisions:**
During the term of this Agreement, Freddie Mac reserves the right to amend, supplement, revise or terminate, in whole or in part, any of the Discretionary Provisions identified on Exhibit 26 to the Guide.

**Special Underwriting Provisions:**
Following is a table which identifies the waivers allowed to the Single-Family Seller/Servicer Guide ("the Guide").  Complete terms and conditions regarding these waivers may be found on the Attachment and page referenced under the "Contract Reference" column.  The waivers relate to the Sections of the Guide which are listed in the "Guide Reference" column.

| ALL MORTGAGE TYPES - ATTACHMENT 1 | | | |
|---|---|---|---|
| **Key Word** | **Waiver Title** | **Contract Reference** | **Guide Reference** |
| Additional Provisions | Mortgages Originated Using CLUES | Page 1, #1 | 37.21.1, 37.22 |
| Additional Provisions | Purchase of DU Mortgages | Page 2, #2 | none |
| Additional Provisions | Purchase of DU Expanded Approval/Eligible Level I Mortgages | Page 6, #3 | Chapter 37 |
| Affordable | Affordable Gold 5, 3/2 and 97 | Page 8, #4 | Chapter 34, 37.4 |
| Appraisals | Form 2055 Exterior-only inspection for Non-LP Mortgages | Page 8, #5 | 44 |
| Condo/PUD | Streamlined Project Review | Page 9, #6 | 42.2, 42.3, 42.4, 42.5, 42.6, 42.7, 42.10 and 42.11 |
| Condo/PUD | Mortgages secured by Units in Class I Condo Projects | Page 10, #7 | 42.2 |
| Condo/PUD | Presale and Occupancy Requirements for Class I, II, and III Condominium Projects | Page 11, #8 | 42.6(i), 42.7(a) & (b) |
| Condo/PUD | Delegated Approval Authority for Class I and Class II Condominium Units | Page 11, #9 | 42.3, 42.4, 42.5, 42.6 |
| Condo/PUD | Delivery Fee for Condominium Mortgages | Page 12, #10 | 58.3.1 |
| Condo/PUD | Insurance for PUDs | Page 13, #11 | 43.2, 58.2, 58.3 and 58.4 |
| Credit Reports | Credit Report from One Credit Repository | Page 13, #12 | 37.10 |
| Documentation | Borrower is a Living Trust | Page 13, #13 | 22.10 |
| Documentation | Age of Verification Documentation | Page 14, #14 | 37.20 |
| Documentation | Use of Streamlined Accept Documentation for Standard Accept Loan Prospector Mortgages | Page 14, #15 | 37.22 |
| Documentation | Borrower is a Living Trust and Mortgaged Premises is an Investment Property | Page 15, #16 | 22.10(a), 22.22.1 |
| Escrow | No Escrow for Incomplete Improvements | Page 15, #17 | 22.17 |
| Escrow | Incomplete Improvements | Page 16, #18 | 22.17 |
| Income | Amount of Trailing Co-Borrower Income | Page 16, #19 | 37.13 (e) |
| Income | Use of Non-Occupying Borrower Income/Debts to Qualify | Page 17, #20 | 22.16, 37.16 |
| Investment Properties | Gift Funds for Investment Properties | Page 17, #21 | 22.22.1 |

| ALL MORTGAGE TYPES - ATTACHMENT 1 | | | |
|---|---|---|---|
| **Key Word** | **Waiver Title** | **Contract Reference** | **Guide Reference** |
| Mortgage Insurance | Non-Loan Prospector Mortgages with Reduced MI Coverage | Page 18, #22 | 27.1(b)(2) |
| Mortgage Insurance | Balloon/Reset Mortgages and Convertible ARMs with Lender-paid Mortgage Insurance | Page 18, #23 | 22.7 and 27.1 |
| Mortgage Insurance | Electronic Mortgage Insurance Certificates | Page 18, #24 | 46.14 |
| Purchase Money | Energy Efficient Properties | Page 19, #25 | 23.8(b) |
| Purchase Money | Second Home Not Suitable for Year-round Occupancy | Page 19, #26 | 22.22(a) |
| Purchase Money | Inspection of Mortgaged Premises after Delinquency | Page 19, #27 | 64.7(a) |
| Source of Funds | Expanded Definition of Cash | Page 20, #28 | 26.2 |
| Source of Funds | Use of Credit Cards to Pay Closing Costs for Borrowers with an Employee Relocation Assistance Program | Page 21, #29 | 26.2 and 37.16 |
| Mortgage Insurance | Mortgages with Lender-paid Mortgage Insurance | Page 21, #30 | 27.1 |
| Streamlined Refi | Streamlined Refinance Mortgages | Page 22, #31 | 24.3 and 24.4 |
| Delivery Requirement | Delivery of Special Characteristic Code 941 for Accept Mortgages | Page 23, #32 | 2.2.1 and 6.1 |

| FIXED-RATE MORTGAGES - ATTACHMENT 2 | | | |
|---|---|---|---|
| Key Word | Waiver Title | Contract Reference | Guide Reference |
| Additional Provisions | Documentation of Construction Permanent Mortgages | Page 1, #1 | section 6.8 |
| Additional Provisions | Initial Interest Mortgages Originated on Fannie Mae InterestFirst Notes | Page 2, #2 | J33.5 |
| Affordable | Subsidized Secondary Financing Approved by Fannie Mae Permitted as Affordable Seconds | Page 2, #3 | 25.1(g) |
| Affordable | Affordable Gold 5 Mortgages Secured by 2- to 4-Unit Primary Residences | Page 3, #4 | 34.1(b) second bullet |
| Affordable | Interest Rate of Affordable Second above Interest Rate on First Lien Mortgage | Page 7, #5 | none |
| Affordable | Alternative Homeownership Education Programs for Affordable Gold Mortgages | Page 7, #6 | 34.4(f), 34.5(f) |
| Affordable | Delivery of Additional Data for Affordable Housing Initiative Mortgages | Page 7, #7 | 16.7 |
| Buydowns | Borrower Qualification for Extended Buydown Mortgages | Page 8, #8 | 25.4, |
| Buydowns | Mortgages subject to Temporary Subsidy Buydown Plans | Page 8, #9 | 25.4, 17.20 |
| Buydowns | Fixed-rate Mortgages with Compressed Buydowns | Page 8, #10 | 25.4,  N/A |
| Income | Non-Occupying Borrowers - Housing Payment Ratios | Page 9, #11 | 37.15 |
| Purchase Money | Bridge Loan Payments excluded from calculation of Borrower's monthly debt payment-to-income ratio | Page 10, #12 | 37.16, 37.16 |
| Seasoned Mortgages | Exceeding the Delivery Limitation for Seasoned Mortgages | Page 10, #13 | Chapter 36 |
| Secondary Financing | Mortgages with Secondary Financing and a TLTV Ratio of Up to 100 Percent | Page 11, #14 | 23.4 |
| Secondary Financing | Mortgages with Secondary Financing Having TLTV Ratios up to 100 Percent | Page 11, #15 | 26.7, 23.4 |
| Streamlined Refi | Streamlined Refinance Mortgage Application Form | Page 13, #16 | 24.2(c) |
| Income | Mortgages Originated with Stated Income/Assets Under Seller's Fast & Easy Program | Page 13, #17 | 37.21.1, 37.22 |
| Secondary Financing | Mortgages with secondary financing | Page 15, #18 | 23.4 |
| Appraisals | Use of Automated Valuation Models | Page 16, #19 | 44.7 and 44.9 |

| ADJUSTABLE RATE MORTGAGES - ATTACHMENT 3 | | | |
|---|---|---|---|
| Key Word | Waiver Title | Contract Reference | Guide Reference |
| Additional Provisions | Documentation of Construction Permanent Mortgages | Page 1, #1 | section 6.8 |
| Additional Provisions | Initial Interest Mortgages Originated on Fannie Mae InterestFirst Notes | Page 2, #2 | J33.5 |
| ARM | Nonstandard Conversion Agreement | Page 2, #3 | 31.4 |
| Buydowns | Mortgages subject to Temporary Subsidy Buydown Plans | Page 2, #4 | 25.4, 17.20 |
| Buydowns | Borrower Qualification for Extended Buydown Mortgages | Page 3, #5 | 25.4, |
| Seasoned Mortgages | Exceeding the Delivery Limitation for Seasoned Mortgages | Page 3, #6 | Chapter 36 |
| Secondary Financing | Mortgages with Secondary Financing Having TLTV Ratios up to 100 Percent | Page 3, #7 | 26.7, 23.4 |
| Income | Mortgages Originated with Stated Income/Assets Under Seller's Fast & Easy Program | Page 5, #8 | 37.21.1, 37.22 |
| Secondary Financing | Mortgages with secondary financing | Page 6, #9 | 23.4 |
| Appraisals | Use of Automated Valuation Models | Page 7, #10 | 44.7 and 44.9 |

| BALLOON/RESET MORTGAGES - ATTACHMENT 4 | | | |
|---|---|---|---|
| **Key Word** | **Waiver Title** | **Contract Reference** | **Guide Reference** |
| Buydowns | Borrower Qualification for Extended Buydown Mortgages | Page 1, #1 | 25.4 |
| Buydowns | Mortgages subject to Temporary Subsidy Buydown Plans | Page 1, #2 | 25.4, 17.20 |
| Purchase Money | Non-uniform Balloon Mortgage Instruments | Page 1, #3 | 33.4 |
| Streamlined Refi | Streamlined Refinance Mortgage Application Form | Page 1, #4 | 24.2(c) |

**Special Programs and Products:**
Following is a table which identifies the programs and products for which Seller is eligible under this Agreement.  Complete terms and conditions regarding the program/product may be found in the Sections of the Single-Family Seller/Servicer Guide ("the Guide") which are listed in the "Guide Reference" column or in the Attachment referenced under the "Contract Reference" column.

| Key Word | Program/Product Title | Contract Reference | Guide Reference |
|----------|----------------------|-------------------|-----------------|
| Affordable | Renovation Mortgages Attachment | Attachment 5 | none |
| Affordable | Affordable Gold 97/1/2 Mortgages with Secondary Financing from California Housing Loan Insurance Fund (CaHLIF) | Attachment 6 | none |
| Affordable | Community Gold Mortgages | Attachment 7 | none |
| Affordable | Community Gold Mortgages Secured by 2-plus Unit Dwellings | Attachment 8 | none |
| Affordable | 1% Borrower Personal Funds Exhibit to Community Gold Mortgages Attachment | Attachment 9 | none |
| Affordable | Section 8 Mortgages Attachment | Attachment 10 | none |
| Affordable | Borrower Contribution of One Percent for Section 8 Mortgages Exhibit | Attachment 11 | none |
| Affordable | Mortgage Revenue Bond Mortgages | Attachment 12 | none |
| Affordable | Affordable Gold, Community Gold and other Affordable Housing Mortgages - Builder Grants Attachment | Attachment 13 | none |
| Affordable | HOME WORKS! Mortgages Attachment | Attachment 14 | none |
| Affordable | Los Angeles HOME WORKS! Program | Attachment 15 | none |
| Affordable | Affordable Gold 100 Mortgages Attachment | Attachment 16 | none |
| Affordable | Countrywide Special Initiative Mortgages Attachment | Attachment 17 | none |
| ARM | 5/1 ARMs with Minimum Servicing Spreads of 10 Basis Points | Attachment 18 | none |
| ARM | LIBOR ARMs with Nonstandard Lookback | Attachment 19 | Exhibit 17 |
| Cash-out Refi | Texas Equity First Lien Refinance Mortgages Attachment | Attachment 20 | 24.1 |
| Purchase Money | Cooperative Share Mortgage Program | Attachment 21 | none |
| Purchase Money | Relocation and Employer-assisted Mortgages | Attachment 22 | 29.4 |
| Purchase Money | Provisions Relating to Alt A Mortgages | Attachment 27 | none |
| Purchase Money | Provisions Applicable to Mortgages Originated by Seller's Builder Partners | Attachment 28 | none |

| Key Word | Program/Product Title | Contract Reference | Guide Reference |
|---|---|---|---|
| ARM Program | ARMs with Nonstandard Caps | Attachment 29 | Exhibit 17 |

**Additional Provisions:**

Following is a table identifying additional variances to provisions of the Guide or, if applicable, limitations on products or programs otherwise eligible under the Purchase Documents. Generally, the provisions included in this Attachment will concern topics such as legal documentation, third-party originators, quality control, delivery or servicing of Mortgages sold under this Agreement. Complete terms and conditions regarding these provisions may be found on the Attachment and page referenced under the "Contract Reference" column. The waivers relate to the Sections of the Guide which are listed in the "Guide Reference" column.

| Key Word | Additional Provision Title | Contract Reference | Guide Reference |
|---|---|---|---|
| Additional Provisions | Terms of Business Arrangement | Page 1, #1, Attachment 23 | none |
| Custodial Provisions | Transfers of Servicing from Seller to an Affiliated Servicer | Page 5, #2, Attachment 23 | 22.14 |
| Purchase Money | Using an Investment Account to hold Principal and Interest Payments | Page 7, #3, Attachment 23 | 77.8 |
| Quality Control | Quality Control of Non-Performing Loans | Page 8, #4, Attachment 23 | 46.1 |
| Quality Control | Reverification of Source of Funds for Mortgages Selected by Seller for Post-funding Quality Control Review | Page 8, #5, Attachment 23 | 46.16 |
| Credit Reports | Credit Reports Obtained in Quality Control Review | Page 9, #6, Attachment 23 | 48.5 |
| Quality Control | No New Credit Reports Required for Quality Control Review | Page 10, #7, Attachment 23 | 48.5(c) |
| Quality Control | Extension of Appeal Process | Page 10, 38, Attachment 23 | 72.6(1) |
| Custodial Provisions | Document Custodial Waivers | Attachment 24 | 6.7, 16.4, 16.5, 16.7 and 16.8 |
| Custodial Provisions | Mortgages with Delayed Note Certification | Attachment 25 | None |

**Special Pricing Provisions:**

Following is a table identifying special provisions concerning the calculation of Required Spreads, delivery fees, buyups/buydowns, remittance programs or other pricing related programs or processes for Mortgages sold under this Agreement.  Complete terms and conditions regarding these provisions may be found in the Attachment referenced under the "Contract Reference" column.

| Key Word | Special Pricing Provision Title | Contract Reference | Guide Reference |
|---|---|---|---|
| Additional Provisions | No A-minus Fees for Manually Underwritten Mortgages - Exhibit 19 | Attachment 26 | none |

**Seller's Execution of Master Commitments and Amendments:**

From time to time, Freddie Mac and Seller may negotiate Master Commitments incorporating the terms of this Master Agreement and/or amendments to this Master Agreement.  Freddie Mac will not require that such Master Commitments or amendments be executed and returned by Seller.  Seller's delivery of Mortgages shall be deemed Seller's acceptance of all terms and conditions contained in such Master Commitments and/or amendments, including, but not limited to, terms which impose any fee or require a credit enhancement related to the delivery of such Mortgages.  The provisions of this paragraph shall apply also to any amendments to Master Commitments.

Freddie Mac shall continue to require that Seller execute and return to Freddie Mac all Master Agreements.

IN WITNESS WHEREOF, the parties hereto have caused this Master Agreement to be duly executed by their respective authorized representatives as of the date set forth above.


**FEDERAL HOME LOAN MORTGAGE CORPORATION**

By: _____

David H. Stevens
Senior Vice President
Single Family Sourcing


**COUNTRYWIDE HOME LOANS, INC.**

By: _____

Name: _Gregory M. Togneri_

Title: _SVP, Agency Relations_


Reference
rdk/204305_MA04120883.doc/LMLO-68DNMS/JH

Countrywide Home Loans, Inc.
MA04120883
Page 2 – February 25, 2005

## ATTACHMENT 1
## SPECIAL UNDERWRITING PROVISIONS
## ALL MORTGAGE TYPES

**1.**    **Mortgages Originated Using CLUES**

Mortgages that were underwritten and originated through Seller's automated underwriting system, known as CLUES, are eligible for purchase, provided that:

(a)    the Mortgage must be classified by CLUES as an "Accept" loan and Seller must maintain in the Mortgage file a copy of the CLUES underwriting findings evidencing such classification ("CLUES Report");

(b)    Seller must obtain and maintain in the Mortgage file the credit, income, employment and asset documentation that comply with the requirements of the CLUES Report;

(c)    Seller must obtain and maintain in the Mortgage file an appraisal, property inspection report or Property Inspection Waiver ("PIW") that complies with the requirements of the CLUES Report;

(d)    with respect to each Mortgage, Seller is not responsible for representations and warranties to Freddie Mac that the Borrower shows a willingness to repay the Mortgage, that Borrower's credit reputation is acceptable, and that Borrower has sufficient income to support the Mortgage payments on the Mortgage;

(e)    with respect to each Mortgage that was originated using a PIW, Seller is not responsible for representations and warranties to Freddie Mac regarding the value, the interior and exterior condition and the marketability of the Mortgaged Premises as stated in Chapter 44;

(f)    each Mortgage originated as a Fannie Mae InterestFirst Mortgage must comply with all the requirements of Chapter J33, as specifically modified by any provision of this Master Agreement, and with the delivery requirements of Section 17.41;

(g)    (i)    in connection with the delivery of each Mortgage, Seller must insert "945" (indicating automated underwriting system-scored Mortgage with no CS/LTV fee) in one of the special characteristic code fields on the Form 11 or 13SF, as applicable;

(ii)    in connection with the delivery of each Mortgage originated as a Fannie Mae InterestFirst Mortgage, Seller must insert "D04" (indicating a FNMA InterestFirst mortgage) in one of the special characteristics code fields on the Form 11 or 13SF, as applicable; and

(iii)    in connection with the delivery of each Mortgage originated with a PIW, Seller must insert "431" (indicating Mortgage with property inspection waiver) in one of the special characteristics code fields on the Form 11 or 13SF, as applicable;

(h)    notwithstanding any provision to the contrary set forth in the Guide, the Mortgages will not be assessed CS/LTV delivery fees (also referred to as A-minus fees), however:

(i)    for Mortgages with PIWs, Seller must pay Freddie Mac the postsettlement delivery fee for "Mortgages with Property Inspection Waivers ("PIWs")" indicated on Exhibit 19 attached to the Master Commitment under which the CLUES Mortgage is delivered; and

(ii)    all Mortgages will be assessed any other applicable delivery fees described in Exhibit 19 of the Master Commitment under which the Mortgage was delivered;

(i)    Seller must provide Freddie Mac with 90-days prior written notice of any material or significant changes made to CLUES or the CLUES scorecard during the term of this Master Agreement;

(j)    Seller represents and warrants that CLUES complies in all respects with applicable laws, rules and regulations, including fair lending requirements; and

(k)    Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, during the term of this Master Agreement, provided however, that Freddie Mac must first notify Seller's Senior Managing Director, Secondary Marketing, of its intention to modify this paragraph, and thereupon Freddie Mac and Seller will have 30 days within which to meet, confer and use all reasonable efforts to resolve Freddie Mac's concerns; at the end of such 30-day period, if the parties have been unable to resolve Freddie Mac's concerns, Freddie Mac must provide Seller with 60-days prior written notice of the modification to the provisions of this paragraph, in which event, Seller will not be required to comply with the Minimum Market Share (as described in the paragraph of this Master Agreement titled "Terms of Business Arrangement") for the period beginning with the effective date set forth in the notice.

## 2.    Purchase of DU Mortgages

Freddie Mac will purchase Mortgages that were underwritten using Fannie Mae's Desktop Underwriter Automated Scoring System ("DU"; such Mortgages, "DU Mortgages"), provided that:

(a)    each DU Mortgage must have received an "Approve/Eligible" recommendation as documented in the DU Underwriting Findings report (the "DU Report");

(b)     the following DU Mortgages are not eligible for purchase:

 (i)      Fannie Mae Expanded Approval Level I, II, III or IV Mortgages (except that Fannie Mae Expanded Approval Level I Mortgages may be eligible for purchase under other provisions of this Agreement);

 (ii)     Mortgages originated under a Fannie Mae/Freddie Mac special initiative or Pilot Program, except as provided in subparagraph (c) below;

 (iii)    Mortgages originated using the "lower cost mi" option;

 (iv)     Mortgages originated under Fannie Mae's stated income, no income or no income-no assets offerings; or

 (v)      Mortgages originated under Fannie Mae's My Community Mortgage;

(c)     the following Mortgages are eligible for purchase subject to the conditions described:

 (i)      notwithstanding the provisions of subparagraph (b) above, the following DU Mortgages are eligible for purchase if and to the extent permitted by Fannie Mae's Flexible Mortgage Product Guidelines:

  o      Flexible 80/20 Mortgages, including such Mortgages with respect to which the secondary financing is a HELOC

  o      Flexible 97 Mortgages with Mortgage Insurance coverage of either 18 percent or 35 percent

  o      Flexible 100 Mortgages with Mortgage Insurance coverage of 25, 30, 35 or 40 percent

 (ii)     Mortgages originated on Fannie Mae's InterestFirst loan instruments must comply with all the requirements of Chapter J33 (except as specifically modified by any provision of this Master Agreement), and with the delivery requirements of Section 17.41;

 (iii)    Mortgages secured by Manufactured Homes must comply with all the requirements of Chapter H33, except that:

  o      the Mortgage must be a purchase transaction or a "no cash-out" refinance;

  o      the LTV, TLTV and HTLTV ratios of each such Mortgage must not exceed 90 percent; and

           o       the term of the Mortgage must be 30 years;

(d)      all data about the Mortgage that was submitted to DU for evaluation must have been accurate and complete, and the DU Mortgage received an Approve/Eligible recommendation;

(e)      each DU Mortgage must be documented in accordance with the requirements of the DU Report, including the mortgage insurance coverage requirements (such as the "reduced mi" option, but not including the "lower cost mi" option) and appraisal requirements, and each DU Mortgage file must contain the DU Underwriting Findings Report that sets forth the DU classification and any other conditions;

(f)      credit, income, employment and asset documentation in the Mortgage file for each DU Mortgage must at a minimum comply with Fannie Mae's requirements for Mortgages with an Approve/Eligible recommendation and any requirements in the DU Report or as otherwise required by Fannie Mae; additionally, the documentation in the Mortgage file must be sufficient to determine that the Borrower's credit reputation and capacity to repay the Mortgage are acceptable;

(g)      Seller must obtain and maintain in the DU Mortgage file an appraisal, property inspection report or Property Inspection Waiver ("PIW") that complies with the requirements of the DU Report;

(h)      with respect to each DU Mortgage, Seller is not responsible for any representations and warranties to Freddie Mac relating to the Borrower's credit reputation and capacity to repay the Mortgage;

(i)      with respect to each DU Mortgage that was originated with a PIW, Seller is not responsible for representations and warranties to Freddie Mac regarding the value, the interior and exterior condition and the marketability of the Mortgaged Premises as stated in Chapter 44 of the Guide;

(j)     in connection with the delivery of each DU Mortgage sold under the terms of this paragraph, Seller must insert the appropriate codes, data or other information in the specified fields on the Form 11 or Form 13SF, as applicable:

| DU Mortgage Characteristics | Code/Data | Field |
| --- | --- | --- |
| All DU Mortgages* | 943 | Special Characteristics Code (SCC) |
| InterestFirst Mortgages | D04 | SCC |
| Mortgages originated with a PIW | 431 | SCC |
| Flexible 80/20 Mortgages | 963 | SCC |
| Flexible 97 Mortgages | 432 | SCC |
| Flexible 100 Mortgages | 964 | SCC |
| Mortgages with respect to which Seller uses the Fannie Mae representative credit score as described in Part X of Fannie Mae's Selling Guide | 1 | CST |
| Flexible 97 Mortgages | 18 or 35, as appropriate | MI Loss Coverage % |
| Flexible 100 Mortgages | 25, 30, 35 or 40, as appropriate | MI Loss Coverage % |

*If the code is not delivered, the Mortgage file must contain credit and collateral documentation required by the Purchase Documents for Manually Underwritten Mortgages, and Seller will be responsible for all representations and warranties applicable to Manually Underwritten Mortgages

(k)     notwithstanding any provision to the contrary set forth in the Guide, the DU Mortgages will not be assessed CS/LTV delivery fees (also referred to as A-minus fees), however:

(i)     in connection with the sale of the following Mortgages, post settlement delivery fees will be assessed and billed to Seller at the delivery fee rates indicated on the Delivery Fee Matrix attached to the Master Commitment under which the particular Mortgage is delivered, and such delivery fees must be paid in accordance with the provisions outlined in Section 17.2:

o     Mortgages with PIWs

o     Flexible 80/20 Mortgages

o     Flexible 97 Mortgages (the delivery fee rate will vary depending on the amount of mortgage insurance coverage)

o     Flexible 100 Mortgages (the delivery fee rate will vary depending on the amount of mortgage insurance coverage)

o      InterestFirst Mortgages

(ii)    all Mortgages will be assessed any other applicable delivery fees described in Exhibit 19 of the Master Commitment under which the Mortgage was delivered;

(l)    Seller and Freddie Mac agree that it is the intention of the parties that the DU Mortgages sold to Freddie Mac under a particular Master Commitment will have loan characteristics that are similar to those of DU Mortgages sold to Fannie Mae and other investors during the same period of time, and that Seller will not determine where to sell a DU Mortgage on the basis of loan characteristics, except to the extent a particular loan characteristic renders the DU Mortgage ineligible for sale to Freddie Mac.  For purposes of this paragraph, the phrase "loan characteristics" includes (i) Borrower's creditworthiness and capacity to repay, (ii) the Mortgaged Premises type and value, and (iii) the characteristics of the Mortgage, such as the loan-to-value ratio and whether the loan is purchase transaction or refinance, but does not include the product type (e.g., 30-year fixed-rate Mortgages, 5/1 Treasury-indexed ARMs) or the note rate.  Freddie Mac reserves the right to adjust the Required Spreads applicable to the DU Mortgages upon 30 days written notice if Freddie Mac, in its sole discretion, determines that there has been an adverse and material change in the loan characteristics mix of DU Mortgages delivered by Seller during the term of this Master Agreement; and

(m)    Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, during the term of this Master Agreement, provided however, that Freddie Mac must first notify Seller's Senior Managing Director, Secondary Marketing, of its intention to modify this paragraph, and thereupon Freddie Mac and Seller will have 30 days within which to meet, confer and use all reasonable efforts to resolve Freddie Mac's concerns; at the end of such 30-day period, if the parties have been unable to resolve Freddie Mac's concerns, Freddie Mac must provide Seller with 60-days prior written notice of the modification to the provisions of this paragraph.

## 3.    Purchase of DU Expanded Approval/Eligible Level I Mortgages

Freddie Mac will purchase mortgages underwritten using Fannie Mae's Desktop Underwriter Automated Scoring System ("DU"; such Mortgages, "DU Mortgages") that comply with the following:

(a)    the DU Mortgage received an Expanded Approval/Eligible Level I Classification (the "DU Level I EA Mortgage") as documented in the DU Underwriting Findings report (the "DU report");

(b)      the DU Level I EA Mortgage was not (i) a DU Approve/Eligible Mortgage, (ii) a DU Expanded Approval Level II, III or IV Mortgage, (iii) originated under a Fannie Mae/Freddie Mac special initiative or Pilot Program, (iv) originated using the "lower cost mi" option, (v) originated under a stated income, no income or no income-no assets offerings, (vi) originated as a Timely Payment Rewards Mortgage, (vii) originated as a Fannie Mae Flexible Mortgage, or (viii) originated using a Property Inspection Waiver ("PIW") in lieu of a property inspection or appraisal;

(c)      all data about the Mortgage that was submitted to DU for evaluation must have been accurate and complete;

(d)      Seller must maintain in the Mortgage file for each DU Level I EA Mortgage the DU report that sets forth the DU classification and any other conditions;

(e)      Seller must obtain and maintain in the Mortgage file documentation that at a minimum complies with Fannie Mae's requirements for DU Level I EA Mortgages and the requirements set forth in the DU report, including all credit, verification and underwriting documentation, evidence of the mortgage insurance coverage (but not coverage consistent with the "lower cost MI" option), and an appraisal or property inspection report (but not a PIW);

(f)      with respect to each DU Level I EA Mortgage:

      (i)      Seller is not responsible for any representations and warranties to Freddie Mac relating to the Borrower's credit reputation and capacity to repay the Mortgage; and

      (ii)      Seller is not responsible for any representations and warranties to Freddie Mac regarding (A) the value of the Mortgaged Premises, and (B) the interior and exterior condition and marketability of the Mortgaged Premises as stated in Chapter 44;

(g)      notwithstanding any provision to the contrary set forth in the Guide, DU Level I EA Mortgages will not be assessed CS/LTV delivery fees (also referred to as A-minus fees); however, DU Level I EA Mortgages will be assessed any other applicable delivery fees described in Exhibit 19 of the Guide and/or the Master Commitment under which the DU Level I EA Mortgages were delivered;

(h)      in connection with the delivery of each DU Level I EA Mortgage, Seller must insert both of the following codes in the special characteristic code fields on the Mortgage Submission Schedule - Form 11 or Mortgage Submission Voucher - Form 13SF, as appropriate;

(i)     Seller and Freddie Mac agree that it is the intention of the parties that the DU Level I EA Mortgages sold to Freddie Mac under a particular Master Commitment will have loan characteristics that are similar to those of DU Level I EA Mortgages sold to Fannie Mae and other investors during the same period of time, and that Seller will not determine where to sell a DU Level I EA Mortgage on the basis of loan characteristics, except to the extent a particular loan characteristic renders the DU Level I EA Mortgage ineligible for sale to Freddie Mac.  For purposes of this paragraph, the phrase "loan characteristics" includes (i) Borrower's creditworthiness and capacity to repay, (ii) the Mortgaged Premises type and value, and (iii) the characteristics of the Mortgage, such as the LTV ratio and whether the loan is purchase transaction or refinance, but does not include the product type (e.g., 30-year fixed-rate Mortgages, 5-year Balloon/Reset Mortgages) or the note rate.  Freddie Mac reserves the right to adjust the Required Spreads applicable to the DU Level I EA Mortgages upon 30 days written notice if Freddie Mac, in its sole discretion, determines that there has been an adverse and material change in the loan characteristics mix of DU Level I EA Mortgages delivered by Seller during the term of this Master Agreement; and

(j)     Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, during the term of this Master Agreement, provided however, that Freddie Mac must first notify Seller's Senior Managing Director, Secondary Marketing, of its intention to modify this paragraph, and thereupon Freddie Mac and Seller will have 30 days within which to meet, confer and use all reasonable efforts to resolve Freddie Mac's concerns; at the end of such 30-day period, if the parties have been unable to resolve Freddie Mac's concerns, Freddie Mac must provide Seller with 60-days prior written notice of the modification to the provisions of this paragraph.

## 4.     Affordable Gold 5, 3/2 and 97

For Affordable Gold 5, Affordable Gold 3/2 and Affordable Gold 97 Mortgages delivered under this Master Agreement:

(a)     Borrower Funds to be used in connection with the down payment requirements for the Affordable Gold Mortgages may include disaster relief grants and/or loans; and

(b)     Seller must use a minimum of three Noncredit Payment References, provided that all Noncredit Payment References have a minimum payment history of 12 months and one of the Noncredit Payment References is housing related.

## 5.     Form 2055 Exterior-only inspection for Non-LP Mortgages

Form 2055s with exterior-only inspections may be used for Non-Loan Prospector Mortgages, provided that:

(a)     the Mortgages must be secured by 1-unit Primary Residences or second homes;

(b)     the maximum loan-to-value and total loan-to-value ratios and the minimum
        Indicator Scores for the various Mortgage purposes and Borrower types are as
        follows:

| Mortgage purpose | Borrower | Maximum LTV/TLTV ratio | Minimum Indicator Score |
|---|---|---|---|
| Purchase Transaction | Salaried | 90% | 700 |
| | Salaried | 80% | 680 |
| | Self-employed | 80% | 700 |
| "No Cash-out" Refinance | Salaried | 75% | 680 |
| | Self-employed | 75% | 700 |
| "Cash-out" Refinance | Salaried | 65% | 680 |
| | Self-employed | 65% | 700 |

(c)     the appraiser must determine that the Mortgaged Premises is of the quality and
        condition that will be acceptable to typical purchasers in the area in which the
        Mortgaged Premises are located; and

(d)     Seller represents and warrants that the Mortgaged Premises, including the interior
        condition, is adequate security for the Mortgage.

## 6.     Streamlined Project Review

For Mortgages secured by units located in Class I, II or III Condominium Projects, Seller
shall not be required to make the warranties of Sections 42.3, 42.4, 42.6 and 42.7 of the
Guide, except as noted below, provided that:

(a)     such Mortgages are purchase money or "no cash-out" refinance Mortgages
        secured by Primary Residences or second homes and have LTV ratios not
        exceeding 90 percent;

(b)     the homeowner's association maintains the insurance coverage on the
        Condominium Project and the Borrowers maintain the insurance coverage on the
        individual units as required in Chapter 58 of the Guide;

(c)     the units securing such Mortgages are not subject to any timesharing ownership
        arrangement; and

(d)     Seller makes the following warranties, regardless of the Class of the
        Condominium Project to which the provision specifically applies:

        (i)     Sections 42.3(a) and 42.6(a) regarding compliance with the laws;

        (ii)    Sections 42.3(c) and 42.6(c) regarding unpaid homeowner association
                dues;

(iii)    Sections 42.3(f) and 42.6(f) regarding taxes, assessments and charges;

(iv)    Sections 42.3(h), 42.6(h) and 42.7(b), fifth bullet regarding leasehold estates;

(v)    Section 42.4(a) to the effect that all common elements and amenities are completed; and

(vi)    Section 42.4(c) to the effect that at least 70 percent of the units have been sold to individuals for their Primary Residence or second home.

**7.    Mortgages secured by Units in Class I Condo Projects**

Mortgages secured by Units in Class I Condominium Projects with respect to which Seller is not able to warrant that (i) all common elements and amenities are fully installed, completed and in operation for use by the Condominium Unit owners (the "completion requirement") and/or (ii) at least 70 percent of the units in the Condominium Project have been sold to bona fide purchasers who have closed or are legally obligated to close (the "presale requirement"), are eligible for purchase, provided that:

(a)    all such Mortgages are secured by units located in condominium projects located in California;

(b)    all such Mortgages are purchase money mortgages or "no cash-out" refinance mortgages secured by Primary Residences or second homes;

(c)    prior to delivering any such Mortgage to Freddie Mac, Seller shall notify Freddie Mac that the Condominium Project does not meet the completion and/or presale requirements, by sending or faxing a fully and accurately completed Project Notification, substantially the form set forth at Exhibit A attached hereto, to Freddie Mac's Western Region offices, attention:  Leila Quadra, fax number 818-710-3045.  On the Project Notification, Seller shall advise Freddie Mac of the progress the Condominium Project has made in complying with the completion and presale requirements.  Seller shall also provide Freddie Mac with an estimated date of compliance with the completion and presale requirements.  The estimated compliance date may not be more than 12 months after the date of the Project Notification;

(d)    all Mortgages sold to Freddie Mac secured by units in such Condominium Project will be deemed to have been sold "with recourse" within the meaning of Section 11.10(a) of the Guide, notwithstanding the fact that Seller has endorsed the Notes for such Mortgages in accordance with Section 16.4(a) of the Guide;

(e)     Seller shall forward Freddie Mac either (i) a written Certification of Compliance, in substantially the form set forth at Exhibit B attached hereto, if the Condominium Project meets the completion and presale requirements, or (ii) a letter describing the status of the Condominium Project in complying with the completion and presale requirements and a new estimated date of compliance, if the Condominium Project does not meet the completion and presale requirements;

(f)     if, on or before the compliance date specified in the Project Notification, the Condominium Project complies with the completion and presale requirements and Seller so notifies Freddie Mac pursuant to a Certification of Compliance, Mortgages secured by units in any such Condominium Project will be deemed to have been sold "without recourse";

(g)     Seller may not sell or transfer the servicing of any Mortgages secured by units in such Condominium Projects (i) until after the date on which a Certificate of Compliance is received by Freddie Mac with respect to such Condominium Project, provided such date occurs on or before (A) the estimated compliance date specified in the Project Notification or (B) any extension for compliance that may have been granted by Freddie Mac, or (ii) if such Mortgage is deemed to have been sold "with recourse";

(h)     in connection with the delivery of each Mortgage, Seller must insert "399" in one of the special characteristic code ("SCC") fields of the Form 11 or 13SF, as applicable; and

(i)     Freddie Mac hereby identifies and Seller agrees to treat the special provisions set forth herein as "confidential information" as that term is defined in Section 2.16 of the Guide.

**8.     Presale and Occupancy Requirements for Class I, II, and III Condominium Projects**

Mortgages secured by units located in Class I, II or III Condominium Projects for which Seller has determined the presale and occupancy requirements based on each legal phase of a project rather than on the entire project shall be eligible for purchase.

**9.     Delegated Approval Authority for Class I and Class II Condominium Units**

In connection with the origination of Condominium Unit Mortgages, Seller need not perform the necessary due diligence nor make the warranties required in Sections 42.3 and 42.4 of the Guide for Class I Condominium Projects and in Sections 42.5 and 42.6 for Class II Condominium Projects, provided that:

(a)     all such Condominium Unit Mortgages must be purchase transactions or "no cash out" refinance Mortgages;

(b)    Mortgages secured by Condominium Units that are located on leasehold estates or that are Manufactured Homes are not eligible for the provisions of this paragraph;

(c)    Seller must, at a minimum, perform the following due diligence and must maintain in the Mortgage file the documentation described below or documentation substantiating the facts described below:

    (i)    review the Condominium Unit appraisal to determine that the Condominium Unit is marketable;

    (ii)    review the budget and reserves of the Condominium Project to determine that they are adequate; and

    (iii)    determine that at least 70 percent of the Condominium Units in the Condominium Project are sold to individuals for use as their Primary Residences or second homes;

    Freddie Mac delegates to Seller the authority to approve the Condominium Unit and the Condominium Project based on this due diligence;

(d)    the maximum number of Condominium Units in any particular Condominium Project with respect to which Seller may exercise the delegation of approval authority is as follows:

| Number of Delegations of Approval Exercised in Each Condominium Project | Size of Condominium Project |
|---|---|
| 1 | 5-10 Condominium Units |
| 2 | 11-20 Condominium Units |
| 5 | 21-49 Condominium Units |
| A number equal to 10% of the Units in the particular Condominium Project | 50 and more Condominium Units |

(e)    in connection with the delivery of each Condominium Unit Mortgage, Seller must insert the code "979" (indicating Condominium Projects approved with delegated approval authority) in one of the special characteristics code fields on the Form 11 or Form 13SF, as applicable; and

(f)    Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, upon 60 days written notice to Seller during the term of this Master Agreement.

## 10.    Delivery Fee for Condominium Mortgages

Mortgages that are secured by units in a condominium project for which earthquake insurance would be required in accordance with Section 58.3.1 of the Guide, but for which no earthquake insurance is obtained shall be eligible for purchase without the assessment and payment of the delivery fee required by Section 17.2 and 42.12 of the Guide, provided that:

(a)    Freddie Mac may amend, supplement, revise or terminate any of the provisions above, in whole or in part, upon 90-days prior written notice to Seller during the term of this Master Agreement; and

(b)    Seller shall enter special characteristics code "263" in one of the special characteristics code fields of the applicable delivery form.

## 11.    Insurance for PUDs

For Mortgages secured by units in PUDs (Planned Unit Developments), the homeowners association is not required to maintain the insurance noted below, provided that:

(a)    (i)    such insurance is limited to hazard and liability insurance for the common areas in such PUDs; and

(ii)    the common areas consist of only minimal amenities, such as entrance gates, parking areas and grass median strips and do not include structural improvements or amenities which typically require such insurance coverage, such as playgrounds and retention ponds.

## 12.    Credit Report from One Credit Repository

Mortgages underwritten using credit information from only one credit repository are eligible for purchase, provided that:

(a)    the Mortgages are either Manually Underwritten Mortgages or are mortgages underwritten using CLUES, Seller's automated underwriting system;

(b)    the Mortgages are not Wholesale Home Mortgages; and

(c)    Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph in whole or in part, upon 60 days written notice to Seller during the term of this Master Agreement.

## 13.    Borrower is a Living Trust

Mortgages with respect to which the Borrower is a living trust, that have one or more of the following characteristics but otherwise comply with all the requirements of Section 22.10 of the Guide, are eligible for purchase:

(a)    the loan applicant is (i)(a) the settlor in an individual capacity, (b) a beneficiary of the living trust, provided such beneficiary is also a settlor of the living trust, or (c) the trustee on behalf of the living trust, and (ii) if the living trust does not qualify for the loan, the settlor in an individual capacity; and the Mortgage is underwritten by qualifying the loan applicant(s);

(b)  for purchase money Mortgages secured by Primary Residences located in California, (i) the Security Instrument is not acknowledged by the settlor, or (ii) if the living trust qualifies for the loan, the Note and the Security Instrument are executed by the trustee on behalf of the living trust and the Security Instrument is not acknowledged by the settlor; and

(c)  for Mortgages secured by property located in California, Seller has obtained and maintains in the Mortgage file, instead of a complete copy of the trust documents, either (i) an opinion of counsel to the effect that the trustee on behalf of the living trust, is authorized by the trust documents to enter into the Mortgages, or (ii) a trustee's affidavit complying with the California Probate Code.

## 14.   Age of Verification Documentation

For Mortgages with respect to which Borrower applied to the lender for the Mortgage before construction of the Mortgaged Premises was completed, any verifications of employment, income, source of funds and payment history dated more than 180 days, but not more than 225 days, before the date of the Note need not be reverified, provided that:

(a)  the Mortgages are purchase money mortgages secured by 1-2 unit Primary Residences;

(b)  the Mortgages have loan-to-value and total loan-to-value ratios not exceeding 90 percent;

(c)  prior to the closing of the Mortgage, Seller obtains an in-file credit report for the Borrower(s) and verbally reverifies the employment of the Borrower(s);

(d)  after the closing of the Mortgage, the Borrower has reserves, as defined in Section 26.5 of the Guide, equal to six monthly payments of principal, interest and tax and insurance; and

(e)  Freddie Mac reserves the right to amend, supplement, revise or terminate any or all of the provisions of this paragraph, in whole or in part, upon 60 days written notice to Seller during the term of this Master Agreement.

## 15.   Use of Streamlined Accept Documentation for Standard Accept  Loan Prospector Mortgages

With respect to Mortgages that are processed through Loan Prospector and that receive an Accept Documentation Class with a feedback message indicating Standard Accept eligibility, Seller may underwrite the Mortgages using the Streamlined Accept Documentation described in Section 37.22 of the Guide.  Additionally, the Risk and Documentation Classes for the Mortgages may be based upon submission of data to Loan Prospector after the Note Date.  Such Mortgages are eligible for sale to Freddie Mac provided they comply with the following conditions:

(a)    for Mortgages that are processed through Loan Prospector after the Note Date:

    (i)    the date on which loan data is submitted to Loan Prospector may be no later than 120 days after the Note Date;

    (ii)    in connection with the delivery of such Mortgages, Seller must insert "912" (indicating Loan Prospector submission after closing) in one of the special characteristics code fields of the Form 11 or Form 13SF as applicable; and

    (iii)    Seller must originate and deliver to Freddie Mac each such Mortgage pursuant to the requirements applicable to Loan Prospector Mortgages;

(b)    for Mortgages that are processed through Loan Prospector before the Note Date as well as after the Note Date, Seller must use the Risk and Documentation Classes indicated by Loan Prospector in connection with the submission of data made before the Note Date; and

(c)    Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, upon 45-days prior written notice to Seller during the term of this Master Agreement.

## 16.    Borrower is a Living Trust and Mortgaged Premises is an Investment Property

Mortgages with respect to which the Borrower is a living trust and which are secured by Investment Properties are eligible for purchase, provided that the Mortgages otherwise comply with all the requirements of Section 22.10 of the Guide.

## 17.    No Escrow for Incomplete Improvements

Mortgages secured by property with respect to which construction of the improvements are not complete prior to the Delivery Date and a cash escrow for the incomplete items is not established shall be eligible for purchase, provided that:

(a)    the value of the incomplete items does not exceed 2 percent of the value of the completed Mortgaged Premises;

(b)    a certificate or permit of occupancy for the Mortgaged Premises has been issued prior to the Delivery Date and the incomplete improvements do not affect habitability of the Mortgaged Premises or conformance of the Mortgaged Premises to all applicable zoning, use or building code requirements; and

(c)    within 180 days after the Delivery Date, Seller obtains and maintains in the mortgage file documentation establishing that the incomplete items have been completed.

**18.     Incomplete Improvements**

Purchase money Mortgages secured by detached 1 unit Primary Residences with certain swimming pool (the "Pool Improvements") and other minor improvements (the "Minor Improvements") that will not be completed by the Delivery Date and that do not affect the livability or the habitability of the Mortgaged Premises, shall be eligible for purchase, provided that:

(a)     Seller withholds Mortgage loan proceeds at closing in an amount equal to one and one-half times (150%) the total estimated cost to complete the Pool Improvements, and one and one-fifth times (120%) the total estimated cost to complete the Minor Improvements, and Seller establishes an escrow account with such proceeds (the "Completion Escrow");

(b)     the reason for the incompletion of the Pool Improvements or the Minor Improvements and establishment of the escrow need not be weather related;

(c)     an escrow agreement between Seller and the Borrower governing the disbursement of the Completion Escrow is executed;

(d)     the maximum LTV ratio for any such Mortgage does not exceed 95 percent;

(e)     all such Mortgaged Premises are new construction;

(f)     the cost to complete the Pool Improvements and the Minor Improvements does not exceed 10 percent of the appraised value of the Mortgaged Premises as completed;

(g)     the cost of the Pool Improvements and the Minor Improvements (collectively, the "Outstanding Improvements") is part of the sales transaction, but may be contracted for separately;

(h)     the appraisal must show the "as completed" value of the Outstanding Improvements; provided, however, the appraiser does not make dollar for dollar adjustments; and

(i)     except as provided herein, the Mortgages comply with Section 22.17 of the Guide.

**19.     Amount of Trailing Co-Borrower Income**

The amount of the Trailing Co-Borrower income used to determine the qualifying income for the Mortgage may exceed 33  percent of the total qualifying income, provided that:

(a)     the amount of the Trailing Co-Borrower income does not exceed 40 percent of the total qualifying income.

**20.     Use of Non-Occupying Borrower Income/Debts to Qualify**

For a Mortgage with a non-occupying Borrower, the monthly debt payment and the stable monthly income used to determine the monthly housing expense-to-income ratio and the monthly debt payment-to-income ratio will be calculated as follows:

(i)     The monthly debt payment will include sum of all the monthly charges identified in Section 37.16 for both the occupant Borrower and the non-occupying Borrower

(ii)    The stable monthly income will include the sum of all stable monthly income attributable to both the occupant Borrower and the non-occupying Borrower

Additionally, the down payment for the Mortgage may be from the occupant Borrower and/or the non-occupying Borrower.

Each such Mortgage must comply with the following conditions:

(a)     the Mortgage must be secured by a 1-unit Primary Residence;

(b)     the maximum LTV ratio of each Mortgage is 90 percent;

(c)     the non-occupying Borrower must not be an interested party to the transaction, such as the builder, developer, seller of the Mortgaged Premises or real estate agent;

(d)     Seller must obtain and maintain in the Mortgage file a certificate stating that the occupant Borrower is either the parent or the child of the non-occupying Borrower and the primary purpose of the Mortgage is to provide financing for the Primary Residence of the non-occupying Borrower's parent or child; and

(e)     Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, upon 60-days prior written notice to Seller during the term of this Master Agreement.

**21.     Gift Funds for Investment Properties**

Borrower Funds to be used in connection with the purchase of Investment Properties may include funds the Borrower received from gifts, provided that:

(a)     the Investment Property is a 1-unit residential property;

(b)     the LTV ratio of the Mortgage does not exceed 70 percent; and

(c)     20 percent of the total funds used for the Borrower's down payment comes from the Borrower's own funds.

22.   **Non-Loan Prospector Mortgages with Reduced MI Coverage**

Mortgages that were not processed using Loan Prospector may have Reduced MI coverage if the Mortgages have Indicator Scores not less than:

| Descriptions of Mortgages | Minimum Indicator Scores |
|---|---|
| Mortgages secured by 1 unit Primary Residences | 700 |
| Mortgages secured by 2-unit Primary Residences | 740 |

23.   **Balloon/Reset Mortgages and Convertible ARMs with Lender-paid Mortgage Insurance**

Balloon/Reset Mortgages and Convertible ARMs that have lender-paid mortgage insurance are eligible for purchase, provided that all convertible ARMs are subject to repurchase and resale processing upon conversion in to a fixed-rate of interest.

24.   **Electronic Mortgage Insurance Certificates**

Mortgages covered by mortgage insurance with respect to which Seller maintains on its servicing database system electronic evidence of mortgage insurance coverage transmitted directly from the mortgage insurer, in lieu of maintaining hard copies of the mortgage insurance certificates in the mortgage files, shall be eligible for purchase, provided that:

(a)   the electronic evidence of mortgage insurance coverage is as fully effective and legally binding on the mortgage insurer and grants to the insured as complete rights as a hard copy mortgage insurance certificate issued by the mortgage insurer;

(b)   Seller develops and implements effective processes and procedures, including back-up as part of a disaster recovery plan, to ensure that the appropriate mortgage insurance coverage can be tracked to each individual Mortgage.  The tracking system shall include, at a minimum for each Mortgage, the Borrower name, the Freddie Mac loan number or, provided Seller complies with all conditions set forth in the Purchase Documents, the Seller loan number, the name of the mortgage insurer, the certificate number and the level of insurance;

(c)   by no later than five Business Days after Seller's receipt of a written request from Freddie Mac, Seller shall provide Freddie Mac with:

(i)   a copy of Seller's processes and procedures relating to the tracking system;

(ii)   access to the tracking system and the information relating to Freddie Mac described in subparagraph (b) above;

(iii) evidence of payment of the premiums in connection with the mortgage insurance coverage; and/or

(iv) the name of the mortgage insurer, the certificate number and the level of insurance for any Mortgage or group of Mortgages specified in the written request; and

(d) upon Seller's receipt of a written request from Freddie Mac, Seller shall promptly place in the Mortgage file for any Mortgage identified in the written request a hard copy print out of the mortgage insurance certificate, together with evidence of payment of the applicable mortgage insurance premiums.

## 25. Energy Efficient Properties

With respect to Mortgages secured by properties that have an incomplete energy retrofit, notwithstanding the requirements of Section 23.8(b)(3), Seller warrants that:

(a) the amount of the escrow account is not less than the funds required to complete the improvements and not more than 15 percent of the original amount of the Mortgage; and

(b) the amount of the escrow account is not more than 150 percent of the cost of improvements.

## 26. Second Home Not Suitable for Year-round Occupancy

Purchase money and "no cash-out" refinance Mortgages secured by Second Homes which are not suitable for year-round occupancy shall be eligible for purchase, provided that:

(a) the Mortgaged Premises are located in an area where second homes are common and are not commonly suitable for year-round occupancy; and

(b) the inability to use the Mortgaged Premises year-round is not detrimental to the marketability of the Mortgaged Premises.

## 27. Inspection of Mortgaged Premises after Delinquency

Seller shall not be required to make a property inspection on a single family home until the 90th day after Delinquency (instead of the 60th day as provided by the Guide), and again every month thereafter until satisfactory repayment arrangements have been made, provided that:

(a) Seller is required to make a property inspection before the 60th day of Delinquency (and again every month thereafter until satisfactory repayment arrangements have been made) if:

(i)      Seller has been unsuccessful in its attempts to contact the Borrower to resolve the Delinquency;

(ii)     the property is non-owner occupied;

(iii)    the property is a 2-4 unit dwelling; or

(iv)    the property secures a second deed of trust; and

(b)      notwithstanding anything to the contrary set forth in this Agreement relating to lock-in of terms or relating to continuing effect of special underwriting provisions, Freddie Mac may at any time during the term of this Agreement or any Master Agreement entered into under this Agreement, upon written notice to Seller, revoke Seller's right to deliver Mortgages under the terms and conditions of this paragraph with respect to all Mortgages that, from and after the date of Seller's receipt of the notice, are 60 or more days Delinquent.

## 28.   Expanded Definition of Cash

Mortgages with respect to which the Borrower is required to pay unanticipated additional closing costs at closing and the Borrower pays the additional costs by charging the additional amount to the Borrower's credit card or by making a withdrawal of cash from the Borrower's checking or savings account at an automated teller machine ("ATM") shall be eligible for purchase, provided that:

(a)      this special underwriting provision may only be used for those instances in which the closing costs were inadvertently miscalculated and the Borrower is required to pay unanticipated additional closing costs at closing;

(b)      such Mortgages are purchase money Mortgages or "no cash-out" refinance Mortgages and have loan-to-value ratios that do not exceed the lesser of (i) 95 percent; or (ii)  the maximum loan-to-value ratios permitted by the Purchase Documents for the particular Mortgage;

(c)      the maximum amount that may be charged to the Borrower's credit card or the total amount of unverified funds that may be withdrawn from the Borrower's savings or checking account at an ATM to pay the unanticipated additional closing costs shall not exceed $250;

(d)      the source of funds withdrawn from the Borrower's checking or savings account at an ATM may or may not have been originally verified and documented in the Mortgage file;

(e)      Seller has documentation in the Mortgage file, prior to closing, that verifies that the Borrower had sufficient assets to cover the original amount of calculated closing costs;

(f)    the Borrower's credit card account was opened at least six months prior to the date of the mortgage application; and

(g)    such Mortgages shall only be originated through Seller's retail mortgage operations and shall not be originated by Seller's Mortgage Brokers or Correspondents through Seller's correspondent or wholesale operations.

## 29.    Use of Credit Cards to Pay Closing Costs for Borrowers with an Employee Relocation Assistance Program

Funds obtained from a credit card and applied towards closing costs shall be considered "cash", and shall not be included in the calculation of the Borrower's monthly debt payment-to-income ratio, provided that:

(a)    the Borrower is an employee who is being relocated to a new location and the employer has agreed, pursuant to its employee relocation assistance program, to reimburse Borrower after the closing for closing costs that are charged to the Borrower's credit card;

(b)    such Mortgages are purchase money Mortgages secured by Primary Residences;

(c)    the amount of the funds obtained from the credit card does not exceed the closing costs which the employer has agreed to reimburse Borrower pursuant to its employee relocation assistance program; and

(d)    Seller obtains and retains in the Mortgage file evidence that the employee relocation assistance program states the closing costs are reimbursable by the employer and lists the procedures by which the employee is to seek reimbursement.

## 30.    Mortgages with Lender-paid Mortgage Insurance

Mortgages with lender-paid mortgage insurance with respect to which the Minimum Contract Servicing Spread is less than the sum of the Minimum Servicing Spread plus the amount of the lender-paid mortgage insurance premium are eligible for purchase, provided that:

(a)    Seller must not transfer servicing of any such Mortgages, except that Seller may transfer servicing to Seller's affiliate, Countrywide Home Loan Servicing, L.P.;

(b)    Freddie Mac may terminate the provisions of this paragraph in the following events:

    (i)      if Seller or Seller's parent, Countrywide Financial Corporation, fail to maintain the following minimum senior unsecured debt ratings:

        o      BBB+ as determined by Standard and Poor's Corporation; and
        o      Baa1 as determined by Moody's; or

    (ii)     if loan level buyups and buydowns become available for Mortgages with lender-paid mortgage insurance under Freddie Mac's new Selling System; or

    (iii)    if Freddie Mac permits Seller to retain 12.5 basis points as the Minimum Servicing Spread for Mortgages sold into TBA PC Pools;

  (c)    the aggregate unpaid principal balance of Mortgages delivered under this paragraph must not exceed 15 percent of the aggregate unpaid principal balance of all Mortgages sold to Freddie Mac during the term of this Agreement; compliance with this delivery limitation will be determined on the basis of Mortgage sales each quarter during the term of this Agreement.

## 31.   Streamlined Refinance Mortgages

Mortgages being refinanced that are currently owned by Freddie Mac or Fannie Mae may be processed and underwritten as streamlined refinance Mortgages in accordance with the requirements of Section 24.4, except as modified below:

  (a)    The LTV/TLTV ratios of streamlined refinance Mortgage must not exceed the following:

    (i)     95% for Mortgages secured by 1-2 unit Primary Residences and second homes;

    (ii)    85% for Mortgages secured by 3-4 unit Primary Residences;

    (iii)   85% for Mortgages secured by 1-2 unit Investment Properties; and

    (iv)   80% for Mortgages secured by 3-4 unit Investment Properties;

  (b)    The Borrowers on the Mortgage being refinanced must be identical to the Borrowers on the streamlined refinance Mortgage; provided, however, if one of the original Borrowers has died or if the Borrowers have divorced, the new mortgage will be eligible as a streamlined refinance Mortgage if:

    (i)     the remaining Borrower provides evidence that he/she has been making the payments on the Mortgage being refinanced from his/her own funds for at least 12 months;

     (ii)     the remaining Borrower provides evidence of the divorce or death; and

     (iii)    the Mortgage being refinanced has had no 30-day delinquency in the 12 months prior to the Mortgage application;

(c)    the streamlined refinance Mortgage may exceed the original Mortgage amount of the Mortgage being refinanced by up to five percent, provided that the increased amount is used for Closing Costs, Prepaids and Escrows;

(d)    refinance Mortgages with new secondary financing or a new junior lien are not eligible for the streamlined processing described in this paragraph;

(e)    Seller may used Stated Income to qualify the Borrower;

(f)    in connection with the delivery of each streamlined refinance Mortgage, Seller must insert in one of the special characteristic code fields of the Form 11 or 13SF, as applicable:

     (i)     "288" if the Mortgage being refinanced is owned by Freddie Mac;

     (ii)    "289" if the mortgage being refinanced is owned by Fannie Mae; and

(g)    Freddie Mac reserves the right to amend, supplement, revise or terminate any or all of the provisions of this paragraph, in whole or in part, upon 60-days prior written notice to Seller during the term of this Master Agreement.

## 32.  Delivery of Special Characteristic Code 941 for Accept Mortgages

In connection with the delivery of Accept Mortgages evaluated by Loan Prospector, Seller must insert the code "941" (indicating an Accept Mortgage) in one of the special characteristics code fields of the Mortgage Submission Schedule – Form 11 or the Mortgage Submission Voucher – Form 13SF, as applicable.  By inserting the special characteristics code 941 on the Form 11 or Form 13SF, the following provisions will apply:

(a)    Seller represents and warrants that the Mortgage is in all respects an Accept Mortgage and that the Mortgage complies with the requirements of the Purchase Documents relating to Accept Mortgages sold to Freddie Mac, including in particular and without limitation:

     (i)     the provisions of Sections 2.2.1(j) and (k) of the Guide regarding the truth, completeness and accuracy of all information submitted to Loan Prospector in connection with the evaluation of the Mortgage by Loan Prospector; and

        (ii)     the provisions of Section 6.1 of the Guide relating to the truth, completeness and accuracy of all information, such as the information on the Form 11 and the Form 13SF, submitted by Seller to Freddie Mac in connection with the Mortgage; and

(b)     if it is determined that Seller's representations and warranties with respect to any such Mortgage are incorrect, Freddie Mac may assess any applicable CS/LTV ("A-minus") postsettlement delivery fee plus interest, in addition to pursuing any other remedies available under the Purchase Documents.

Countrywide Home Loans, Inc.
MA04120883
Page 2 – February 25, 2005

**Exhibit A**

FREDDIE MAC PROJECT NOTIFICATION


Condo/PUD Project Name: _____

Address: _____

City, State: _____   Zip: _____

1.  Total number of units in the project                                     _____
2.  Total number of units sold and closed                              _____
3.  Number of units under contract but not closed              _____
4.  Total number of units within the project occupied as:
      A.  Owner-occupied as principal residence                 _____
      B.  Owner-occupied as second home                          _____
      C.  Investment/Rental                                                    _____
5.  Does any one person own more than one unit?
      Yes _____     No _____

    If yes, list the number of persons and how many units each owns:

    _____
    _____
    _____
    _____
    _____
    _____
    _____

6.  _____ We are requesting a waiver for the completion of the amenities.

7. Estimated date project will be in compliance with the Freddie Mac Guide requirements:
_____

_____        _____
Signature of Person Requesting Waiver                         Date

_____        _____
Printed Name                                                     Phone Number

Countrywide Home Loans, Inc.
MA04120883
Page 2 – February 25, 2005

**Exhibit B**

Special Class I Condominium Warranty Certification


This is to certify that an authorized representative of Countrywide Home Loans, Inc. ("Seller") has reviewed the Condominium documents and other information specified in Section 42.6 of the Freddie Mac Single-Family Seller/Servicer Guide ("Guide") for the _____ ("Condominium Project"). Seller hereby warrants that (1) the Condominium Project is in full compliance with the requirements of Section 42.6 of the Guide, without exception, (2) the Condominium Project is a Class I Condominium Project as defined in Section 42.5(a) of the Guide, and (3) the mortgage(s) identified below that Seller previously sold to the Federal Home Loan Mortgage Corporation ("Freddie Mac") that are secured by condominium unit(s) within said Condominium Project is/are now in full compliance with Section 42.6 of the Guide.

(Identify all Freddie Mac Mortgages in the Condominium Project as follows:)

Borrower Name(s):
Freddie Mac Loan No.:
Property Address:
City, State & Zip Code:

This certification is in confirmation of, and not in lieu of, the warrants and representations in the Guide.  In addition, Seller hereby requests that Freddie Mac release Seller from Seller's Repurchase Obligation with respect to the Mortgages listed above pursuant to the provisions of Master Agreement Number _____


Date: _____


Seller Name:
Seller/Servicer No.


By: _____
Name: _____
Title: _____


Freddie Mac's authorized representative by signing below, acknowledges receipt of this certification and hereby releases the above named Seller from Seller's Repurchase Obligation with respect to the Mortgages listed above pursuant to Master Agreement Number _____


By: _____
Name: _____
Title: _____

Countrywide Home Loans, Inc.
MA04120883
Page 2 – February 25, 2005

## ATTACHMENT 2
## SPECIAL UNDERWRITING PROVISIONS
## FIXED-RATE MORTGAGES

**1.    Documentation of Construction Permanent Mortgages**

Mortgages with respect to which the interim construction financing loan is converted to a permanent loan and which are originated on notes, note riders, security instruments and security instrument riders that are substantially identical to loan documents developed by Seller having the following taglines:

| Note and Rider Forms | Security Instrument and Rider Forms |
|---|---|
| Fixed Rate Note | Deed of Trust and Fixture Filing |
| FORM INMC #917 (9/2/94); and | FORM INMC 912 (2/10/95); and |
| Construction Period Rider | Construction Period Rider to Deed/Mortgage |
| FORM INMC 910 (12/31/94) | FORM INMC 911 (2/10/95) |
| | |
| CLCA Option 1/T-Bill ARM Note | Deed of Trust and Fixture Filing |
| FORM CLCA #981 (4/1/95); and | FORM INMC 912 (2/10/95); and |
| Construction Period Rider | CLCA Option 1/T-Bill ARM Rider |
| FORM INMC 910 (12/31/94) | FORM CLCA #980 (4/1/95) |
| | |
| CLCA Option 1/6 Month LIBOR Note | Deed of Trust and Fixture Filing |
| FORM CLCA #982 (4/1/95); and | FORM INMC 912 (2/10/95); and |
| Construction Period Rider | CLCA Option 1/6 Month Libor ARM Rider |
| FORM INMC 910 (12/31/94) | FORM CLCA #983 (4/1/95) |

in lieu of the Uniform Instruments, shall be eligible for purchase.

(a)    Freddie Mac hereby identifies and Seller hereby agrees to treat the provisions set forth herein as "confidential information" as that term is defined in Section 2.16 of the Guide; and

(b)    Seller must provide a copy of this waiver to the Custodian, unless Seller uses Freddie Mac's Document Custodial Services.

2.      **Initial Interest Mortgages Originated on Fannie Mae InterestFirst Notes**

Initial Interest Mortgages with Note Dates on or after August 1, 2004 originated on Fannie Mae InterestFirst Notes will be eligible for purchase without Seller making the changes to the InterestFirst Notes as described in Section J33.5(b) of the Freddie Mac Seller/Servicer Guide, provided that:

(a)      Seller represents and warrants that it has communicated to the Borrower the actual date (month/day/year) the first fully amortizing principal and interest payment is due and that this date is the same date that is stated as the First Amortizing Payment Date in the Mod/Conv Date field of the Form 11 or Form 13SF, as applicable, as required by Section 17.41 of the Guide; and

(b)      Seller agrees that the delivery requirements stated in Section 17.41 of the Guide are met for all such Mortgages.

3.      **Subsidized Secondary Financing Approved by Fannie Mae Permitted as Affordable Seconds**

Freddie Mac will purchase Affordable Gold Mortgages and other affordable housing initiative Mortgages with secondary financing that, in lieu of complying with the provisions in Section 25.1(g) of the Guide, complies with the subsidized secondary financing requirements of Fannie Mae as stated in the Fannie Mae Community Seconds Program Requirements and the contract documents between Seller and Fannie Mae (collectively, the "Fannie Mae Requirements"), or that has otherwise been approved in writing by Fannie Mae (collectively, "Fannie Mae Approved Seconds") provided:

(a)      any Land Use Restrictions meet the requirements of the fourth bullet of Section 25.1(g) of the Guide;

(b)      Seller represents and warrants to Freddie Mac that, at all times after the Origination Date of the first Lien Mortgage, the debt obligation and lien or other restriction on the Mortgaged Premises of the Fannie Mae Approved Second and any security instrument, Land Use Restriction, or other document recorded in connection with the Second is, and shall remain in all respects, subject and subordinate to the first Lien Mortgage; and

(c)      in the event that Fannie Mae makes significant changes to the Fannie Mae Requirements, Freddie Mac, with reasonable prior notice to Seller, has the right not to purchase Affordable Gold Mortgages and other Expanding Markets Mortgage Products with Fannie Mae Approved Seconds.

4.      **Affordable Gold 5 Mortgages Secured by 2- to 4-Unit Primary Residences**

Affordable Gold 5 Mortgages may be secured by 2- to 4-unit Primary Residences, provided that:

(a)      The Mortgages are 15-, 20-, or 30-year fully amortizing fixed-rate, purchase transaction or "no cash out" refinance Mortgages and are not A-Minus Mortgages;

(b)      The following maximum LTV ratios, TLTV ratios and down payment requirements have been met:

| Requirements | 2 units | 3 units | 4 units |
|---|---|---|---|
| Maximum LTV ratio | 95 percent | 90 percent | 80 percent |
| Maximum TLTV ratio | 105 percent | 105 percent | 105 percent |
| Minimum down payment | 5 percent | 10 percent | 20 percent |
| Amount of down payment from Borrower Funds other than a gift or grant from An Agency or a gift from a Related Person | 5 percent | 5 percent | 10 percent |

The amount of the down payment above that required to be from Borrower Funds (other than a gift or grant from An Agency or a gift from a Related Person) may be from any source of funds permitted for down payment for a 1-unit Primary Residence under Section 34.2(c) of the Guide;

(c)      If the Mortgage is underwritten using the Deduction from Expenses Approach (as described below), the Mortgage is a Manually Underwritten Mortgage; if the Mortgage is underwritten using the Addition to Income Approach (as described below), the Mortgage is either a Manually Underwritten Mortgage or an Accept Mortgage.  For Accept Mortgages, Seller may ignore the "ineligible" feedback message issued for Affordable Gold 2-4 Unit Property Mortgages, and may use the Accept rating;

(d)      For Manually Underwritten Mortgages, Seller obtains Credit Scores and selects an Indicator Score following the recommended policies and procedures in Section 37.5(b), (c), (d) and (e) of the Guide.  The Indicator Score must be:

2-unit dwellings:                       FICO Bureau Score of 660 or higher;

3- and 4-unit dwellings:           FICO Bureau Score of 680 or higher;

(e)     For Mortgages secured by 2-unit Primary Residences only, if there is no usable Credit Score, and consequently, no Indicator Score, at least one Borrower whose income was used to qualify for the Mortgage meets all of the following requirements:

(i)     has a credit history consisting of at least four Noncredit Payment References or a combination of at least four Tradelines and Noncredit Payment References;

(ii)    at least one Noncredit Payment Reference is housing related;

(iii)   each Noncredit Payment Reference has existed for at least 12 months;

(iv)    no history of a major credit weakness such as bankruptcy, foreclosure, collections or judgments;

(v)     no history of delinquency on any housing-related Tradelines or Noncredit Payment References;

(vi)    no more than one 30-day delinquency on any Noncredit Payment Reference; and

(vii)   no late payments with the previous 24 months on any revolving accounts;

(f)     Seller underwrites rental income using one of the following approaches instead of the approach used in Section 37.14(a) of the Guide:

(i)     Addition to Income Approach.  Monthly Operating Income from the Form 998 or net rental income from Schedule E of the Borrower's federal income tax return entered under "Gross Monthly Income" in Section V of Form 65, may be added to the Borrower's stable monthly income provided the Borrower has monthly Mortgage payment reserves as specified in this Paragraph.  Except as modified by this subparagraph, the provisions of Section 37.14(a) of the Guide apply.

(ii)    Deduction from Expenses Approach.  For Mortgages secured by the type of dwelling stated below, the percentage stated below of anticipated gross rental income from the units not occupied by the Borrower may be deducted from the monthly housing expense, provided the Borrower's stable monthly income (without the inclusion of rental income) exceeds the monthly housing expense by the amount stated below ("residual amount").

| Units | Percent Rent Deducted | Residual Amount |
|---|---|---|
| 2 units | 75 percent | $1,000 |
| 3- and 4-units | 60 percent | $1,250 |

The adjusted monthly housing expense should be used when calculating the Borrower's qualifying ratios.  Rental income must be substantiated by using the income approach on the appraisal and obtaining copies of the present lease or prior years' federal income tax returns;

(g)    Although Section 34.1(e) of the Guide provides otherwise, the Borrower may not exceed the following maximum qualifying ratios:

| Underwriting Approach | Housing Expense-to-Income Ratio | Debt-to-Income Ratio |
|---|---|---|
| Addition to Income | 32 percent | 40 percent |
| Deduction from Expenses | 28 percent | 36 percent; |

(h)    The Borrower has the following amount of monthly Mortgage payments in reserves:

| | |
|---|---|
| 2-unit dwellings: | two months reserves |
| 3- and 4-unit dwellings: | four months reserves; |

(i)    At least one Borrower whose income was used for qualification purposes has participated in, and completed, prior to the closing on the mortgage financing, a home ownership education program as required by Section 34.1(h) of the Guide, and a landlord counseling program;

(j)     Seller must complete the Mortgage Submission Schedule (Freddie Mac Form 11) as follows:

Stable Monthly Income:     For Mortgages underwritten using the Deduction from Expenses Approach, use the stable monthly income without the addition of rental income; for Mortgages underwritten using the Addition to Income Approach, use the stable monthly income with the addition of rental income.

Monthly Housing Expense:     For Mortgages underwritten using the Deduction from Expenses Approach, use the monthly housing expense after deducting the allowable portion of anticipated gross rental income.

Special Characteristics Code: Enter one of the following, as applicable:

530 = Mortgage underwritten using the Addition to Income Approach
528 = Mortgage underwritten using the Deduction from Expenses Approach;

(k)     The aggregate unpaid principal balance of all Mortgages sold under this Paragraph does not exceed $5,000,000; and

(l)     Freddie Mac will assess and bill to Seller postsettlement delivery fees as follows:

(i)     2-unit Primary Residences with an LTV ratio greater than 90 percent:  the delivery fee rate indicated on the Delivery Fee Matrix attached to the Master Commitment under which the Mortgage is delivered.

(ii)     3-unit and 4-unit Primary Residences with an LTV ratio greater than 70 percent:  the delivery fee rate indicated on the Delivery Fee Matrix attached to the Master Commitment under which the Mortgage is delivered.

Delivery fees are paid in accordance with the delivery fee provisions stated in Section 17.2 of the Guide.

The following postsettlement delivery fee indicated on Exhibit 19 of the Guide, will not be assessed and billed to Seller for Affordable Gold 5 Mortgages secured by 2- to 4-unit Primary Residences:

o         A-Minus Fee.

Freddie Mac reserves the right to assess this fee at the earlier of (i) 90-days notice to Seller, or (ii) at the time Seller enters into a new Master Agreement.

## 5.  Interest Rate of Affordable Second above Interest Rate on First Lien Mortgage

Freddie Mac will purchase Affordable Gold Mortgages and other affordable housing initiative Mortgages with an Affordable Second with an interest rate above the interest rate on the first lien Mortgage, provided that:

(a)      the interest rate does not exceed two percent above the interest rate of the first lien Mortgage.

## 6.  Alternative Homeownership Education Programs for Affordable Gold Mortgages

Seller may use a homeownership education program format that involves a telephone conference discussion and video tapes and is provided to Borrowers through Seller's counseling center.

## 7.  Delivery of Additional Data for Affordable Housing Initiative Mortgages

For Mortgages originated under a Freddie Mac affordable housing initiative program, Seller shall not be required to provide the following additional data elements on the Form 11, Mortgage Submission Schedule ("Form 11"):

down payment sources;
down payment amounts;
closing cost sources;
closing costs amounts;
secondary financing sources;
secondary financing amounts; and
Borrower education counseling codes;

provided, however, that Freddie Mac reserves the right to require Seller to provide the Borrower education counseling code for designated affordable lending programs or pilots. With respect to deliveries of affordable housing initiative Mortgages, Seller shall enter "571" in one of the special characteristics code fields on the Form 11 instead of "071."

8.    **Borrower Qualification for Extended Buydown Mortgages**

For Extended Buydown Mortgages secured by a Primary Residence or second home, the Borrower may be qualified using the monthly payment at the initial interest rate, provided that:

(a)    for Borrowers who are self-employed, the Indicator Score is at least 680; and

(b)    for Borrowers who are not self-employed, the Indicator Score is at least 660.

9.    **Mortgages subject to Temporary Subsidy Buydown Plans**

For Mortgages subject to temporary subsidy buydown plans, Seller is not required to deliver the special characteristics code applicable to each plan.

10.    **Fixed-rate Mortgages with Compressed Buydowns**

Fixed-rate Mortgages that are subject to temporary buydown plans that adjust twice each year ("Compressed Buydowns") are eligible for purchase, provided that:

(a)    such Mortgages are purchase money or "no cash-out" refinance Mortgages that are secured by:

(i)    1-unit Primary Residences and have LTV ratios not exceeding 90 percent; or

(ii)    Second homes and have LTV ratios not exceeding 90;

(b)    (i)    for Mortgages that are secured by Primary Residences and have LTV ratios not exceeding 80 percent, the Borrower is qualified at the initial interest rate under the buydown plan;

(ii)    for Mortgages that are secured by Primary Residences and have LTV ratios exceeding 80 percent, the Borrower is qualified at the interest rate in effect as of the thirteenth month (Note Rate minus one percent) after the first payment Date;

(iii)    for Mortgages that are secured by second homes, the Borrower is qualified at the Note Rate;

(c)    the initial interest rate is not more than 3 percent below the Note Rate;

(d)    the buydown plan does not extend for more than 36 months after the first payment Due Date;

(e)    the interest rate adjustments are limited to twice per year and the interest rate must not increase more than 0.5 percent every six months;

(f)     a minimum of six months must elapse before the first interest rate adjustment and a minimum of six months must elapse between subsequent interest rate adjustments;

(g)     Seller must enter the code provided below in one of the special characteristic code fields on the Form 11, Mortgage Submission Schedule:

     (i)     for Compressed Buydowns extending more than 24 months, enter "208";

     (ii)    for Compressed Buydowns extending for 24 months, enter "210";

     (iii)   for Compressed Buydowns extending for less than 24 months, enter "209"; and

(h)     for any such Compressed Buydown Mortgages that are also Extended Buydown Mortgages as described in Section 25.4(c) of the Guide, the following delivery and pooling provisions apply:

     (i)     all such Compressed Buydown/Extended Buydown Mortgages must be delivered under the fixed-rate Guarantor program only; and

     (ii)    the aggregate unpaid principal balance of Compressed Buydown/Extended Buydown Mortgages comprising any particular Gold PC Pool must not exceed 10 percent of the aggregate unpaid principal balance of all Mortgages in the applicable Gold PC Pool; and if the Gold PC Pool also includes Relocation Mortgages, as described in Section 13.4(5) of the Guide, and/or, if eligible under this Agreement, Cooperative Share Mortgages, the aggregate unpaid principal balance of all Compressed Buydown/Extended Buydown Mortgages, Relocation Mortgages and/or Cooperative Share Mortgages must not exceed 15 percent of the aggregate unpaid principal balance of all Mortgages in the applicable Gold PC Pool.

## 11.     Non-Occupying Borrowers - Housing Payment Ratios

For each Mortgage that includes a non-occupying Borrower, the Borrower's monthly housing expense-to-income ratio may exceed the ratio described in Section 37.15 of the Guide, provided that:

(a)     the Mortgage must be a fixed rate Mortgage secured by a 1 unit Primary Residence;

(b)     the occupying Borrower makes a down payment of at least five percent from the Borrower's own funds;

(c)     the loan-to-value ratio for such Mortgage may not exceed 75 percent; and

(d)     the non-occupying Borrower is an immediate family member (parent, grandparent, child, sibling, or former legal guardian of the occupant Borrower) of the occupying Borrower.

**12.     Bridge Loan Payments excluded from calculation of Borrower's monthly debt payment-to-income ratio**

Seller may exclude monthly payments on bridge loans, as defined in Section 37.16 of the Guide, from the calculation of the Borrower's monthly debt payment-to-income ratio if the Borrower has reserves, as defined in Section 26.5 of the Guide, equal to three months' payments on the bridge loan and the new mortgage, provided that:

(a)     the term of the bridge loan does not exceed six months;

(b)     all proceeds from the bridge loan are used either to payoff existing liens on the Borrower's previous residence or applied as a down payment for a new mortgage;

(c)     the Borrower may have no more than one 30-day mortgage payment delinquency in the 12 months preceding loan application;

(d)     the Borrower's previous residence was the Borrower's Primary Residence;

(e)     the Borrower's previous residence is in a stable market area with average marketing time not to exceed six months;

(f)     the total loan-to-value ratio on the Borrower's previous residence does not exceed 80 percent and is determined using an appraisal report meeting the requirements of the Purchase Documents;

(g)     the Borrower's Indicator Score is not less than 680; and

(h)     the Borrower's previous residence is subject to an executed non-contingent sales contract or an executed buyout agreement that is part of an employer relocation plan where the employer/relocation company takes responsibility for the outstanding Mortgage(s).

**13.     Exceeding the Delivery Limitation for Seasoned Mortgages**

Seller may deliver more than $10 million in Seasoned Mortgages each year to Freddie Mac, provided that:

(a)     each such Seasoned Mortgage is subject to any applicable postsettlement delivery fee required by Exhibit 19 to the Guide, including but not limited to CS/LTV delivery fees (A-minus fees);

(b)      this special underwriting provision may be modified, supplemented, or terminated by Freddie Mac upon 90 days prior written notice to Seller; and

(c)      the aggregate unpaid principal balance of Mortgages delivered under this provision shall not exceed $1.2 billion.

## 14.      Mortgages with Secondary Financing and a TLTV Ratio of Up to 100 Percent

Mortgages that have secondary financing and total loan-to-value ratios up to 100 percent are eligible for purchase, provided that:

(a)      each Mortgage must be a fixed-rate, fully amortizing, purchase or "no cash-out" refinance Mortgage secured by a 1-unit Primary Residence;

(b)      the loan-to-value ratio of each Mortgage must not exceed 80 percent;

(c)      each Mortgage must have a minimum Indicator Score of 660;

(d)      the maximum debt payment-to-income ratio for each Mortgage must not exceed 45 percent;

(e)      each Borrower has sufficient cash or other equity or assets after the closing of the Mortgage to apply toward reserves of at least two monthly payments of principal, interest, taxes and insurance;

(f)      each Mortgage is not subject to a temporary subsidy buydown plan;

(g)      the Mortgage file contains a completed Uniform Residential Appraisal Report (Form 70, 72 or 465);

(h)      Freddie Mac will price and purchase the Mortgages from Seller on a bulk basis only; and

(i)      Freddie Mac reserves the right to limit the amount of these Mortgages delivered by Seller each quarter. In addition, Freddie Mac may, in its sole discretion, advise Seller in writing that Freddie Mac will no longer purchase these Mortgages from Seller; in such a case, Freddie Mac will notify Seller that Mortgages with an application date later than a date specified by Freddie Mac will be ineligible for sale.

## 15.      Mortgages with Secondary Financing Having TLTV Ratios up to 100 Percent

Mortgages with secondary financing used for the down payment and having TLTV ratios exceeding 95 percent are eligible for purchase, provided that:

(a)      each Mortgage has an LTV ratio not exceeding 80 percent and a TLTV ratio not exceeding 100 percent;

(b)     the Mortgage is a fixed-rate Mortgage or 5/1, 7/1 or 10/1 ARM, but is not an Initial Interest Mortgage;

(c)     the Mortgage is a purchase transaction or "no cash-out" refinance Mortgage;

(d)     the Mortgage is secured by 1-unit Primary Residence that is occupied by each of the Borrowers; Mortgages with non-occupying Co-Borrowers are not eligible for purchase;

(e)     Mortgages secured by Manufactured Homes are not eligible for purchase;

(f)     the Mortgage is a Loan Prospector Accept Mortgage (eligibility for the provisions of this paragraph is irrespective of any message to the contrary set forth in the applicable Loan Prospector Feedback Certificate);

(g)     the Borrower has an Indicator Score of at least 660;

(h)     regardless of any message to the contrary set forth in the applicable Loan Prospector Feedback Certificate, the value of the Mortgaged Premises has been assessed using an Uniform Residential Appraisal Report (Form 70), if applicable an Appraisal Report - Individual Condo or PUD Unit (Form 465) or a Loan Prospector Quantitative Analysis Appraisal Report (Form 2055) with an interior and exterior inspection;

(i)     the Mortgage must not be subject to any temporary subsidy buydown plans;

(j)     notwithstanding any other provisions in the Purchase Documents and irrespective of any message to the contrary set forth in the applicable Loan Prospector Feedback Certificate, Seller must verify the Borrower's income in the manner described in Section 37.22;

(k)     Seller must verify in accordance with Section 37.20 that the Borrower has "reserves" of at least two monthly payments for principal, interest, taxes and insurance due on the Mortgaged Premises;

(l)     in connection with the purchase of the Mortgaged Premises or the Mortgage financing, Borrower must pay at least $500 in cash, as defined in Section 26.2, towards the Closing Costs;

(m)     in connection with the delivery of each Mortgage, Seller must enter 297 (indicating Mortgages with secondary financing) in one of the special

(n)     for each Mortgage purchased by Freddie Mac, a postsettlement delivery fee (delivery fee) will be assessed and billed to the Seller.  The delivery fee rate will be the applicable delivery fee rate specified in the Delivery Fee Matrix attached to Seller's Master Commitment for such Mortgages.  The delivery fee must be paid in accordance with the delivery fee provisions outlined in Section 17.2;

(o)     for purposes of sample selection under Seller's quality control process, Seller must identify such Mortgages as "high risk" pursuant to Section 48.4;

(p)     Freddie Mac hereby identifies and Seller hereby agrees to treat the provisions set forth herein as "confidential information" as that term is defined in Section 2.16; and

(q)     Freddie Mac may amend, supplement, revise or terminate any of the terms of this provision, in whole or in part, upon 60-days prior written notice to Seller during the term of this Master Agreement.

## 16.     Streamlined Refinance Mortgage Application Form

Streamlined refinance Mortgages with respect to which the loan application form used in connection with the origination of the refinance Mortgage consists of a "Countrywide Fastrack Application" form, substantially identical to the form of the document which Seller transmitted to Freddie Mac, rather than a Uniform Residential Loan Application - Freddie Mac Form 65, shall be eligible for purchase, provided that:

(a)     the loan application form used in connection with the origination of the mortgage being refinanced consists of a Uniform Residential Loan Application; and

(b)     a copy of the Uniform Residential Loan Application completed in connection with the origination of the mortgage being refinanced is attached to the loan application form used for the refinance Mortgage.

## 17.     Mortgages Originated with Stated Income/Assets Under Seller's Fast & Easy Program

Mortgages originated under Seller's Fast & Easy Program with respect to which the Borrower is underwritten using stated income and/or stated assets, are eligible for purchase, provided that:

(a)     each Mortgage must:

(i)      be underwritten and originated through Seller's automated underwriting system, known as CLUES;

(ii)     have been classified by CLUES as an "Accept" loan; and

      (iii)    comply with all the requirements of the paragraph of this Master Agreement titled "Mortgages Originated Using CLUES", except as specifically provided otherwise in this paragraph;

(b)    the Mortgages must be:

      (i)    fixed-rate fully amortizing conventional whole Mortgages;

      (ii)    3/1, 5/1, 7/1 or 10/1 convertible and nonconvertible ARMs; and

      (iii)    Initial Interest fixed-rate Mortgages or ARMs, including Mortgages originated on Fannie Mae's InterestFirst loan instruments provided that such Mortgages comply with all the requirements of Chapter J33 (except as specifically modified by any provision of this Master Agreement) and are delivered pursuant to the requirements of Section 17.41;

(c)    the Mortgages must be:

      (i)    purchase transactions or "no cash-out" refinance mortgages that are secured by Primary Residences, second homes or Investment Properties; or

      (ii)    cash-out refinance mortgages that are secured by Primary Residences;

(d)    the Mortgages must have Indicator Scores that are not less than the minimum Indicator Scores and LTV, TLTV and HTLTV ratios that do not exceed the maximum LTV, TLTV and HTLTV ratios specified in Exhibit B attached hereto;

(e)    the Mortgages must not be subject to temporary subsidy buydown plans;

(f)    the loan application form used in connection with the origination of the Mortgage may consist of a "Countrywide Fastrack Application" form (the "loan application"), substantially identical to the form of the document which Seller transmitted to Freddie Mac, rather than a Uniform Residential Loan Application - Freddie Mac Form 65;

(g)    to qualify the Borrower, Seller must use the amount of income from all sources as well as the amount of assets, which are stated by the Borrower on the loan application, and Seller need not verify or otherwise document the amount of income or the amount of assets stated by the Borrower;

(h)    Seller must determine that the amount of the stated income is consistent with the Borrower's employment and profession;

(i)    Borrower's monthly debt payment-to-income ratio as determined by CLUES using the amount of Borrower's stated income must not exceed 55 percent;

(j)     Seller must verify the source of Borrower's income by obtaining for each Borrower at the time of loan application and maintaining in the Mortgage file a fully completed and signed IRS form 8821 or 4506 (or alternative form acceptable to the IRS that authorizes the release of comparable information) for the most recent year;

(k)     in connection with the delivery of each Mortgage, Seller must insert "403" (indicating Fast & Easy stated income/assets Mortgages) in one of the special characteristic code fields of the Form 11 or 13SF, as applicable; and

(l)     Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, upon 60-days prior written notice to Seller during the term of this Master Agreement.

## 18.     Mortgages with secondary financing

The following described fixed-rate Mortgages and ARMs that have secondary financing and that have loan-to-value ratios exceeding the maximum LTV ratios set forth in Section 23.4 of the Guide are eligible for purchase, provided that:

(a)     the maximum LTV ratios must not exceed the following:

**Purchase and "No Cash-out" Refinance Mortgages with secondary financing**

| Property Type | Max. LTV ratio |
|---|---|
| 1-2 unit Primary Residence or second home | 95 |
| 3-4 unit Primary Residence | 80 |

**Cash-out Refinance Mortgages with secondary financing**

| Property Type | Max. LTV w/sec. fin. |
|---|---|
| 1-2 unit Primary Residence or second home 3-4 unit Primary Residence | 90 75 |

(b)     Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, upon written notice to Seller.

**19.    Use of Automated Valuation Models**

In lieu of obtaining an appraisal or inspection report to evidence that the Mortgaged Premises is acceptable for the transaction, Seller may use the results of automated valuation models developed by independent third parties ("AVMs"), provided that:

(a)    Seller must use the AVMs in a "waterfall" approach, whereby the Mortgage data are processed through several different AVMs in succession, and the value of the Mortgaged Premises is established by the first of the successive AVMs to successfully assess the Mortgaged Premises (rather than, for example, the AVM that assigns the highest value to the Mortgaged Premises);

(b)    the AVMs used in the waterfall approach are CAPES, PASS, HVE, HPA 2000 and APS; if Seller changes the AVMs used, Seller must notify Freddie Mac;

(c)    each such Mortgage is a purchase transaction or a "no cash-out" refinance Mortgage and has LTV and TLTV ratios not exceeding 90 percent;

(d)    the Mortgage is a fixed-rate Mortgage (excluding Balloon/Reset Mortgages), or a 3/1, 5/1, 7/1 or 10/1 ARM and is secured by a 1-unit residential property;

(e)    the Mortgage has an Indicator Score of not less than 680, as determined pursuant to Section 37.5(e), except that Seller may, at its option, request a FICO score for each Borrower from only one of the credit repositories (instead of from at least two credit repositories as required by Section 37.5(b));

(f)    Mortgages originated under Seller's Fast and Easy program may be processed through the AVM waterfall approach pursuant to this paragraph;

(g)    for Mortgages selected for quality control review or audit by Freddie Mac, Seller must provide a report identifying the AVM used and the value of the Mortgaged Premises obtained from the AVM; additionally, if requested by Freddie Mac, Seller must provide Freddie Mac with such a report for the Mortgages specified by Freddie Mac;

(h)    Seller is responsible for representations and warranties to Freddie Mac regarding the value, the interior and exterior condition and the marketability of the Mortgaged Premises as stated in Chapter 44;

(i)    in connection with the delivery of each Mortgage, Seller must insert "F03" (indicating CHL AVM waterfall Mortgages) in one of the special characteristic code fields on the Form 11 or Form 13SF, as applicable;

(j)     in the event Freddie Mac acquires the Mortgaged Premises as Real Estate Owned, Freddie Mac will bill Seller for and Seller must pay Freddie Mac a fee of $400; and

(k)     Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, during the term of this Master Agreement, provided however, that Freddie Mac must first notify Seller's Senior Managing Director, Secondary Marketing, of its intention to modify this paragraph, and thereupon Freddie Mac and Seller will have 30 days within which to meet, confer and use all reasonable efforts to resolve Freddie Mac's concerns; at the end of such 30-day period, if the parties have been unable to resolve Freddie Mac's concerns, Freddie Mac must provide Seller with 60-days prior written notice of the modification to the provisions of this paragraph.

Countrywide Home Loans, Inc.
MA04120883
Page 2 – February 25, 2005

**Exhibit A**
**LTV/TLTV/HTLTV and Minimum Indicator Score for Fast & Easy Mortgages**

| **Retail Channel** | | | | |
|---|---|---|---|---|
| **Purchase and "No cash-out" Refinance** | | | | |
| **Product and Property** | **Max LTV w/o sec fin** | **Max LTV with sec fin** | **Max TLTV/HTLTV with sec fin** | **Min Indicator Score** |
| Fixed-rate Mortgages, 7/1, 10/1 ARMs<br>- Primary Residence<br>- Employed Borrower only | 95% | 80% | 95% | 730 |
| Fixed-rate Mortgages, 3/1, 5/1, 7/1, 10/1 ARMs<br>- Primary Residence | 90% | 80% | 90% | 680 |
| Fixed-rate Mortgages, 3/1, 5/1, 7/1, 10/1 ARMs<br>- Second Homes | 90% | 80% | 90% | 700 |
| Fixed-rate Mortgages, 3/1, 5/1, 7/1, 10/1 ARMs<br>- Investment Property | 75% | 75% | 75% | 700 |
| **"Cash-out" refinances** | | | | |
| Fixed-rate Mortgages, 3/1, 5/1, 7/1, 10/1 ARMs<br>- Primary Residence | 70% | 70% | 70% | 720 |
| **Wholesale (that is, broker and Correspondent) Channel** | | | | |
| **Purchase and "No Cash-out" Refinance** | | | | |
| Fixed-rate Mortgages, 3/1, 5/1, 7/1, 10/1 ARMs<br>- Primary Residence<br>- Second Home | 90% | 80% | 90% | 700 |
| Fixed-rate Mortgages, 3/1, 5/1, 7/1, 10/1 ARMs<br>- Investment Property | 75% | 75% | 75% | 700 |
| **"Cash-out" Refinance** | | | | |
| Fixed-rate Mortgages, 3/1, 5/1, 7/1, 10/1 ARMs<br>- Primary Residence | 70% | 70% | 70% | 720 |

Countrywide Home Loans, Inc.
MA04120883
Page 2 – February 25, 2005

## ATTACHMENT 3
## SPECIAL UNDERWRITING PROVISIONS
## ADJUSTABLE RATE MORTGAGES

**1.      Documentation of Construction Permanent Mortgages**

Mortgages with respect to which the interim construction financing loan is converted to a permanent loan and which are originated on notes, note riders, security instruments and security instrument riders that are substantially identical to loan documents developed by Seller having the following taglines:

| Note and Rider Forms | Security Instrument and Rider Forms |
|---|---|
| Fixed Rate Note | Deed of Trust and Fixture Filing |
| FORM INMC #917 (9/2/94); and | FORM INMC 912 (2/10/95); and |
| Construction Period Rider | Construction Period Rider to Deed/Mortgage |
| FORM INMC 910 (12/31/94) | FORM INMC 911 (2/10/95) |
| | |
| CLCA Option 1/T-Bill ARM Note | Deed of Trust and Fixture Filing |
| FORM CLCA #981 (4/1/95); and | FORM INMC 912 (2/10/95); and |
| Construction Period Rider | CLCA Option 1/T-Bill ARM Rider |
| FORM INMC 910 (12/31/94) | FORM CLCA #980 (4/1/95) |
| | |
| CLCA Option 1/6 Month LIBOR Note | Deed of Trust and Fixture Filing |
| FORM CLCA #982 (4/1/95); and | FORM INMC 912 (2/10/95); and |
| Construction Period Rider | CLCA Option 1/6 Month Libor ARM Rider |
| | |
| FORM INMC 910 (12/31/94) | FORM CLCA #983 (4/1/95) |

in lieu of the Uniform Instruments, shall be eligible for purchase.

(a)      Freddie Mac hereby identifies and Seller hereby agrees to treat the provisions set forth herein as "confidential information" as that term is defined in Section 2.16 of the Guide; and

(b)      Seller must provide a copy of this waiver to the Custodian, unless Seller uses Freddie Mac's Document Custodial Services.

2.     **Initial Interest Mortgages Originated on Fannie Mae InterestFirst Notes**

Initial Interest Mortgages with Note Dates on or after August 1, 2004 originated on Fannie Mae InterestFirst Notes will be eligible for purchase without Seller making the changes to the InterestFirst Notes as described in Section J33.5(b) of the Freddie Mac Seller/Servicer Guide, provided that:

(a)     Seller represents and warrants that it has communicated to the Borrower the actual date (month/day/year) the first fully amortizing principal and interest payment is due and that this date is the same date that is stated as the First Amortizing Payment Date in the Mod/Conv Date field of the Form 11 or Form 13SF, as applicable, as required by Section 17.41 of the Guide; and

(b)     Seller agrees that the delivery requirements stated in Section 17.41 of the Guide are met for all such Mortgages.

3.     **Nonstandard Conversion Agreement**

Convertible ARMs owned by Freddie Mac and serviced by Seller may be converted to Fixed-rate Mortgages, using a nonstandard conversion agreement, in lieu of using Form 3180, provided that:

(a)     the nonstandard conversion agreement is substantially identical to Exhibit A, titled "Nonstandard Agreement to Convert"; and

(b)     Seller represents and warrants that:

(i)     using the Conversion agreement does not adversely affect the title insurance coverage;

(ii)     the Conversion agreement complies with federal and all other applicable laws in the jurisdictions;

(iii)     the use of the Conversion agreement results in a properly converted and legally enforceable Fixed-rate Mortgage; and

(iv)     such converted Mortgages continue to be valid first liens.

4.     **Mortgages subject to Temporary Subsidy Buydown Plans**

For Mortgages subject to temporary subsidy buydown plans, Seller is not required to deliver the special characteristics code applicable to each plan.

5. **Borrower Qualification for Extended Buydown Mortgages**

For Extended Buydown Mortgages secured by a Primary Residence or second home, the Borrower may be qualified using the monthly payment at the initial interest rate, provided that:

    (a)    for Borrowers who are self-employed, the Indicator Score is at least 680; and

    (b)    for Borrowers who are not self-employed, the Indicator Score is at least 660.

6. **Exceeding the Delivery Limitation for Seasoned Mortgages**

Seller may deliver more than $10 million in Seasoned Mortgages each year to Freddie Mac, provided that:

    (a)    each such Seasoned Mortgage is subject to any applicable postsettlement delivery fee required by Exhibit 19 to the Guide, including but not limited to CS/LTV delivery fees (A-minus fees);

    (b)    this special underwriting provision may be modified, supplemented, or terminated by Freddie Mac upon 90 days prior written notice to Seller; and

    (c)    the aggregate unpaid principal balance of Mortgages delivered under this provision shall not exceed $1.2 billion.

7. **Mortgages with Secondary Financing Having TLTV Ratios up to 100 Percent**

Mortgages with secondary financing used for the down payment and having TLTV ratios exceeding 95 percent are eligible for purchase, provided that:

    (a)    each Mortgage has an LTV ratio not exceeding 80 percent and a TLTV ratio not exceeding 100 percent;

    (b)    the Mortgage is a fixed-rate Mortgage or 5/1, 7/1 or 10/1 ARM, but is not an Initial Interest Mortgage;

    (c)    the Mortgage is a purchase transaction or "no cash-out" refinance Mortgage;

    (d)    the Mortgage is secured by 1-unit Primary Residence that is occupied by each of the Borrowers; Mortgages with non-occupying Co-Borrowers are not eligible for purchase;

    (e)    Mortgages secured by Manufactured Homes are not eligible for purchase;

(f)     the Mortgage is a Loan Prospector Accept Mortgage (eligibility for the provisions of this paragraph is irrespective of any message to the contrary set forth in the applicable Loan Prospector Feedback Certificate);

(g)     the Borrower has an Indicator Score of at least 660;

(h)     regardless of any message to the contrary set forth in the applicable Loan Prospector Feedback Certificate, the value of the Mortgaged Premises has been assessed using an Uniform Residential Appraisal Report (Form 70), if applicable an Appraisal Report - Individual Condo or PUD Unit (Form 465) or a Loan Prospector Quantitative Analysis Appraisal Report (Form 2055) with an interior and exterior inspection;

(i)     the Mortgage must not be subject to any temporary subsidy buydown plans;

(j)     notwithstanding any other provisions in the Purchase Documents and irrespective of any message to the contrary set forth in the applicable Loan Prospector Feedback Certificate, Seller must verify the Borrower's income in the manner described in Section 37.22;

(k)     Seller must verify in accordance with Section 37.20 that the Borrower has "reserves" of at least two monthly payments for principal, interest, taxes and insurance due on the Mortgaged Premises;

(l)     in connection with the purchase of the Mortgaged Premises or the Mortgage financing, Borrower must pay at least $500 in cash, as defined in Section 26.2, towards the Closing Costs;

(m)     in connection with the delivery of each Mortgage, Seller must enter 297 (indicating Mortgages with secondary financing) in one of the special characteristics code fields of the Form 11 or Form 13SF, as applicable;

(n)     for each Mortgage purchased by Freddie Mac, a postsettlement delivery fee (delivery fee) will be assessed and billed to the Seller.  The delivery fee rate will be the applicable delivery fee rate specified in the Delivery Fee Matrix attached to Seller's Master Commitment for such Mortgages.  The delivery fee must be paid in accordance with the delivery fee provisions outlined in Section 17.2;

(o)     for purposes of sample selection under Seller's quality control process, Seller must identify such Mortgages as "high risk" pursuant to Section 48.4;

(p)     Freddie Mac hereby identifies and Seller hereby agrees to treat the provisions set forth herein as "confidential information" as that term is defined in Section 2.16; and

(q)   Freddie Mac may amend, supplement, revise or terminate any of the terms of this provision, in whole or in part, upon 60-days prior written notice to Seller during the term of this Master Agreement.

## 8.   Mortgages Originated with Stated Income/Assets Under Seller's Fast & Easy Program

Mortgages originated under Seller's Fast & Easy Program with respect to which the Borrower is underwritten using stated income and/or stated assets, are eligible for purchase, provided that:

(a)   each Mortgage must:

   (i)   be underwritten and originated through Seller's automated underwriting system, known as CLUES;

   (ii)   have been classified by CLUES as an "Accept" loan; and

   (iii)   comply with all the requirements of the paragraph of this Master Agreement titled "Mortgages Originated Using CLUES", except as specifically provided otherwise in this paragraph;

(b)   the Mortgages must be:

   (i)   fixed-rate fully amortizing conventional whole Mortgages;

   (ii)   3/1, 5/1, 7/1 or 10/1 convertible and nonconvertible ARMs; and

   (iii)   Initial Interest fixed-rate Mortgages or ARMs, including Mortgages originated on Fannie Mae's InterestFirst loan instruments provided that such Mortgages comply with all the requirements of Chapter J33 (except as specifically modified by any provision of this Master Agreement) and are delivered pursuant to the requirements of Section 17.41;

(c)   the Mortgages must be:

   (i)   purchase transactions or "no cash-out" refinance mortgages that are secured by Primary Residences, second homes or Investment Properties; or

   (ii)   cash-out refinance mortgages that are secured by Primary Residences;

(d)   the Mortgages must have Indicator Scores that are not less than the minimum Indicator Scores and LTV, TLTV and HTLTV ratios that do not exceed the maximum LTV, TLTV and HTLTV ratios specified in Exhibit B attached hereto;

(e)     the Mortgages must not be subject to temporary subsidy buydown plans;

(f)     the loan application form used in connection with the origination of the Mortgage may consist of a "Countrywide Fastrack Application" form (the "loan application"), substantially identical to the form of the document which Seller transmitted to Freddie Mac, rather than a Uniform Residential Loan Application - Freddie Mac Form 65;

(g)     to qualify the Borrower, Seller must use the amount of income from all sources as well as the amount of assets, which are stated by the Borrower on the loan application, and Seller need not verify or otherwise document the amount of income or the amount of assets stated by the Borrower;

(h)     Seller must determine that the amount of the stated income is consistent with the Borrower's employment and profession;

(i)     Borrower's monthly debt payment-to-income ratio as determined by CLUES using the amount of Borrower's stated income must not exceed 55 percent;

(j)     Seller must verify the source of Borrower's income by obtaining for each Borrower at the time of loan application and maintaining in the Mortgage file a fully completed and signed IRS form 8821 or 4506 (or alternative form acceptable to the IRS that authorizes the release of comparable information) for the most recent year;

(k)     in connection with the delivery of each Mortgage, Seller must insert "403" (indicating Fast & Easy stated income/assets Mortgages) in one of the special characteristic code fields of the Form 11 or 13SF, as applicable; and

(l)     Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, upon 60-days prior written notice to Seller during the term of this Master Agreement.

**9.     Mortgages with secondary financing**

The following described fixed-rate Mortgages and ARMs that have secondary financing and that have loan-to-value ratios exceeding the maximum LTV ratios set forth in Section 23.4 of the Guide are eligible for purchase, provided that:

(a)     the maximum LTV ratios must not exceed the following:

**Purchase and "No Cash-out" Refinance Mortgages with secondary financing**

| Property Type | Max. LTV ratio |
|---|---|
| 1-2 unit Primary Residence or second home | 95 |
| 3-4 unit Primary Residence | 80 |

**Cash-out Refinance Mortgages with secondary financing**

| Property Type | Max. LTV w/sec. fin. |
|---|---|
| 1-2 unit Primary Residence or second home<br>3-4 unit Primary Residence | 90<br>75 |

(b)     Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, upon written notice to Seller.

**10.     Use of Automated Valuation Models**

In lieu of obtaining an appraisal or inspection report to evidence that the Mortgaged Premises is acceptable for the transaction, Seller may use the results of automated valuation models developed by independent third parties ("AVMs"), provided that:

(a)     Seller must use the AVMs in a "waterfall" approach, whereby the Mortgage data are processed through several different AVMs in succession, and the value of the Mortgaged Premises is established by the first of the successive AVMs to successfully assess the Mortgaged Premises (rather than, for example, the AVM that assigns the highest value to the Mortgaged Premises);

(b)     the AVMs used in the waterfall approach are CAPES, PASS, HVE, HPA 2000 and APS; if Seller changes the AVMs used, Seller must notify Freddie Mac;

(c)     each such Mortgage is a purchase transaction or a "no cash-out" refinance Mortgage and has LTV and TLTV ratios not exceeding 90 percent;

(d)     the Mortgage is a fixed-rate Mortgage (excluding Balloon/Reset Mortgages), or a 3/1, 5/1, 7/1 or 10/1 ARM and is secured by a 1-unit residential property;

(e)     the Mortgage has an Indicator Score of not less than 680, as determined pursuant to Section 37.5(e), except that Seller may, at its option, request a FICO score for each Borrower from only one of the credit repositories (instead of from at least two credit repositories as required by Section 37.5(b));

(f)     Mortgages originated under Seller's Fast and Easy program may be processed through the AVM waterfall approach pursuant to this paragraph;

(g)     for Mortgages selected for quality control review or audit by Freddie Mac, Seller must provide a report identifying the AVM used and the value of the Mortgaged Premises obtained from the AVM; additionally, if requested by Freddie Mac, Seller must provide Freddie Mac with such a report for the Mortgages specified by Freddie Mac;

(h)     Seller is responsible for representations and warranties to Freddie Mac regarding the value, the interior and exterior condition and the marketability of the Mortgaged Premises as stated in Chapter 44;

(i)     in connection with the delivery of each Mortgage, Seller must insert "F03" (indicating CHL AVM waterfall Mortgages) in one of the special characteristic code fields on the Form 11 or Form 13SF, as applicable;

(j)     in the event Freddie Mac acquires the Mortgaged Premises as Real Estate Owned, Freddie Mac will bill Seller for and Seller must pay Freddie Mac a fee of $400; and

(k)     Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, during the term of this Master Agreement, provided however, that Freddie Mac must first notify Seller's Senior Managing Director, Secondary Marketing, of its intention to modify this paragraph, and thereupon Freddie Mac and Seller will have 30 days within which to meet, confer and use all reasonable efforts to resolve Freddie Mac's concerns; at the end of such 30-day period, if the parties have been unable to resolve Freddie Mac's concerns, Freddie Mac must provide Seller with 60-days prior written notice of the modification to the provisions of this paragraph.

**Exhibit A**
**Nonstandard Agreement to Convert**

LN# 4088925-5

MODIFICATION AGREEMENT
CONVERSION TO A FIXED RATE LOAN          Exhibit 2

THIS AGREEMENT, dated the 6th day of November, 1995, is made between
JORGE LAMBARENA, MARIA ISABEL LAMBARENA

("BORROWER") & COUNTRYWIDE FUNDING CORPORATION, a New York
Corporation ("LENDER") authorized to do business in the State of
California, to modify the Promissory Note dated 5/04/94, to
bearing interest at the rate of 8.250 percent per annum
("NOTE"). This Note, as modified by an attached Rider ("RIDER")
and an attached Addendum to the Rider ("ADDENDUM"), is secured by
an Adjustable Rate Mortgage/Deed of Trust/Deed to Secure Debt
("SECURITY INSTRUMENT") of the same date made by BORROWER to LENDER
on property located in the State of CALIFORNIA , County of
_____ , which has the property address of

3825 FERNTOWER AVE
WEST COVINA, CA 91790

The parties to this Agreement agree to modify the terms of the Note
as follows:

A. The Addendum to Adjustable Rate/Graduated Payment Rider is
deleted in its entirety.

B. All provisions in the Note pertaining to the interest rate
adjustments and monthly payment changes/payment cap are deleted.
The words "Adjustable Rate" are deleted.

C. The amount of your monthly principal and interest payments will
be fixed for the remaining term of the debt and changed to
ONE THOUSAND, SEVENTEEN DOLLARS AND 84/100.
($ 1017.84) per month beginning with your January 1, 1996 payment.

D. This loan is no longer assumable.

E. All other terms and conditions of the Note are unchanged. This
Agreement is not binding, in whole or in part, on LENDER until
executed by LENDER.

Executed by the parties to this Agreement on the day and year first
above written.

COUNTRYWIDE FUNDING CORPORATION
(LENDER)

Frederick J. Budig, Sr. V.P.                    JORGE LAMBARENA

                                                MARIA ISABEL LAMBARENA

STATE OF California        }
                           } SS.
COUNTY OF Los Angeles.     }

On this 10th day of Noviembre , 19 95 , before me appeared
JORGE LAMBARENA and MARIA ISABEL LAMBARENA (proved To me with satisfactory
evidence) known to be the persons described in and who executes
the foregoing instrument as Borrowers and acknowledged that they
executed the same as their own free act and deed.

My commission expires: 10-31-97
                                                Notary Public

STATE OF CALIFORNIA}
                    } SS.
COUNTY OF LOS ANGELES}

The foregoing Instrument was acknowledged before me on this 14
day of NOVEMBER , 19 95 , by Frederick J. Budig,
Sr. Vice President, of COUNTRYWIDE FUNDING CORPORATION, a New York
corporation, on behalf of the corporation.

My commission expires: 6/26/99                  Notary Public
                        HARRY SLOAN
                        Comm #1041593

                                                almletter

**Exhibit B**
**LTV/TLTV/HTLTV and Minimum Indicator Score for Fast & Easy Mortgages**

**Retail Channel**

**Purchase and "No cash-out" Refinance**

| Product and Property | Max LTV w/o sec fin | Max LTV with sec fin | Max TLTV/HTLTV with sec fin | Min Indicator Score |
|---|---|---|---|---|
| Fixed-rate Mortgages, 7/1, 10/1 ARMs<br>- Primary Residence<br>- Employed Borrower only | 95% | 80% | 95% | 730 |
| Fixed-rate Mortgages, 3/1, 5/1, 7/1, 10/1 ARMs<br>- Primary Residence | 90% | 80% | 90% | 680 |
| Fixed-rate Mortgages, 3/1, 5/1, 7/1, 10/1 ARMs<br>- Second Homes | 90% | 80% | 90% | 700 |
| Fixed-rate Mortgages, 3/1, 5/1, 7/1, 10/1 ARMs<br>- Investment Property | 75% | 75% | 75% | 700 |
| *"Cash-out" refinances* | | | | |
| Fixed-rate Mortgages, 3/1, 5/1, 7/1, 10/1 ARMs<br>- Primary Residence | 70% | 70% | 70% | 720 |

**Wholesale (that is, broker and Correspondent) Channel**

**Purchase and "No Cash-out" Refinance**

| Product and Property | Max LTV w/o sec fin | Max LTV with sec fin | Max TLTV/HTLTV with sec fin | Min Indicator Score |
|---|---|---|---|---|
| Fixed-rate Mortgages, 3/1, 5/1, 7/1, 10/1 ARMs<br>- Primary Residence<br>- Second Home | 90% | 80% | 90% | 700 |
| Fixed-rate Mortgages, 3/1, 5/1, 7/1, 10/1 ARMs<br>- Investment Property | 75% | 75% | 75% | 700 |

**"Cash-out" Refinance**

| Product and Property | Max LTV w/o sec fin | Max LTV with sec fin | Max TLTV/HTLTV with sec fin | Min Indicator Score |
|---|---|---|---|---|
| Fixed-rate Mortgages, 3/1, 5/1, 7/1, 10/1 ARMs<br>- Primary Residence | 70% | 70% | 70% | 720 |

**ATTACHMENT 4**
**SPECIAL UNDERWRITING PROVISIONS**
**BALLOON/RESET MORTGAGES**

**1.      Borrower Qualification for Extended Buydown Mortgages**

For Extended Buydown Mortgages secured by a Primary Residence or second home, the Borrower may be qualified using the monthly payment at the initial interest rate, provided that:

(a)      for Borrowers who are self-employed, the Indicator Score is at least 680; and

(b)      for Borrowers who are not self-employed, the Indicator Score is at least 660.

**2.      Mortgages subject to Temporary Subsidy Buydown Plans**

For Mortgages subject to temporary subsidy buydown plans, Seller is not required to deliver the special characteristics code applicable to each plan.

**3.      Non-uniform Balloon Mortgage Instruments**

Balloon/reset Mortgages secured by Mortgaged Premises located in Texas which are originated on a Balloon Note with terms substantially identical to those contained in the document transmitted by Seller to Freddie Mac by facsimile on March 3, 1993 and having a tag line "Texas Balloon Note (fixed rate) - Single Family - With Conditional Modification and Extension Option (01/91)", shall be eligible for purchase.

**4.      Streamlined Refinance Mortgage Application Form**

Streamlined refinance Mortgages with respect to which the loan application form used in connection with the origination of the refinance Mortgage consists of a "Countrywide Fastrack Application" form, substantially identical to the form of the document which Seller transmitted to Freddie Mac, rather than a Uniform Residential Loan Application - Freddie Mac Form 65, shall be eligible for purchase, provided that:

(a)      the loan application form used in connection with the origination of the mortgage being refinanced consists of a Uniform Residential Loan Application; and

(b)      a copy of the Uniform Residential Loan Application completed in connection with the origination of the mortgage being refinanced is attached to the loan application form used for the refinance Mortgage.

**ATTACHMENT 5**
**Renovation Mortgages Attachment**

This Attachment, including the exhibits, describes the requirements for Mortgage Products that are permitted under the Purchase Documents to be secured by Mortgaged Premises undergoing rehabilitation or renovation that will not be completed by the Delivery Date.

Mortgages delivered pursuant to this Attachment are subject to the provisions of the Guide and the other applicable Purchase Documents, as modified by this Attachment.

The following supporting material is available from Freddie Mac:

>Rehabilitation Loan Agreement (without Secondary Financing)
>Rehabilitation Loan Agreement (with Secondary Financing)
>Guidelines for Servicing Rehabilitation Mortgages

**Section I.        General Terms.**

1.      <u>Definitions</u>.  Terms used in this Attachment, including terms not capitalized, are defined or otherwise described in the Guide or other Purchase Documents.  The term "renovation" includes similar activities such as rehabilitation, repair, remodeling and restoration.

The <u>Additional Borrower Deposit</u> is the amount deposited in the Escrow Account that is equal to the difference between the Renovation Loan Proceeds and the Total Cost of Renovation.  The Additional Borrower Deposit must be from sources stated in Sections 26.2 and 26.3 of the Guide (other than Sweat Equity).

The <u>Contingency Reserve</u> is a reserve in the amount equal to 10 percent of the Cost of Renovation Work.

The <u>Cost of Renovation Work</u> is the documented estimate of the amount needed to complete all the renovation work in the plans and specifications and in the contractors' itemized cost estimates or bids, including soft costs such as reasonable fees for inspection and title updates and other third party expenses.  Although Sweat Equity must be included in the plans and specifications, the labor costs provided as Sweat Equity and the cost of materials for which there are no paid receipts are not included in the Cost of Renovation Work.

The <u>Escrow Account</u> is an interest bearing special deposit account maintained by Seller in an Eligible Depository that holds the Renovation Loan Proceeds.  The Escrow Account must be custodial in nature and titled in a manner that reflects the interest of the Borrower and Freddie Mac in the funds in the Account.

The <u>Estimated As Completed Appraised Value</u> is the appraised value determined by the Origination Appraisal subject to completion of the renovation in accordance with the plans and specifications.

<u>Expanding Markets Mortgage Products</u> are Affordable Gold Mortgages, Community Gold Mortgages, and other Mortgage Products originated under one of Freddie Mac's Community Development Lending local initiatives.  The Purchase Documents for Expanding Markets Mortgage Products, other than Affordable Gold Mortgages and Community Gold Mortgages, must specifically allow the Mortgage Product to be a Rehabilitation or Renovation Mortgage.

<u>Expanding Markets Renovation Mortgages</u> are Renovation Mortgages originated using an Expanding Markets Mortgage Product.

The <u>Government Account</u> is the account set up in the U.S. Department of Housing and Urban Development ("HUD"), or a State or local housing agency accounting system when HUD or the State or local agency rehabilitation loan program requires a separate account be used for the Renovation Loan Proceeds from a Government Funded Second.

A <u>Government Funded Second</u> is secondary financing funded with proceeds from a HUD sponsored program such as the HOME Investment Partnerships Program (Title II of the Cranston-Gonzalez National Affordable Housing Act) or the Community Development Block Grant ("CDBG") program or from a State or local housing agency rehabilitation loan program.

The <u>Origination Appraisal</u> is the appraisal report that provides an estimate of value as of the date the appraisal is performed based on market data of comparable properties and assuming that the proposed renovation, including work performed by Sweat Equity, is completed in accordance with the plans and specifications.

The <u>PITI Reserve</u> is a reserve in the amount not to exceed six months payment of principal, interest, taxes and insurance on the Mortgage, permitted if the property requires substantial renovation and the Borrower cannot occupy the Mortgaged Premises during the Renovation Period.  The PITI Reserve is separate from any monthly payment reserves required under the terms of the Purchase Documents for a particular Mortgage Product.

The <u>Refinancing Cost</u> is the total of the amount needed to pay the following, subject to any limitation in amount stated in the Purchase Documents for the refinance Mortgage Product being used:

(a)     Pay off the first Mortgage, regardless of its age;
(b)     Pay off any junior liens secured by the Mortgaged Premises, as permitted by the Mortgage Product; and
(c)     Pay related Closing Costs, Financing Costs and Prepaid items.

The <u>Renovation Completion Conditions</u> are those specific activities described in this Attachment that must be completed or have occurred before the renovation can be considered completed.

<u>Renovation Loan Proceeds</u> are funds from the proceeds of the Mortgage representing the difference between the principal amount of the Mortgage and the following:

(a)     for purchase transaction Mortgages, the purchase price of the Mortgaged Premises;

(b)     for "no cash-out" refinance Mortgages, the Refinancing Costs; and

(c)     for "cash-out" refinance Mortgages, the Refinancing Costs; the "cash-out" to the Borrower is considered as Renovation Loan Proceeds until the Renovation Completion Conditions have been satisfied.

When there is secondary financing, the Renovation Loan Proceeds are the total of (i) the Renovation Loan Proceeds from the Mortgage, and (ii) an amount representing the difference between the principal amount of the secondary financing and any amount from the secondary financing used to finance acquisition costs, closing costs and/or prepaids/escrows.

Renovation Loan Proceeds include the PITI Reserve, if any.

<u>Renovation Mortgages</u> are eligible Home Mortgages that are (a) secured by Mortgaged Premises undergoing renovation, a portion of the proceeds from which are to be used to finance the renovation of the Mortgaged Premises and (b) delivered to Freddie Mac prior to the completion of the renovation.

The <u>Renovation Period</u> is the period during which the renovation is ongoing; it begins on the Note Date and terminates when all the Renovation Completion Conditions are satisfied.

<u>Special Renovation Affordable Seconds</u> are second loans that satisfy the criteria for an Affordable Second stated in Section 25.1(g) of the Guide and the following additional terms and conditions:

(a)     The second loan bears no interest and there is no provision for An Agency sharing or participation in the appreciation of the Mortgaged Premises.

(b)     There are no monthly payments of principal; any principal that is not forgiven is deferred until the Mortgaged Premises are sold or refinanced.

(c)     The second loan does not contain Land Use Restrictions, including resale restrictions, in the Security Instrument, the conveyance deed, or any separate deed restriction or land use covenants document.

Sweat Equity is labor performed or material furnished by the Borrower that meets the requirements stated in Section 26.3, third bullet of the Guide.  The cost of materials provided by the Borrower evidenced by paid receipts, is not considered Sweat Equity and may be included in the Cost of Renovation Work.

The Total Cost of Renovation is the sum of (a) the Cost of Renovation Work (excluding Sweat Equity except for materials provided by the Borrower evidenced by paid receipts), (b) the Contingency Reserve, and (c) PITI Reserve, if applicable.

2.      Delivery Prior to Completion of Renovation.  Freddie Mac will purchase eligible Home Mortgages the proceeds from which are to be used to finance either (i) the acquisition and renovation, or, (ii) if applicable, the refinance and renovation, of an existing residential dwelling and that comply with the requirements of this Attachment.  Although the provisions of Section 22.17 of the Guide provide otherwise, Seller may deliver Mortgages secured by Mortgaged Premises undergoing renovation prior to completion of the renovation.

3.      Eligible Mortgages.  Except for those Mortgage Products listed below, Renovation Mortgages may be any Mortgage Product that Seller is permitted to sell Freddie Mac under the terms of the Seller's Purchase Documents, including any specially negotiated underwriting and other provisions applicable to that Mortgage Product, unless the negotiated terms of a particular Mortgage Product or special underwriting or other special provision specifically prohibit it to be used with Renovation or Rehabilitation Mortgages.

Renovation Mortgages may not be the following Mortgage Products:

*       Section 502 GRH Mortgages
*       HUD-Guaranteed Section 184 Native American Mortgages
*       A-Minus Mortgages
*       FHA 203(k) Rehabilitation Mortgages (specially negotiated)
*       HOME WORKS! Mortgages (specially negotiated)
*       Section 8 Mortgages (specially negotiated)
*       Affordable Lease-Purchase Mortgages and Lease-Purchase Bond Mortgages (specially negotiated)

FHA 203(k) Rehabilitation Mortgages and HOME WORKS! Mortgages are Mortgages that may be delivered prior to the completion of the renovation/ rehabilitation that are eligible for sale under the terms of other specially negotiated Attachments related to those products.  The terms of the HOME WORKS! Mortgages Attachment requires compliance with certain provisions of this Attachment.

Renovation Mortgages may not be Seasoned Mortgages or Wholesale Home Mortgages.

4.  <u>Investment Property Renovation Mortgages</u>.  Renovation Mortgages may be Investment Property provided the Purchase Documents for the Mortgage Product being used permit Investment Property and all the requirements in Seller's Purchase Documents for Investment Property and Investment Property Mortgages are satisfied.

Although the provisions of Section 34.1(b) second bullet of the Guide and the Purchase Documents for other Expanding Markets Mortgage Products may provide otherwise, Expanding Markets Renovation Mortgages may be originated as Investment Property Mortgages in accordance with the specially negotiated Expanding Markets Nonindividual Borrower and Investor Borrower Exhibit to this Attachment.

5.  <u>Refinance Renovation Mortgages</u>.  Renovation Mortgages may be refinance Mortgages if the Purchase Documents for the Mortgage Product being used permit refinance Mortgages.

If the Purchase Documents for a Mortgage Product permit "no cash out" refinance Mortgages, the Mortgage may be a Renovation Mortgage if all the proceeds not used for Refinancing Costs are used for renovation.

If the Purchase Documents for a Mortgage Product permit "cash out" refinance Mortgages, the Mortgage may be a Renovation Mortgage provided all "cash out", including amounts above the Total Cost of Renovation, are disbursed to the Escrow Account for renovation.  The "cash out" not used for renovation will be disbursed to the Borrower when the Renovation Completion Conditions are satisfied.

6.  <u>Eligible Property</u>.  Renovation Mortgages must be secured by 1-unit dwellings; however, Renovation Mortgages may be secured by 2-unit, 3-unit and 4-unit dwellings to the extent permitted by the Purchase Documents for the Mortgage Product being used.

The dwelling must have been constructed prior to the Note Date of the Mortgage and the renovation must be in connection with an existing dwelling structure.

**Section II.     Appraisal; Cost of Renovation.**

1.  <u>Qualifications of Appraiser</u>.  The appraiser must have demonstrated competency and experience in evaluating properties for construction or renovation financing based on the future completion of the construction or renovation work in accordance with plans and specifications and/or construction costs estimates.

2.  <u>Appraisal Report</u>.  The appraisal report must provide an estimate of value as of the date the appraisal is performed based on market data of comparable properties and assuming that the proposed renovation, including work performed by Sweat Equity, is completed in accordance with the plans and specifications ("as completed" value).  The plans and specifications must include any work being done by Sweat Equity and must be included in the appraisal report.

3.    <u>Sweat Equity</u>.  Although Section 26.3, third bullet, of the Guide provides otherwise, Sweat Equity may not be used as a source of down payment, Closing Costs, Financing Costs or Prepaids/Escrows.

4.    <u>Limit on Total Cost of Renovation</u>.  The Renovation Loan Proceeds plus the Additional Borrower Deposit, must be at least equal to the Total Cost of Renovation.

    Except for Community Gold Mortgages for which there is no comparable limit on the ratio, the ratio of the Total Cost of Renovation to the Estimated As Completed Appraised Value must not exceed 50 percent.

## Section III.    Insurance.

1.    <u>Hazard Insurance</u>.  At the time the Mortgage is delivered to Freddie Mac, the Mortgaged Premises must be covered by property insurance in an amount at least equal to the "as is" value of the improvements undergoing renovation.  When the renovation is completed, the insurance must be increased to meet the insurance requirements stated in Section 58.2 of the Guide.

2.    <u>Title Insurance</u>.  The Mortgage must be covered by title insurance in the full amount of the recorded Mortgage and dated concurrently with the recordation of the Mortgage.

3.    <u>Mortgage Insurance</u>.  If Mortgage insurance is required under the terms of the Mortgage Product, Seller must provide Mortgage insurance on each Mortgage, either through its master policy or through an endorsement to the commitment to insure, that covers a default of the Borrower during the Renovation Period, subject to completion of the renovation.

4.    <u>Builder's Risk Insurance</u>.  Builder's risk insurance, including a provision for the loss of materials, with coverage generally acceptable in the single family construction/renovation industry based on the type of dwelling, anticipated nature of the renovation and the total renovation cost, must be in effect during the Renovation Period.  The insurance policy must include a standard mortgagee clause in accordance with Section 58.6 of the Guide.

## Section IV.    Borrower Loan Documents.

1    <u>Payment Obligation</u>.  The Borrower must be obligated to pay principal and interest on the full amount of the Mortgage beginning no later than the first day of the second month following the Note Date.

2.    <u>Mortgage Documents</u>.  The following Mortgage loan documents are required:

    (a)    a Rehabilitation Rider to the Uniform Security Instrument executed by the Borrower that is substantially identical to the form attached to this Attachment; and

(b)     a Rehabilitation Loan Agreement executed by the Borrower and Seller, on behalf of the Noteholder, in the form substantially identical to the form prepared by Freddie Mac or in a form containing, at a minimum, the following items in detail:

- Description of the renovation work, including plans and specifications, schedule of project costs, completion schedules.

- Lender's right to approve the plans and specifications and the construction contract and any changes.

- Terms and conditions for the creation and administration of the Escrow Account and the Contingency Reserve.

- Lender's right to inspect the property during the renovation.

- Events of default and the right to discontinue advances from the Escrow Account and to accelerate the Mortgage in the event of a default.

- Lender's right to complete the renovation and assume the construction contract and all other contracts made by the Borrower or to engage other contractors.

For Mortgages with secondary financing, Seller, on behalf of the Noteholder of the primary Mortgage, the lending institution providing the secondary financing, and each Borrower, must execute a form of Rehabilitation Loan Agreement containing the provisions stated above and containing provisions appropriate for situations in which there is more than one secured lender.  Freddie Mac has prepared a form of Rehabilitation Loan Agreement appropriate for use with secondary financing that will be provided to Seller.

## Section V.     Value, Additional Borrower Deposit; LTV and TLTV Ratios and Maximum Loan Amount.

1.     <u>Value</u>.  For purchase transaction Renovation Mortgages, value is determined as the lower of (i) the purchase price of the Mortgaged Premises plus the Total Cost of Renovation, and (ii) the Estimated As Completed Appraised Value of the Mortgaged Premises.  If the Estimated As Completed Appraised Value is less than the purchase price plus the Total Cost of Renovation, the Borrower, in addition to the required down payment, must provide an Additional Borrower Deposit.

For refinance Renovation Mortgages, value is determined using the Estimated As Completed Appraised Value of the Mortgaged Premises.

2.     <u>LTV and TLTV Ratios</u>.  The maximum LTV and TLTV ratios, using value computed as described above, for Renovation Mortgages are those stated in the Purchase Documents for the Mortgage Product being used.

3.     Secondary Financing.  Secondary financing is permitted with Renovation Mortgages if permitted with the Mortgage Product being used, subject to the maximum TLTV ratio for that Mortgage Product.

For Affordable Gold Mortgages, Community Gold Mortgages and other Expanding Markets Mortgage Products:

| If the secondary financing is: | The maximum TLTV ratio is: |
| --- | --- |
| An Affordable Second that satisfies the requirements of Section 25.1(g) of the Guide | The maximum TLTV ratio permitted for the Expanding Markets Mortgage Product, but in no event greater than 105 percent |
| A Community Affordable Second, used with a Community Gold Mortgage | 105 percent |
| A Special Renovation Affordable Second | 120 percent, even if the Purchase Documents for the Expanding Markets Mortgage Product specify a lower ratio. |

4.     Maximum Loan Amount.  For purchase transaction and "cash out" refinance Renovation Mortgages, the maximum loan amount is determined by the maximum LTV ratio.

For "no cash out" refinance Renovation Mortgages, the maximum loan amount is the total of Refinancing Costs and the Total Cost of Renovation, even if the LTV ratio would permit a higher loan amount.

**Section VI.     Administering the Renovation.**

1.     Responsibilities and Inspection during the Renovation Period.  Seller is responsible for monitoring the process of the renovation work, including work being performed by Sweat Equity, during the Renovation Period.  In connection with its Servicing obligations, Seller should review the Guidelines for Servicing Rehabilitation Mortgages prepared by Freddie Mac.

Seller must conduct inspections of the Mortgaged Premises prior to the payment of any draw from the Escrow Account and upon completion of the renovation work.

2.     Escrow Fund Administration.

(a)     Creation and Borrower Deposit.  Seller must establish an Escrow Account for each Borrower.  At the closing on the Mortgage, the Borrower must deposit in the Escrow Account:

- the Renovation Loan Proceeds;
- if needed, the Additional Borrower Deposit; and
- if applicable "cash out" from a "cash-out" refinance Mortgage.

(b)    <u>Administration of the Account</u>.  Seller is responsible for the administration of the Escrow Account and the disbursement of funds from the Account.

Interest earned on the Escrow Account may either accrue and be applied to the renovation or be paid to the Borrower.

(c)    <u>Disbursements</u>.  The Borrower, through Seller, must request draws from the Escrow Account as needed to pay for the work completed less any holdback required by Seller.  Funds may not be withdrawn for work performed or materials (other than materials for which there are paid receipts) provided by Sweat Equity.  Before agreeing to a withdrawal of funds from the Escrow Account, Seller must determine that the request for the release of funds complies with the timing and procedures for disbursement and the draw schedule and that the draw request is properly documented.

During the Renovation Period, funds in the Contingency Reserve should be used only for required and necessary unforeseen repairs or deficiencies discovered during the renovation.

Seller may withdraw funds from that portion of the Escrow Account representing the PITI Reserve only to make monthly payments on the primary Mortgage.

(d)    <u>Disposition of Remaining Funds</u>.  After completion of all the work in the renovation plans and specifications, including work performed by Sweat Equity, funds remaining in the Contingency Reserve, may be applied to additional renovation at the discretion of the Borrower.

Except for the "cash out" from a "cash out" refinance Mortgage, any funds remaining in the Escrow Account, including funds remaining in the Contingency Reserve, after payment of all the actual renovation costs, including addition renovation, and returning to the Borrower the amount of the Additional Borrower Deposit (but not the amount of the Borrower's down payment or equity) must be applied to reduce the unpaid principal balance of the Mortgage.  "Cash out" from a "cash out" refinance Mortgage may be disbursed to the Borrower.

(e)    <u>Secondary Financing</u>.  If secondary financing is permitted and used, the secondary financing must be fully funded and loan proceeds fully disbursed to the Borrower; the Borrower must deposit the Renovation Loan Proceeds from the secondary financing in the Escrow Account.

(f)     <u>Special Provisions with Government Funded Seconds</u>.  HUD or a State or local housing agency may not permit the entity providing a Government Funded Second to disburse the entire loan proceeds into the Escrow Account, and instead may require that the proceeds be maintained in a separate Government Account and disbursed only to the extent needed to fund the renovation work.  The following provisions apply to Mortgages with Government Funded Seconds with these restrictions.

(i)     <u>Renovation Escrow Account</u>.  Seller must establish and administer the Escrow Account for the Renovation Loan Proceeds from the Mortgage in accordance with the provisions of this Attachment.

(ii)    <u>Verification of Creation of Government Account</u>.  Prior to the closing on the Mortgage, Seller must verify that the housing agency administering the government renovation loan program (the "administering agency") has established a new project account for the renovation of the Mortgaged Premises in the applicable governmental agency accounting system.

(iii)   <u>Account Deposits</u>.  On or before the closing on the Government Funded Second, Seller must verify that the administering agency has committed funds to the Government Account from the applicable government renovation loan program in the amount of the Renovation Loan Proceeds from the Government Funded Second.

(iv)    <u>Disbursements</u>.  Seller is responsible coordinating draws from the Escrow Account and the Government Account and for assuring that funds to pay for the work completed are withdrawn from the Government Account.

The Borrower, through Seller, must request draws from the Government Account as needed to pay for the work completed less any holdback required.  Before applying for a withdrawal of funds from the Government Account, Seller must determine that the request for the release of funds complies with the timing and procedures for disbursement and the draw schedule for the Government Account.  Generally, Seller must exhaust the amount deposited in the Escrow Fund, other than the PITI Reserve and "cash out" from a refinance Mortgage, if permitted, before withdrawing funds from the Government Account.

(v)     <u>Disposition of Remaining Funds</u>.  Any amount remaining of the committed funds in the Government Account after payment of all the actual renovation costs may be used to reduce the outstanding principal balance of the Government Funded Second.

**Section VII.   Representations and Warranties; Completion Agreement.**

1.   <u>Seller Representations and Warranties</u>.  Seller represents and warrants to Freddie Mac with respect to each Mortgage at the time of delivery of the Mortgage that the proceeds of the Mortgage have been fully disbursed to the Borrower and the Borrower has deposited in the Escrow Account: the Renovation Loan Proceeds, including any "cash out" from a "cash out" refinance Mortgage, the Additional Borrower Deposit, if necessary, and the proceeds of any permitted secondary financing other than a Government Funded Second.

Seller agrees that, upon demand by Freddie Mac, Seller will remit to Freddie Mac all funds on deposit in the Escrow Account and will take all action, and execute and deliver all instruments, necessary and appropriate to assign all rights of Seller provided by the Rehabilitation Loan Agreement to Freddie Mac, subject only to receipt of any duly executed instruments necessary to effect the assumption by Freddie Mac of the duties of Seller provided under the Rehabilitation Loan Agreement.

2.   <u>Completion Agreement</u>.  With respect to each Renovation Mortgage, Seller represents and warrants that all the Renovation Completion Conditions will be satisfied and the Renovation Period will terminate 12 months after the Note Date.

3.   <u>Completion of Renovation</u>.  The renovation will be considered complete when all of the following Renovation Completion Conditions have been satisfied:

(a)   <u>Completion Certificate</u>.  Seller has obtained a satisfactory completion certificate based on an inspection of the Mortgaged Premises evidencing satisfactory completion of the renovation work, including Sweat Equity, in accordance with the plans and specifications and all state and local building codes and health and safety regulations.

(b)   <u>Appraisal Certificate</u>.  Seller has obtained certification from the original appraiser (Freddie Mac Form 442) that the renovation work was done according to contractor's estimates and the plans and specifications, including all Sweat Equity and work that was not in the original plans.  If the original appraiser is not available to provide the certification of completion, Seller may have a substitute appraiser perform the certification of completion, provided the substitute appraiser reviews the original "as completed" appraisal, including the approved plans and specifications, as modified by any change orders, and is able to certify that the renovation work was completed in accordance with the plans and specifications.

(c)   <u>Certificate of Occupancy</u>.  If required by the jurisdiction, Seller has obtained a certification of occupancy from the local governmental authorities.

(d)    <u>Title Endorsement</u>.  Seller has obtained a title endorsement extending the effective date of the title policy to the date the rehabilitation was completed, showing the Mortgage as a First Lien and no other liens, including contractor's, subcontractors' or mechanic's or material suppliers' liens, except for permitted secondary financing recorded on the Note Date.

(e)    <u>Property Insurance Endorsement</u>.  Seller has obtained certification of property insurance in the amount required by Section 58.2 of the Guide.

(f)    <u>Mortgage Insurance Notification</u>.  If Mortgage insurance was obtained at the time the Mortgage was originated, Seller has notified the Mortgage insurer that the renovation is completed.

(g)    <u>Final Payment</u>.  Seller has made final payment to the contractor for the last draw and any hold-backs retained during renovation.

4.    <u>Disposition of Remaining Funds</u>.  After all Rehabilitation Completion Conditions have been satisfied, Seller must dispose of all funds remaining in the Escrow Account in accordance with the terms of this Attachment.

## Section VIII.  Mortgage File

1.    <u>Documentation in Mortgage File</u>.  In addition to the documentation required to be in the Mortgage file by the Purchase Documents for the Mortgage Product being used, the Mortgage File for Renovation Mortgages must include:

(a)    a description of the renovation work to be performed, including, but not limited to, plans and specifications, schedule of project costs, completion milestones and draw schedules;

(b)    the documented actual cost of the renovation work, as evidenced by, but not limited to, a description of the labor, materials, cost estimates/ overruns, soft costs and /or paid receipts; and

(c)    documentation, including a satisfactory completion certificate, evidencing that the Rehabilitation Completion Conditions have been satisfied.

**Section IX.     Recourse.**

1.      <u>Recourse Obligations</u>.  Although other provisions of Seller's Master Commitment or Master Agreement, as applicable, may provide that all Mortgages be sold "without recourse", the Renovation Mortgages with the recourse conditions described below must be sold "with recourse" in accordance with the provisions of Section 11.10(a) of the Guide.

      (a)      <u>Ongoing Renovation</u>.  All Mortgages during the Renovation Period and/or for which the Renovation Completion Conditions have not been satisfied.

      (b)      <u>Noncompletion</u>.  Any Mortgage for which the Renovation Completion Conditions have not been satisfied within 12 months after the Note Date.

      (c)      <u>Renovation Period Delinquency</u>.  Any Mortgage on which the Borrower is more than 120 days Delinquent prior to satisfaction of the Renovation Completion Conditions.

2.      <u>Termination of Recourse</u>.  If either (i) the Renovation Completion Conditions are not satisfied on the date that is 12 months after the Note Date, or (ii) the Borrower is more than 120 days Delinquent at any time prior to satisfaction of the Renovation Completion Conditions Freddie Mac may require Seller to repurchase the Renovation Mortgage at any time prior to foreclosure.  Or, in Freddie Mac's sole discretion, Freddie Mac may require Seller to repurchase Freddie Mac's Participation Interest in the Renovation Mortgage upon completion of the foreclosure sale or upon delivery of a deed-in-lieu of foreclosure in accordance with Section 11.10(a) of the Guide.

Seller's recourse obligations will terminate upon satisfaction of all the Rehabilitation Completion Conditions provided that if the Mortgage is covered by Mortgage insurance, the Mortgage insurance company has confirmed that any losses arising from a Mortgage default during the Renovation Period are covered under the Mortgage insurance policy.

**Section X.     Servicing Transfer Restriction.**

1.      Freddie Mac will not permit Transfers of Servicing of Mortgages until the satisfaction of the Renovation Completion Conditions.

**Section XI.     Special Delivery Requirements**

1.      <u>Delivery Amount Limitation</u>.  In addition to any purchase limits stated in the Purchase Documents for a particular Mortgage Product, Freddie Mac will purchase Renovation Mortgages with an aggregate original unpaid principal balance not to exceed $5 million.

2.  Form 11 and 13 Instructions.  In addition to the requirements for the Mortgage Submission Schedule required in the Purchase Documents for the Mortgage Product, Seller must follow the following instructions when completing the Mortgage Submission Schedule (the Freddie Mac Form 11 or Form 13):

| | |
|---|---|
| Purchase Price field | Use the purchase price of the property plus the Total Cost of Renovation |
| Appraised Value field | Enter the Estimated As Completed Appraised Value of the property |
| Date of the Note | Enter the date of mortgage funding; not the anticipated date of final disbursement of renovation loan funds |
| Year Built | Enter the year the original dwelling structure was built regardless of the extent of the renovation |

3.  Delivery Fees.  Although the Purchase Documents may provide otherwise, there is no delivery fee charged for "cash-out" refinance mortgage when all the "cash-out" goes to renovation escrow fund and there is no "cash-out" to the Borrower, provided Seller enters SCC 203 in the Special Characteristics Code field of the Form 11.  Delivery fees for other Mortgage Products and special negotiated underwriting and other provisions being used with Renovation Mortgages will apply.

4.  Special Characteristics Codes.  In addition to the SCC requirements required in the Purchase Documents for the Mortgage Product, Seller must enter the following codes in one of the special characteristics code fields of the Form 11 or Form 13.

| | |
|---|---|
| Mortgages delivered prior to completion of renovation | 590 |
| "Cash-out" refinance mortgage with all "cash-out" to renovation escrow fund and no "cash-out" to the Borrower | 203 |
| Transfer of servicing restricted until completion of renovation | 510 |

EXHIBIT TO RENOVATION ATTACHMENT
*Rehabilitation Rider to Security Instrument*

[THIS FORM REHABILITATION RIDER HAS BEEN PREPARED BY FREDDIE MAC FOR INFORMATIONAL PURPOSES ONLY. TECHNICAL REVISIONS AND SUBSTANTIVE CHANGES MAY BE NECESSARY FOR IT TO BE IN A FORM TO BE EXECUTED BY A POTENTIAL BORROWER IN A PARTICULAR STATE.  FREDDIE MAC EXPLICITLY DISCLAIMS ANY AND ALL RESPONSIBILITY FOR THE ACCURACY, COMPLETENESS, VALIDITY OR LEGAL SUFFICIENCY IN CONNECTION WITH THE USE OF THIS FORM REHABILITATION RIDER.]

**REHABILITATION RIDER TO SECURITY INSTRUMENT**

THIS REHABILITATION LOAN RIDER is made this ___ day of _____, ____, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed ("Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note ("Note") to _____ (together with its successors and assigns, "Lender") of the same date and covering the property described in the Security Instrument (the "Property") and located at:

_____
(Property Address)

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.      Loan proceeds are to be advanced for the rehabilitation of the premises in accordance with the Rehabilitation Loan Agreement dated _____, ___, between Borrower, Lender and, if applicable, certain other parties. This Agreement is incorporated by reference and made a part of this Security Instrument.

B.      If the rehabilitation is not properly completed, performed with reasonable diligence, or is suspended or discontinued at any time unless caused by strike, lockout, insured casualty, Act of God or other cause beyond the reasonable cause of Borrower, in which event such suspension shall not exceed forty-five (45) days, Lender is vested with full authority to take the necessary steps to protect the rehabilitation improvements and the Property from harm, continue existing contracts or enter into necessary contracts to complete the rehabilitation. All sums expended for such protection, exclusive of the advances of the principal indebtedness, in the sole discretion of Lender, may be added to the principal indebtedness, and be secured by the Security Instrument and be due and payable on demand with interest as set out in the Note.

C.     If Borrower fails to make any payment or to perform any other obligation under the Note or Security Instrument or Rehabilitation Loan Agreement, or an Event of Default has occurred under the Rehabilitation Loan Agreement, the loan shall, at the option of Lender, be in default.  Among the Events of Default under the Rehabilitation Loan Agreement are the following:

(a)     <u>Failure to complete the Rehabilitation</u>.  The Rehabilitation is not completed in accordance with the Plans and Specifications on or before the date that is 12 months after the date of the Note.

The Rehabilitation is not carried on with reasonable diligence or there is a substantial suspension in the rehabilitation or equipping of the Mortgaged Premises for a period in excess of twenty (20) consecutive business days, unless caused by strike, insured casualty, Act of God or other cause beyond the reasonable cause of Borrower, in which event such suspension shall not exceed forty-five (45) days.

(b)     <u>Filing of other liens</u>.  A lien for the performance of work or the supply of materials is filed against the Mortgaged Premises and remains unsatisfied or unbonded for a period of ten (10) days after the date of the filing.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rehabilitation Loan Rider.

_____
Typed Name of Borrower

_____
Typed Name of Borrower

_____
Signature of Borrower (Seal)

_____
Signature of Borrower (Seal)

# GUIDELINES FOR SERVICING
# REHABILITATION MORTGAGES

These Guidelines for Servicing Rehabilitation Mortgages ("Guidelines") are provided to assist Seller/Servicers in the performance of their obligations with respect to the origination and servicing of Freddie Mac's Mortgage Products secured by dwellings undergoing rehabilitation ("Rehabilitation Mortgages").

Capitalized terms used in these Guidelines are defined in the Purchase Documents related to Rehabilitation Mortgages.

1.      **Outline of Seller's Responsibilities during the Rehabilitation Period**.  Seller's responsibilities in connection with the origination and servicing of Rehabilitation Mortgages include the activities outlined below.  Seller should perform these activities in accordance with these Guidelines.

   (a)      <u>Initial Assessment</u>.  Conduct initial assessment of the Mortgaged Premises based on the appraisal and property inspection (as more fully described in the Paragraph below titled "<u>Initial Assessment</u>").

   (b)      <u>Rehabilitation Counseling</u>.  Counsel the Borrower on the rehabilitation (as more fully described in the Paragraph below titled "<u>Rehabilitation Counseling</u>").

   (c)      <u>Plans Review</u>.  Review plans and specifications and cost estimates; establish policy on holdbacks, (as more fully described in the Paragraph below titled "<u>Plans Review</u>").

   (d)      <u>Contractor and Contract Review</u>.  Review qualifications of contractor and review Rehabilitation Work Contract (as more fully described in the Paragraph below titled "<u>Contractor and Contract Review</u>").

   (e)      <u>Monitoring Progress</u>.  Monitor progress of rehabilitation work, including conducting or arranging for inspection of the Mortgaged Premises during rehabilitation, approving changes in plans and specifications and rehabilitation work, obtaining title bring-downs, approving payments to contractors, approving payments from the Contingency Reserve (as more fully described in the Paragraph below titled "<u>Monitoring Progress</u>").

   (f)      <u>Completion Documentation</u>.  Obtain and approve documentation needed upon completion of rehabilitation and assure that all Rehabilitation Completion Conditions are satisfied (as more fully described in the Paragraph below titled "<u>Completion Documentation</u>").

2.      **Initial Assessment.**  Seller must have sufficient documentation to evaluate the nature, type, quality and cost of the rehabilitation work that is to be done, including work that is to be performed by the Borrower as sweat equity, and to determine the amount of financing that will be available.

Seller should review the appraisal and inspection report and the rehabilitation construction contract (the "Rehabilitation Work Contract"), including the plans and specifications, cost estimates, completion schedule, draw schedule and all other rehabilitation work documents to determine the following:

(a)      the proposed rehabilitation work is consistent with the requirements of Seller's rehabilitation program and the Rehabilitation Mortgages Purchase Documents, including these Guidelines; and

(b)      the proposed rehabilitation work can be completed within the proposed time period and with the funds available.

3.      **Rehabilitation Counseling.**  In addition to the Borrower education and landlord training required for Borrowers under the terms of the relevant Expanding Markets® Mortgage Product Purchase Documents, Seller must conduct personal, individual Borrower counseling covering:

(a)      the Borrower's obligations during the Rehabilitation Period;

(b)      the risks involved in property rehabilitation;

(c)      the additional value generated by the rehabilitation;

(d)      the rehabilitation financing process and the amount of financing available;

(e)      contractor selection; and

(f)      rehabilitation work documents, including the Rehabilitation Work Contract.

4.      **Plans Review.**

(a)      <u>Initial Review</u>.  Seller must obtain and review the plans and specifications, cost estimates and itemized bids, draw schedule, and work completion schedule.

Seller must determine, based on the Rehabilitation Work Contract and knowledge of the local market that:

(i)      the rehabilitation work, including work performed by sweat equity, can be completed within time period specified (and within 12 months); and

      (ii)    the cost estimates, including a 10 percent contingency reserve, are reasonable and work can be completed within the amount of the cost estimates and the financing available.

(b)    <u>Additional Work</u>.  If additional funds are needed to pay for the contemplated rehabilitation work, Seller must require the Borrower to deposit additional funds in the Escrow Account on the Origination Date of the Rehabilitation Mortgage. Any such additional funds must be from cash or other equity, other than sweat equity, or, if applicable, additional funds advanced by the lender providing secondary financing and added to the principal amount of the secured second loan provided the TLTV ratio does not exceed the limit in the Rehabilitation Mortgages Purchase Documents.  Additional funds cannot be added to the principal amount of the Rehabilitation Mortgage.

## 5.    <u>Contractor and Contract Review</u>.

(a)    <u>Contractor Selection and Approval</u>.  The Borrower must choose the general contractor to perform the rehabilitation work.  Seller may provide the Borrower with a list of several acceptable contractors but must not choose the contractor or refer the Borrower to a specific contractor.  The Borrower must not act as the general contractor unless Seller determines that the Borrower has the necessary expertise and experience to manage the rehabilitation work or that is the Borrower's full-time occupation.  A subcontractor may not act as the general contractor.

Seller must approve the general contractor selected by the Borrower.  Seller must determine that the contractor:

      (i)    is qualified and experienced in rehabilitation contracting;

      (ii)    has all the appropriate credentials required by the state or locality and is registered, licensed and/or certified in accordance with state and local law; and

      (iii)    is financially able to pay subcontractors and materials suppliers and to complete the rehabilitation work within the proposed completion schedule.

(b)    <u>Review and Approval of Rehabilitation Work Contract</u>.  Seller must obtain and review the entire Rehabilitation Work Contract.  As part of this review, Seller must determine that:

      (i)    the plans and specifications cover all the rehabilitation work, including work done by sweat equity and work to be paid for from the additional funds provided by the Borrower;

(ii)    the terms of the Rehabilitation Work Contract are consistent with, and do not conflict with, the Mortgage loan documents, including the Rehabilitation Loan Agreement and the terms of the Rehabilitation Mortgages Purchase Documents;

(iii)    no additional costs will be added or required after the Origination Date of the Rehabilitation Mortgage; and

(iv)    holdbacks, if required by Seller, are disclosed.

(c)    <u>Rehabilitation Work Contract Provisions</u>.  The Rehabilitation Work Contract should include, among other provisions as may be required by Seller, the following:

(i)    Complete description of rehabilitation work to be done, including work performed by sweat equity (the "plans and specifications"), including:

(A)    rehabilitation work plans and drawings;

(B)    rehabilitation work specifications; and

(C)    materials to be used.

(ii)    Rehabilitation work cost estimates based on bids of registered, certified or licensed contractors and itemized estimates, including a statement of maximum construction costs and a schedule of payments to the contractors.

(iii)    Schedule of work, including a description of when various jobs or stages of work will be completed, including work performed by sweat equity, the start date and the completion date (the "completion schedule").

(iv)    Timing and conditions precedent for disbursement, including:

(A)    holdback requirements;

(B)    draw requisition procedures;

(C)    form of draw requisition; and

(D)    draw schedule.

(v)    Procedures for requesting and obtaining changes in the plans and specifications, including requirement for obtaining approval of Seller to any changes.

(vi)    Release of lien provisions stating the procedures for obtaining and maintaining clear title.

(vii)   Customary contractor representations, warranties and covenants with respect to obtaining insurance and building permits and code compliance, including covenant to complete rehabilitation work in accordance with all state and local building and zoning codes.

(viii)  Process for mediation of disputes and work stoppages.

(ix)    Indemnification to the homeowner for any claims resulting from unpaid labor and materials.

(x)     Notice of work completion and conditions for final draw, including:

(A)   form notice of rehabilitation work completion; and

(B)   form of final draw requisition.

**6.    Monitoring Progress.**

(a)     <u>Seller Responsibilities</u>.  Seller is responsible for assuring that the rehabilitation work, including work performed by sweat equity, is completed in accordance with the Rehabilitation Work Contract, including the plans and specifications, within the time period designated in the completion schedule and the Rehabilitation Mortgages Purchase Documents.

Seller must exercise all approval and oversight responsibilities that are customary and required to comply with specific state laws and to assure that clear title to the Mortgaged Premises is maintained.

(b)     <u>Change Orders</u>.  Seller must approve any changes to the plans and specifications (each a "change order") and assure that adequate funds, including a 10 percent contingency reserve, are available and that the proposed changes will not affect the completion of the work as contemplated in the completion schedule.

If additional funds are needed to pay for the additional work, Seller must require the Borrower to deposit additional funds in the Escrow Account before executing the change order.

(c)     <u>Additional Funds</u>.  If due to unanticipated circumstances or approved change orders, additional funds are needed to complete the rehabilitation, funds must be provided by the Borrower.

Any such additional funds must be from cash or other equity, other than sweat equity, or, if secondary financing is permitted and being use, additional funds advanced by the lender providing secondary financing, and added to the principal amount of the secured second loan provided the TLTV ratio does not exceed the limit in the Rehabilitation Mortgages Purchase Documents.  Additional funds cannot be added to the principal amount of the Rehabilitation Mortgage.

(d)     <u>Inspection</u>.  Seller, or an designated inspector acting on behalf of Seller, must perform periodic inspections of the Mortgaged Premises during the Rehabilitation Period to determine:

    (i)     the rehabilitation work, including work performed by sweat equity, is being completed in accordance with the Rehabilitation Work Contract, including the approved plans and specifications and the completion schedule; and

    (ii)     adequate funds remain in the Escrow Account to complete the rehabilitation work.

**7**.     **Completion Documentation**.  Upon completion of the rehabilitation work, Seller must conduct the following activities:

(a)     <u>Completion Certificate</u>.  Have the Mortgaged Premises inspected and obtain a satisfactory completion certificate evidencing satisfactory completion of the rehabilitation work, including work performed by sweat equity, in accordance with the plans and specifications and all state and local building codes and health and safety regulations.

(b)     <u>Appraisal Certificate</u>.  Obtain certification from the original appraiser (Freddie Mac Form 442) that rehabilitation work was done according to contractor's estimates and the plans and specifications, including all work done by sweat equity and work that was not in the original plans.  If the original appraiser is not available to provide the certification of completion, Seller may have a substitute appraiser perform the certification of completion, provided the substitute appraiser reviews the original "as completed" appraisal, including the approved plans and specifications, as modified by any change orders and is able to certify that the rehabilitation work was completed in accordance with the plans and specifications.

(c)     <u>Certificate of Occupancy</u>.  If required by the jurisdiction, obtain a certification of occupancy from the local governmental authorities.

(d)     <u>Title Endorsement</u>.  Obtain a title endorsement extending the effective date of the title policy to the date the rehabilitation was completed, showing First Lien priority of the Rehabilitation Mortgage and no other liens, including no contractor's, subcontractors' or material suppliers' liens, except permitted secondary financing recorded on the Origination Date.

(e)     <u>Property Insurance Endorsement</u>.  Obtain certification of property insurance in the amount required by Rehabilitation Mortgages Purchase Documents.

(f)     <u>Final Disbursement</u>.  Make final payment to the contractor for the last draw and any hold-backs retained during rehabilitation.

THIS FORM REHABILITATION LOAN AGREEMENT HAS BEEN PREPARED BY
FREDDIE MAC FOR INFORMATIONAL PURPOSES ONLY.  TECHNICAL REVISIONS
AND SUBSTANTIVE CHANGES MAY BE NECESSARY FOR IT TO BE IN A FORM TO BE
EXECUTED BY A POTENTIAL BORROWER AND TO CREATE REHABILITATION
OBLIGATIONS IN A PARTICULAR STATE.  FREDDIE MAC EXPLICITLY DISCLAIMS
ANY AND ALL RESPONSIBILITY FOR THE ACCURACY, COMPLETENESS, VALIDITY
OR LEGAL SUFFICIENCY IN CONNECTION WITH THE USE OF THIS FORM.

## REHABILITATION LOAN AGREEMENT

Date:                          _____, _____

Borrower:                    _____
                             _____

Lienholder:                  _____
                             _____; and its assigns
                             *[Insert Name of Seller/Servicer]*


Escrow Agent:                _____
                             _____
                             *[Insert name of entity administering the escrow accounts and
                             monitoring the rehabilitation; generally it is the Seller/Servicer]*

Property Address:    Address:          _____
                                       _____
                                       _____
                     City/County:      _____
                     State:            _____

**Special Terms and Definitions for the Capitalized Terms Used in this Agreement**.

The <u>Completion Date</u> is _____, _____. *[The completion date should be determined based on the complexity of the work; it may not be longer than 12 months from the origination date of the Mortgage.]*

The <u>Mortgage</u> is the mortgage loan in the amount of $_____, made by the Lienholder to finance the acquisition or refinance, and a portion of the rehabilitation, of the Property.

The <u>Total Rehabilitation Cost</u> is $_____, which is the sum of the cost of the rehabilitation work, plus soft costs, plus the contingency reserve, plus the mortgage payment reserve, if any.

The <u>Rehabilitation Loan Proceeds</u> are:  $ _____.

The Rehabilitation Loan Proceeds plus the Additional Deposit, if necessary, must be equal to the Total Rehabilitation Cost.

The <u>Additional Deposit</u> is $_____, and is the amount the Borrower must deposit in the Rehabilitation Escrow Account to make the total amount on deposit in the Escrow Accounts equal to the Total Rehabilitation Cost.

<u>Interest on the Rehabilitation Escrow Account</u> is _____% per annum.  Accrued interest on the funds in the Account shall either accrue in the Account and be applied to the Rehabilitation or shall be paid to the Borrower on or before the _____ day of each month.

**This Rehabilitation Agreement establishes the conditions under which the Lienholder and the Escrow Agent will advance the Rehabilitation Loan Proceeds to rehabilitate the Property. The Borrower, the Lienholder and the Escrow Agent agree as follows:**

**Section I.        Rehabilitation.**

1.      <u>Rehabilitation</u>.  The Rehabilitation consists of the repair, remodeling and/or rehabilitation of the Property according to (a) the Rehabilitation Work Contract, which consists of the architect's, general contractors' and/or construction manager's contracts, (b) the Plans and Specifications, (c) the Schedule of Project Costs, which is the budget for the Rehabilitation, and (d) the Completion Schedule, which are all attached to this Rehabilitation Loan Agreement as exhibits.

   The Rehabilitation must be performed with labor and materials of first rate quality, and must comply with the requirements of all governmental authorities having jurisdiction of the Property.

2.      <u>Work Progress and Completion</u>.  The Borrower must commence work on the Rehabilitation within 30 days of the date of this Rehabilitation Loan Agreement.

No delay or suspension of Rehabilitation may exceed 20 consecutive business days, unless caused by strike, inclement weather, insured casualty, or other event beyond the reasonable control of the Borrower, in which event the delay or suspension may not exceed 45 days.

The Rehabilitation must be completed on or before the Completion Date.

3.   Rehabilitation Inspector; Plans and Specifications.  The Escrow Agent, in its sole discretion, may appoint a Rehabilitation Inspector to monitor the Rehabilitation.

The Plans and Specifications must be approved in writing by the Escrow Agent, the Rehabilitation Inspector, the Borrower's general contractor or architect and by all required governmental authorities.

The Escrow Agent and the Rehabilitation Inspector must approve any additions or modifications to the Plans and Specifications; this approval may not be unreasonably withheld or delayed.

4.   Rehabilitation Documents.  The Borrower must provide the Lienholder and the Escrow Agent with copies of all documents relating to the Rehabilitation.

The Escrow Agent must review and approve all the Rehabilitation documents.  The Lienholder, the Escrow Agent and Rehabilitation Inspector must approve any additions or modifications to the Rehabilitation documents that will result in an increase or decrease in the total rehabilitation budget, or that will cause a delay in the commencement or progress of the Rehabilitation.

The Borrower must give prompt notice to the Escrow Agent of all changes in line items in the Schedule of Project Costs and specified task completion dates in the Completion Schedule, whether or not the Escrow Agent's approval is required.

5.   Assignment.  The Borrower must provide the Lienholder with unilateral assignments, in substantially the form of assignment prepared by the Escrow Agent and set forth in Exhibit B of this Rehabilitation Loan Agreement, of all the Rehabilitation documents providing for the performing or furnishing of work, labor, services, materials or supplies.  The general contractor, architect and/or the rehabilitation manager, as applicable, must consent to the assignment of their contracts.

## Section II.   Escrow Accounts.

1.   Types of  Escrow Accounts.  There are two types of Escrow Accounts:

(a)   Rehabilitation Escrow Account.  The Rehabilitation Escrow Account holds   the Rehabilitation Loan Proceeds from the Mortgage.

(b)     <u>Mortgage Payment Reserve Account</u>.  The Mortgage Payment Reserve Account holds the Rehabilitation Loan Proceeds to be used to make monthly payments on the Mortgage.  Funds from the Mortgage Payment Reserve Account cannot be used for Rehabilitation costs.

2.     <u>Creation and Initial Deposits</u>.

(a)     <u>Rehabilitation Escrow Account</u>.  The Escrow Agent or the Lienholder, depending on the rehabilitation program, will establish the Rehabilitation Escrow Account in a federally-insured depository institution.  The Rehabilitation Escrow Account will be an interest-bearing, special deposit account, custodial in nature and titled in a manner that reflects the interest of the Borrower and the Lienholder in the funds in the Account.

On behalf of the Borrower, the Lienholder will deposit the Rehabilitation Loan Proceeds from the Mortgage and any Additional Deposit in the Rehabilitation Escrow Account.

(b)     <u>Mortgage Payment Reserve Account</u>.  On behalf of the Borrower, the Lienholder, if not also the Escrow Agent, will establish the Mortgage Payment Reserve Account and will deposit the amount reserved for making payments on the Mortgage in that Account.

If the Lienholder is the Escrow Agent, the amount reserved for making payments on the Mortgage may be deposited in the Rehabilitation Escrow Account.

3.     <u>Disbursements</u>.

(a)     <u>Disbursement Requirements</u>.  The Escrow Agent is responsible for administering all disbursements from the Rehabilitation Escrow Account.  The Escrow Agent will disburse the escrowed funds from the Rehabilitation Escrow Account by check, payable to the Borrower and the contractor or other appropriate payee who performed the work or supplied the materials, as the stages of rehabilitation are completed.

The Borrower can request a disbursement only for completed work and only for the actual cost of Rehabilitation.  The Borrower may not request a disbursement for labor performed by the Borrower.

Subject to the limitations above, funds will be disbursed in accordance with the Requisition Procedures set forth in Exhibit C attached to this Rehabilitation Loan Agreement.

(b)    <u>Payment Directly to Contractor</u>.  At its option, the Escrow Agent may provide for any or all disbursements to go directly to any general contractor or to any other contractors or subcontractors.  The Borrower's execution of this Rehabilitation Loan Agreement constitutes an irrevocable authorization to make these direct payments.

(c)    <u>No Disbursement if Default or after the Completion Date</u>.  The Escrow Agent is under no obligation to make any disbursements under this Rehabilitation Loan Agreement if on the date that the Escrow Agent is to make a disbursement there exists an Event of Default under this Agreement or under any of the Mortgage loan documents or there exists an event which would constitute an Event of Default but for the requirement that notice be given.  The Borrower, by requesting a disbursement, certifies that no event of default exists as of the date of the execution of request for a disbursement.

The Escrow Agent incurs no liability to the Borrower in acting in good faith upon instructions which the Escrow Agent believes to have been given by the Borrower or other authorized persons.

The Escrow Agent has no obligation to make any disbursement after the Completion Date if the Rehabilitation has not been completed in accordance with this Rehabilitation Loan Agreement to the Escrow Agent's or to the Lienholder's satisfaction.

4.    <u>Contingency Reserve; Mortgage Payment Reserve</u>.

(a)    <u>Contingency Reserve</u>.  The Rehabilitation Loan Proceeds include an amount equal to 10 percent of the total project costs to pay any necessary, unforeseen repairs or to correct any health or safety deficiencies that arise during completion of the Rehabilitation.  The Contingency Reserve may not be used to fund change orders for discretionary modifications to the Plans and Specifications until all the work in the Plans and Specifications has been completed.  If the actual cost of Rehabilitation exceeds the estimated cost of Rehabilitation and the Lienholder consents, the Contingency Reserve or some portion of the reserve, may be paid to the Borrower and/or the general contractor to cover unforeseen repairs or deficiencies.  After completion of all the work in the Plans and Specifications, if the Contingency Reserve is not fully used for unforeseen repairs, deficiencies or necessity items, and no further items are expected to be discovered, funds remaining in the Contingency Reserve may be applied to additional rehabilitation at the discretion of the Borrower, or if none, will be applied as described below.

(b)    <u>Mortgage Payment Reserve Account</u>.  If a Mortgage Payment Reserve Account is established, the Lienholder will make draws from the Account to make the monthly mortgage payments on the Mortgage, provided the Property has not been occupied and no notice of final release of funds has been issued.

5.      Remaining Funds.  Any amount remaining in the Rehabilitation Escrow Account and the Mortgage Payment Reserve Account, including amounts allocated to the Contingency Reserve, will be applied, first to the Borrower in the amount of the Additional Deposit, and second to the Lienholder as a partial prepayment of the Mortgage.  Any prepayment will not extend or postpone the due date of any monthly installment due under the Mortgage, or change the amount of the installments.

## Section III.   Inspections.

1.      Right to Inspect.  The Lienholder, the Escrow Agent and the Rehabilitation Inspector have the right to enter Property at any time to inspect the Rehabilitation.

The Escrow Agent or the Lienholder may require periodic inspection and reports on the appropriateness of any proposed disbursement and the status of Rehabilitation.  Such inspections and reports, if required by the Escrow Agent, or by the Lienholder, may be performed at the Escrow Agent's or Lienholder's option by the Rehabilitation Inspector or by another person retained by such entity, in each case at the Borrower's expense.

The Borrower will permit the Rehabilitation Inspector and any other representatives of the Escrow Agent or the Lienholder, at all reasonable times after verbal notice, to have access to the Property and all contractors, sub-contractors, architects, rehabilitation managers and other parties concerned with the design of and work on the Rehabilitation and to examine all Rehabilitation documents, including the Plans and Specifications.

2.      Documentation.  The Borrower must furnish the records, contracts, bills and other documents relating to the Property and the Rehabilitation requested by the Escrow Agent or by the Lienholder.

3.      Emergency Orders.  The Borrower authorizes the Escrow Agent to issue emergency orders and/or instructions if the Escrow Agent or the Rehabilitation Inspector observes the work in progress and can anticipate that without authority to issue emergency instructions, the Rehabilitation will be done in a manner that will:

(a)     violate the terms of this Rehabilitation Loan Agreement or the Rehabilitation documents;

(b)     increase or decrease the cost of the Rehabilitation;

(c)     delay the progress of the Rehabilitation; or

(d)     decrease the value or injure the Property.

When emergency orders are issued, the Escrow Agent or Rehabilitation Inspector will contact the Borrower and the contractor or sub-contractor most directly responsible for the work in question as quickly as possible, and all parties will examine and approve the work in question before proceeding.

**Section IV.       Borrower Covenants.**

1.    <u>Completion Certificate</u>.  When the Rehabilitation is completed, the Borrower must provide the Escrow Agent with a Completion Certificate signed by the architect or general contractor and the Borrower, certifying that the Rehabilitation has been completed in accordance with the Plans and Specifications.  The Borrower must provide all certificates, licenses, consents and other approvals of all governmental authorities, required by the Escrow Agent, showing satisfactory completion of the Rehabilitation in compliance with all laws and regulations affecting the Rehabilitation and the Property.

2.    <u>Protection against Other Liens</u>.  The Borrower must not use any materials, equipment, fixtures or other items in the Rehabilitation if the Borrower does not have absolute title to these items, except for the security interest of the Lienholder.  The Borrower may not purchase or install fixtures subject to conditional sales contracts, security agreements, lease agreements or other such arrangements in which title is retained or a right is reserved to another party to remove or repossess any item or consider it personal property.  The Borrower must not permit, or allow to remain, any lien, attachment or other encumbrance on the Property for any materials, fixtures, or other items used or to be used or stored or to be stored on the Property.

The Borrower must provide the Escrow Agent access to any receipts, vouchers, bills of sale and other evidence of the title of the Borrower that the Escrow Agent requires.  If a mechanic's lien relating to the Property or to the Rehabilitation is recorded against the Property or a notice of contract violation or notice of intent to file a mechanic's lien is recorded, the Escrow Agent will request the Borrower to cause any such recording to be removed.

During the period this Rehabilitation Loan Agreement is in effect, the Borrower must not create or permit any financing junior to the Mortgage with respect to the Property.

**Section V.       Events of Default; Remedies.**

1.    <u>Events of Default</u>.  The following are Event of Defaults:

(a)    <u>Failure to Make Payments on the Mortgage</u>.  The Borrower fails to make payment to the Lienholder of any amounts due under the Mortgage in accordance with the terms of the Mortgage loan documents or is in default under any of the terms of the Mortgage loan documents.

(b)    <u>Failure to Maintain and Complete the Rehabilitation</u>.  The Rehabilitation is not completed in accordance with the Plans and Specifications on or before the Completion Date.

The Rehabilitation is not carried on with reasonable diligence or there is a substantial suspension in the Rehabilitation of the Property for a period in excess of 20 consecutive business days, unless caused by strike, inclement weather, insured casualty, or other event beyond the reasonable control of the Borrower, in which event such suspension shall not exceed 45 days.

(c)   <u>Filing of Other Liens.</u>  A lien for the performance of work or the supply of materials is filed against the Property and remains unsatisfied or unbonded for a period of 10 days after the date of the filing.

2.   <u>Remedies</u>.  If an Event of Default occurs and continues:

(a)   the Escrow Agent has no further obligation to make disbursements;

(b)   the Lienholder will have access to all funds in the Rehabilitation Escrow Account and the Mortgage Payment Reserve Account and may apply all funds in these Accounts toward the cost of completing the Rehabilitation or, in the sole discretion of the Lienholder, to the outstanding principal balance of the Mortgage; and

(c)   the Escrow Agent and the Lienholder may pursue any remedies provided for in this Rehabilitation Loan Agreement or under the Mortgage loan documents.

3.   <u>Default to be Default under the Mortgage</u>.  Any Event of Default under the terms of this Rehabilitation Loan Agreement constitutes an Event of Default under the Mortgage. Accordingly, the Lienholder may exercise any remedies available under the Mortgage documents, including acceleration of all amounts due under the Note for the Mortgage and foreclosure upon the Property.

4.   <u>Completion of Work</u>.  When an Event of Default occurs, the Escrow Agent or the Lienholder may take or refrain from taking any action relating to the completion of the Rehabilitation as the Escrow Agent or the Lienholder may from time to time determine, including:

(a)   completing the Rehabilitation substantially in accordance with the Plans and Specifications, and employing security guards to protect the Property, all at the risk, cost and expense of the Borrower;

(b)   discontinuing any Rehabilitation work or changing the course of action undertaken by the Borrower without being bound by any limitations or requirements of time;

(c)   assuming any contracts relating to the Rehabilitation made by the Borrower and using the labor, materials, supplies and equipment contracted for by the Borrower; and

(d)     engaging builders, contractors, architects, engineers and others to furnish labor, materials and equipment in connection with the Rehabilitation; paying or compromising all bills or claims which may become liens against the Property or which have been or may be incurred in connection with completing the Rehabilitation, and discharging any liens or encumbrances, and curing any title defects.

The Borrower shall be liable to the party taking action for all sums paid or incurred for the Rehabilitation.  All liabilities incurred by the Escrow Agent or the Lienholder shall be paid by the Borrower to the Escrow Agent or the Lienholder, as applicable, upon demand, with interest at the rate provided in the Note for the Mortgage from the date of payment by the party making payment to the date of payment by the Borrower to the party making payment.

For the purpose of exercising the rights granted by this Section, the Borrower hereby irrevocably constitutes and appoints the Escrow Agent its true and lawful attorney-in-fact to execute, acknowledge and deliver any instruments and to do and perform any acts in the name and on behalf of the Borrower.  The Borrower agrees to execute any documents and take any other actions necessary to enable the Escrow Agent to exercise the rights granted.

## Section VI.     General Provisions; Assignment.

1.      <u>No Assignment by the Borrower</u>.  Without the prior written consent of the Lienholder, the Borrower may not assign this Rehabilitation Loan Agreement or the funds in the Escrow Accounts, and except for the assignment to the Lienholder, may not assign, encumber or transfer any of the Rehabilitation documents.

2.      <u>Obligation of Escrow Agent</u>.  The Escrow Agent named above agrees to act as escrow agent on behalf of the Lienholder.

3.      <u>Termination</u>.  This Rehabilitation Loan Agreement shall terminate upon the completion of the Rehabilitation by the Completion Date as evidenced by the Completion Certification and related documentation and the application of any unused committed funds in the Escrow Accounts in accordance with the terms of the Agreement.  In the event the Rehabilitation is not completed by the Completion Date, this Rehabilitation Loan Agreement shall not terminate, but shall remain in effect until terminated by the Lienholder.

BY SIGNING BELOW, the Borrower, the Escrow Agent, the Lienholder accept and agree to the terms and covenants in this Rehabilitation Loan Agreement as of the date stated above.

._____.
Signature(s) of Borrower(s)

._____.
Signature(s) of Borrower(s)

_____.
Signature of authorized representative of Escrow Agent

_____.
Signature of authorized representative of Lienholder, on its behalf and on behalf of its assigns

_____

Exhibit A-1:  Rehabilitation Work Contract

Exhibit A-2:  Plans and Specifications

Exhibit A-3:  Schedule of Project Costs

Exhibit A-4:  Completion Schedule

Exhibit B:  Form of Contract Assignment

Exhibit C:  Requisition Procedures

THIS FORM REHABILITATION LOAN AGREEMENT HAS BEEN PREPARED BY FREDDIE MAC FOR INFORMATIONAL PURPOSES ONLY. TECHNICAL REVISIONS AND SUBSTANTIVE CHANGES MAY BE NECESSARY FOR IT TO BE IN A FORM TO BE EXECUTED BY A POTENTIAL BORROWER AND TO CREATE REHABILITATION OBLIGATIONS IN A PARTICULAR STATE. FREDDIE MAC EXPLICITLY DISCLAIMS ANY AND ALL RESPONSIBILITY FOR THE ACCURACY, COMPLETENESS, VALIDITY OR LEGAL SUFFICIENCY IN CONNECTION WITH THE USE OF THIS FORM.

## REHABILITATION LOAN AGREEMENT
### (Subsidized Secondary Financing)

Date:  _____, \_\_\_\_\_

Borrower:  _____
_____

First Lienholder:  _____
_____; and its assigns
*[Insert Name of Seller/Servicer]*

Second Lienholder:  _____
*[Insert name of governmental agency or nonprofit community organization originating the secondary financing]*

Escrow Agent:  _____
_____
*[Insert name of entity administering the escrow accounts and monitoring the rehabilitation; for Community Gold Mortgages, including NeighborWorks Mortgages, and Affordable Gold Rehabilitation Mortgages, it is the Seller/Servicer; for HOME WORKS! Mortgages, it may be a governmental agency]*

Property Address:  Address:  _____
_____
_____
City/County:  _____
State:  _____

**Special Terms and Definitions for the Capitalized Terms Used in this Agreement**.

The <u>Completion Date</u> is _____, _____. *[The completion date should be determined based on the complexity of the work; it may not be longer than 12 months from the origination date of the First Mortgage.]*

The <u>First Mortgage</u> is the first mortgage loan in the amount of $_____, made by the First Lienholder to finance the acquisition or refinance, and a portion of the rehabilitation, of the Property.

The <u>Second Mortgage</u> is the rehabilitation second mortgage loan in the amount of $_____, made by the Second Lienholder to finance a portion of the rehabilitation of the Property and other allowed closing costs.

The <u>Total Rehabilitation Cost</u> is $_____, which is the sum of the cost of the rehabilitation work, plus soft costs, plus the contingency reserve, plus the mortgage payment reserve, if any.

The <u>Rehabilitation Loan Proceeds</u> are:_

$_____ from the First Mortgage; and

$_____ from the Second Mortgage.

The Rehabilitation Loan Proceeds plus the Additional Deposit, if necessary, must be equal to the Total Rehabilitation Cost.

The <u>Additional Deposit</u> is $_____, and is the amount the Borrower must deposit in the Rehabilitation Escrow Account to make the total amount on deposit in the Escrow Accounts equal to the Total Rehabilitation Cost.

<u>Interest on the Rehabilitation Escrow Account</u> is _____% per annum.  Accrued interest on the funds in the Account shall either accrue in the Account and be applied to the Rehabilitation or shall be paid to the Borrower on or before the _____ day of each month.

The <u>Project Account Number</u> for the Federal/State Escrow Account is No._____.  If the Project Number for this Account is not known at the time this Rehabilitation Loan Agreement is executed, the Second Lienholder will provide the Account No. to all parties as soon as the number becomes available.

**This Rehabilitation Agreement establishes the conditions under which the Lienholders and the Escrow Agent will advance the Rehabilitation Loan Proceeds to rehabilitate the Property. The Borrower, the Lienholders and the Escrow Agent agree as follows:**

**Section I.        Rehabilitation.**

1.      <u>Rehabilitation</u>.  The Rehabilitation consists of the repair, remodeling and/or rehabilitation of the Property according to (a) the Rehabilitation Work Contract, which consists of the architect's general contractors' and/or construction manager's contracts, (b) the Plans and Specifications, (c) the Schedule of Project Costs, which is the budget for the Rehabilitation, and (d) the Completion Schedule, which are all attached to this Rehabilitation Loan Agreement as exhibits.

The Rehabilitation must be performed with labor and materials of first rate quality, and must comply with the requirements of all governmental authorities having jurisdiction of the Property.

2.      <u>Work Progress and Completion</u>.  The Borrower must commence work on the Rehabilitation within 30 days of the date of this Rehabilitation Loan Agreement.

No delay or suspension of Rehabilitation may exceed 20 consecutive business days, unless caused by strike, inclement weather, insured casualty, or other event beyond the reasonable control of the Borrower, in which event the delay or suspension may not exceed 45 days.

The Rehabilitation must be completed on or before the Completion Date.

3.      <u>Rehabilitation Inspector; Plans and Specifications</u>.  The Escrow Agent, in its sole discretion, may appoint a Rehabilitation Inspector to monitor the Rehabilitation.

The Plans and Specifications must be approved in writing by the Escrow Agent, the Rehabilitation Inspector, the Borrower's general contractor or architect and by all required governmental authorities.

The Escrow Agent and the Rehabilitation Inspector must approve any additions or modifications to the Plans and Specifications; this approval may not be unreasonably withheld or delayed.

4.      <u>Rehabilitation Documents</u>.  The Borrower must provide the Lienholders and the Escrow Agent with copies of all documents relating to the Rehabilitation.

The Escrow Agent must review and approve all the Rehabilitation documents.  The Lienholders, the Escrow Agent and Rehabilitation Inspector must approve any additions or modifications to the Rehabilitation documents that will result in an increase or decrease in the total rehabilitation budget, or that will cause a delay in the commencement or progress of the Rehabilitation.

The Borrower must give prompt notice to the Escrow Agent of all changes in line items in the Schedule of Project Costs and specified task completion dates in the Completion Schedule, whether or not the Escrow Agent's approval is required.

5.    <u>Assignment</u>.  The Borrower must provide the Lienholders with unilateral assignments, in substantially the form of assignment prepared by the Escrow Agent and set forth in Exhibit B of this Rehabilitation Loan Agreement, of all the Rehabilitation documents providing for the performing or furnishing of work, labor, services, materials or supplies.  The general contractor, architect and/or the rehabilitation manager, as applicable, must consent to the assignment of their contracts.

**Section II.    Escrow Accounts.**

1.    <u>Types of Escrow Accounts</u>.  There are three types of Escrow Accounts:

   (a)    <u>Rehabilitation Escrow Account</u>.  The Rehabilitation Escrow Account holds the Rehabilitation Loan Proceeds from the First Mortgage.  The Rehabilitation Escrow Account will also hold the Rehabilitation Loan Proceeds from the Second Mortgage unless the Second Mortgage is originated using Federal or State funds and the Federal or State agency providing the funds requires the use of a separate accounting system.

   (b)    <u>Federal/State Escrow Account</u>.  If the Federal or State Agency providing the funds for the Second Mortgage requires the use of a separate accounting system, a Federal/State Escrow Account will be set up in the government accounting system to hold the Rehabilitation Loan Proceeds from the Second Mortgage.

   (c)    <u>Mortgage Payment Reserve Account</u>.  The Mortgage Payment Reserve Account holds the Rehabilitation Loan Proceeds to be used to make monthly payments on the First Mortgage.  Funds from the Mortgage Payment Reserve Account cannot be used for Rehabilitation costs.

2.    <u>Creation and Initial Deposits</u>.

   (a)    <u>Rehabilitation Escrow Account</u>.  The Escrow Agent, either the First Lienholder or the Second Lienholder, depending on the rehabilitation program, will establish the Rehabilitation Escrow Account in a federally-insured depository institution.  The Rehabilitation Escrow Account will be an interest-bearing, special deposit account, custodial in nature and titled in a manner that reflects the interest of the Borrower and the Lienholders in the funds in the Account.

   On behalf of the Borrower, the First Lienholder will deposit the Rehabilitation Loan Proceeds from the First Mortgage and any Additional Deposit in the Rehabilitation Escrow Account.

Unless a separate Federal/State Escrow Account is required, the Second Lienholder will deposit the Rehabilitation Loan Proceeds from the Second Mortgage in the Rehabilitation Escrow Account.

(b)    <u>Federal/State Account</u>.  Prior to the closing on the Second Mortgage, the Escrow Agent will verify that the appropriate governmental agency has properly established a new project account for the rehabilitation of the Property in the Federal or State accounting system and that funds in an amount equal to the Rehabilitation Loan Proceeds from the Second Mortgage have been committed to that Account.

(c)    <u>Mortgage Payment Reserve Account</u>.  On behalf of the Borrower, the First Lienholder, if not also the Escrow Agent, will establish the Mortgage Payment Reserve Account and will deposit the amount reserved for making payments on the First Mortgage in that Account.

If the First Lienholder is the Escrow Agent, the amount reserved for making payments on the First Mortgage may be deposited in the Rehabilitation Escrow Account.

3.    <u>Disbursements</u>.

(a)    <u>Disbursement Requirements</u>.  The Escrow Agent is responsible for administering all disbursements from the Rehabilitation Escrow Account.  The Escrow Agent will disburse the escrowed funds from the Rehabilitation Escrow Account by check, payable to the Borrower and the contractor or other appropriate payee who performed the work or supplied the materials, as the stages of rehabilitation are completed.

The Borrower can request a disbursement only for completed work and only for the actual cost of Rehabilitation.  The Borrower may not request a disbursement for labor performed by the Borrower.

Subject to the limitations above, funds will be disbursed in accordance with the Requisition Procedures set forth in Exhibit C attached to this Rehabilitation Loan Agreement.

If a Federal/State Account is required, the Escrow Agent will coordinate withdrawals from the Federal/State Account.  The Escrow Agent will disburse funds <u>first</u> from the Rehabilitation Escrow Account (other than the amount set aside for First Mortgage payments) until all funds on deposit in that Account are exhausted, and then request withdrawals from the Federal/State Account.

The Escrow Agent and the Second Lienholder agree that they will initiate a project draw down request from the Federal/State Account within a reasonable period of time after the Borrower submits a request for disbursement that complies with the Federal or State requisition procedures.

(b)     <u>Payment Directly to Contractor</u>.  At its option, the Escrow Agent may provide for any or all disbursements to go directly to any general contractor or to any other contractors or subcontractors.  The Borrower's execution of this Rehabilitation Loan Agreement constitutes an irrevocable authorization to make these direct payments.

(c)     <u>No Disbursement if Default or after the Completion Date</u>.  The Escrow Agent is under no obligation to make any disbursements under this Rehabilitation Loan Agreement if on the date that the Escrow Agent is to make a disbursement there exists an Event of Default under this Agreement or under any of the Mortgage loan documents or there exists an event which would constitute an Event of Default but for the requirement that notice be given.  The Borrower, by requesting a disbursement, certifies that no event of default exists as of the date of the execution of request for a disbursement.

The Escrow Agent incurs no liability to the Borrower in acting in good faith upon instructions which the Escrow Agent believes to have been given by the Borrower or other authorized persons.

The Escrow Agent has no obligation to make any disbursement after the Completion Date if the Rehabilitation has not been completed in accordance with this Rehabilitation Loan Agreement to the Escrow Agent's or to either Lienholder's satisfaction.

4.     <u>Contingency Reserve; Mortgage Payment Reserve</u>.

(a)     <u>Contingency Reserve</u>.  The Rehabilitation Loan Proceeds include an amount equal to 10 percent of the total project costs to pay any necessary, unforeseen repairs or to correct any health or safety deficiencies that arise during completion of the Rehabilitation.  The Contingency Reserve may not be used to fund change orders for discretionary modifications to the Plans and Specifications until all the work in the Plans and Specifications has been completed.  If the actual cost of Rehabilitation exceeds the estimated cost of Rehabilitation and both Lienholders consent, the Contingency Reserve or some portion of the reserve, may be paid to the Borrower and/or the general contractor to cover unforeseen repairs or deficiencies.  After completion of all the work in the Plans and Specifications, if the Contingency Reserve is not fully used for unforeseen repairs, deficiencies or necessity items, and no further items are expected to be discovered, funds remaining in the Contingency Reserve may be applied to additional rehabilitation at the discretion of the Borrower, or if none, will be applied as described below.

(b)     <u>Mortgage Payment Reserve Account</u>.  If a Mortgage Payment Reserve Account is established, the First Lienholder will make draws from the Account to make the monthly mortgage payments on the First Mortgage, provided the Property has not been occupied and no notice of final release of funds has been issued.

5.      Remaining Funds.  Any amount remaining in the Rehabilitation Escrow Account and the Mortgage Payment Reserve Account, including amounts allocated to the Contingency Reserve, will be applied, first to the Borrower in the amount of the Additional Deposit, and second to the First Lienholder as a partial prepayment of the First Mortgage.  Any prepayment will not extend or postpone the due date of any monthly installment due under the First Mortgage or the Second Mortgage, or change the amount of the installments.

If a Federal/State Account is used, any amount remaining of the committed funds in the Account, including amounts allocated to the Contingency Reserve, will be applied as a partial prepayment of the Second Mortgage.  Any prepayment will not extend or postpone the due date of any monthly installment due under the Second Mortgage, or change the amount of the installments.

## Section III.      Inspections.

1.      Right to Inspect.  The Lienholders, the Escrow Agent and the Rehabilitation Inspector have the right to enter Property at any time to inspect the Rehabilitation.

The Escrow Agent or either Lienholder may require periodic inspection and reports on the appropriateness of any proposed disbursement and the status of Rehabilitation.  Such inspections and reports, if required by the Escrow Agent, or by a Lienholder, may be performed at the Escrow Agent's or Lienholder's option by the Rehabilitation Inspector or by another person retained by such entity, in each case at the Borrower's expense.

The Borrower will permit the Rehabilitation Inspector and any other representatives of the Escrow Agent or the Lienholders, at all reasonable times after verbal notice, to have access to the Property and all contractors, sub-contractors, architects, rehabilitation managers and other parties concerned with the design of and work on the Rehabilitation and to examine all Rehabilitation documents, including the Plans and Specifications.

2.      Documentation.  The Borrower must furnish the records, contracts, bills and other documents relating to the Property and the Rehabilitation requested by the Escrow Agent or by either of the Lienholders.

3.      Emergency Orders.  The Borrower authorizes the Escrow Agent to issue emergency orders and/or instructions if the Escrow Agent or the Rehabilitation Inspector observes the work in progress and can anticipate that without authority to issue emergency instructions, the Rehabilitation will be done in a manner that will:

(a)      violate the terms of this Rehabilitation Loan Agreement or the Rehabilitation documents;

(b)      increase or decrease the cost of the Rehabilitation;

(c)      delay the progress of the Rehabilitation; or

(d)      decrease the value or injure the Property.

When emergency orders are issued, the Escrow Agent or Rehabilitation Inspector will contact the Borrower and the contractor or sub-contractor most directly responsible for the work in question as quickly as possible, and all parties will examine and approve the work in question before proceeding.

## Section IV.    Borrower Covenants.

1.      <u>Completion Certificate</u>.  When the Rehabilitation is completed, the Borrower must provide the Escrow Agent with a Completion Certificate signed by the architect or general contractor and the Borrower, certifying that the Rehabilitation has been completed in accordance with the Plans and Specifications.  The Borrower must provide all certificates, licenses, consents and other approvals of all governmental authorities, required by the Escrow Agent, showing satisfactory completion of the Rehabilitation in compliance with all laws and regulations affecting the Rehabilitation and the Property.

2.      <u>Protection against Other Liens</u>.  The Borrower must not use any materials, equipment, fixtures or other items in the Rehabilitation if the Borrower does not have absolute title to these items, except for the security interest of the Lienholders.  The Borrower may not purchase or install fixtures subject to conditional sales contracts, security agreements, lease agreements or other such arrangements in which title is retained or a right is reserved to another party to remove or repossess any item or consider it personal property.  The Borrower must not permit, or allow to remain, any lien, attachment or other encumbrance on the Property for any materials, fixtures, or other items used or to be used or stored or to be stored on the Property.

The Borrower must provide the Escrow Agent access to any receipts, vouchers, bills of sale and other evidence of the title of the Borrower that the Escrow Agent requires.  If a mechanic's lien relating to the Property or to the Rehabilitation is recorded against the Property or a notice of contract violation or notice of intent to file a mechanic's lien is recorded, the Escrow Agent will request the Borrower to cause any such recording to be removed.

During the period this Rehabilitation Loan Agreement is in effect, the Borrower must not create or permit any financing junior to the First or Second Mortgage with respect to the Property.

## Section V.     Events of Default; Remedies.

1.      <u>Events of Default</u>.  The following are Event of Defaults:

(a)      <u>Failure to Make Payments on the First or Second Mortgage</u>.  The Borrower fails to make payment to either Lienholder of any amounts due under the First or Second Mortgage in accordance with the terms of the Mortgage loan documents or is in default under any of the terms of the Mortgage loan documents.

(b)    <u>Failure to Maintain and Complete the Rehabilitation</u>.  The Rehabilitation is not completed in accordance with the Plans and Specifications on or before the Completion Date.

The Rehabilitation is not carried on with reasonable diligence or there is a substantial suspension in the Rehabilitation of the Property for a period in excess of 20 consecutive business days, unless caused by strike, inclement weather, insured casualty, or other event beyond the reasonable control of the Borrower, in which event such suspension shall not exceed 45 days.

(c)    <u>Filing of Other Liens.</u>  A lien for the performance of work or the supply of materials is filed against the Property and remains unsatisfied or unbonded for a period of 10 days after the date of the filing.

2.    <u>Remedies</u>.  If an Event of Default occurs and continues:

(a)    the Escrow Agent has no further obligation to make disbursements;

(b)    the First Lienholder will have access to all funds in the Rehabilitation Escrow Account and the Mortgage Payment Reserve Account and may apply all funds in these Accounts toward the cost of completing the Rehabilitation or, in the sole discretion of the First Lienholder, to the outstanding principal balance of the First Mortgage; and

(c)    the Escrow Agent and the Lienholders may pursue any remedies provided for in this Rehabilitation Loan Agreement or under the First or Second Mortgage loan documents.

3.    <u>Default to be Default under First and Second Mortgage</u>.  Any Event of Default under the terms of this Rehabilitation Loan Agreement constitutes an Event of Default under the First and Second Mortgages.  Accordingly, the First and Second Lienholders may exercise any remedies available under the Mortgage documents for the First and Second Mortgages, including acceleration of all amounts due under the Note for the First Mortgage and the Note for the Second Mortgage and foreclosure upon the Property.

4.    <u>Completion of Work</u>.  When an Event of Default occurs, the Escrow Agent or a Lienholder may take or refrain from taking any action relating to the completion of the Rehabilitation as the Escrow Agent or the Lienholders may from time to time determine, including:

(a)    completing the Rehabilitation substantially in accordance with the Plans and Specifications, and employing security guards to protect the Property, all at the risk, cost and expense of the Borrower;

(b)    discontinuing any Rehabilitation work or changing the course of action undertaken by the Borrower without being bound by any limitations or requirements of time;

(c)     assuming any contracts relating to the Rehabilitation made by the Borrower and using the labor, materials, supplies and equipment contracted for by the Borrower; and

(d)     engaging builders, contractors, architects, engineers and others to furnish labor, materials and equipment in connection with the Rehabilitation; paying or compromising all bills or claims which may become liens against the Property or which have been or may be incurred in connection with completing the Rehabilitation, and discharging any liens or encumbrances, and curing any title defects.

The Borrower shall be liable to the party taking action for all sums paid or incurred for the Rehabilitation.  All liabilities incurred by the Escrow Agent or either Lienholder shall be paid by the Borrower to the Escrow Agent or the Lienholder, as applicable, upon demand, with interest at the rate provided in the Note for the First Mortgage from the date of payment by the party making payment to the date of payment by the Borrower to the party making payment.

For the purpose of exercising the rights granted by this Section, the Borrower hereby irrevocably constitutes and appoints the Escrow Agent its true and lawful attorney-in-fact to execute, acknowledge and deliver any instruments and to do and perform any acts in the name and on behalf of the Borrower.  The Borrower agrees to execute any documents and take any other actions necessary to enable the Escrow Agent to exercise the rights granted.

## Section VI.     General Provisions; Assignment.

1.     No Assignment by the Borrower.  Without the prior written consent of the Lienholders, the Borrower may not assign this Rehabilitation Loan Agreement or the funds in the Escrow Accounts, and except for the assignment to the Lienholders, may not assign, encumber or transfer any of the Rehabilitation documents.

2.     Obligation of Escrow Agent.  The Escrow Agent named above agrees to act as escrow agent on behalf of both the First and Second Lienholders.  In the event of a dispute between the First and Second Lienholders with respect to actions to be taken by the Escrow Agent or the Borrower, the determination of the First Lienholder shall control.

3.     Termination.  This Rehabilitation Loan Agreement shall terminate upon the completion of the Rehabilitation by the Completion Date as evidenced by the Completion Certification and related documentation and the application of any unused committed funds in the Escrow Accounts in accordance with the terms of the Agreement.  In the event the Rehabilitation is not completed by the Completion Date, this Rehabilitation Loan Agreement shall not terminate, but shall remain in effect until terminated by the First and Second Lienholders.

BY SIGNING BELOW, the Borrower, the Escrow Agent, the First Lienholder and the Second Lienholder accept and agree to the terms and covenants in this Rehabilitation Loan Agreement as of the date stated above.

_____.
Signature(s) of Borrower(s)

_____.
Signature(s) of Borrower(s)

_____.
Signature of authorized representative of Escrow Agent

_____.
Signature of authorized representative of First Lienholder, on its behalf and on behalf of its assigns

_____.
Signature of authorized representative of Second Lienholder

Exhibit A-1:  Rehabilitation Work Contract

Exhibit A-2:  Plans and Specifications

Exhibit A-3:  Schedule of Project Costs

Exhibit A-4:  Completion Schedule

Exhibit B:  Form of Contract Assignment

Exhibit C:  Requisition Procedures

**ATTACHMENT 6**
**Affordable Gold 97/1/2 Mortgages with Secondary Financing from**
**California Housing Loan Insurance Fund (CaHLIF)**

This Attachment and the accompanying exhibits, if any, describes the terms under which Freddie Mac will purchase Affordable Gold 97 Mortgages originated under a subsidized down payment mortgage financing program developed by the California Housing Loan Insurance Fund (CaHLIF) and Freddie Mac.  Affordable Gold 97/1/2 Mortgages delivered pursuant to this Attachment are subject to the provisions of the Guide, as modified by this Attachment.

1.   Definitions.

An Affordable Gold 97/1/2 Mortgage is an Affordable Gold 97 Mortgage for which the Borrower makes a down payment of one percent of value from Borrower Funds and the remaining two percent of value is from a CaHLIF Affordable Second.

A CaHLIF Affordable Second is an Affordable Second meeting the criteria for Affordable Seconds in Section 25.1(g) of the Guide and the following additional terms:

(a)   it is funded initially by Seller, as originating lender, and purchased by CaHLIF;

(b)   it is for an amount no greater than three percent of value;

(c)   interest accrues at a rate of three percent a year (not compounded) and there is no equity sharing; and

(d)   no interest or principal payment is due until the earlier of the sale or transfer of the Mortgaged Premises or the maturity date of the Affordable Gold 97/1/2 Mortgage.

A Local Initiative Program is a housing development and financing program developed as part of a community development and financing alliance or affordable housing initiative involving Freddie Mac and a local community Organization and/or a local governmental agency.

2.   Right to Modify and Terminate.  Freddie Mac may amend, supplement, revise or terminate any of the provisions of this Attachment, in whole or in part, upon 90 days written notice to Seller during the term of Seller's Master Agreement or mandatory Master Commitment Contract.

3.   Eligible Mortgages.  Affordable Gold 97/1/2 Mortgages must be 30-year fixed-rate, purchase transaction, Affordable Gold 97 Mortgages originated in connection with a Local Initiative Program.  Freddie Mac will notify Seller of the Local Initiative Programs with which Affordable Gold 97/1/2 Mortgages may be used.

All Affordable Gold 97/1/2 Mortgages must be secured by 1-unit Primary Residences.

4.      <u>Borrower Income Limits</u>.  Although Section 34.1(b) third bullet of the Guide requires otherwise, all Affordable Gold 97/1/2 Mortgages must be made to Borrowers whose stable monthly income converted to an annual basis does not exceed 120 percent of the Area Median Income for the Metropolitan Statistical Area or the county, as applicable, in which the Mortgaged Premises are located.

5.      <u>Underwriting of Credit Reputation</u>.  Seller must obtain Credit Scores and select an Indicator Score following the recommended policies and procedures in Section 37.5(b), (c), (d), (e) and (f) of the Guide.  The Indicator Score must be equivalent to a FICO Bureau Score equal to or greater than 660.

Up to 25 percent of the aggregate unpaid principal balance of the Affordable Gold 97/1/2 Mortgages purchased by Freddie Mac may have either (i) an Indicator Score that is a FICO Bureau Score between 620 and 660, or (ii) be based on Nontraditional Credit References, in each case, provided the Mortgage insurer has approved the Mortgage. Seller must maintain documentation of the Mortgage insurer approval in the Mortgage file.

6.      <u>Debt Ratios</u>.  Although Sections 34.1(e) and 37.16 of the Guide provide otherwise, for an occupying Borrower, the monthly debt payment-to-income ratio should not be greater than 41 percent of the Borrower's stable monthly income; the provisions of the last literary paragraph of Section 37.16 apply if the monthly debt payment-to-income exceeds 41 percent.

If there is a nonoccupying Borrower, Seller must comply with the provisions of Section 37.16 of the Guide.

7.      <u>LTV Ratio; TLTV Ratio; Down Payment; Sources of Funds</u>.  The maximum LTV ratio and TLTV ratio for Affordable Gold 97/1/2 Mortgages are 97 percent and 101 percent, respectively.

The Borrower must make a minimum down payment of at least one percent of value from Borrower Funds.  Any amount of the down payment not paid from Borrower Funds, must be from a CaHLIF Affordable Second.

Closing Costs and Prepaids/Escrows may come from any sources permitted for Affordable Gold Mortgages, including the CaHLIF Affordable Second.

Except for the CaHLIF Affordable Second, no other secondary financing may be used for down payment or Closing Costs or Prepaids/Escrows.

8.      <u>Reserves</u>.  The Borrower must have reserves equal to at least two monthly payments of principal, interest, taxes and insurance available after completion of the purchase transaction.

9.    <u>Mortgage Insurance</u>.  Affordable Gold 97/1/2 Mortgages must have Mortgage Insurance with loss coverage equal 50 percent provided by CaHLIF.

10.   <u>Delivery Amount Limitation</u>.  Freddie Mac will purchase Affordable Gold 97/1/2 Mortgages with an aggregate unpaid principal balance not to exceed $5 million.

11.   <u>Mortgage Submission Schedule (Form 11) Instructions</u>.  For Affordable Gold 97/1/2 Mortgages, Seller must follow the delivery instructions for Affordable Gold 97 Mortgages and the following special instructions:

| | |
|---|---|
| MI Loss Coverage Percent field | Enter 050 |
| Special Characteristics Code | Enter<br>   071   Affordable lending mortgage product<br>   801   Affordable Gold 97/1/2<br>   All other SCCs required for Affordable Gold 97 Mortgages |

12.   <u>Delivery Fees</u>.  The following postsettlement delivery fee indicated on Exhibit 19 of the Guide, will not be assessed and billed to Seller for Affordable Gold 97/1/2 Mortgages:

• A-Minus Fee.

Freddie Mac reserves the right to assess this fee at the earlier of (i) 90-days notice to Seller, or (ii) at the time Seller enters into a new Master Agreement.

**ATTACHMENT 7**
**Community Gold Mortgages**

This Attachment, including the exhibits, if any, describes the terms under which Freddie Mac will purchase Community Gold Mortgages.  Community Gold Mortgages delivered pursuant to this Attachment are subject to the provisions of the Guide, as amended by this Attachment.

**Section I.        General Terms.**

1.      <u>Definitions</u>.  Terms used in this Attachment, including terms not capitalized, are defined or otherwise described in the Guide.

   <u>Borrower Contribution</u> means the total amount contributed by the Borrower for down payment, Closing Costs, Financing Costs and Prepaids/Escrows.

   <u>Borrower Personal Funds</u> means Borrower Funds (as defined in the Glossary of the Guide) (i) excluding a gift or grant from An Agency (as described in Section 26.2 item 3 of the Guide), (ii) excluding a gift from a Related Person (as described in Section 26.2 item 2 of the Guide), and (iii) including cash-on hand provided the requirements of Section 34.1(d) are satisfied.

   A <u>Community Affordable Second</u> is subsidized secondary financing that complies with the criteria for an Affordable Second; however for Community Affordable Seconds, the definition of An Agency may include a for-profit corporation or financial institution.

   <u>Community Gold 97 Mortgages</u> are Community Gold Mortgages in which the LTV ratio is greater than 95 percent but does not exceed 97 percent.

   <u>Community Gold Mortgages</u> are Expanding Markets® Mortgages designed to meet the housing finance needs of individuals and families served by a Local Community Organization and originated under either (i) the NeighborWorks Campaign, or (ii) a Local Initiative Program.

   A <u>Comprehensive Homeownership Program</u> is a homeownership education program certified by Freddie Mac that involves the Borrower in comprehensive prepurchase through postpurchase education and counseling, including early delinquency intervention, and that is provided in a one-on-one or classroom format.  The homeownership counseling program offered under the NeighborWorks Campaign is a Comprehensive Homeownership Program.  Freddie Mac will notify Seller in writing of the certified Comprehensive Homeownership Programs that may be used with Community Gold Mortgages originated under each specific Local Initiative Program.

   A <u>Local Community Organization</u> is an organization that provides Comprehensive Homeownership Education, and if applicable, secondary financing and rehabilitation support and is either:

(a)     a local Neighborhood Housing Services Corporation or other affiliated NeighborWorks organization that has been approved for participation in the NeighborWorks Campaign by the Neighborhood Reinvestment Corporation; or

(b)     a local nonprofit community development organization that has been approved in writing by Freddie Mac to participate in a Local Initiative Program.

A <u>Local Initiative Program</u> is a housing development and financing program developed as part of a community development and financing alliance or affordable housing initiative involving Freddie Mac and a Local Community Organization and/or a local governmental agency that provides services to potential homebuyers in connection with the origination of Community Gold Mortgages.

The <u>NeighborWorks Campaign</u> is the NeighborWorks Campaign for Home Ownership supported by the Neighborhood Reinvestment Corporation and Neighborhood Housing Services of America and that provides borrower services and support through local affiliated NeighborWorks organizations.

2.    <u>Right to Amend and Terminate</u>.  Seller agrees that Freddie Mac may amend, supplement, revise or terminate any of the provisions of this Attachment, in whole or in part, including any of the Exhibits to this Attachment or any of the other Attachments referenced in this Attachment, upon 90 days prior written notice to Seller during the term of this Master Agreement.

3.    <u>Eligible Mortgages</u>.

(a)     <u>Mortgage Terms</u>.  Community Gold Mortgages eligible for sale are 15-, 20- and 30-year, fixed-rate, First Lien, fully amortizing conventional whole Mortgages (other than Balloon/Reset Mortgages) with a Note Date of not more than 12 months prior to the Delivery Date and that meet the requirements of this Attachment.

The origination and Servicer eligibility requirements stated in Section 51.11(c) of the Guide apply to Community Gold 97 Mortgages.

(b)     <u>Type Mortgage</u>.  Community Gold Mortgages must be either (i) purchase transaction, or (ii) "no cash-out" refinance Mortgages.

4.    <u>Participation with Local Community Organizations</u>.  Seller must participate with an eligible Local Community Organization in connection with the origination of Community Gold Mortgages.

**Section II.    Eligible Property.**

1.    <u>No Real Property Ownership Interests</u>.  Except as stated in the following sentence, for Community Gold Mortgages, the Borrower must not have an ownership interest in any other real property other than the Mortgaged Premises on the Note Date of the Community Gold Mortgage.  The Borrower may have an ownership interest in property owned with a Related Person, an ex-spouse or with other parties as a result of an inheritance, provided that the Borrower does not occupy this property and all provisions stated in Section 37.17 of the Guide related to disregarding contingent liabilities are met.

2.    <u>Property Type</u>.  All Community Gold Mortgages must be secured by 1-unit Primary Residences unless Seller is authorized to originate Community Gold Mortgages secured by 2-unit, 3-unit and 4-unit Primary Residences under the terms of the 2-Plus Unit Dwelling Exhibit.

**Section III.    Eligible Borrowers.**

1.    <u>Ineligible for Loan Prospector</u>.  Community Gold Mortgages are not eligible to be Loan Prospector Mortgages.

2.    <u>Borrower Qualifying Ratios</u>.

    (a)    <u>Stable Monthly Income</u>.  Rental income from a 1-unit Primary Residence may be considered as stable monthly income if the provisions of Section 34.1(f) of the Guide are satisfied.

    (b)    <u>Housing Expense-to-Income Ratio</u>.  Although Section 37.15 of the Guide provides otherwise, Seller does not have to calculate a housing expense-to-income ratio for an occupying Borrower; however if there is a nonoccupying Borrower, Seller must comply with the provisions of Section 37.15 of the Guide.

    (c)    <u>Debt Payment-to-Income Ratio</u>.  Although Section 37.16 of the Guide provides otherwise, for an occupying Borrower, the monthly debt payment-to-income ratio should not be greater than 42 percent of the Borrower's stable monthly income.

    If there is a nonoccupying Borrower, Seller must comply with the provisions of Section 37.16 of the Guide.

3.    <u>Mortgage Credit Certificates</u>.  Mortgage Credit Certificates may be used with Community Gold Mortgages in accordance with Section 34.1(g) of the Guide.

4.    <u>Borrower Credit Reputation; Number and Type of Payment References</u>.  All Borrowers must have a credit reputation established in accordance with the requirements of Sections 37.1 to 37.11 of the Guide except as stated in this Attachment.

Although the provisions of Section 37.4(b) fourth literary paragraph provide otherwise, at least one Borrower whose income or assets are used for qualification must have a minimum number of payment references comprised of a total of three Tradelines and Noncredit Payment References.

When payment references are used to document a reestablished credit reputation in accordance with Section 37.7(b) of the Guide, the following provisions apply:

(a)     Although the provisions of Section 37.7(b)(i) item 4 second bullet and Section 37.7(b)(ii) item 2 second bullet of the Guide provide otherwise, if the derogatory credit included Tradeline credit, the Borrower is not expected to have reestablished credit with at least one Tradeline credit; regardless of the type of derogatory credit, either Tradeline or Noncredit Payment References may be used.

(b)     Although the provisions of Section 37.7(b)(i) item 4, second bullet, third sub bullet and Section 37.7(b)(ii) item 2, third bullet, second sub bullet of the Guide provide otherwise, none of the payment references are required to be housing related.

5.     <u>Reestablished Credit</u>.  Although the provisions of the Guide stated below provide otherwise, the following provisions apply when determining whether or not a Borrower has reestablished an acceptable credit reputation:

| Characteristic | Cause of Significant Adverse or Derogatory Credit Event | |
| --- | --- | --- |
| | Extenuating Circumstances | Financial Mismanagement |
| Minimum Underwriting Score | Inapplicable | Section 37.7(b)(ii) item 1<br><br>No minimum Underwriting Score required |
| Time period for evidence on credit report and other credit documentation that the Borrower has reestablished an acceptable credit reputation for situations other than Chapter 13 bankruptcy and foreclosure | Section 37.7(b)(i) item 4 first bullet<br><br>At least the most recent 12 months prior to date of the loan application | Section 37.7(b)(ii) item 2 first bullet<br><br>At least the most recent 24 months prior to date of the loan application |
| Number and time period for open accounts and active accounts for situations other than Chapter 13 bankruptcy and foreclosure | Section 37.7(b)(i) item 4 second bullet, first sub bullet<br><br>At least one payment reference must have been open for at least the most recent 12 months and all must have been active within the most recent 12 months | Section 37.7(b)(ii) item 2 third bullet<br><br>At least one payment reference must have been open for at least the most recent 24 months and all must have been active within the most recent 24 months |

| Time period for evidence of no new public records for bankruptcy (other than Chapter 13), unpaid judgments or collections, and delinquent payments | Section 37.7(b)(i) item 6<br><br>The most recent 12 months | Section 37.7(b)(ii) item 4<br><br>The most recent 24 months |
|---|---|---|
| Time period for reestablished credit reputation and evidence of no new public records for Chapter 13 bankruptcy | Section 37.7(b)(i) item 6 first bullet<br><br>Bankruptcy must be discharged and at least 24 months have passed since the date of the bankruptcy filing. | Section 37.7(b)(ii) item 2 first bullet and item 4 first bullet<br><br>Bankruptcy must be discharged and at least 24 months have passed since the date of the bankruptcy filing. |
| Time period for evidence of no new public records for foreclosure | Section 37.7(b)(i) item 6<br><br>Foreclosure must have been completed at least 24 months prior to the date of the loan application | Section 37.7(b)(ii) item 4<br><br>Foreclosure must have been completed at least 24 months prior to the date of the loan application |

**Section IV.    Financing; LTV and TLTV Ratios; Sources of Funds; Secondary Financing; Mortgage Insurance.**

1.    <u>Maximum Financing</u>.  Although the provisions of Section 23.5 of the Guide provide otherwise, maximum financing is permitted provided the Mortgaged Premises are located in an area that is the subject of a local NeighborWorks Campaign or Local Initiative Program targeted revitalized plan; evidence of the revitalization plan, such as a summary of the plan including the targeted area, must be in the Mortgage file.

2.    <u>LTV and TLTV Ratios, Borrower Contribution and Equity</u>.  The maximum LTV ratio and TLTV ratio, required down payment, or for a refinance Mortgage, the required amount of equity, and the required minimum Borrower Contribution from Borrower Personal Funds are:

| Maximum LTV Ratio | 97 percent |
|---|---|
| Maximum TLTV Ratio | 105 percent |
| Minimum Down Payment or Equity | 3 percent |
| Minimum Borrower Contribution from Borrower Personal Funds | |
|     For Mortgaged Premises with a value of $80,000 or less | The lesser of $1,000 or 2 percent of value |
|     For Mortgages Premises with a value greater than $80,000 | 2 percent of value |

Affordable Seconds may not be used to reduce the minimum Borrower Contribution from Borrower Personal Funds.

3. <u>Source of Funds</u>.  Once the Borrower has made the required minimum Borrower Contribution from Borrower Personal Funds, the remaining down payment, Closing Costs, Financing Costs and Prepaids/Escrows must consist of one or more of the following sources:

(a) Borrower Personal Funds;

(b) a gift from a Related Person (as described in Guide Section 26.2, item 2), however the Borrower is not required to have made a downpayment of at least five percent from other sources of cash or other equity if the Borrower has made the minimum Borrower Contribution from Borrower Personal Funds;

(c) a gift or grant from An Agency (as described in Guide Section 26.2, item 3);

(d) a gift or grant from Seller, if Seller is the originating lender, (as described in Guide Section 34.2(c), however, the gift or grant from Seller may be used for an additional down payment if the minimum Borrower Contribution from Borrower Personal Funds has been made);

(e) an unsecured loan from An Agency or Seller, if Seller is the originating lender, meeting the requirements of Guide Section 34.1(c) provided the amount of all unsecured loans does not exceed the actual amount being used for down payment, Closing Costs, Financing Costs, and Prepaids/Escrows;

(f) an unsecured loan from a Related Person meeting the requirements of Guide Section D33.3(b), item 1;

(g) funds from Premium Financing for Closing Costs, Financing Costs, and Prepaids/Escrows only;

(h) up to three percent of value from financing concessions pursuant to Guide Section 25.3(b) for down payment, Closing Costs, Financing Costs, and Prepaids/Escrows; and

(i) Affordable Seconds may be used to reduce the amount of the downpayment, after the minimum Borrower Contribution from Borrower Personal Funds has been met, and for Closing Costs, Financing Costs, and Prepaids/Escrows.

4.    <u>Mortgage Insurance</u>.

Community Gold Mortgages, including Mortgages with Community Affordable Seconds, must have Mortgage Insurance as follows:

| All Mortgages except for Community Gold 97 Mortgages | In accordance with Section 27.1 of the Guide |
|---|---|
| Community Gold 97 Mortgages | 35 percent |

## Section V.    Comprehensive Homeownership Counseling Program.

1.    <u>Comprehensive Homeownership Program Required</u>.  Each Borrower whose income was used for qualification purposes must participate in the Comprehensive Homeownership Program offered by the local NeighborWorks Campaign or Local Initiative Program.  A copy of the completion certificate issued by the Local Community Organization providing the Comprehensive Homeownership Counseling must be maintained in the Mortgage file.

2.    <u>Financing Local Community Organization Fee</u>.

(a)    <u>Conditions for Inclusion</u>.  The Local Community Organization borrower education fee may be included in the loan amount of the Community Gold Mortgage or included as a Closing Cost, provided all of the following are satisfied:

(i)    Freddie Mac has approved the Borrower education program as a comprehensive homebuyer education/counseling process the costs of which can be financed.  Freddie Mac has approved the NeighborWorks Campaign Borrower education program for this purpose; and

(ii)    the fee does not exceed two percent of value.

(b)    <u>Borrower Disclosure</u>.  Seller must comply with all borrower disclosure requirements under all applicable law, including (without limitation) the Real Estate Settlement Procedures Act and the Truth-in-Lending Act.

3.    <u>Mortgage File</u>.  Seller must maintain in the Mortgage file, the Borrower's Comprehensive Homeownership Program participation certificate certified by the Local Community Organization.

**Section VI.    Servicing.**

1.    <u>Early Intervention Delinquency Counseling</u>.  Seller, as Servicer, must provide early intervention delinquency counseling for all Borrowers or enter into a contractual agreement with the Local Community Organization to provide such counseling.

The early intervention must consist of the following:

(a)    Servicer provides the Local Community Organization with a list of delinquent Borrowers;

(b)    if the Mortgage payment has not been received by the 16th day after the payment is due, the Local Community Organization counselor contacts the delinquent Borrower to determine the Borrower's current financial situation and the reason for the delinquency;

(c)    the Local Community Organization counselor analyses the Borrower's financial situation and develops a plan of action for solving the delinquency situation which in most cases will be a budget worksheet or work-out plan giving priority to the Mortgage payment; and

(d)    the Local Community Organization counselor reviews the budget worksheet or workout plan with the delinquent Borrower.

2.    <u>Transfer of Servicing</u>.  In addition to the conditions stated in Chapter 56 of the Guide, Seller, as Servicer, must determine that the transferee servicer is obligated to provide, or arrange with the Local Community Organization to provide, early intervention delinquency counseling as described in the subparagraph above.

**Section VII.   Special Delivery Requirements.**

1.    <u>Special Characteristics Codes</u>.  Seller must enter the following codes, if applicable, in the special characteristics code field of the Form 11.  Because the Form 11 contains a limited number of SCC fields, Freddie Mac suggests that Seller enter SCCs in the order stated below.

| | |
|---|---|
| Affordable housing initiative Mortgage | 071 |
| One of the following: | |
| Mortgage originated under the NeighborWorks campaign | 518 |
| Mortgage originated under a Local Initiative Program | 544 |
| One of the following, if applicable: | |
| Mortgage with a Community Affordable Second | 583 |
| Mortgage with a Community Affordable Second with TLTV ratio greater than 100 percent | 535 |

2.    <u>Delivery Program for Community Gold 97 Mortgages</u>.  Community Gold 97 Mortgages must be delivered in accordance with the delivery instructions, including special Form 11 instructions, in Section 17.13(b) and (d) of the Guide.

3.    <u>Delivery Fees</u>.  The following postsettlement delivery fee indicated on Exhibit 19 of the Guide, will not be assessed and billed to Seller for Community Gold Mortgages:

- A-Minus Fee.

Freddie Mac reserves the right to assess this fee at the earlier of (i) 90-days notice to Seller, or (ii) at the time Seller enters into a new Master Agreement.

4.    <u>Delivery Limitations</u>.  The aggregate unpaid principal balance of Community Gold Mortgages delivered under the terms of this Master Agreement may not exceed $10 million.

**ATTACHMENT 8**
**Community Gold Mortgages Secured by 2-plus Unit Dwellings**

This Community Gold 2-Plus Unit Dwelling Exhibit states additions and modifications to the Community Gold Mortgages Attachment applicable to Community Gold Mortgages secured by 2-unit, 3-unit and 4-unit Primary Residences.

1.   <u>Definitions</u>.  In addition to the definitions in the Community Gold Mortgages Attachment, the following definitions apply to this Exhibit.

<u>2-Plus Unit Community Gold Mortgages</u> are Community Gold Mortgages secured by 2-unit, 3-unit and 4-unit Primary Residences meeting the requirements of this Exhibit.

<u>Borrower Contribution</u> means the total amount contributed by the Borrower for down payment, Closing Costs, Financing Costs and Prepaids/Escrows.

<u>Borrower Personal Funds</u> means Borrower Funds (as defined in the Glossary of the Guide) (i) excluding a gift or grant from An Agency (as described in Section 26.2 item 3 of the Guide), (ii) excluding a gift from a Related Person (as described in Section 26.2 item 2 of the Guide), and (iii) including cash-on hand provided the requirements of Section 34.1(d) of the Guide are satisfied.

2.   <u>Renovated Dwellings</u>.  2-Plus Unit Community Gold Mortgages secured by renovated or rehabilitated dwellings are eligible for purchase provided either (a) the Mortgage is a Expanding Markets Renovation Mortgage originated in accordance with the terms of the Renovation Mortgages Attachment, or (b) the renovation or rehabilitation is completed on or before the Delivery Date.

3.   <u>Underwriting Rental Income</u>.

(a)   <u>Deduction from Expenses</u>.  Although the provisions of Section 37.14(a) of the Guide provide otherwise, for Mortgages secured by 2-unit Primary Residences only, 75 percent of anticipated gross rental income from the units not occupied by the Borrower may be deducted from the monthly housing expense, provided the Borrower's stable monthly income (without the inclusion of rental income) exceeds the monthly housing expense by $1000.  The adjusted monthly housing expense should be used when calculating the Borrower's qualifying ratios.  Rental income must be substantiated by using the income approach on the appraisal and obtaining copies of the present lease or prior years' federal income tax returns.

(b)   <u>Addition to Income</u>.  For Mortgages secured by 2-, 3- and 4-unit Primary Residences, Monthly Operating Income from the Form 998 or net rental income (divided by number of months of such income) from Schedule E of the Borrower's federal income tax return entered under "Gross Monthly Income" in Section V of Form 65, may be added to the Borrower's stable monthly income provided the Borrower has monthly Mortgage payment reserves as specified below in this Exhibit.  Except as modified by this subparagraph, the provisions of Section 37.14(a) of the Guide apply.

4.   <u>Borrower Credit Underwriting</u>.  The Mortgage must be a Manually Underwritten Mortgage.

5.   <u>LTV and TLTV Ratios, Borrower Contribution</u>.  The maximum LTV ratio and TLTV ratio, required down payment, or for a refinance Mortgage, the required amount of Equity, and the required minimum Borrower Contribution from Borrower Personal Funds are:

| Characteristic | 2-units | 3-units | 4-units |
|---|---|---|---|
| Maximum LTV Ratio | 95 percent | 90 percent | 80 percent |
| Maximum TLTV Ratio | | | |
|     For Community Gold Mortgages other than Renovation Mortgages | 105 percent | 105 percent | 105 percent |
|     For Community Gold Expanding Markets Renovation Mortgages, if permitted | 120 percent | 120 percent | 120 percent |
| Minimum Down Payment or Equity | 5 percent | 10 percent | 20 percent |
| Minimum Borrower Contribution from Borrower Personal Funds | | | |
|     For Mortgaged Premises with a value of $80,000 or less: | The lesser of $1,000 or 2 percent of value | Same as 2-unit | Same as 2-unit |
|     For Mortgages Premises with a value greater than $80,000 | 2 percent of value | Same as 2-unit | Same as 2-unit |

6.   <u>Reserves</u>.  The Borrower must have reserves at least equal to following number of months of Mortgage payments of principal, interest, taxes and insurance:

| | |
|---|---|
| Mortgages secured by 2-unit Primary Residences | None |
| Mortgages secured by 3-unit and 4-unit Primary Residences | Two months |

7.   <u>Landlord's Education Program</u>.  In addition to the Comprehensive Homeownership Program required under the terms of the Community Gold Mortgages Attachment, for 2-Plus Unit Community Gold Mortgages, at least one Borrower whose income was used for qualification purposes must have participated in and completed a landlord education program prior to the closing on the mortgage financing.

Evidence that the Borrower completed a Landlord's Education Program must be maintained in the Mortgage file.

8. <u>Form 11 Instructions</u>.  Seller must complete the Mortgage Submission Schedule (Freddie Mac Form 11) as follows:

| Stable Monthly Income | For Mortgages underwritten by adding rental income to stable monthly income, use the stable monthly income with the addition of rental income. For Mortgages underwritten by deducting rental income from housing expense, use the stable monthly income without the addition of rental income. |
| --- | --- |
| Monthly Housing Expense | For Mortgages underwritten by deducting rental income from housing expense, use the monthly housing expense after deducting the allowable portion of anticipated gross rental income. |

9. <u>Special Characteristics Codes</u>.  In addition to the SCCs required under the Community Gold Mortgages Attachment and the Renovation Mortgages Attachment, if applicable, Seller must enter the following codes, if applicable, in the special characteristics code field of the Form 11.

| Mortgage underwritten by subtracting a percentage of monthly rental income from the monthly housing expenses | 528 |
| --- | --- |
| Mortgage underwritten by adding monthly rental income to stable monthly income | 530 |

**ATTACHMENT 9**
**1% Borrower Personal Funds Exhibit to Community Gold Mortgages Attachment**

The following special underwriting provisions apply to Community Gold Mortgages in lieu of or in addition to the provisions stated in the Community Gold Mortgages Attachment.

1.  <u>Minimum Borrower Contributions</u>.  Although the provisions of the Community Gold Mortgages Attachment provide otherwise, the Borrower must make a minimum Borrower Contribution of at least one percent of value from Borrower Personal Funds, provided that conditions below are satisfied.  After making the minimum Borrower Contribution from Borrower Personal Funds, the remaining down payment, Closing Costs, Financing Costs and Prepaid/Escrows may come from any sources allowed in the Community Gold Mortgages Attachment:

    (a)   the Community Gold Mortgage is secured by a 1-unit dwelling;

    (b)   in addition to the other SCCs required under the Community Gold Mortgages Attachment and the applicable Exhibits to that Attachment, Seller enters the following SCC on the Form 11:

    | Less than or equal to one percent Borrower Contribution | 803 |
    |---|---|

    (c)   the aggregate unpaid principal balance of Community Gold Mortgages with one percent Borrower Contributions delivered under the terms of this Master Agreement may not exceed $10 million.

**ATTACHMENT 10**
**Section 8 Mortgages Attachment**

This Attachment states the terms and conditions applicable to Affordable Gold Mortgages and Community Gold Mortgages originated to Borrowers who are participating in the HUD Section 8 Housing Choice Homeownership Program.

1.      <u>Definitions</u>.

A <u>Comprehensive Homeownership Counseling Program</u> is a homeownership education program approved by Freddie Mac or the Neighborhood Reinvestment Corporation.  The program must involve the Borrower in comprehensive pre-purchase through post-purchase education and counseling, including early financial and/or debt management and Early Delinquency Intervention.  The program must be provided in a one-on-one or classroom format.

<u>Early Delinquency Intervention</u> is post-purchase counseling that consists of the following:

(a)      the Borrower has given its written consent to the Servicer to release delinquency information to the counseling organization;

(b)      Servicer provides the counseling organization with a list of delinquent Borrowers;

(c)      if the Mortgage payment has not been received by the 16th day after the payment is due, the counseling organization counselor contacts the delinquent Borrower to determine the Borrower's current financial situation and the reason for the delinquency;

(d)      the counseling organization counselor analyzes the Borrower's financial situation and develops a plan of action for solving the delinquency situation which in most cases will be a budget worksheet or work-out plan giving priority to the Mortgage payment; and

(e)      the counseling organization counselor reviews the budget worksheet or workout plan with the delinquent Borrower.

The <u>First Mortgage Option</u> is the Section 8 Homeownership Program option that allows for a conventional first lien mortgage with either (i) no Section 8 Affordable Second and no other secondary financing; or (ii) if there is secondary financing, it is a Section 8 Affordable Second that does not bear interest and requires principal repayment only upon the sale or transfer of the property, the maturity of the Section 8 Mortgage or upon default of the Section 8 Affordable Second.  For this Option, the Section 8 Payment is sent directly to Seller, as Servicer, to be applied to the monthly payments on the Section 8 Mortgage.

The First Mortgage with Section 8 Affordable Second Option is the Section 8 Homeownership Program option that allows for a conventional first lien mortgage in an amount determined by the Borrower's qualifying ratios and has one or more Section 8 Affordable Second (but not any other type of secondary financing) that bears interest or requires principal repayment.  For this Option, the Section 8 Payment is applied to the payment of one of the Section 8 Affordable Second.

The Section 8 Affordable Second is an Affordable Second or, if applicable, a Community Affordable Second, with a maximum term that does not exceed the maximum term of the Section 8 Payment voucher.  That is, the term of the Section 8 Affordable Second cannot exceed 15 years.  The interest rate, if any, on the Section 8 Affordable Second must not exceed the interest rate on the first lien mortgage.

The Section 8 Agency is the local public housing authority or other government agency responsible for administering the HUD Section 8 housing subsidy program and the sponsor of the Section 8 Homeownership Program.

The Section 8 Homeownership Program is the Housing Choice Homeownership Program using HUD Section 8 Housing Assistance Payment vouchers offered by the Section 8 Agency to qualified subsidy voucher recipients to assist in the purchase of a home.

The Section 8 Homeownership Program must contain the following provisions:

(a)     Financing and underwriting terms, including down payment requirements, that comply with the requirements for Affordable Gold Mortgages or Community Gold Mortgages, as applicable.

(b)     A requirement that the Borrower participate in Comprehensive Homeownership Counseling, including Early Delinquency Intervention.

(c)     Requirements that the Section 8 Payments be made directly to a dedicated, limited access account established by Seller, as Servicer, or that the Section 8 Payment vouchers be provided to the Borrower to be combined with the Borrower's personal funds when making the Mortgage payment or, any other method mutually agreed upon in writing by Freddie Mac and the Seller/Servicer.

(d)     A policy that grants rental payment subsidies to a Borrower who defaults on a conventional Mortgage in the same manner as is provided for Borrowers who default on FHA-insured mortgages.

(e)     A policy that permits Borrowers to return to using rental payment subsidies if the Borrower determines that home ownership is not suitable.

A Section 8 Mortgage is a Home Mortgage that is originated in connection with a Section 8 Homeownership Program and that complies with the terms of this Attachment.

Section 8 Payments are housing assistance payments or vouchers provided by HUD to eligible individuals and families that HUD has agreed may be applied to the debt service payments on the Section 8 Mortgage or the Section 8 Affordable Second.

2.   Eligible Mortgages.  All Section 8 Mortgages must be 30-year, fixed-rate, purchase transaction Mortgages.  Section 8 Mortgages must be either Affordable Gold Mortgages or if Seller has the Community Gold Mortgages Attachment in its Master Agreement, Community Gold Mortgages.

Except as specifically provided otherwise in this Attachment, if the Section 8 Mortgage is an Affordable Gold Mortgage, the provisions of Chapter 34 of the Guide shall apply to the Section 8 Mortgage, but specially negotiated attachments and special underwriting provisions permitted under Seller's Master Agreement that are related to Affordable Gold Mortgages may not be used.

If the Section 8 Mortgage is a Community Gold Mortgage, the provisions of the Community Gold Mortgages Attachment shall apply to the Section 8 Mortgage, but none of the provisions of the Exhibits to the Community Gold Mortgages Attachment shall apply.

3.   Eligible Property.  All Section 8 Mortgages must be secured by a 1-unit Primary Residence other than a cooperative unit.  Except as provided in Section 22.17 of the Guide, any renovation, rehabilitation or repairs to the Mortgaged Premises must be completed by the Delivery Date.

4.   Eligible Borrowers.  All Borrowers must meet the federal eligibility criteria for the Section 8 Housing Choice Homeownership program and any additional eligibility requirements established by the Section 8 Agency.

5.   Qualifying Ratios.

(a)   First Mortgage Option.  Seller may either:

(i)   Deduct the amount of the monthly Section 8 Payment from the monthly housing expense to determine the adjusted monthly housing expense. Seller must use the adjusted monthly housing expense when calculating the Borrower's qualifying ratios; or

(ii)   Add the amount of the monthly Section 8 Payment, which may be grossed-up 25 percent, to Borrower's stable monthly income, calculated in accordance with Section 37.13 of the Guide, and use the adjusted stable monthly income when calculating the Borrower's qualifying ratios.

(b)    <u>First Mortgage with Section 8 Affordable Second Option</u>.  Seller may deduct the amount of the Section 8 Payment from the Section 8 Affordable Second payment to determine the adjusted monthly housing expense.  Seller must use the adjusted monthly housing expense when calculating the Borrower's qualifying ratios.

(c)    <u>Qualifying Ratio Limits</u>.  The monthly debt payment-to-income ratio using the adjusted monthly housing expense, or alternatively for the First Mortgage Option, the adjusted stable monthly income, must not exceed the limits stated for Affordable Gold Mortgages or Community Gold Mortgages, as applicable.

6.    <u>Source of Funds</u>.  For Section 8 Mortgages, the funds from the Family Self Sufficiency escrow account may be considered as Borrower Funds.

7.    <u>Borrower Homeownership Counseling</u>.  In addition to the homeownership counseling provided by the Section 8 Agency, the Borrower must participate in a Comprehensive Homeownership Counseling Program.  If the Section 8 Program or the Section 8 Agency requires post-purchase delinquency counseling, the Borrower must have given consent to the provision of delinquency information to the counseling program.

8.    <u>Form 11 Instructions</u>.  Seller must complete the Mortgage Submission Schedule (Freddie Mac Form 11) as follows:

| | |
|---|---|
| Stable Monthly Income | For Mortgages underwritten by adding the grossed-up Section 8 Payment to stable monthly income, use the stable monthly income with the addition of the grossed-up Section 8 Payment.<br>For Mortgages underwritten by deducting the Section 8 Payment from the housing expense, use the stable monthly income without the addition of the Section 8 Payment. |
| Monthly Housing Expense | For Mortgages underwritten by deducting the Section 8 Payment from housing expense, use the monthly housing expense after deducting the Section 8 Payment. |

9.    <u>Special Characteristics Codes</u>.  In addition to the SCCs required for Affordable Gold Mortgages and Community Gold Mortgages, as applicable, Seller must enter the following codes, if applicable, in one of the special characteristics code fields of the Form 11.

| | |
|---|---|
| Affordable housing initiative | 071 |
| Section 8 homeownership program | 592 |

10.    <u>Delivery Fees</u>.  The following postsettlement delivery fee indicated on Exhibit 19 of the Guide, will not be assessed and billed to Seller for Section 8 Mortgages:

- A-Minus Fee.

Freddie Mac reserves the right to assess this fee at the earlier of (i) 90-days notice to Seller, or (ii) at the time Seller enters into a new Master Agreement.

11.   <u>Delivery Limitations</u>.  The aggregate unpaid principal balance of Section 8 Mortgages delivered under the terms of this Master Agreement may not exceed $5 million.

Section 8 Mortgages that are Community Gold Mortgages must also be included in the delivery limits for Community Gold Mortgages.

**ATTACHMENT 11**
**Borrower Contribution of One Percent for Section 8 Mortgages Exhibit**

One Percent Minimum Borrower Contribution.  Although the provisions of the Section 8 Mortgages Attachment provide otherwise, for Section 8 Programs that permit a one percent Borrower Contribution, if the Section 8 Mortgage is a Community Gold Mortgage, the provisions of the Paragraph in the Special Underwriting Provisions Exhibit to the Community Gold Mortgages Attachment, allowing a one percent minimum Borrower Contribution, may be used with Section 8 Mortgages.

**ATTACHMENT 12**
**Mortgage Revenue Bond Mortgages**

This Attachment, including all exhibits and program descriptions, if any, states the terms and conditions under which Freddie Mac will purchase Mortgages originated in connection with one or more Mortgage Revenue Bond programs.  MRB Mortgages delivered pursuant to this Attachment are subject to the provisions of the Guide, as amended and supplemented by this Attachment and the other applicable Purchase Documents.

**Section I.      General Terms.**

1.      <u>Definitions</u>.  Terms used in this Attachment, including terms not capitalized, are defined or otherwise described in the Guide.

The <u>Agency</u> is the state or local housing finance agency or organization authorized to offer an MRB Program and to issue the Bonds.

The <u>Bond Documents</u> are, collectively, the documents generally titled the Origination Agreement and the Servicing Agreement together with any other documents entered into by Seller in connection with the Agency's MRB Program and that establish the terms and conditions for origination and servicing of the mortgages loans originated under the Agency's MRB Program.

<u>Bonds</u> or <u>MRBs</u> are tax exempt mortgage revenue obligations of an Agency.

<u>Homebuyer Assistance Funds</u>.  Homebuyer Assistance Funds, sometimes referred to as "premium financing", means funds provided by Seller and refunded to Seller through the sale or swap at a premium of a PC backed by an Affordable Gold MRB Mortgage with a premium mortgage interest rate.

<u>MRB Mortgages</u> are Mortgages originated in connection with an MRB Program and that comply with the terms of this Attachment.

An <u>MRB Program</u> is a mortgage lending program offered by an Agency and financed through the issuance of the Bonds.

2.      <u>Eligible Mortgages</u>.  MRB Mortgages must be 30-year single-family fixed-rate, purchase transaction Mortgages that are Mortgage Products described in the Guide (except for Balloon/Reset Mortgages, Prepayment Protection Mortgages, A-Minus Mortgages, Alt 97 Mortgages, Affordable Merit Rate Mortgages and Mortgages with Financed Permanent Buydowns), modified by any Special Underwriting Provisions applicable to the eligible Mortgage Products permitted under the terms of Seller's Master Agreement.

3.    <u>Nonstandard MRB Programs</u>.  Freddie Mac, in its sole discretion, may approve MRB Programs that use mortgage products and underwriting flexibilities that are different from the terms and conditions of this Attachment.  To initiate the review and approval of a nonstandard mortgage revenue bond program, Seller must submit a description of the program, including the Bond Documents, to Seller's Freddie Mac account representative.

If Freddie Mac approves the nonstandard mortgage revenue bond program, the approved special features and documentation will be stated in an exhibit to this Attachment titled "Program Description for Approved Nonstandard MRB Program".

4.    <u>Remittance Options</u>.  Buyups and Buydowns and Note-level Buyup and Buydown (as described in Section 11.11(b), (c) and (d), respectively, of the Guide), are not permitted with MRB Mortgages.

5.    <u>Compliance with MRB Program</u>.  Seller represents and warrants that the Borrower and the Mortgaged Premises qualify under the terms and conditions of the Agency's MRB Program, and that each MRB Mortgage complies with all the requirements of the Agency's MRB Program, including the terms and conditions stated in the Bond Documents, in effect on the Note Date of the MRB Mortgage.

Freddie Mac may exercise any of its rights under Sections 6.12 and 72.1 of the Guide, including its right to require Seller to repurchase the MRB Mortgage in the event that Freddie Mac receives notice from the Agency or from the trustee for the bondholders that Seller:

(a)    is in default under the Bond Documents; or
(b)    has sold an MRB Mortgage to Freddie Mac does not comply with the terms of the Agency's MRB Program or is otherwise defective within the meaning given in the Bond Documents.

## Section II.    Mortgage Instruments.

1.    <u>Note Addendum and Security Instrument Rider</u>.  The Borrower must execute a Note Addendum and a Security Instrument Rider each in the form substantially identical to the forms set forth as Exhibits to this Attachment.  Seller must obtain the consent of the Agency to use the attached Note Addendum and Security Instrument Rider forms in lieu of, or in addition to, comparable documents provided by the Agency and/or included in the Bond Documents.

**Section III.     Special Underwriting Provisions.**

1.     <u>Eligible Property</u>.  All MRB Mortgages must be secured by Primary Residences.

2.     <u>Calculation of Stable Monthly Income</u>.  For purposes of computing Borrower's monthly housing expense-to-income ratio and monthly debt payment-to-income ratio, Seller must compute the Borrower's stable monthly income in accordance with Section 37.13 of the Guide although the instructions on the calculation of "Household Income" provided in the Bond Documents may be different.

3.     <u>Borrower Income Limits</u>.  The Borrower must comply with the income eligibility requirements stated in the Bond Documents.  For Affordable Gold MRB Mortgages these income eligibility requirements apply in lieu of the income limits in Section 34.1(b) third bullet of the Guide.

4.     <u>No Use of Mortgage Credit Certificates</u>.  Borrowers are not entitled to use Mortgage Credit Certificates with an MRB Mortgage.

5.     <u>Sources of Funds for Down Payment and Closing Costs and Prepaid/Escrows</u>.

    (a)     <u>Use of Homebuyer Assistance Funds</u>.  If permitted under the terms of the specific MRB Program, Homebuyer Assistance Funds may be used for down payment and/or Closing Costs and Prepaids/Escrows with Affordable Gold MRB Mortgages only.

        The amount of down payment from Homebuyer Assistance Funds must not exceed two percent of value.  The total amount of Homebuyer Assistance Funds used as the source of the Borrower's down payment and/or Closing Costs and Prepaids/Escrows cannot exceed the lesser of five percent of value and the actual amount being used for down payment, Closing Costs and Prepaids/Escrows.

        Seller should consult its tax counsel to determine if the use of Homebuyer Assistance Funds for a portion of the down payment has federal income tax consequences to the Borrower.  Seller should provide appropriate disclosure to the Borrower of any federal income tax consequences and provide applicable Internal Revenue Service required reports.

(b)     Calculation of the Premium Mortgage Interest Rate.  For Affordable Gold MRB Mortgages with Homebuyer Assistance Funds, Seller represents and warrants that the premium mortgage interest rate is not greater than the weekly average interest rate for 30-year conventional single family fixed-rate mortgages established by the Freddie Mac Primary Mortgage Market Survey for the week ending immediately prior to pricing of the bond issue, or prior to any subsequent adjustment in the mortgage interest rate, plus 25 basis points.  The Freddie Mac Primary Mortgage Market Survey is available from the Corporate Communications (703-903-2446); the weekly average interest rate for 30-year conventional single family fixed-rate mortgages is also released by the Federal Reserve Board in Federal Reserve Board Release H.15(519).

## Section IV.     Servicing.

1.     Servicing Obligation.  Seller, as Servicer, shall service the MRB Mortgage in accordance with the Purchase Documents and the Bond Documents.

In the event that Freddie Mac receives notice from the Agency or the trustee for the bondholders that Servicer is in default under the Bond Documents or that a cause exists for termination of Seller pursuant to the Bond Documents, Freddie Mac may exercise any of its rights under Chapter 73 of the Guide.

2.     Servicing Assumable Mortgages.  Servicer warrants that notwithstanding any provision of the Note and Security Instrument to the contrary, in the event of a transfer of all or any part of the Mortgaged Premises, Seller shall not exercise or enforce its option to declare all of the sums due under the Note and secured by the Security Instrument to be immediately due and payable if (a) the Borrower causes to be submitted to Seller information required by Seller to evaluate the transferee as if a new loan were being made to the transferee; and (b) Seller reasonably determines that the noteholder's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in the Security Instrument is acceptable to Seller.

Servicer must follow the provisions of Chapter 60 of the Guide with respect to servicing transfers of ownership and assumption of the MRB Mortgages.

3.     Transfer of Servicing.  In addition to the conditions set forth in Chapter 56 of the Guide, when considering a request for approval of a Transfer of Servicing, Freddie Mac will require evidence that the transfer complies with the terms of the Bond Documents.

## Section V.     Delivery Terms and Restrictions.

1.     Delivery Date.  Seller must not deliver MRB Mortgages pursuant to this Attachment until Seller, the Agency and the trustee for the bondholders, have executed and delivered the Bond Documents for that particular series or issue of Bonds.

2.     <u>Use of PC's</u>.  Seller represents and warrants that all the PC's received by Seller in exchange for the MRB Mortgages purchased by Freddie Mac will be sold to the trustee for the bondholders to be used as collateral for the Bonds.

3.     <u>Type Delivery; Guarantor Conversion and Pooling Requirements for Assumable Mortgages</u>.  All MRB Mortgages must be delivered under the Guarantor Program only.

In addition to the pooling requirements applicable to fixed-rate Mortgages stated in Section 13.4 of the Guide, MRB Mortgages delivered pursuant to the provisions of this Attachment must be pooled separately and may not be combined with other 30-year conventional single family fixed-rate Mortgages.

Each MRB Mortgage PC Pool must be delivered pursuant to a separate Guarantor Program Conversion.

At the time Seller calls in a Guarantor Program Conversion of MRB Mortgages, Seller must inform the Commitment Operator that the Mortgages are Mortgage Revenue Bond Mortgages (assumable fixed-rate Mortgages) with a Guarantee Fee of 25 basis points.

Seller should direct the Commitment Operator to place these Mortgages in pools with the Offer Products set forth below:

| Type Mortgage | Offer Product |
|---|---|
| 30-year, SFFR Mortgages $1 Million Pool | 415 |
| 30-year, SFFR Mortgages $250,000 Pool | 455 |

4.     <u>Pool Size</u>.  Under Section 13.4(c), the minimum pool size for Guarantor pools with Offer Product number 455 (30-year, assumable SFFR Mortgages Pool) is $250,000.  However, if the aggregate unpaid principal balance of the final delivery of Mortgages with a specific interest rate or the final delivery of MRB Mortgages under a specific MRB Program does not meet the minimum of $250,000, the minimum pool size for the Offer Product 455 for that Mortgage delivery may be reduced to $100,000.

To initiate the delivery of a pool of less than $250,000, Seller must:

(a)     notify its Freddie Mac Affordable Lending Manager in the Expanding Markets Department at least 15 days in advance of delivery; and

(b)     after notification, direct the Commitment Operator to place the Mortgages in Offer Product 455/003.

5.    <u>Form 11 Instructions</u>.  Seller must follow the following instructions when completing the Mortgage Submission Schedule (the Freddie Mac Form 11):

| Monthly Income field | Use the Borrower's stable monthly income (not the income used to qualify the Borrower under the MRB Program) |
|---|---|

6.    <u>Special Characteristics Codes</u>.  Seller must enter the following codes in one of the special characteristics code fields of the Form 11:

| MRB Mortgage | 545 |
|---|---|
| Transfer of servicing restricted | 510 |

7.    <u>Delivery Fees</u>.  The following postsettlement delivery fee indicated on Exhibit 19 of the Guide, will not be assessed and billed to Seller for MRB Mortgages:

- A-Minus Fee.

Freddie Mac reserves the right to assess this fee at the earlier of (i) 90-days notice to Seller, or (ii) at the time Seller enters into a new Master Agreement.

EXHIBIT TO MORTGAGE REVENUE BOND MORTGAGES ATTACHMENT
*Note Addendum for Conventional Single Family Mortgage Revenue Bond Program*

## NOTE ADDENDUM
(Conventional Loans)

This Addendum is made this day of _____, 20__, and is incorporated into and shall be deemed to amend and supplement the Note, dated of even date (the "Note"), given by the undersigned ("Borrower") to _____ (together with its successors and assigns, the "Lender") and secured by Borrower's Mortgage, Deed of Trust or other Security Instrument (the "Security Instrument") covering the property described in the Security Instrument (the "Property") and located at:

_____
(property address)

Borrower shall pay to Lender all damages Lender sustains by reason of the breach of the covenants set forth in this Addendum.  The provisions of this Addendum shall prevail notwithstanding any contrary provisions in the Note or Security Instrument or any other instrument which evidences the obligations secured by the Security Instrument.

Borrower agrees that Lender, at any time and without prior notice, may declare an event of default under the Security Instrument and accelerate all payments due under the Security Instrument and the Note under the following terms and conditions:

1.  <u>Failure to Occupy</u>.  Borrower agrees that Lender may declare an event of default under the Security Instrument and accelerate all payments due under the Security Instrument and the Note if Borrower fails to occupy the Property without prior written consent of Lender.

2.  <u>Notice of Misrepresentation</u>.  Borrower understand that Lender has relied upon statements provided by the Borrower contained in the documents provided by Borrower in support of the loan application in the processing, financing and granting of this loan.

    Upon discovery of fraud or misrepresentation by Borrower with respect to any information provided by Borrower in the loan application or other documents executed in connection with the Note and Security Instrument, or if Borrower omits or misrepresents a fact that is material with respect to the provisions of Section 143 of Internal Revenue Code of 1986, as amended, in an application for the loan secured by the Security Instrument, Lender, in its sole discretion, by written notice to Borrower, may declare all obligations secured by the Security Instrument and all obligations payable under the Note immediately due and payable and exercise any other remedy allowed by law or provided by the Security Instrument.

Borrower shall notify Lender promptly in writing of any transaction or event which may give rise to such a right of acceleration. Borrower shall pay to Lender all damages sustained by reason of the breach of the covenant of notice set forth above or by reason of such fraud or misrepresentation.

3.   <u>Transfer of the Property or a Beneficial Interest in Borrower</u>.  If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums due on this Note.  However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Note.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in the Note or the Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in the Security Instrument.  Borrower will continue to be obligated under the Note and the Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums due on this Note.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Note or by the Security Instrument without further notice or demand on Borrower.

4.   <u>Restrictions on Transfer of Property</u>.  As long as the Security Instrument related to the Note is backing a FHLMC Certificate held by the Trustee for the mortgage revenue bonds issued by [INSERT NAME OF ISSUER] (the "Agency"), the unpaid principal balance of the Note may be declared immediately due and payable if all or part of the Property is sold or otherwise transferred by Borrower to a purchaser or other transferee:

   (a)   who cannot reasonably be expected to occupy the Property as a principal residence within a reasonable time after the sale or transfer, all as provided in Section 143(c) and (i)(2) of the Internal Revenue Code of 1986, as amended; or

   (b)   who has had a present ownership interest in a principal residence during any part of the three-year period ending on the date of the sale or transfer, all as provided in Section 143(d) and (i)(2) of the Internal Revenue Code of 1986, as amended (except that the words "100 percent" shall be substituted for the words "95 percent or more" where the latter appears in Section 143(d)(1); or

(c)     at an acquisition cost which is greater than 90 percent of the average area purchase price (greater than 110 percent for targeted area residences), all as provided in Section 143(e) and (i)(2) of the Internal Revenue Code of 1986, as amended; or

(d)     whose family income exceeds that established by the Agency pursuant to Section 143 of the Internal Revenue Code of 1986, as amended, in effect on the date of sale or transfer.

IN WITNESS WHEREOF, Borrower has executed this Addendum to the Note.

_____

_____ Borrower

_____

_____ Borrower

EXHIBIT TO MORTGAGE REVENUE BOND MORTGAGES ATTACHMENT
*Rider to Security Instrument*
*for Conventional Single Family Mortgage Revenue Bond Program*

## RIDER TO SECURITY INSTRUMENT
(Conventional Loans)

This Rider is made this day of _____, 20__, and is incorporated into and shall be deemed to amend and supplement the Mortgage,  Deed of Trust or other Security Instrument (the "Security Instrument") dated of even date, given by the undersigned ("Borrower") to secure Borrower's Note (the "Note") to _____ (together with its successors and assigns, the "Lender") and covering the property described in the Security Instrument (the "Property") and located at:

_____

(property address)

The provisions of this Rider shall prevail notwithstanding any contrary provisions in the Note, or Security Instrument, or any other instrument which evidences the obligations secured by the Security Instrument.

Borrower agrees that Lender, at any time and without prior notice, may declare an event of default under the Security Instrument and accelerate all payments due under the Security Instrument and the Note under the following terms and conditions:

1.   <u>Failure to Occupy</u>.  Borrower agrees that Lender may declare an event of default under the Security Instrument and accelerate all payments due under the Security Instrument and the Note if Borrower fails to occupy the Property without prior written consent of Lender.

2.   <u>Notice of Misrepresentation</u>.  Borrower understand that Lender has relied upon statements provided by the Borrower contained in the documents provided by Borrower in support of the loan application in the processing, financing and granting of this loan.

Upon discovery of fraud or misrepresentation by Borrower with respect to any information provided by Borrower in the loan application or other documents executed in connection with the Note and Security Instrument, or if Borrower omits or misrepresents a fact that is material with respect to the provisions of Section 143 of Internal Revenue Code of 1986, as amended, in an application for the loan secured by the Security Instrument, Lender, in its sole discretion, by written notice to Borrower, may declare all obligations secured by the Security Instrument and all obligations payable under the Note immediately due and payable and exercise any other remedy allowed by law or provided by the Security Instrument.

Borrower shall notify Lender promptly in writing of any transaction or event which may give rise to such a right of acceleration. Borrower shall pay to Lender all damages sustained by reason of the breach of the covenant of notice set forth above or by reason of such fraud or misrepresentation.

3.  **Transfer of the Property or a Beneficial Interest in Borrower**. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in the Note or the Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in the Security Instrument. Borrower will continue to be obligated under the Note and the Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Note or by the Security Instrument without further notice or demand on Borrower.

4.  **Restrictions on Transfer of Property**. As long as this Security Instrument related to the Note is backing a FHLMC Certificate held by the Trustee for the mortgage revenue bonds issued by [INSERT NAME OF ISSUER] (the "Agency"), the unpaid principal balance of the Note may be declared immediately due and payable if all or part of the Property is sold or otherwise transferred by Borrower to a purchaser or other transferee:

    (a)  who cannot reasonably be expected to occupy the Property as a principal residence within a reasonable time after the sale or transfer, all as provided in Section 143(c) and (i)(2) of the Internal Revenue Code of 1986, as amended; or

    (b)  who has had a present ownership interest in a principal residence during any part of the three-year period ending on the date of the sale or transfer, all as provided in Section 143(d) and (i)(2) of the Internal Revenue Code of 1986, as amended (except that the words "100 percent" shall be substituted for the words "95 percent or more" where the latter appears in Section 143(d)(1); or

(c)      at an acquisition cost which is greater than 90 percent of the average area purchase price (greater than 110 percent for targeted area residences), all as provided in Section 143(e) and (i)(2) of the Internal Revenue Code of 1986, as amended; or

(d)      whose family income exceeds that established by the Agency pursuant to Section 143 of the Internal Revenue Code of 1986, as amended, in effect on the date of sale or transfer.

IN WITNESS WHEREOF, Borrower has executed this Rider to Security Instrument.

_____

_____ Borrower

_____

_____ Borrower

**ATTACHMENT 13**
**Affordable Gold, Community Gold and other Affordable Housing**
**Mortgages - Builder Grants Attachment**

This Attachment describes the special underwriting requirements for Mortgages originated using financial assistance provided by the builder or developer in connection with the purchase of newly constructed homes.  Mortgages using Builder Grants are subject to the provisions of the Guide, as amended and supplemented by this Attachment and the other applicable Purchase Documents.

1.   <u>Definitions</u>.

A <u>Builder Grant</u> is a grant from the builder or developer of a newly constructed home to the purchaser of that home, that does not have to be repaid and is not secured by the Mortgaged Premises and that meets the requirements of Section 37.20(a) of the Guide. When used with eligible Mortgages in accordance with the terms of this Attachment, a Builder Grant will be considered An Agency Grant (as described in item 3 of Section 26.2 of the Guide).  A Builder Grant is a financing concession and must comply with the total value limitations stated in Section 25.3(b) of the Guide.

2.   <u>Mortgages with Builder Grants Eligible for Sale</u>.  Although the provisions of Sections 25.3 and 26.6 of the Guide provide otherwise, Freddie Mac will purchase eligible Mortgages originated using Builder Grants for all or a portion of the down payment (and except for Community Gold Mortgages, including that portion required to be from Borrower Funds), Closing Costs and Prepaid/Escrows, provided all the following conditions are satisfied:

(a)   <u>Eligible Mortgage Products</u>.  A Builder Grant can only be used with the following Mortgage Products and only if Seller is authorized under the Purchase Documents to deliver that Mortgage Product to Freddie Mac:

- Affordable Gold 3/2 Mortgages
- Affordable Gold 97 Mortgages
- Affordable Gold Alt 97 Mortgages
- Alt 97 Mortgages
- Community Gold Mortgages in accordance with the terms of the Community Gold Mortgages Attachment, subject to certain additional conditions described below.

All Mortgages originated using a Builder Grant must be purchase transaction Mortgages.

(b)   <u>Eligible Properties</u>.  A Builder Grant can be used only in connection with the purchase of a newly constructed home that is the Borrower's Primary Residence. The construction must be completed on or before the Delivery Date.

(c) <u>Limitation on Amount</u>.  The Builder Grant plus any other financing concessions, cannot exceed three percent of value.

(d) <u>Special Provisions for Community Gold Mortgages</u>.  When a Builder Grant is being used with a Community Gold Mortgage, the Borrower must make the required minimum Borrower Contribution from Borrower Personal Funds.  All the requirements for Community Gold Mortgages, including the Comprehensive Homeownership Counseling requirement, must be satisfied.

3. <u>Delivery Limitations</u>.  The aggregate unpaid principal balance of all Mortgages using Builder Grants delivered under this Attachment may not exceed $5 million.

4. <u>SCCs</u>.  In addition to the SCCs required by the other applicable Purchase Documents, Seller must enter the following SCCs, if applicable, in one of the special characteristics code fields:

| Mortgage using Builder Grant for down payment | 563 |
|---|---|

**ATTACHMENT 14**
**HOME WORKS! Mortgages Attachment**

This Attachment, including the exhibits, describes the terms under which Freddie Mac will purchase Affordable Gold Mortgages originated under the HOME WORKS!® affordable housing rehabilitation/renovation and financing program.  HOME WORKS! Mortgages delivered pursuant to this Attachment are subject to the provisions of the Guide and the other applicable Purchase Documents, including the Renovation Mortgages Attachment.

**Section I.     General Terms.**

1.     <u>Definitions</u>.  Terms used in this Attachment, including terms not capitalized, are defined or otherwise described in the Guide; certain capitalized terms are defined in the other Purchase Documents.

The <u>Agency Reserve Fund</u> is the fund established by the HOME WORKS! Agency under the terms of the Rehabilitation and Reserve Fund Agreement.

The <u>Agency Rehabilitation Second</u> is a Special Renovation Affordable Second that is provided by the HOME WORKS! Agency.

A <u>Comprehensive Homeownership Program</u> is a homeownership education program certified by Freddie Mac for use with each specific HOME WORKS! Program and that involves the Borrower in comprehensive prepurchase through postpurchase education and counseling, including early delinquency intervention, and is provided in a one-on-one or classroom format.

The <u>Escrow Accounts</u> are the special deposit accounts established and maintained by the HOME WORKS! Agency in which the Renovation Loan Proceeds (referred to in the Rehabilitation and Reserve Fund Agreement as the Rehabilitation Loan Proceeds) from the HOME WORKS! Mortgage, if any, and the Agency Rehabilitation Second are deposited.

The <u>HOME WORKS! Agency</u> is the state or local housing agency that is participating with Freddie Mac in the HOME WORKS! Program.

A <u>HOME WORKS! Mortgage</u> is an Affordable Gold 5, 3/2 or 97 Mortgage that is an Expanding Markets Renovation Mortgage originated pursuant to a HOME WORKS! Program.

The <u>HOME WORKS! Program</u> is the targeted housing rehabilitation/renovation and financing program developed by Freddie Mac to facilitate a State or local housing agency's use of its federal funds from the HOME Program, the CDBG Program or other available sources of funds to support housing rehabilitation and renovation in areas targeted by the HOME WORKS! Agency.

A <u>Nonindividual Borrower</u> is a nonprofit organization or governmental agency that meets the requirements of the Expanding Markets Nonindividual Borrower Attachment and that is the owner of the Mortgaged Premises during the Renovation Period and is the initial Borrower.

The <u>Rehabilitation and Reserve Fund Agreement</u> is the HOME WORKS! Rehabilitation and Reserve Fund Agreement between the HOME WORKS! Agency and Freddie Mac that describes the responsibilities of the HOME WORKS! Agency under the HOME WORKS! Program.

A <u>Renovation Default</u> occurs if the Renovation Completion Conditions are not satisfied on the date that is 12 months after the Note Date.

A <u>Sight Draft</u> is the form attached to this Attachment that gives direction to the depository institution holding the Agency Reserve Fund to pay to Seller the amount specified from the Agency Reserve Fund.

2. <u>Right to Amend and Terminate</u>.  Freddie Mac may amend, supplement, revise or terminate any of the provisions of this Attachment, in whole or in part, upon written notice to Seller during the term of Seller's Master Agreement.

3. <u>Eligible Mortgages</u>.  HOME WORKS! Mortgages eligible for sale are Affordable Gold 5, 3/2 and 97 Mortgages meeting the requirements of the Sections 34.1, 34.2, 34.3 and 34.4 of the Guide and the Renovation Mortgages Attachment, each as modified by this Attachment.

HOME WORKS! Mortgages must be either:  (i) purchase transaction Mortgages, or (ii) "no cash-out" refinance Mortgages (as defined in Section 24.5 of the Guide) with all the proceeds not used for Refinancing Costs used for rehabilitation/renovation.

4. <u>Eligible HOME WORKS! Programs</u>.  Eligible HOME WORKS! Programs are affordable housing financing and rehabilitation/renovation initiatives undertaken by a HOME WORKS! Agency that has agreed to collaborate with Freddie Mac.  The HOME WORKS! Program must be either (i) consistent with the terms of this Attachment, or (ii) approved by Freddie Mac and described in a program description exhibit attached to this Attachment.

5. <u>Agreement with HOME WORKS! Agency</u>.  Seller must not originate HOME WORKS! Mortgages until notified by Freddie Mac that the HOME WORKS! Agency and Freddie Mac have fully executed the Rehabilitation and Reserve Fund Agreement and the Agency Reserve Fund has been established.

6.     Origination Suspension; Termination.  Seller must not originate HOME WORKS! Mortgages after it receives notice from the HOME WORKS! Agency that the amount in the Agency Reserve Fund is below the required minimum amount until it receives notice from the Agency that the amount in the Agency Reserve Fund has been restored to the required minimum amount.

**Section II.     Eligible Borrowers; Borrower Loan Documents.**

1.     Nonindividual Borrowers Eligible.  HOME WORKS! Mortgages may be originated to an eligible Nonindividual Borrower.  HOME WORKS! Mortgages originated to a Nonindividual Borrower must be One-Time Assumable Mortgages with a Subsequent Owner-Occupancy Requirement and must comply with the terms of:  (i) the Expanding Markets Nonindividual Borrower and Investor Borrower Exhibit to the Renovation Mortgages Attachment, (ii) the Expanding Markets Nonindividual Borrower Attachment and (iii) the Expanding Markets One-Time Assumable Mortgages Attachment.

2.     Second Loan Documents.  The Borrower must execute the Agency Rehabilitation Second loan documents and any other documents required by the HOME WORKS! Agency.

**Section III.     Eligible Property.**

1.     Eligible Property.  All HOME WORKS! Mortgages, other than those originated to Nonindividual Borrowers, must be secured by one-unit Primary Residences located in certain targeted areas designated by the HOME WORKS! Agency and within the jurisdiction of the HOME WORKS! Agency; HOME WORKS! Mortgages originated to a Nonindividual Borrower must be secured by one-unit Investment Property.

**Section IV.     Credit Underwriting.**

1.     Non-Loan Prospector Mortgages.  Unless Freddie Mac notifies Seller otherwise, HOME WORKS! Mortgages must be Non-Loan Prospector Mortgages.

2.     Noncredit Payment References.  Although Section 37.4(b) of the Guide does not require it, if Seller uses Noncredit Payment References to document that at least one Borrower has the minimum number of payment references, the Borrower must participate in a Comprehensive Homeownership Program.

**Section V.     LTV and TLTV Ratios; Secondary Financing.**

1.     LTV Ratio; TLTV Ratio.  The maximum LTV ratio for HOME WORKS! Mortgages is the maximum LTV ratio for Affordable Gold 5, 3/2 or 97 Mortgages, as applicable.  The maximum TLTV ratio is stated in the Renovation Mortgages Attachment.

2.     Secondary Financing.  Each HOME WORKS! Mortgage must be originated in connection with an Agency Rehabilitation Second.

**Section VI.     Homeownership Education.**

1.    <u>Basic Homeownership Education Required</u>.  The Borrower must participate in homeownership education as required by Sections 34.1(h) and 34.4(f) of the Guide, as applicable.

2.    <u>Comprehensive Homeownership Program</u>.  Each Borrower whose income was used for qualification purposes that had a credit reputation underwritten using Noncredit Payment References must participate in a Comprehensive Homeownership Program.

3.    <u>Financing the Costs of the Comprehensive Homeownership Program</u>.

    (a)    <u>Conditions for Inclusion</u>.  The cost to the Borrower of participating in the Comprehensive Homeownership Program may be included in the loan amount of the HOME WORKS! Mortgage or included as a Closing Cost, provided all of the following are satisfied:

        (i)    Freddie Mac has approved the Comprehensive Homeownership Program as a progressive homebuyer education/counseling process the costs of which can be financed; and

        (ii)    the amount financed does not exceed two percent of value.

    (b)    <u>Borrower Disclosure</u>.  Seller must comply with all borrower disclosure requirements under all applicable law, including (without limitation) the Real Estate Settlement Procedures Act and the Truth-in-Lending Act.

**Section VII.   Renovation.**

1.    <u>Amount Limitations</u>.  Although the Renovation Mortgages Attachment provides otherwise, the Total Cost of Renovation (referred to in the Rehabilitation and Reserve Fund Agreement as Total Cost of Rehabilitation) must not exceed the Renovation Loan Proceeds.

The Total Cost of Renovation plus the cost of acquisition or refinancing of the property must not exceed 120 percent of the Renovation Value (referred to in the Rehabilitation and Reserve Fund Agreement as the Rehabilitation Value).

2.    <u>Property Inspection</u>.  Seller must obtain, and retain in the Mortgage file, a satisfactory comprehensive property inspection report on the Mortgaged Premises prior to the Origination Date of the HOME WORKS! Mortgage.  The property inspection report may be prepared by a representative of the HOME WORKS! Agency.

3.    <u>Deposit of Renovation Loan Proceeds</u>.  Although the Renovation Mortgages Attachment requires Seller to hold the Escrow Fund, under the terms of the Rehabilitation and Reserve Fund Agreement, the HOME WORKS! Agency is permitted to assume major responsibility for the Escrow Accounts.  The following provisions apply if the HOME WORKS! Agency assumes that responsibility:

   (a)    <u>PITI Reserve</u>.  Seller must establish an Escrow Account for the PITI Reserve, if any.  Seller must withdraw funds from the PITI Reserve to make monthly payments on the HOME WORKS! Mortgage.  Funds from the Escrow Account that serves as the PITI Reserve cannot be drawn for rehabilitation costs.

   (b)    <u>First Mortgage Escrow Account</u>.  The HOME WORKS! Agency will establish in a depository institution an Escrow Account for the Renovation Loan Proceeds from the HOME WORKS! Mortgage.

   Seller represents and warrants that the proceeds of the HOME WORKS! Mortgage have been fully disbursed to the Borrower and the Borrower has deposited the Renovation Loan Proceeds from the HOME WORKS! Mortgage in the Escrow Account.

   (c)    <u>Government Account</u>.  Prior to the closing on the HOME WORKS! Mortgage, Seller must verify that (i) the HOME WORKS! Agency has established a new project account for the rehabilitation/renovation of the Mortgaged Premises in the applicable federal or State accounting system, and (ii) that the HOME WORKS! Agency has committed funds to the Government Account from the applicable government rehabilitation/renovation loan program in the amount of the Renovation Loan Proceeds from the Agency Rehabilitation Second.

4.    <u>Completion of Renovation; Process in the Event Renovation is not Completed</u>.

   (a)    <u>HOME WORKS! Agency Completion Agreement</u>.  Under the terms of the Rehabilitation and Reserve Fund Agreement, the HOME WORKS! Agency is responsible for monitoring the rehabilitation/renovation work.  The HOME WORKS! Agency agrees that the rehabilitation or renovation will be completed and that it will issue a satisfactory completion certificate before the end of the Rehabilitation Period.

   (b)    <u>Agency Reserve Fund</u>.  The HOME WORKS! Rehabilitation and Reserve Fund Agreement provides for the HOME WORKS! Agency to establish an Agency Reserve Fund which may be used to:

      (i)    complete the rehabilitation/renovation in the event the Rehabilitation Loan Proceeds have been exhausted and the rehabilitation/renovation work has not been completed; or

(ii)    provide funds to Seller to repurchase the HOME WORKS! Mortgage in the event of a Renovation Default.

Seller is a third party beneficiary of these provisions in the Rehabilitation and Reserve Fund Agreement.

(c)    <u>Completion of Renovation; Notice of Renovation Default</u>.  Upon completion of the rehabilitation/renovation work, Seller must satisfy the Renovation Completion Conditions.

If Seller has actual knowledge that a Renovation Default has occurred, Seller should notify Freddie Mac to initiate a Mortgage repurchase.  Freddie Mac will issue a repurchase letter as soon as it has notice from any source that there is a Renovation Default.

(d)    <u>Repurchase Letter and Repurchase</u>.  The Freddie Mac repurchase letter notice will state the repurchase price calculated in accordance with Section 72.3 of the Guide.  Upon receipt of a Freddie Mac repurchase letter, Seller may issue a Sight Draft, together with a Certificate of Incumbency and Authorization, in the amount of the repurchase price plus all other costs and expenses expected to be incurred by Seller in connection with the repurchase and resale of the Mortgage to the HOME WORKS! Agency.

Seller should use the funds withdrawn from the Agency Reserve Fund to repurchase the HOME WORKS! Mortgage from Freddie Mac and upon repurchase, transfer the Mortgage to the HOME WORKS! Agency.

If Seller is unable to obtain funds from the Agency Reserve Fund, it should notify Freddie Mac in writing.  Seller may appeal any repurchase letter for a HOME WORKS! Mortgage in accordance with the provisions of Section 72.6 of the Guide.  The repurchase appeal will be granted by Freddie Mac if the basis for the appeal is Seller's inability to withdraw sufficient funds from the Agency Reserve Fund.

Seller must remit the repurchase funds or comply with the repurchase appeal requirements within 30 days of the date of Freddie Mac's repurchase letter.

## Section VIII.  Transfer of Servicing.

Transfers of Servicing on HOME WORKS! Mortgages is restricted under the terms of the Renovation Mortgages Attachment.

**Section IX.     Special Delivery Requirements.**

1.     <u>Delivery Amount Limitation</u>.  Freddie Mac will purchase HOME WORKS! Mortgages, including Mortgages originated to Nonindividual Borrowers with an aggregate unpaid principal balance not to exceed $5 million.

2.     <u>Form 11 Instructions and Special Characteristics Codes</u>.  Seller must follow the special delivery instructions in Section 17.13 of the Guide, the Renovation Mortgages Attachment, the Expanding Markets Nonindividual Borrower Attachment and the Expanding Markets One-Time Assumable Mortgages Attachment, when completing the Mortgage Submission Schedule (the Freddie Mac Form 11).

   In addition to the SCCs required under these Purchase Documents, Seller must use the SCC:

| HOME WORKS! Mortgage | 516 |
|---|---|

EXHIBIT TO HOME WORKS! MORTGAGES ATTACHMENT
*Sight Draft and Certificate of Incumbency and Authorization*

**Name of Depository:**
_____

**Street Address:**
_____

**City:** _____  **State, Zip Code:** _____

**Account No:** _____

**Date:** _____

**Time:** _____

**Payee:** Pay to the order of:  (check one)

☐ the *[Name of HOME WORKS! Agency]* (the depositor)
☐ Federal Home Loan Mortgage Corporation ("Freddie Mac")
☐ _____ ("Servicer")
   (Name of Mortgage Servicer for Freddie Mac)

**Amount:**  Pay the sum of $_____ or, if no sum certain is specified, the total balance held in the Account.

**Payment Instructions:**

If the depositor is the Payee:

*[Insert wire instructions for the HOME WORKS! Agency]*

If Freddie Mac is the Payee:

Pay by Fed wire to credit of the account of the Freddie Mac at Chase Manhattan Bank, New York, New York, ABA No. 021-0000-21, account no. 910-2-447498; reference Sight Draft and reference the *[Name of HOME WORKS! Agency]* and Seller/Servicer No. _____.

If the Servicer is the Payee:

*[Insert wire instructions for the Servicer]*

**Representations and Warranties:**

If the depositor is the Payee:

The depositor represents and warrants that additional funds are necessary to complete the rehabilitation work and the borrower is financially unable to provide additional funds. The depositor further represents and warrants that the depositor is not in default in its obligation to maintain the minimum balance required under its agreement with Freddie Mac.

If Freddie Mac is the Payee:

No representations and warranties are required from Freddie Mac.

If a Servicer is the Payee:

The Servicer represents and warrants that one or more of the following conditions exists:

(i)     additional funds are necessary to complete the rehabilitation work and the borrower is financially unable to provide additional funds, and/or

(ii)    the mortgage loan identified in the supporting documentation is in default because the rehabilitation was not completed within the specified rehabilitation period or documentation necessary to evidence the satisfactory completion of the rehabilitation has not been obtained and Freddie Mac has issued a repurchase letter to the Servicer.  The Servicer must attach to the Sight Draft the repurchase letter and an itemized list of expenses to support its demand.

Typed complete legal name of authorized officer, employee, agent or attorney of Payee

_____

By:_____
                    (Signature)


_____
            (Typed name and title of signatory)
Dated: _____

## Certificate of Incumbency and Authorization

_____[1] the _____[2] of the
_____ [3] ("Payee"), do hereby certify as follows:

      (1) _____[4] is an officer, employee, agent, representative or
attorney of the Payee.

      (2) _____[4] is authorized to present sight drafts on behalf of
the Payee to draw against any and all monies in a reserve fund held for the [Name of City] (the
"City") in a financial depository institution or in an account system maintained by the U.S.
Department of Housing and Urban Development for remittance to, or for the benefit of, Payee,
pursuant to the [Name of City] HOME WORKS! Rehabilitation and Reserve Fund Agreement.

      (3)  Appearing immediately below this sentence is a true and correct, specimen signature
of _____.[4]

                                             _____.[5]

IN WITNESS WHEREOF, I have hereunto set my hand as of this ___ day of _____,
_____[6]

By:                                      Typed name and title

_____      _____

---

[1] Type name of person executing Certificate.
[2] Type title of person executing Certificate.
[3] Type name of entity, e.g., Federal Home Loan Mortgage Corporation, [Name of City] or name of Servicer
[4] Type name of authorized person.
[5] Authorized person should write signature on this line.
[6] Type day, month, and year on which Certificate is executed.

**ATTACHMENT 15**
**Los Angeles HOME WORKS! Program**


This Exhibit states the special terms and conditions under which Freddie Mac will purchase HOME WORKS! Mortgages originated under the Los Angeles HOME WORKS! Initiative ("Los Angeles HOME WORKS! Mortgages").

1.　　　Eligible Mortgages.  All Los Angeles HOME WORKS! Mortgages must be HOME WORKS! Mortgages originated in connection with the Los Angeles HOME WORKS! Initiative developed by the Los Angeles Housing Department of the City of Los Angeles, California (the "City") and Freddie Mac and must comply with the terms of the HOME WORKS! Mortgages Attachment, as modified by this Exhibit.

2.　　　Reduced Down Payment.  Although the provisions of Sections 34.2 first literary paragraph, 34.3 first literary paragraph, and 34.4 first literary paragraph, of the Guide provide otherwise, the Borrower may make a minimum down payment from Borrower Funds in an amount less than that required by the applicable Guide provisions, but not less than one percent of value (a "reduced down payment"), provided that each Borrower whose income was used for qualification purposes participates in a Comprehensive Homeownership Program.

　　　Los Angeles HOME WORKS! Mortgages with a reduced down payment may not be Loan Prospector Mortgages.

3.　　　SCC Requirements.  In addition to the SCC's required for HOME WORKS! Mortgages, Seller must use the following SCC:

| Los Angeles HOME WORKS! Mortgage with a reduced down payment | 803 |
|---|---|

**ATTACHMENT 16**
**Affordable Gold 100 Mortgages Attachment**

This Attachment, including any exhibits, describes the terms on which Freddie Mac will purchase Affordable Gold Mortgages originated under a 100 percent loan-to-value mortgage financing program developed by the California Housing Loan Insurance Fund ("CaHLIF") and Freddie Mac.  Affordable Gold 100 Mortgages delivered pursuant to this Attachment are subject to the provisions of the Guide, as amended by this Attachment.

1.    <u>Definitions</u>.

  An <u>Affordable Gold 100 Mortgage</u> is an Affordable Gold Mortgage in which the LTV ratio is greater than 97 percent but does not exceed 100 percent and which meets the requirements of this Attachment.

  A <u>Comprehensive Homeownership Counseling Program</u> is a homeownership education program approved by Freddie Mac or the Neighborhood Reinvestment Corporation.  The program must involve the Borrower in comprehensive pre-purchase through post-purchase education and counseling, including early financial and/or debt management and delinquency intervention.  The program must be provided in a one-on-one or classroom format.

2.    <u>Right to Amend and Terminate</u>.  Freddie Mac may amend, supplement, revise or terminate any of the provisions of this Attachment, in whole or in part, upon 90 days written notice to Seller during the term of Seller's Master Agreement or mandatory Master Commitment Contract.

3.    <u>Eligible Mortgages; Property</u>.  Affordable Gold 100 Mortgages must be 30-year fixed-rate purchase transaction Affordable Gold Mortgage.

  All Affordable Gold 100 Mortgages must be secured by one-unit Primary Residences located in the State of California.

4.    <u>Borrower Income Limits</u>.  All Affordable Gold 100 Mortgages must be made to Borrowers whose stable monthly income converted to an annual basis does not exceed 140 percent of the Area Median Income for the MSA or the county in which the Mortgaged Premises are located.

  There is no income limit:

(a) if the Mortgaged Premises are located in a Concentrated Area; or

(b) for Borrowers who are sworn public safety employees if the Mortgage is secured by Mortgage Premises located in jurisdictions approved by the mortgage insurer and Freddie Mac.

5.      <u>Underwriting of Credit Reputation</u>.  Seller must obtain Credit Scores and select an Indicator Score following the recommended policies and procedures in Section 37.5(b), (c), (d) and (e) of the Guide.  The Indicator Score must be a FICO Bureau Score equal to or greater than 660.

Up to 25 percent of the aggregate unpaid principal balance of the Affordable Gold 100 Mortgages delivered by Seller under the terms of this Attachment and purchased by Freddie Mac may have either (i) an Indicator Score that is a FICO Bureau Score between 620 and 660, or (ii) be based on Nontraditional Credit References, provided the Mortgage insurer has approved the Mortgage.  Seller must maintain documentation of the Mortgage insurer approval in the Mortgage file.

6.      <u>Debt Ratios</u>.  Although Sections 34.1(e) and 37.16 of the Guide provide otherwise, for an occupying Borrower, the monthly debt payment-to-income ratio should not be greater than 41 percent of the Borrower's stable monthly income; the provisions of the last literary paragraph of Section 37.16 apply if the monthly debt payment-to-income exceeds 41 percent.

If there is a nonoccupying Borrower, Seller must comply with the provisions of Section 37.16 of the Guide.

7.      <u>Down Payment</u>.  There is no required down payment.  For Affordable Gold 100 Mortgages with an LTV ratio greater than 97 percent but less than 100 percent, the down payment must be from Borrower Funds.  Affordable Seconds may not be used for down payment.

8.      <u>Affordable Seconds</u>.  Affordable Seconds may be used for Closing Costs and Prepaids/Escrows, provided that, in addition to the criteria for Affordable Seconds in Section 25.1(g) of the Guide, the Affordable Second:

(a)      bears no interest and has no provisions for equity sharing; and
(b)      there is no monthly payment of principal; any principal that is not forgiven is deferred until the Mortgaged Premises are sold or transferred.

9.      <u>Reserves</u>.  The Borrower must have reserves equal to at least two monthly Mortgage payments of principal, interest, taxes and insurance.

10.    <u>Comprehensive Homeownership Counseling</u>.  Each Borrower must have completed or be enrolled in a Comprehensive Homeownership Counseling Program on the Note Date.

11.    <u>Mortgage Insurance</u>.  Affordable Gold 100 Mortgages must have Mortgage insurance with loss coverage equal to 55 percent provided by CaHLIF.

12.   <u>Form 11 Instructions</u>.  In addition to the requirements of Section 17.13(b) of the Guide, Seller must follow the following special instructions for Affordable Gold 100 Mortgages:

| MI Loss Coverage Percent field | Enter 055 for loss coverage percentage |
|---|---|
| SCCs | Enter 071 for affordable Mortgages<br>Enter 588 for Affordable Gold 100 Mortgages |

13.   <u>Type Delivery</u>.  All Affordable Gold 100 Mortgages must be delivered under the Guarantor Program or MultiLender Swap Program only.

14.   <u>Guarantee Fee; Conversions; Delivery Fees</u>.  At the time Seller calls in a Guarantor Program or MultiLender Swap Conversion of Affordable Gold 100 Mortgages, Seller should inform the Commitment Operator that the Guarantee Fee for Affordable Gold 100 Mortgages is 25 basis points.

For Guarantor Program deliveries, each Affordable Gold 100 Mortgage PC Pool must be delivered under a separate Master Commitment and pursuant to a separate Guarantor Program Conversion.

The following postsettlement delivery fee indicated on Exhibit 19 of the Guide, will not be assessed and billed to Seller for Affordable Gold 100 Mortgages:

- A-Minus Fee.

Freddie Mac reserves the right to assess this fee at the earlier of (i) 90-days notice to Seller, or (ii) at the time Seller enters into a new Master Agreement.

**ATTACHMENT 17**
**Countrywide Special Initiative Mortgages Attachment**

This Attachment, including the exhibits, if any, describes the terms under which Freddie Mac will purchase Special Initiative Mortgages, originated by Countrywide Home Loans, Inc. under its Optimum Loan Program.  Special Initiative Mortgages delivered pursuant to this Attachment are subject to the provisions of the Guide, as amended by this Attachment.  Unless specifically made applicable to Special Initiative Mortgages, special underwriting provisions and other special negotiated mortgage products described in Seller's Purchase Documents may not be used with Special Initiative Mortgages.

**Section I.        General Terms.**

1.       <u>Definitions</u>. Terms used in this Attachment, including terms not capitalized, are defined or otherwise described in the Guide.

An <u>Affordable Second</u> is subsidized secondary financing or other financial assistance that complies with the requirements in Guide Section 25.1(g) for Affordable Seconds or complies with any nonstandard Affordable Second program permitted under the terms of Seller's Purchase Documents.

The <u>Borrower Contribution</u> is the total amount contributed by the Borrower to the downpayment, Closing Costs, Financing Costs and Prepaid/Escrows.

<u>Borrower Personal Funds</u> are the following:

- Cash as described in Guide Section 26.2 other than gifts from a Related Person or gifts or grants from An Agency as described in Guide Section 26.2 items 2 and 3; and
- Other Equity as described in Guide Section 26.3.

<u>CLUES</u> is the term used for Seller's automated underwriting system.  CLUES interfaces with Fannie Mae's "Desktop Underwriting" (DU) automated underwriting system.

<u>Coops Units</u> or <u>Coops</u> are units in a Cooperative Project that meet the requirements of the Attachment to Seller's Master Agreement titled "Cooperative Share Mortgages Attachment" as modified by this Attachment.

<u>Essential Employees</u> are teachers, health care providers and public safety officers.

<u>Limited Use Funds</u> are:

- Financing concessions as described in Section Guide 25.3(b) meeting the applicable requirements of Guide Section 25.3; and
- Premium Financing meeting the requirements of the Glossary definition.

<u>Other Borrower Funds</u> are:

- Gifts from a Related Person that do not need to be repaid meeting the requirements of Guide Section 26.2 item 2 except that a downpayment of five percent from other sources or cash or other Equity is not required;
- Gifts or grants from An Agency meeting the requirements of Guide Section 26.2 item 3;
- Proceeds from an unsecured loan from An Agency meeting the requirements of Guide Section 34.1(c);
- Proceeds from an Affordable Second meeting the requirements of Guide Section 25.1(g) may be used to reduce the downpayment and as a source of funds for Closing Costs, Financing Costs and Prepaids/Escrows; no other secondary financing is permitted;
- Pooled funds as described in Guide Section 26.5; and
- Cash on hand meeting the requirements of Guide Section 34.1.

<u>Special Features</u> are one or more of the following:
- Rental income from a boarder for a 1-unit Primary Residence;
- Noncredit Payment References or other nontraditional credit;
- Cash on hand meeting the requirements of Guide Section 34.1(d);
- Funds pooled by a group of Related Persons meeting the requirements of Guide Section 26.4;
- Funds on deposit in a Community Savings System that are deposited by the Borrower as described in Guide Section 26.2 first paragraph item 9;
- Stated Secondary Income;
- Nonoccupying Borrowers;
- Coop Units; and
- Manually Underwriting for Mortgages with CLUES Refers underwriting status or no credit history.

<u>Special Initiative Mortgages</u> are Mortgages originated under Seller's Optimum affordable loan program designed to meet the housing finance needs of creditworthy Borrowers with special down payment, qualifying ratios and credit history flexibility.

<u>Stated Secondary Income</u> is income from a secondary source stated on the Residential Mortgage Loan Application that meets the requirements described in this Attachment. Stated Secondary Income may not be used with Special Initiative Mortgages secured by 2-unit, 3-unit or 4-unit Primary Residences.

2.  <u>Right to Amend and Terminate</u>.  Seller agrees that Freddie Mac may amend, supplement, revise or terminate any of the provisions of this Attachment, in whole or in part, including any of the Exhibits to this Attachment or any of the other Attachments referenced in this Attachment, upon 90 days prior written notice to Seller during the term of this Master Agreement.

3.    <u>Seller Eligibility</u>.  Seller must have either a Tier 1 or Tier 2 rating on its Servicer Performance Profile in both the investor reporting and remitting and default management categories to be eligible to originate Special Initiative Mortgages.  In the event Seller falls below a Tier 2 rating in either category, Freddie Mac, in its sole discretion, may require that Seller suspend origination of Special Initiative Mortgages until it has regained at least a Tier 2 rating.

4.    <u>Eligible Mortgages and Mortgage Characteristics</u>.

    (a)    <u>Mortgage Terms</u>.  Special Initiative Mortgages must be First Lien fully amortizing conventional whole Mortgage products as follows:

| | Secured by 1-unit and 2-unit Primary Residences | Secured by 3-unit and 4-unit Primary Residences |
|---|---|---|
| Type product | • fixed-rate Mortgages (other than Balloon/reset Mortgages); or<br>• 7/1, or 10/1 CMT- or LIBOR-Indexed ARMs | • fixed-rate Mortgages (other than Balloon/reset Mortgages); or |

    (b)    <u>Purpose of Mortgage</u>.  Special Initiative Mortgages must be either:

        (i)    a  purchase transaction Mortgage; or

        (ii)    a "no cash-out" refinance Mortgage; however, although the provisions of Guide Section 24.5 fourth bullet provide otherwise, the principal balance of the new refinance Mortgages does not exceed the unpaid principal balance of the Mortgages being refinanced  rounded up to the nearest $100.

Special Initiative Mortgages may not be Seasoned Mortgages or Initial Interest[SM] Mortgages.

    (c)    <u>No Buydowns Plans; No Prepayment Premiums</u>.  Although the provisions of Guide Section 25.4 provide otherwise, temporary subsidy buydowns plans are not permitted with Special Initiative Mortgages.

Special Initiative Mortgages may not be Prepayment Protection Mortgages, as described in Guide Chapter B33 or have any other type of prepayment penalty or premium.

    (d)    <u>Affordable Gold Mortgages Provisions Applicable</u>.  Except as modified by the terms in this Attachment, the provisions of Guide Section 34.1 relating to Affordable Gold Mortgages apply to Special Initiative Mortgages.

**Section II.      Eligible Property; Appraisal.**

1.    <u>Property Type</u>.  All Special Initiative Mortgages must be secured by a 1-unit to 4-unit Primary Residence or a Coop Unit.  Mortgages secured by Manufactured Homes are not eligible.  The underwriting requirements stated in this Attachment may differ depending on the number of units.

2.    <u>Appraisal Report</u>.  The appraisal report for the Mortgaged Premises must meet the requirements of Guide Chapter 44 for Non-Loan Prospector Mortgages.

**Section III.      Eligible Borrowers.**

1.    <u>Income Restrictions</u>.  The Borrower must satisfy the following income limits using the following income:

| Number of Units | Restrictions | Income Used |
|---|---|---|
| 1-unit Primary Residence | No income limits unless there are Special Features.<br><br>If there are Special Features, annual income may not exceed 120% of area median income, or the percentages for designated areas stated in Guide Section 34.1(b) third bullet; there is no income limit if the Mortgaged Premises are located in a Concentrated Area | All verified income and all Stated Secondary Income used to qualify the Borrower, if permitted, for all occupant and nonoccupying Borrowers |
| 2-unit to 4-unit Primary Residences | Annual income may not exceed: 100% of area median income for metropolitan areas; and 115% for nonmetropolitan areas; or the percentages for designated areas stated in Guide Section 34.1(b) third bullet There is no income limit if the Mortgaged Premises are located in a Concentrated Area | All verified income for occupant Borrowers; nonoccupying Borrower are not permitted. |

2.    <u>No Real Property Ownership Interests</u>.  The Borrower is not required to be a First-Time Homebuyer, however, except as provided in the following sentence, the Borrower must not have an ownership interest in any other real property other than the Mortgaged Premises on the Note Date of the Mortgage.  The Borrower may have an ownership interest in property owned with a Related Person, an ex-spouse or domestic partner or with other parties as a result of an inheritance, provided that the Borrower does not occupy this property and all provisions stated in Guide Section 37.17 related to disregarding contingent liabilities are met.

3.    <u>Nonoccupying Borrowers</u>.  Nonoccupying Borrowers are eligible with Mortgages secured by 1-unit Primary Residences provided that:

    (a)    each nonoccupying Borrower is a Related Person or, if not a Related Person, the Mortgage file contains documentation that establishes a relationship to the occupant Borrower other than through the Mortgage financing transaction;

    (b)    the income of the nonoccupying Borrower is included in the calculation for determining the annual income limit as described in Section III.1 above;

    (c)    rental income from a boarder for a 1-unit Primary Residence is not used in determining stable monthly income;

    (d)    Secondary Stated Income is not used in the calculation of stable monthly income; and

    (e)    the monthly debt payment-to-income ratio calculation and the other provisions stated in Section V.5 below related to the calculation of the monthly debt payment-to-income ratio are satisfied.

For Mortgages secured by 2-unit, 3-unit and 4-unit Primary Residences, all Borrowers must occupy the Mortgaged Premises as a Primary Residence; nonoccupying Borrowers are not eligible.

## IV.    **Credit History.**

1.    <u>CLUES Underwriting; Accept or Refer Rating; Alternatives</u>.  Except as noted below, Special Initiative Mortgages must be underwritten using CLUES.
A three-part merged credit report is required.

Mortgages receiving a CLUES/DU underwriting classification of Accept are eligible for purchase subject to the other applicable provisions of this Attachment.

Mortgages receiving a CLUES/DU underwriting classification of Refer must meet either:

    (a)    the Credit Score, debt ratio and reserve requirements stated in Section IV.2 below; or

    (b)    or for Mortgages secured by 1-unit Primary Residences, the alternative credit history provisions stated in section IV.3 below.

Borrowers with credit histories that have insufficient information to create a Credit Score or with credit histories that create a credit score less than the required minimum may qualify if the alternative conditions stated in Section IV.4 below are satisfied.

For Borrowers with no Credit Score (nontraditional credit):

- Mortgages without a Credit Score must be treated as a 620 Credit Score for underwriting purposes.
- If a non-permanent resident alien Borrower does not have enough credit references in the United States to satisfy the above, the same number of credit references from a foreign country may be used to achieve the requirements.
- Under no circumstances may a nontraditional credit report be used to offset derogatory credit.

2. <u>CLUES Underwriting; Refer Rating</u>. A CLUES/DU underwriting classification of Refer is acceptable provided that the Mortgage meets the following LTV Ratio, debt payment-to-income ratio, Credit Score and reserve requirements provided below:

| Maximum LTV Ratio | Maximum monthly debt payment-to-income ratio | Minimum Credit Score | Minimum Reserves |
|---|---|---|---|
| **1-unit Primary Residence without Stated Secondary Income** | | | |
| 97% if not Coop 90% if Coop | 41% | 600 | None |
| 100% if not Coop | 41% | 620 | None |
| 100% if not Coop 90% if Coop | 45% without rental income | 620 | 1 month |
| 100% if not Coop 90% if Coop | 45% without rental income | 680 | None |
| **1-unit Primary Residence with Stated Secondary Income** | | | |
| 97% if not Coop 90% if Coop | 40% | 600 | None |
| 100% if not Coop 90% if Coop | 40% | 620 | None |
| **1-unit Primary Residence with Nonoccupying Borrower Income** | | | |
| 97% if not Coop 90% if Coop | 55% Occupant Borrower 45% Combined occupant and non-occupying Borrower | 620 | None |
| **2-unit Primary Residence without Stated Secondary Income** | | | |
| 97% | 43% | 620 | 2 months |
| **3-unit and 4-unit Primary Residence without Stated Secondary Income** | | | |
| 95% | 43% | 660 | 2 months |

3.    <u>Underwriting Borrowers with a Refer Rating (1-unit Primary Residences) or Credit Score Less than the Minimum (2-unit to 4-unit Primary Residences)</u>.  For Special Initiative Mortgages:

- secured by 1-unit Primary Residences with a CLUES Refer rating; or
- secured by 2-unit Primary Residences with a Credit Score of less than 620; or
- secured by 3-unit and 4- unit Primary Residences with a Credit Score of less than 660.

The credit history must meet one of the following alternatives:

<u>Alternative 1 – Extenuating Circumstances</u>.

(a)    <u>Debt Ratio; Documentation</u>.  The total monthly debt payment-to-income ratio must be is no greater than 41 percent.

The Borrower's Credit Score must have been heavily influenced by credit deficiencies that were the result of documented extenuating circumstances (or when the derogatory information relates to a Chapter 13 bankruptcy, regardless of the reason) and the Borrower must have reestablished a positive credit history.

When a Borrower's previous credit history included a bankruptcy or foreclosure-related action, all of the accounts in the Borrower's credit report must be current as of the date of the mortgage application.

The Borrower's credit record under the reestablished credit history must include the following:

Proof that the extenuating circumstance:
- Was a nonrecurring event over which the applicant had no control
- Resulted in a sudden, significant and prolonged reduction in income or a catastrophic increase in financial obligations
- Has been resolved
- Is not likely to recur

The extenuating circumstance must be clearly and thoroughly documented. Examples of documentation that can be used to support extenuating circumstances include documents that confirm the event (such as a copy of insurance papers or claims settlements, property listing agreements, lease agreements, tax returns covering the periods prior to, during, and after loss of employment).

(b)     <u>Credit References</u>.  The Borrower must have a minimum of four credit references, with at least one of the references being a Tradeline and one of the references being housing related.  Housing-related references should cover the period following bankruptcy discharge, foreclosure, or deed in lieu and can be in the form of mortgage payments or rental payments.  Three of the four credit references (including any rental housing reference) must have been active in the past 24 months.

If the Borrower is an Essential Employee, an acceptable nontraditional credit report may contain only a 12-month rental history as long as there are no delinquencies.

(c)     <u>Installment Payments</u>.  The Borrower must have:
- no more than two installments or revolving debt payments that were 30 days past due in the last 24 months;
- no installment or revolving debt payments 60 or more days past due; and
- No housing debt payments past due.

(d)     <u>Bankruptcies; Foreclosures</u>.  The Borrower must have no new public records for bankruptcies, foreclosures, deeds-in-lieu, pre-foreclosure sales, unpaid judgments or collections.

<u>Alternative 2 – Insufficient Tradelines</u>.  If the Borrower has an insufficient Credit Score due to insufficient Tradelines, as documented by the credit report's reason codes, the credit will be considered acceptable provided the borrower has all of the following:

(a)     <u>Credit History</u>.
- A minimum credit history of four Tradelines at least two years old (including both installment and revolving accounts) but no more than nine accounts currently open (accounts closed six months or more at application are not counted).
- No history of bankruptcy, foreclosure, collections or judgments.
- No history of delinquency in housing debt.
- No delinquencies for revolving accounts in the last 12 months, and no more than 1 account was 1x30 days in the 12 months before that.
- No delinquencies for installment accounts in the last 24 months, and no more than 1 account that was 1x30 days delinquent in the 12 months before that.
- Outstanding revolving account balances representing no more than 50 percent of aggregate credit lines at application.  The account may not be paid off or paid down to qualify the Borrower.

(b)     <u>Income and Homebuyer Education</u>.  For Mortgages secured by 1-unit Primary Residences, the Borrower's income must meet the income restrictions stated in Section III.1 above and, if a first-time homebuyer, the homebuyer education requirements stated in Section VII.

4.  <u>Underwriting Borrowers with No Credit Score (Nontraditional Credit) 1-unit to 4-unit Primary Residences</u>.

    (a)  <u>Acceptable Nontraditional Credit Report</u>.  If the Borrower has no Credit Score due to no credit record with the repositories, an acceptable nontraditional credit report that contains all of the following will be acceptable:

- A minimum of three sources of nontraditional credit.  All sources must be at least one year old.
- Sources may include rental housing expense, utility payments, telephone service or cable television service.
- There may be no history of rental housing delinquency.
- The Borrower may have had one 30-day delinquency for any non-housing obligations; however, there may be no history of delinquencies on the remaining accounts.

    (b)  <u>Multiple Occupying Borrowers</u>.  For Mortgages secured by 1-unit Primary Residences, if there are multiple occupying Borrowers, and any of the occupying Borrowers has no Credit Score due to no credit record with the repositories, no credit analysis on those occupying Borrowers is required, as long as their combined income is not greater than 30 percent of the total qualifying income.

For Mortgages secured by 2-unit, 3-unit and 4-unit Primary Residences, if there are multiple occupying Borrowers, each occupying Borrower is required to have a nontraditional credit report.

**V.  Underwriting.**

1.  <u>Documentation</u>.  Special Initiative Mortgages must meet the documentation requirements in Guide Section 37.23, Standard Documentation requirements for Non-Loan Prospector Mortgages.

2.  <u>Stated Secondary Income</u>.  For Special Initiative Mortgages secured by 1-unit Primary Residences, Stated Secondary Income may be used as stable monthly income for computing the monthly debt payment-to-income ratio provided the following conditions are satisfied:

    (a)  the amount and source of the income from the secondary source must be included on the loan application;

    (b)  the Borrower must disclose the type of work, hours and rate of pay from the secondary source;

    (c)  the loan application shows that the Borrower has been on the same job or in the same occupation or has received the same type of income from non-employment source(s) for at least one year;

(d)     Seller reasonably expects the Stated Secondary Income to continue for at least the next three years.  If there is no evidence to the contrary, Seller should assume continuance of the income;

(e)     the Stated Secondary Income used to calculate the monthly debt payment-to-income ratio may not exceed the lesser of (i) $1200 or (ii) 25 percent of the Borrower's total stable monthly income;

(f)     the Stated Secondary Income is reasonable and due to its supplemental nature, the source and amount cannot be documented; if the income can be documented (i.e., a W-2 was issued), it may not be used as secondary stated income;

(g)     Stated Secondary Income may not used with rental income from a boarder for a 1-unit Primary Residence;

(h)     the monthly debt payment to income ratio when using both verified stable monthly income and Stated Secondary Income does not exceed 40 percent;

(i)     both verified stable monthly income and Stated Secondary Income must be counted in determining whether the Borrower income limits are satisfied;

(j)     Stated Secondary Income may not be used if there is a nonoccupying Borrower;

(k)     Stated Secondary Income may not be used to qualify a Borrower if a Borrower must demonstrate a re-established credit reputation after a bankruptcy, foreclosure or deed-in-lieu of foreclosure resulting from financial mismanagement; and

(l)     Mortgage insurance coverage of 35 percent loss coverage is required if the LTV ratio is greater than 90.01 percent up to and including 95 percent.

Stated Secondary Income may not be used with Special Initiative Mortgages secured by 2-unit, 3-unit and 4-unit Primary Residences; Mortgages secured by 2-unit, 3-unit and 4-unit Primary Residences must comply with the employment and income documentation requirement stated in Guide Section 37.23(a), except that provisions for Alternative Stated Income Mortgages in Section 37.23(a) Paragraph 2 do not apply.

3.     <u>Rental Income from Subject Property</u>.

(a)     <u>1-unit Primary Residence</u>.  Rental income from a boarder for a 1-unit Primary Residence may be included in stable monthly income in accordance with Guide Section 34.1(f) provided that:

(i)     Stated Secondary Income is not included in the total qualifying stable monthly income; and

       (ii)      rental income from a boarder for a 1-unit Primary Residence may not be used if there is a nonoccupying Borrower; and

       (iii)     the monthly debt payment-to-income ratio does not exceed 41 percent.

Although the provisions of Guide Section 34.1(f) provide otherwise, the source of the rental income does not have to be a Related Person provided the other requirements of Section 34.1(f) are satisfied.

(b)    <u>2-unit to 4-unit Primary Residences</u>.  Rental income from a 2-unit to 4-unit Primary Residence may be added to stable monthly income when computing the debt payment-to-income ratio, provided the following conditions are satisfied:

<u>Calculation of Monthly Income</u>.

When underwriting rental income from a 2-unit to 4-unit Primary Residence, Seller may use either:

       (i)       the following percent of either (A) the gross rental income from leases, or (B) the gross estimated rent from the appraisal report:

| | |
|---|---|
| 2-units: | 75 percent |
| 3- and 4-units: | 65 percent; <u>or</u> |

       (ii)      100 percent of either (A) the Monthly Operating Income from Form 998, or (B) the net rental income from Schedule E of the Borrower's federal income tax returns.

If net rental income is a negative number, it must be included as a liability for qualification purposes.

4.    <u>Qualifying Ratios</u>.  There is no maximum monthly housing expense-to-income ratio.  For Special Initiative Mortgages receiving a CLUES/DU Accept classification, the maximum monthly debt payment-to-income ratio is determined by the CLUES/DU underwriting system; for Mortgages receiving a Refer classification, the Mortgage must satisfy the requirements stated in Section IV.2 above.

Seller must show all income sources and amounts from each source and the qualifying ratios calculations on the Uniform Underwriting and Transmittal Summary, Form 1077, or an equivalent document.

**Section VI.    Minimum Indicator Score, Maximum LTV and TLTV Ratios, Down Payment, Reserves; Sources of Funds.**

1.    <u>Minimum Indicator Scores; Maximum LTV and TLTV Ratios; and Down Payment</u>.   The following minimum Indicator Scores, maximum LTV and TLTV ratios, Borrower Contribution and down payment requirements apply:

| Credit/Loan Terms | | | | |
|---|---|---|---|---|
| **CLUES/DU Evaluation Status and Minimum Indicator Score** | **Maximum LTV Ratio** | **Maximum TLTV Ratio** | **Borrower Contribution from Borrower Personal Funds** | **Down Payment** |
| **1-Unit Primary Residence (other than Coop Units)** | | | | |
| CLUES Accept or DU Approve/ Eligible <u>or</u><br><br>CLUES Refer or DU Refer <u>and</u> Credit Score 620 | 100 percent | 105 percent | Lesser of 1 percent of value and $500 | None required |
| CLUES Refer or DU Refer <u>and</u> Credit Score 600 or greater | 97 percent | 105 percent | Lesser of 1 percent of value and $500 | 3 percent |
| **Coop Units** | | | | |
| CLUES Accept or DU Approve/ Eligible <u>or</u><br><br>CLUES Refer or DU Refer <u>and</u> Credit Score 620 or greater | 90 percent | 90 percent | 3 percent | 10 percent |
| **2-Unit Primary Residence** | | | | |
| CLUES Accept or DU Approve/ Eligible <u>or</u><br><br>CLUES Refer or DU Refer <u>and</u> Credit Score 620 or greater (Credit Score may be less than 620 under conditions described in Section III.3 above) | 97 percent | 105 percent | 3 percent | 3 percent |

| 3-Unit and 4-Unit Primary Residence | | | | |
|---|---|---|---|---|
| CLUES Accept or DU Approve/ Eligible <u>or</u><br><br>CLUES Refer or DU Refer <u>and</u> Credit Score 660 or greater (Credit Score may be less than 660 under conditions described in Section III.3 above) | 95 percent | 105 percent | 3 percent | 5 percent |

Mortgages without a usable Credit Score should be treated as having a 620 Credit Score for purposes of this Attachment.

The maximum financing requirements in Guide Section 23.5 apply to the maximum LTV and TLTV ratios.

2.   <u>Source of Funds</u>.

(a)   The Borrower must make the following payments from the following sources of funds:

| Borrower Contribution | Borrower Personal Funds |
|---|---|
| Downpayment | Borrower Personal Funds<br>Borrower Other Funds |
| Closing Costs, Financing Costs, Prepaids/Escrows | Borrower Personal Funds<br>Borrower Other Funds<br>Limited Use Funds |

(b)   <u>Limits on financing concessions</u>.  Up to the following amounts from financing concessions are permitted pursuant to Guide Section 25.3(b):

<u>1-unit Primary Residence</u>:

| LTV ratio | Amount of financing concessions (expressed as a percent of value |
|---|---|
| Greater than 90% | 3 percent |
| Greater than 75% and less than or equal to 90% | 6 percent |
| Less than or equal to 75% | 9 percent |

<u>2-unit to 4-unit Primary Residences</u>:  In accordance with Guide Section 25.3(b)

Financing concessions may not exceed the actual costs for Closing Costs, Financing Costs and Prepaids/Escrows; and

3.    <u>Reserves</u>.  For Special Initiative Mortgages receiving a CLUES/DU Accept classification, the adequacy of the reserves is determined by the CLUES/DU underwriting system; for Mortgages receiving a Refer classification or with no credit history, the Mortgage must satisfy the requirements stated in Section IV.2 above.

**Section VII.   Homeownership Education.**

1.    <u>Homeownership Education</u>.  Homeownership education in accordance with the provisions of Guide Section 34.4(f) or House America telephone counseling, is required for the following Special Initiative Mortgages.

- Mortgages secured by 1-unit Primary Residence with one or more Special Features if the Borrower is a First-Time Homebuyer.
- Mortgages secured by 2-unit, 3-unit and 4-unit Primary Residences if the Borrower is a First-Time Homebuyer.

2.    <u>Landlord Training</u>.  For Mortgages secured by 2-unit to 4-unit Primary Residences, at least one Borrower whose income was used for qualification purposes must have participated in, and completed, a landlord counseling program prior to the closing on the mortgage financing.  The Mortgage file must contain a participation certificate documenting the Borrower's participation.

**Section VIII.  Mortgage Insurance.**

1.    <u>Mortgage Insurance</u>.  Special Initiative Mortgages must have Mortgage insurance with loss coverage as follows:

| LTV Ratio | 1-unit Primary Residence | 2-unit to 4-unit Primary Residences |
|---|---|---|
| Greater than 80% up to 85% | 25 percent | 25 percent |
| Greater than 85% up to 90% | 25 percent | 30 percent |
| Greater than 90% up to 95% | 30 percent | 35 percent |
| Greater than 90% up to 95% with Secondary Stated Income or nonoccupying Borrower income | 35 percent | Inapplicable |
| Greater than 95% up to 97% or 100%, as applicable | 35 percent | 35 percent |

Special Initiative Mortgages are not eligible for custom Mortgage insurance or reduced Mortgage insurance as described in Guide Section 27.1(b).

**Section IX.     Servicing.**

1.     <u>Servicing Eligibility Requirements</u>.  Servicer must have either a Tier 1 or Tier 2 rating on its Servicer Performance Profile in both the investor reporting and remitting and default management categories to be eligible to Service Special Initiative Mortgages.  In the event Servicer falls below a Tier 2 rating in either category, Freddie Mac, in its sole discretion, may require Servicer to complete a Subsequent Transfer of Servicing of Special Initiative Mortgages to a Servicer that has a Tier 1 or Tier 2 rating.  If Freddie Mac requires that all Mortgages Serviced by Servicer be transferred to a Tier 1 or Tier 2 Servicer, all Special Initiative Mortgages must be transferred as well.

2.     <u>Quality Control</u>.  Seller, as Servicer, must treat Special Initiative Mortgages as a Mortgage with high risk characteristics and include these Mortgages in its "full scope" representative sample for internal qualify control as more fully described in Guide Section 48.4.

3.     <u>Escrow Collection; Enhanced Servicing</u>.  Although the Fannie Mae/Freddie Mac Uniform Instruments permit the lender to waive the collection of Escrow, unless applicable law does not permit escrows, the Servicer may not waive the collection of Escrow and must collect one-twelfth of the yearly charge for Escrow with each monthly installment of principal and interest.

       Freddie Mac is assessing alternative and more extensive Mortgage servicing approaches for certain targeted Mortgages such as Special Initiative Mortgages.  Seller, as Servicer, agrees that it will comply with any enhanced servicing requirements upon 90 days written notice from Freddie Mac with respect to all Special Initiative Mortgages it is Servicing, regardless of the Delivery Date of the Mortgage.

**Section IX.     Special Delivery Requirements.**

1.     <u>Execution</u>.  Special Initiative Mortgages must be delivered under either the Fixed-rate Guarantor Program or the MultiLender Swap delivery for fixed-rate Mortgages or the WAC ARM Guarantor delivery program for ARMs.

2.     <u>Special Characteristics Codes</u>.  In addition to any SCCs required under the Purchase Documents, Seller must enter the following codes, if applicable, in the SCC field of the Form 11 or Form 13SF.  Because these forms contain limited fields, Freddie Mac suggests that Seller enter SCCs in the order stated below.

| Affordable housing initiative Mortgage | 071 |
| Countrywide Optimum Mortgage Program | E00 |
| Affordable (Secondary) Stated Income | 806 |
| Use of Noncredit Payment References | 532 |
| Restricted Transfer of Servicing | 510 |
| Mortgage with an Affordable Second | 583 |
| TLTV ratio greater than 100% | 535 |

3.      <u>Delivery Fees</u>.  Freddie Mac will assess and bill to Seller a postsettlement delivery fee in the amount indicated on the Delivery Fee Exhibit attached to Seller's Master Commitment.  Delivery fees are paid in accordance with the delivery fee provisions stated in Section 17.2 of the Guide.

The following postsettlement delivery fees indicated on Exhibit 19 of the Guide will not be assessed and billed to Seller for Special Initiative Mortgages:

- CS/LTV (A-Minus) (LP and non LP)
- A-Minus Alternative FICO Score

Freddie Mac reserves the right to assess one or more of these fees at the earlier of (i) 90-days notice to Seller, or (ii) at the time Seller enters into a new Master Commitment.

Freddie Mac will assess all other applicable postsettlement delivery fees.

**ATTACHMENT 18**
**5/1 ARMs with Minimum Servicing Spreads of 10 Basis Points**

Pursuant to the provisions of this Attachment, Seller may sell to Freddie Mac 5/1 ARMs with respect to which the amount of interest income retained by Servicer as compensation for servicing the ARMs is less than 25 basis points but is at least 10 basis points (the "10 basis points Minimum Servicing Spread").

1. <u>Eligible Products</u>. All ARMs with 10 basis points Minimum Servicing Spread must be:

   - Constant Maturity Treasury (CMT)-indexed nonconvertible and convertible 5/1 ARMs that comply with the provisions of the Guide; and
   - LIBOR-indexed nonconvertible and convertible 5/1 ARMs that comply with the provisions of the Guide.

   Such 5/1 ARMs with 10 basis points Minimum Servicing Spread are collectively referred to as the "Minimum Servicing ARMs".

2. <u>Ineligible Minimum Servicing ARMs</u>. Minimum Servicing ARMs that are Prepayment Premium Mortgages are not eligible for purchase under this Attachment.

3. <u>Eligible Delivery Programs</u>. Seller must sell the Minimum Servicing ARMs under the WAC ARM Guarantor Program pursuant to the provisions set forth in the Guide, as modified by this Attachment.

4. <u>Conversion and Delivery Instructions</u>. In connection with the conversion of Minimum Servicing ARMs, Seller must:

   (a)   provide the conversion operator with the applicable product and program codes set forth at Exhibit A attached hereto; and

   (b)   specify minimum coupon servicing spreads, minimum margin servicing spreads and minimum lifetime ceiling servicing spreads that (i) notwithstanding the provisions of Section 8.8.2 (b) of the Guide, are, for each Minimum Servicing ARM, the same value, and (ii) are less than 25 basis points and not less than 10 basis points.

   Minimum Servicing ARMs must be delivered separately from 5/1 ARMs that have the Minimum Servicing Spread amount specified by the Guide, and must be pooled separately in specified PC Pools, which will contain additional disclosure to the effect that the ARMs comprising the PC Pools have a Minimum Servicing Spread of 10 basis points.

   All CMT-indexed Minimum Servicing ARMs will be pooled in PC Pools with a prefix of 78; all LIBOR-indexed Minimum Servicing ARMs will be pooled in PC Pools with a prefix of 1B.

In the event Seller forward sells PC Pools comprising Minimum Servicing ARMs, Seller must notify the buyer of the particular PC Pool that the ARMs comprising the PC Pool have a Minimum Servicing Spread of 10 basis points.

5.    Variable Servicing.  Notwithstanding any provisions of the Guide or this Master Agreement to the contrary, variable servicing is not permitted with respect to any Minimum Servicing ARMs sold under this Attachment.

6.    Seller Eligibility Requirements.  Seller is eligible to sell Minimum Servicing ARMs to Freddie Mac under this Attachment only if:

(a)    at the time Seller sells Minimum Servicing ARMs to Freddie Mac and for so long as Seller services Minimum Servicing ARMs for Freddie Mac, Seller maintains a Tier rating of 1 or 2 in the Investor Reporting and Remitting category of the Servicer Performance Profile, and a Tier rating of 1, 2, "V" or "X" in the Default Management category; and

(b)    the Seller maintains a weighted average servicing spread for all Mortgages serviced by Seller for Freddie Mac of at least 25 basis points.

7.    Transfers of Servicing of Minimum Servicing ARMs.  In the event Seller transfers servicing of Minimum Servicing ARMs, the following provisions will apply:

(a)    Seller must notify Freddie Mac that the transfer will include Minimum Servicing ARMs;

(b)    when completing the Form 960 for Concurrent Transfers of Servicing, Seller must complete paragraph 2.a by checking the box "yes", and paragraph 2.b by checking the box "other" and inserting "5/1 ARMs with 10bp minimum servicing";

(c)    when completing the Form 981 for Subsequent Transfers of Servicing, Seller must complete paragraph 6 by checking the box "yes", checking the box "other" and inserting "5/1 ARMs with 10bp minimum servicing" in the space provided;

(d)    at the time of any Transfer of Servicing of Minimum Servicing ARMs, the transferee servicer must meet the requirements of paragraph 6 above; and

(e)    prior to the Transfer of Servicing, Seller must notify the transferee servicer that:

(i)    the transfer includes 5/1 ARMs with 10 basis points Minimum Servicing Spread;

(ii)    so long as transferee servicer services Minimum Servicing ARMs for Freddie Mac, transferee servicer must maintain:

- a Tier rating of 1 or 2 in the Investor Reporting and Remitting category of the Servicer Performance Profile, and a Tier rating of 1, 2, "V" or "X" in the Default Management category; and
- a weighted average servicing spread for all Mortgages serviced by transferee servicer for Freddie Mac of at least 25 basis points; and

(iii)   if transferee servicer subsequently transfers servicing of Minimum Servicing ARMs, the transferee servicer must comply with the provisions of 7(a), (c) and (d) above and must provide the subsequent transferee servicer with notice of the matters described in this subparagraph 7(e).

8.   <u>Right to Change or Terminate Terms</u>.  Freddie Mac may amend, supplement, revise or terminate, in whole or in part, any of the provisions of this Attachment including the other Attachments to this Master Agreement that are referenced herein, upon 60 days written notice to Seller during the term of this Master Agreement.

**EXHIBIT A**
Product and Program Codes for
5/1 ARMs with 10 bps Minimum Servicing Spread

| Description of ARM<br>(See Note below for description of information in parentheses) | Applicable Product/Program Codes |
|---|---|
| | |
| 5/1 CMT-indexed ARMs (2/2/5 and 2/2/6) | 194-022 |
| 5/1 CMT-indexed convertible ARMs (2/2/5 and 2/2/6) | 256-022 |
| 5/1 CMT-indexed ARMs (5-2-5) | 811-007 |
| 5/1 CMT-indexed convertible ARMs (5-2-5) | 812-007 |
| 5/1 LIBOR-indexed ARMs (2-2-5 and 2/2/6) | 716-007 |
| 5/1 LIBOR-indexed convertible ARMs (2-2-5 and 2/2/6) | 732-007 |
| 5/1 LIBOR-indexed ARMs (3-2-6) | 723-007 |
| 5/1 LIBOR-indexed convertible ARMs (3-2-6) | 733-007 |
| 5/1 LIBOR-indexed ARMs (5-2-5) | 717-007 |
| 5/1 LIBOR-indexed convertible ARMs (5-2-5) | 734-007 |

Note:   The numeric code in parenthesis represents the Initial Cap/Periodic Cap/Life Cap of the ARM.

## ATTACHMENT 19
## LIBOR ARMs with Nonstandard Lookbacks

Under the terms of this Agreement, Seller may deliver nonconvertible 1-Year LIBOR-indexed ARMs with the nonstandard Lookback Periods, which ARMs are (i) documented by mortgage instruments other than the Uniform Instruments specified in Section 30.12 of the Guide and/or (ii) are not currently mortgage products eligible for purchase under the Guide, provided such ARMs otherwise satisfy the requirements of the Guide ("Nonstandard ARMs").

A.    General Requirements.  The general terms and conditions under which Seller may sell Nonstandard ARMs to Freddie Mac in exchange for WAC ARM PCs are as follows:

   1.    Attached hereto is Exhibit 17 – Addenda titled *Offer Product and Offer Program Numbers for ARMs Eligible under the WAC ARM Guarantor Program*, which supplements Exhibit 17 of the Guide.  Nonstandard ARMs delivered by Seller must have the loan characteristics and comply with the requirements of Exhibit 17 - Addenda.

   2.    Except as otherwise specified in this Attachment, Nonstandard ARMs must be underwritten and originated in accordance with the terms and conditions applicable to ARMs set forth in the Guide and this Agreement.

   3.    Except as otherwise specified in this Attachment, Nonstandard ARMs must be sold to Freddie Mac in accordance with the terms and conditions governing the sale of ARMs to Freddie Mac in exchange for WAC ARM PCs specified in the Guide and this Agreement.

   4.    Seller must make specimens of the mortgage instruments relating to the Nonstandard ARMs, such as the Note and Security Instrument and any riders and/or addenda to the Note and Security Instrument (collectively, the "Nonstandard Instruments") available to Freddie Mac upon request.  Seller must review the Nonstandard Instruments and, based on such a review and upon such further inquiry and review as Seller deems necessary or appropriate, Seller makes the warranties and representations set forth in the following paragraphs.

B.    Warranties relating to Nonstandard Instruments.  Seller makes the following representations and warranties about the Nonstandard Instruments:

1.    The Nonstandard ARMs were originated on the Note and Rider forms that are identified at Exhibit 17 - Addenda, and on a Security Instrument form that is the applicable jurisdiction's Fannie Mae/ Freddie Mac Uniform Instrument in effect as of the Note Date.

2.    Regardless of whether the Nonstandard ARMs are originated on the Freddie Mac loan instruments or Fannie Mae loan instruments, the following change must be made in first paragraph, third sentence in the Note Paragraph 4(B) and in the Rider Paragraph A. 4(B):

The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

3.    The Nonstandard Instruments, including the assumability provisions, allow for servicing in full compliance with the Guide and applicable law.

C.    <u>Delivery and Pooling Requirements</u>.  All Nonstandard ARMs must be delivered under the WAC ARM Guarantor program only.  The offer product/program numbers and the index source codes for the Nonstandard ARMs are as set forth in Exhibit 17 - Addenda.  The Nonstandard ARMs must be pooled in the manner described in Chapter A13 of the Guide for ARMs delivered under the WAC ARM Guarantor program.

D.    <u>Additional Disclosure</u>.  Seller must prepare and distribute an Additional Supplement as described in Section 11.20 of the Guide for any PC Pool comprising the Nonstandard ARMs identified in Exhibit 17 – Addenda.  The Additional Supplement forms applicable to each Nonstandard ARM are attached at the following exhibits:

| Mortgage Product | Exhibit No. |
| --- | --- |
| 3/1 ARMs Assumable After Initial Period | Exhibit A |
| 3/1 Prepayment Protection ARMs Assumable After Initial Period | Exhibit B |
| Prepayment Protection ARMs | Exhibit C |

**Exhibit 17 – Addenda**
**Eligible Nonstandard ARM Programs under the WAC ARM Guarantor Program - Offer Product and Offer Program Numbers**

| Offer Product Number | Offer Program Number | ARM Product | Index Description | ARM Index Source Code | Lookback Period | Initial Period (months) | Subsequent Adjustment period (months) | Initial Cap % | Periodic Cap % | Life Cap % # | Assumability | WAC ARM PC Prefix | Additional Supplement Required (Yes or No) | Note and Rider- | Note and Rider -Fannie Mae Form |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 715 | 004 | 3/1 | 1-Year LIBOR | 41a | First Business Day of the month immediately preceding the month in which the Interest Change Date occurs | 36 | 12 | 2 | 2 | 6 | After initial period | 1B | Yes (Form at Exhibit A) | | Form 3528 and 3187 |
| 715 | 005 | 3/1 | 1-Year LIBOR | 41a | First Business Day of the month immediately preceding the month in which the Interest Change Date occurs | 36 | 12 | 2 | 2 | 6 | After initial period | 1B | Yes (Form at Exhibit B) | | Form 3528 and 3187 |
| 842 | 003 | 3/1 | 1-Year LIBOR | 41a | First Business Day of the month immediately preceding the month in which the Interest Change Date occurs | 36 | 12 | 2 | 2 | 6 | After initial period | 1G | Yes (Form at Exhibit A) | | Form 3528 and 3187 |
| 842 | 004 | 3/1 | 1-Year LIBOR | 41b | 45 day lookback | 36 | 12 | 2 | 2 | 6 | After initial period | 1G | Yes (Form at Exhibit A) | | Form 3526 and 3189 |
| 716 | 006 | 5/1 | 1-Year LIBOR | 41a | First Business Day of the month immediately preceding the month in which the Interest Change Date occurs | 60 | 12 | 2 | 2 | 6 | After Initial Period | 1B | No | Form 5531 and 5131 | Form 3528 and 3187 |

| Offer Product Number | Offer Program Number | ARM Product | Index Description | ARM Index Source Code | Lookback Period | Initial Period (months) | Subsequent Adjustment period (months) | Initial Cap % | Periodic Cap % | Life Cap % # | Assumability | WAC ARM PC Prefix | Additional Supplement Required (Yes or No) | Note and Rider- | Note and Rider -Fannie Mae Form |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 717 | 004 | 5/1 | 1-Year LIBOR | 41a | First Business Day of the month immediately preceding the month in which the Interest Change Date occurs | 60 | 12 | 5 | 2 | 6 | After fist adjustment | 1B | No | | Form 3528 and 3187 |
| 717 | 010 | 5/1 | 1-Year LIBOR | 41a | First Business Day of the month immediately preceding the month in which the Interest Change Date occurs | 60 | 12 | 5 | 2 | 6 | After first adjustment | 1B | Yes (Form at Exhibit C) | | Form 3528 and 3187 |
| 718 | 004 | 7/1 | 1-Year LIBOR | 41a | First Business Day of the month immediately preceding the month in which the Interest Change Date occurs | 84 | 12 | 5 | 2 | 6 | After first adjustment | 1B | No | | Form 3528 and 3187 |
| 718 | 007 | 7/1 | 1-Year LIBOR | 41a | First Business Day of the month immediately preceding the month in which the Interest Change Date occurs | 84 | 12 | 5 | 2 | 6 | After first adjustment | 1B | Yes (Form at Exhibit C) | | Form 3528 and 3187 |
| 719 | 004 | 10/1 | 1-Year LIBOR | 41a | First Business Day of the month immediately preceding the month in which the Interest Change Date occurs | 120 | 12 | 5 | 2 | 6 | After first adjustment | 1B | No | | Form 3528 and 3187 |
| 719 | 007 | 10/1 | 1-Year LIBOR | 41a | First Business Day of the month immediately preceding the month in which the Interest Change Date occurs | 120 | 12 | 5 | 2 | 6 | After first adjustment | 1B | Yes (Form at Exhibit C) | | Form 3528 and 3187 |

**Legend:** Life Cap may be less than or equal to 6%

**Exhibit A**

**Additional Supplement for Mortgage Participation Certificates (PCs)**
**3/1 ARMs that are Assumable After Initial Period**

The following prototype Additional Supplement form is not a final document; it must be reviewed carefully and completed by the Seller. All the fields enclosed by brackets are required to be completed.

To complete the Additional Supplement for 3/1 ARMs that are Assumable After Initial Period, insert the Settlement Date in the field titled "*Additional Supplement dated ___*", and insert the PC Pool and CUSIP numbers of the PC Pool, as well as Seller's name in the appropriate fields.

**Freddie Mac**
**Additional Supplement for Mortgage Participation Certificates (PCs)**
**3/1 ARMs Assumable After Initial Period**

**ADDITIONAL SUPPLEMENT dated [          ], 200[        ]**

**PC Pool Number:** [        ]                    **Seller Name:** Countrywide Home Loans, Inc.

**CUSIP Number:** [      ]                          4500 Park Granada
                                                   Calabasas, CA  91302

This Additional Supplement describes certain characteristics of the PCs and/or the Mortgages comprising the PC Pool that are not contained in the information and characteristics set forth in our Offering Circular for Mortgage Participation Certificates dated July 1, 2004, as is may be supplemented from time to time ("PC Offering Circular") or the related Pool Supplement. This information is as of the PC issue date and supplements the information in the related Pool Supplement.  Information and representations in this Additional Supplement about the seller and the Mortgages are the information and representations only of the seller of the Mortgages; we make no representations or warranties concerning the accuracy or completeness of the information contained herein. You should purchase the PCs only after reading this Additional Supplement, the Pool Supplement and the PC Offering Circular.  Capitalized terms used in this Additional Supplement (other than capitalized terms that are defined in this document) have the same meanings as in the PC Offering Circular.  The Additional Supplement incorporates by reference the PC Offering Circular and the related Pool Supplement.

We guarantee the payment of interest and principal on the PCs as described in the PC Offering Circular.  Principal and interest payments on the PCs are not guaranteed by and are not debts or obligations of the United States or any federal agency or instrumentality other than Freddie Mac. The PCs are not tax-exempt securities.  Because of applicable securities law exemptions, Freddie Mac has not registered the PCs with any federal or state securities commission.  No securities commission has reviewed this Additional Supplement.

## MORTGAGES -- Special Mortgage Characteristics

### *Assumability*

The ARMs in this PC pool are assumable after the initial period.

**Exhibit B**

**Additional Supplement for Mortgage Participation Certificates (PCs)**
**3/1 Prepayment Protection ARMs that are Assumable After Initial Period**

The following prototype Additional Supplement form is not a final document; it must be reviewed carefully and completed by the Seller. All the fields enclosed by brackets are required to be completed.

To complete the Additional Supplement for 3/1 Prepayment Protection ARMs that are Assumable After Initial Period, insert the Settlement Date in the field titled "*Additional Supplement dated ___*", and insert the PC Pool and CUSIP numbers of the PC Pool, as well as Seller's name in the appropriate fields.

At the bottom of the form in the paragraph titled "*Mortgages – Special Mortgage Characteristics*", provide a description of the prepayment premium and prepayment premium period of the Prepayment Protection ARMs comprising the PC Pool.

The following are examples of prepayment premium and prepayment premium period descriptions.  Please use one of these descriptions if it is accurate or draft an accurate description using the examples below as a model.

- Two percent on prepaid amounts aggregating more than twenty percent of the original principal balance during the first three years of the mortgage term

- Six months' interest on prepaid amounts aggregating more than twenty percent of the original principal balance during the first five years of the mortgage term

- Six months' interest on prepaid amounts during the first year of the mortgage term

- Three percent of the prepaid amounts during the first year of the mortgage term and one percent of any prepaid amounts during the second and third years of the mortgage term

- Three percent of the outstanding principal balance on prepaid amounts during the first year, two percent during the second year, and one percent during the third year of the mortgage term

- Three percent of the original loan amount on prepaid amounts during first three years of the mortgage term

**Freddie Mac**
**Additional Supplement for Mortgage Participation Certificates (PCs)**
**3/1 Prepayment Protection ARMs Assumable After Initial Period**

**ADDITIONAL SUPPLEMENT dated [          ], 200[       ]**

**PC Pool Number:** [        ]          **Seller Name:** Countrywide Home Loans, Inc.

**CUSIP Number:** [        ]          4500 Park Granada
                                      Calabasas, CA  91302

This Additional Supplement describes certain characteristics of the PCs and/or the Mortgages comprising the PC Pool that are not contained in the information and characteristics set forth in our Offering Circular for Mortgage Participation Certificates dated July 1, 2004, as is may be supplemented from time to time ("PC Offering Circular") or the related Pool Supplement. This information is as of the PC issue date and supplements the information in the related Pool Supplement.  Information and representations in this Additional Supplement about the seller and the Mortgages are the information and representations only of the seller of the Mortgages; we make no representations or warranties concerning the accuracy or completeness of the information contained herein. You should purchase the PCs only after reading this Additional Supplement, the Pool Supplement and the PC Offering Circular.  Capitalized terms used in this Additional Supplement (other than capitalized terms that are defined in this document) have the same meanings as in the PC Offering Circular.  The Additional Supplement incorporates by reference the PC Offering Circular and the related Pool Supplement.

We guarantee the payment of interest and principal on the PCs as described in the PC Offering Circular.  Principal and interest payments on the PCs are not guaranteed by and are not debts or obligations of the United States or any federal agency or instrumentality other than Freddie Mac. The PCs are not tax-exempt securities.  Because of applicable securities law exemptions, Freddie Mac has not registered the PCs with any federal or state securities commission.  No securities commission has reviewed this Additional Supplement.

**MORTGAGES -- Special Mortgage Characteristics**

***Prepayment Premium & Prepayment Premium Period Description***

[Insert Description]

***Assumability***

The ARMs in this PC pool are assumable after the initial period.

**Exhibit C**

**Additional Supplement for Mortgage Participation Certificates (PCs)**
**Prepayment Protection ARMs**

The following prototype Additional Supplement form is not a final document; it must be reviewed carefully and completed by the Seller. All the fields enclosed by brackets are required to be completed.

To complete the Additional Supplement for Prepayment Protection ARMs, insert the Settlement Date in the field titled "*Additional Supplement dated ___*", and insert the PC Pool and CUSIP numbers of the PC Pool, as well as Seller's name in the appropriate fields.

At the bottom of the form in the paragraph titled "*Mortgages – Special Mortgage Characteristics*", provide a description of the prepayment premium and prepayment premium period of the Prepayment Protection ARMs comprising the PC Pool.

The following are examples of prepayment premium and prepayment premium period descriptions.  Please use one of these descriptions if it is accurate or draft an accurate description using the examples below as a model.

- Two percent on prepaid amounts aggregating more than twenty percent of the original principal balance during the first three years of the mortgage term

- Six months' interest on prepaid amounts aggregating more than twenty percent of the original principal balance during the first five years of the mortgage term

- Six months' interest on prepaid amounts during the first year of the mortgage term

- Three percent of the prepaid amounts during the first year of the mortgage term and one percent of any prepaid amounts during the second and third years of the mortgage term

- Three percent of the outstanding principal balance on prepaid amounts during the first year, two percent during the second year, and one percent during the third year of the mortgage term

- Three percent of the original loan amount on prepaid amounts during first three years of the mortgage term

**Freddie Mac**
**Additional Supplement for Mortgage Participation Certificates (PCs)**
**Prepayment Protection ARMs**

**ADDITIONAL SUPPLEMENT dated [          ], 200[        ]**

**PC Pool Number:** [        ]                    **Seller Name:** Countrywide Home Loans, Inc.

**CUSIP Number:** [        ]                    4500 Park Granada
                                                Calabasas, CA  91302

This Additional Supplement describes certain characteristics of the PCs and/or the Mortgages comprising the PC Pool that are not contained in the information and characteristics set forth in our Offering Circular for Mortgage Participation Certificates dated July 1, 2004, as is may be supplemented from time to time ("PC Offering Circular") or the related Pool Supplement. This information is as of the PC issue date and supplements the information in the related Pool Supplement.  Information and representations in this Additional Supplement about the seller and the Mortgages are the information and representations only of the seller of the Mortgages; we make no representations or warranties concerning the accuracy or completeness of the information contained herein. You should purchase the PCs only after reading this Additional Supplement, the Pool Supplement and the PC Offering Circular.  Capitalized terms used in this Additional Supplement (other than capitalized terms that are defined in this document) have the same meanings as in the PC Offering Circular.  The Additional Supplement incorporates by reference the PC Offering Circular and the related Pool Supplement.

We guarantee the payment of interest and principal on the PCs as described in the PC Offering Circular.  Principal and interest payments on the PCs are not guaranteed by and are not debts or obligations of the United States or any federal agency or instrumentality other than Freddie Mac. The PCs are not tax-exempt securities.  Because of applicable securities law exemptions, Freddie Mac has not registered the PCs with any federal or state securities commission.  No securities commission has reviewed this Additional Supplement.

**MORTGAGES -- Special Mortgage Characteristics**

***Prepayment Premium & Prepayment Premium Period Description***

[Insert Description]

**ATTACHMENT 20**
**Texas Equity First Lien Refinance Mortgages Attachment**

This Attachment sets forth the terms under which Freddie Mac will purchase Texas equity First Lien refinance Mortgages originated pursuant to Section 50(a)(6) of Article XVI of the Texas Constitution ("Texas Equity First Lien Refinance Mortgages").  This Attachment amends and supplements the Guide and other Purchase Documents.

1.  <u>Modification, Supplement, Amendment and Termination</u>.  Although Section 1.2 of the Guide or the other Purchase Documents may provide otherwise, the provisions of this Attachment may be modified, supplemented, amended or terminated by Freddie Mac upon 90-day prior written notice to Seller.

2.  <u>Eligible Mortgages</u>.  A Texas Equity First Lien Refinance Mortgage may be a cash-out refinance Mortgage, "no cash-out" refinance Mortgage or streamlined refinance Mortgage, as these terms are used in Guide Chapter 24, depending on the applicable facts.  The generally accepted commercial terms used to describe Mortgages originated under Article XVI of the Texas Constitution ("cash-out refinance", "rate-term refinance") may not correspond to the meaning given the same terms used in Guide Chapter 24.

    Seller is fully responsible for determining whether the proposed refinance of a Mortgage secured by the Borrower's homestead in the state of Texas is a Mortgage that must be originated pursuant to Section 50(a)(6) of Article XVI of the Texas Constitution.  If Seller determines that the Mortgage must be originated pursuant to Section 50(a)(6) of Article XVI of the Texas Constitution, the Mortgage must also comply with the Guide and other Purchase Documents, as amended and supplemented by this Attachment, to be eligible for sale to Freddie Mac.

3.  <u>Mortgage Type</u>.  The Mortgages must be 15-, 20- or 30-year, First Lien, fixed-rate, fully amortizing, level payment, conventional whole Mortgages (Balloon/Reset Mortgages and ARMs are not eligible).

4.  <u>Mortgaged Premises</u>.  Each Mortgage must be secured by a Mortgaged Premises that is a 1-unit Primary Residence located in the state of Texas and that is the Borrower's homestead.  The Mortgaged Premises must be residential and not be a farm, ranch or used for any agricultural purposes.

5.  <u>LTV and TLTV Ratios</u>.  The maximum LTV and TLTV ratios for Texas Equity First Lien Refinance Mortgages must comply with the provisions of Guide Sections 23.4 and 24.5 for "no cash out" and cash out refinances, as applicable.  However, in no event may the maximum LTV and TLTV ratios for Texas Equity First Lien Refinance Mortgages exceed 80 percent.

6.     Special Uniform Instruments.  Texas Equity First Lien Refinance Mortgages with Note Dates on or after January 15, 2004, must be originated using the following special Fannie Mae/Freddie Mac Texas Home Equity Uniform Instruments:

(a)     Security Instrument.  Texas Home Equity Security Instrument (Texas Equity - First Lien) Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3044.1 01/01 (rev. 10/03).

(b)     Note.  Texas Home Equity Note (Texas Equity - Fixed Rate - First Lien) Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3244.1 01/01 (rev. 10/03).

(c)     Borrower Affidavit.  Texas Home Equity Affidavit and Agreement (Texas Equity - First Lien) Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3185 01/01 (rev. 10/03).  The affidavit must be recorded together with the Security Instrument and any applicable rider.

(d)     Condominium Rider.  Texas Home Equity Condominium Rider (Texas Equity - First Lien) Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3140.44 01/01, if the property is a Condominium Unit.

(e)     Planned Unit Development (PUD) Rider.  Texas Home Equity Planned Unit Development Rider (Texas Equity - First Lien) Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3150.44 01/01, if the property is in a PUD.

Seller may begin using the revised instruments before January 15, 2004.  Seller must not use the Fannie Mae/Freddie Mac Texas Home Equity Uniform Instruments 01/01 (rev. 10/03) in combination with any earlier versions.  Seller may access the Fannie Mae/Freddie Mac Texas Home Equity Uniform Instruments dated 01/01 (rev. 10/03) via the Internet at:  http://www.freddiemac.com/uniform.

7.     Other Special Forms and Documents.  All Texas Equity First Lien Refinance Mortgages must be originated using the following special forms and documents:

(a)     Acknowledgment of "Fair Market Value".  The Seller and the owner of the homestead must execute a written acknowledgment of the "fair market value" of the homestead property as of the date the extension of credit is made.  The written acknowledgment must be prepared in consultation with Seller's Texas legal counsel and the appraisal, completed as set forth in (b) below, must be attached to the acknowledgment.

(b)     Appraisal.  Although the provisions of the Guide or other Purchase Documents may provide otherwise, a new appraisal must be obtained for each Texas Equity First Lien Refinance Mortgage.  The appraisal must comply with the requirements of Chapter 44 of the Guide, as amended and supplemented by this Attachment, and shall only be completed on the:

(i)     Freddie Mac Uniform Appraisal Report (Form 70) or (Form 465), as applicable; or

(ii)    Freddie Mac Summary Quantitative Analysis Appraisal Report ("Freddie Mac Form 2055") or Fannie Mae Quantitative Analysis Appraisal Report ("Fannie Mae Form 2055"), provided that:

   (A)    the Seller's Master Agreement or other Purchase Documents permit Seller to use Freddie Mac Form 2055 or the Fannie Mae Form 2055 in originating refinance Mortgages with LTV/TLTV ratios of 80 percent or less; and

   (B)    the appraiser makes an exterior and interior inspection of the Mortgaged Premises.

In the event the new refinance Mortgage is a streamlined refinance Mortgage, Seller must obtain a new appraisal and may <u>not</u> use the original appraisal from the Mortgage being refinanced.  Furthermore, under no circumstances may Seller use "Home Value$^{SM}$" models or a Freddie Mac Form 2070 or any other inspection form in lieu of an appraisal report completed on the applicable forms described above.

(c)    <u>Other Documents</u>.  Seller shall prepare, provide and/or obtain any and all other documentation that Seller, after consultation with Seller's Texas legal counsel, determines is necessary to originate Mortgages in compliance with all applicable laws and the Purchase Documents.

8.    <u>Special Title Insurance Provisions</u>.

(a)    <u>Title Insurance Policy</u>.  Texas Equity First Lien Refinance Mortgages must be covered by a title insurance policy meeting the requirements of Chapter 39 of the Guide with the endorsements described below.

(b)    <u>Title Insurance Endorsement</u>.  Seller must obtain the following additional title insurance endorsements to the title insurance policy for Texas Equity First Lien Refinance Mortgages:

   (i)    An Equity Loan Mortgage Endorsement (Form T-42).

      (A)    No exceptions to or deletions of paragraphs 2(a) through 2(e) of the Form T-42 endorsement are be permitted.

      (B)    The Form T-42 endorsement must include the optional coverage provided by paragraph 2(f) of the endorsement.

(ii)    A Supplemental Coverage Equity Loan Mortgage Endorsement (Form T-42.1).  No exceptions to or deletions of paragraphs 1(a) through 1(k) of the Form T-42.1 endorsement, or any subsequent subparagraphs added to Paragraph 1 by any revision of the Form T-42.1 approved by the Texas Insurance Commission are permitted.

(iii)    Any other endorsement that provides additional optional mortgagee coverage that is approved by the State of Texas Insurance Commission. The endorsement must be obtained by Seller for Mortgages originated on and after the date the endorsement becomes legally available.  There must be no exceptions to or deletions of any paragraphs providing additional coverage in any such endorsement.

Freddie Mac understands that Endorsements T-42 and T-42.1 are likely to be amended as a result of the Constitutional Amendment to ensure compliance with the requirement for the new notice regarding closing costs, among other things.  Seller must obtain the revised endorsement for all Texas Equity First Lien Refinance Mortgages originated after the revised endorsements become legally available.

(c)    <u>Repurchase Agreement</u>.  Seller acknowledges that a Mortgagee Policy of Title Insurance (T-2) issued together with the Equity Loan Mortgage Endorsement (Form T-42) and the Supplemental Coverage Equity Loan Mortgage Endorsement (Form T-42.1) insuring the lien securing a Mortgage made pursuant to Subsection (a)(6) of Section 50, Article XVI of the Texas Constitution, and any subsequent amendments or modifications to this title insurance, does not provide coverage that is at least as broad as the coverage provided by the 1992 ALTA standard policy form as required by Section 39.2(d) of the Guide.  Therefore, in consideration of Freddie Mac's agreement to permit Seller to obtain a title insurance policy that meets the requirements of this Attachment, but that does not meet all of the requirements of the Guide, Seller agrees to immediately repurchase upon Freddie Mac's demand, at a price determined in accordance with Section 72.3 of the Guide, any Texas Equity First Lien Refinance Mortgage that is discovered to have a title problem that adversely affects the first lien priority of the Mortgage or the enforceability of the Mortgage in accordance with its terms. This remedy is in addition to any other remedies provided by law or under the Purchase Documents.

9.      Special Seller/Servicer Eligibility Requirements.

(a)      Freddie Mac has established special financial and servicing requirements ("Special Requirements") for Seller/Servicers that sell or service Texas Equity First Lien Refinance Mortgages.  Seller/Servicers must comply with the Special Requirements in addition to Freddie Mac's other requirements.  The financial requirements are established and administered by Freddie Mac's Institutional Eligibility Department and the servicing eligibility requirements are set forth in Section 51.11 of the Guide.

(b)      Freddie Mac has determined that, as of the date this Attachment is incorporated by amendment into Seller's Master Agreement, Seller complies with the Special Requirements and is eligible to sell and service Texas Equity First Lien Refinance Mortgages.  Notwithstanding the preceding sentence to the contrary, in the event Seller does not continue to comply with the Special Requirements or the other requirements of the Purchase Documents, Freddie Mac shall have the right, at its sole discretion, to:

(i)      rescind Seller's eligibility to sell Texas Equity First Lien Refinance Mortgages to Freddie Mac, require Seller to subsequently transfer all of Seller's servicing of Texas Equity First Lien Refinance Mortgages to an eligible Servicer, and terminate the Seller's ability to purchase servicing of Texas Equity First Lien Refinance Mortgages; or

(ii)      permit Seller to continue to sell Texas Equity First Lien Refinance Mortgages to Freddie Mac, require Seller to concurrently transfer the servicing of all such Texas Equity First Lien Refinance Mortgages sold to Freddie Mac to an eligible Servicer, require Seller to subsequently transfer all of Seller's servicing of Texas Equity First Lien Refinance Mortgages to an eligible Servicer, and terminate the Seller's ability to purchase any servicing of Texas Equity First Lien Refinance Mortgages; or

(iii)      take other appropriate actions and/or pursue other remedies available to Freddie Mac under the Purchase Documents or at law.

(c)      Seller's Transfer of Servicing of Texas Equity First Lien Refinance Mortgages, whether voluntary or involuntary, must be to a Seller/Servicer that is eligible to sell and service Texas Equity First Lien Refinance Mortgages.

10.      Special Representations and Warranties.  Seller represents and warrants that:

(a)      Neither Seller nor its Correspondents or Mortgage Brokers have been found by any federal regulatory agency to have engaged in the practice of refusing to make loans because the applicants for the loans reside or the property proposed to secure the loans is located in a certain area.

       (b)       Seller has obtained a legal opinion from its Texas legal counsel that confirms that Seller's lending and servicing policies, procedures, and practices are in compliance with Section 50(a)(6) of Article XVI of the Texas Constitution, all other applicable Texas Constitutional provisions, statutes, court decisions, regulations and rules and applicable federal law.

       (c)       All Texas Equity First Lien Refinance Mortgages comply with Section 50(a)(6) of Article XVI of the Texas Constitution, as amended, all other applicable laws, and the Purchase Documents as amended and supplemented by this Attachment.

11.     <u>Effect of Other Provisions of the Purchase Documents</u>.  Texas Equity First Lien Refinance Mortgages may be originated pursuant to any other applicable provisions set forth in the Guide or other Purchase Documents; provided, however, Seller must not originate any Texas Equity First Lien Refinance Mortgages pursuant to any provision in the Guide or other Purchase Documents that conflicts with or contradicts the provisions contained in this Attachment and Section 50(a)(6) of Article XVI of the Texas Constitution.

12.     <u>Servicing</u>.  Seller must Service Mortgages originated on the Fannie Mae/Freddie Mac Texas Home Equity Uniform Instruments dated 01/01 (rev. 10/03) in accordance with the Guide.  Seller, as Servicer, must have in place adequate procedures to receive and timely respond to Borrower inquiries, claims of defects, and other complaints (whether or not the Borrower specifically references Section 50(a)(6)). In addition, if Servicer receives a Borrower notification of failure to comply, or otherwise discovers that it has failed to comply, with the provisions of Article XVI of the Texas Constitution with respect to a Texas Equity First Lien Refinance, it must notify Freddie Mac (via Multipurpose Loan Servicing Transmittal Form 105 pursuant to the requirements in Chapter 67 of the Single Family Seller/Servicer Guide) of the notification or discovery and provide Freddie Mac with a copy of the notification and/or related information.  Servicer must cure all curable defects in accordance with the provisions of Section 50(a)(6) of Article XVI of the Texas Constitution within the time period specified in Section 50(a)(6).

13.     <u>Special Delivery and Pooling Requirements</u>.

       (a)       <u>SCC</u>.  In addition to the SCCs required under the Purchase Documents, including the SCCs required under Chapter 24 and Section 17.2 of the Guide, Seller must insert the following SCC in the special characteristics code field of the Form 11, Mortgage Submission Schedule:

            221 = Texas Equity First Lien Refinance Mortgage

       (b)       <u>Pooling</u>.  Texas Equity First Lien Refinance Mortgages may be pooled with other fixed-rate Mortgages.

14.   <u>Delivery Limit</u>.  The aggregate unpaid principal balance ("UPB")of all Texas Equity First Lien Refinance Mortgages purchased under this Master Agreement shall not exceed $500 million of the aggregate UPB of all Mortgages purchased under this Master Agreement.

**ATTACHMENT 21**
**Cooperative Share Mortgage Program**


Pursuant to the terms of this Agreement and the conditions specified in this Attachment, Seller may sell to Freddie Mac Cooperative Share Mortgages as such term is defined herein.  Seller may not originate Cooperative Share Mortgages in connection with provisions of any other Attachment to this Agreement.

1.      Definitions.  Capitalized terms not defined in this Attachment shall have the meaning ascribed to them in the Purchase Documents.  The following capitalized terms shall have the meanings defined below:

Cooperative Corporation:  An entity that holds title to and governs a Cooperative Project.

Cooperative Project:  Real estate that is owned by a Cooperative Corporation in fee (or an acceptable leasehold estate) that includes the allocation of individual dwelling units to shareholders of the Cooperative Corporation.  A Cooperative Corporation must qualify as a "cooperative housing corporation" under Section 216 of the Internal Revenue Code of 1986, as amended.

Cooperative Share Mortgage:  A loan that is sold to Freddie Mac and secured by a first lien on the rights of ownership and occupancy to a Cooperative Unit granted to a shareholder.  Such loan is secured by a perfected lien on the stock, shares or a membership certificate and an assignment of the Proprietary Lease.

Cooperative Unit:  A one-unit dwelling located in a Cooperative Project.

Maintenance Fee:  The monthly charge paid to the Cooperative Corporation to cover a Cooperative Unit's pro rata share of the Blanket Mortgage, the insurance costs, real estate taxes, water and sewer taxes, and maintenance and operating expenses for the Cooperative Project.

Mortgage:  A Mortgage is a loan secured by a lien on real estate held in fee simple or on an acceptable leasehold estate.  The term Mortgage includes a Cooperative Share Mortgage as defined in the Glossary.

Proprietary Lease:  The Proprietary Lease, occupancy agreement or right of tenancy granting the Tenant-Shareholder exclusive rights to occupy a specific dwelling unit in the building owned by such Cooperative Corporation and defining the rights and obligations of each party.

Recognition Agreement:  An agreement between a Cooperative Corporation and a Seller to establish rights of lenders financing Cooperative Share Mortgages in the Cooperative Project.

<u>Security Agreement</u>:  The agreement between the Tenant-Shareholder and Seller that defines the terms of the security interest in the Cooperative Unit's shares and the Proprietary Lease granted by the Tenant-Shareholder to Seller.

<u>Tenant-Shareholder</u>:  The Borrower of a Cooperative Share Mortgage who is both a shareholder in the Cooperative Corporation and a tenant under a Proprietary Lease.

<u>Underlying Mortgage</u>:  The mortgage encumbering the Cooperative Project.

2.  <u>Eligible Cooperative Share Mortgages and Property Type</u>.

(a)  Each Cooperative Share Mortgage must be secured by a 1-unit Primary Residence or second home.

(b)  For a Cooperative Share Mortgage secured by a Cooperative Unit in a particular Cooperative Project, the total number of Cooperative Share Mortgages sold to Freddie Mac by Seller in such Cooperative Project must not represent more than 20 percent of all Cooperative Units in such Cooperative Project.

(c)  A Cooperative Share Mortgage that is a Seasoned Mortgage is eligible for purchase by Freddie Mac, provided that, on the Origination Date of such Mortgage, the Cooperative Share Mortgage meets the eligibility and underwriting requirements of this Attachment and Chapter 36 of the Guide.

(d)  Each Cooperative Share Mortgage must be secured by a property located in:  the State of New York; the State of New Jersey in the Counties of Hudson, Essex, Union, Middlesex or Bergen; or in the District of Columbia.

(e)  A Cooperative Share Mortgage may not be a special housing initiative such as:

(i)  a Section 502 Guaranteed Rural Housing Mortgage;

(ii)  an Affordable Gold Mortgage with a Rural Housing Service Leveraged Second Mortgage;

(iii)  a HUD – Guaranteed Section 184 Native American Mortgage; or

(iv)  an FHA or VA Mortgage.

(f)  A Cooperative Share Mortgage must be a Mortgage that is eligible for purchase under the Guide and may not be originated in connection with any special underwriting provisions contain in this Master Agreement.

3.    <u>Eligible Cooperative Project</u>.  The Cooperative Project must consist of at least five Cooperative Units and must meet the following requirements:

    (a)    Construction or Rehabilitation:  Additional Phasing or Sections.

        (i)    The Cooperative Project may be subject to additional phasing or add-ons, provided that prior sections and phases are complete with the exception of minor items so long as such items do not affect the habitability of the Cooperative Project.  Any additional phasing or add-ons that are under construction may be included with other completed, sold and occupied sections or phases to determine the eligibility of the Cooperative Project under the sales and occupancy requirements of under Paragraph 3(c) below.

        (ii)    If a Cooperative Project in a Planned Unit Development ("PUD"), Seller must comply with both the requirements of this Attachment and the PUD requirements and warranties in Chapter 43 of the Guide.

    (b)    Amenities.

        (i)    Facilities related to the Cooperative Project, such as parking or recreational facilities/amenities, must be owned by the Cooperative Corporation.

        (ii)    The amenities and facilities may be incomplete, provided that:

            (A)    there are sufficient funds for completion;

            (B)    the incomplete facilities/amenities do not impact the habitability of the Cooperative Project;

            (C)    the sponsor, developer or other entity with unsold shares is current in payments on all financial obligations under the Cooperative Project's Offering Plan including Maintenance Fees; and

            (D)    upon completion of the amenities and facilities, the Maintenance Fees will not increase more than 10 percent including funds necessary to fund adequate reserves.

(c)     Sales and Occupancy Requirements.

    (i)     At least 51 percent of the Cooperative Units have been sold to bona fide purchasers who have closed and who will occupy the Cooperative Units as Primary Residences or second homes.  Multiple purchases of Cooperative Units by one owner are counted as one sale in determining if the sales requirement has been met.  If the Cooperative Project is subject to additional sections or phases that are under construction, the units in these sections or phases may be included in the sales and occupancy requirements.

    (ii)    No single entity or related entity other than the sponsor/developer, may own more than 10 percent of the Cooperative Units.

(d)     Funds for Operating and Maintenance.  Cooperative dues or Maintenance Fees must be:

    (i)     pro rated among the Cooperative Units in the Cooperative Project based on the number of shares attributable to the Cooperative Unit; and

    (ii)    payable in regular installments rather than by special assessments.

(e)     Project Cash Flow.  The Cooperative Project's income from sources other than tenant-shareholders must not exceed 20 percent of its total income and must be sufficient to:

    (i)     service the Cooperative Corporation's debt, operating expenses and be adequate for replacement and operating reserves; and

    (ii)    maintain adequate maintenance, replacement and operating reserves equal to at least three months of income.

(f)     Underlying Mortgage

    (i)     The Cooperative Corporation was not 30 or more days delinquent in the last 12 months on any payments due under any mortgage secured by the Cooperative Project.

    (ii)    If any mortgage secured by the Cooperative Project matures or adjusts in less than three years or financing is being sought by the Cooperative Corporation or subsides, such as tax abatements, end in less than three years, the resulting actual increases in the Maintenance Fee may not exceed 10 percent.

(g)   Maintenance Fees.  No more than 10 percent of the owners of Cooperative Units in the Cooperative Project, including the sponsor, may be 30 or more days delinquent in making their Maintenance Fee payment.

(h)   Conforming Use.  A Cooperative Project may be a legal non-conforming property if the Mortgage file contains documentation that legislation, local zoning or housing authority permits the current improvements to be rebuilt to current density in the event of partial or full destruction.

(i)   Agreement for Professional Management.  If there is an agreement for professional management of the Cooperative Project or any other contract for services of the developer, sponsor, builder or related entity, such agreement and/or contract must provide for termination upon no more than 90 days written notice by either party to the other without cause and without payment of a termination fee.

4.   <u>Ineligible Cooperative Projects</u>.

(a)   Cooperative Hotel.  A Cooperative Share Mortgage in a cooperative hotel is not eligible for purchase by Freddie Mac.  A cooperative hotel is a Cooperative Project that is operated and managed as a commercial hotel even though the units within the Cooperative Project are individually owned.  Freddie Mac considers a number of factors in exercising its judgment and determining whether a project should be classified as a cooperative hotel.  These factors include, but are not limited to the following:

(i)   availability of hotel-type services such as:

- Nightly rentals
- Registration Desk
- Bellman
- Daily maid service
- Food service
- Telephone service
- Advertisement of hotel-type services

(ii)   project names, which include the words "hotel" or "motel".

(iii)   shared revenue between the hotel, hotel management company, or Cooperative Corporation and the unit owner or among Cooperative Unit owners; and

(iv)   zoning.

(b)    Usually no single factor will result in a project being classified as a cooperative hotel.  Freddie Mac's judgment and determination of whether the project functions as a cooperative hotel are conclusive.

(c)    Limited Equity Cooperative.  A Cooperative Share Mortgage in a limited equity cooperative is not eligible for purchase by Freddie Mac.  In a limited equity project, the Cooperative Corporation places a limit on the amount of return than can be received when stock or shares in the Cooperative Corporation are sold.

5.    <u>Seller Warranties Regarding the Cooperative Corporation</u>.  For all Cooperative Share Mortgages, Seller must perform an underwriting analysis to determine that the Cooperative Project satisfies the requirements contained in this Attachment.  Seller represents and warrants that the Cooperative Corporation meets the following requirements:

(a)    Compliance with Laws.

(i)    The Cooperative Corporation has been created and exists in full compliance with the requirements for residential cooperatives in the jurisdiction where the Cooperative Project is located and all applicable laws.

(ii)    The Cooperative Corporation qualifies as a "cooperative housing corporation" under Section 216 of the Internal Revenue Code of 1986, as amended.

(b)    Cooperative Project Title.

(i)    The Cooperative Corporation has good and marketable title to the Cooperative Project.

(ii)    The Cooperative Corporation owns the Cooperative Project in fee simple.

(iii)    The Cooperative Project is free and clear of any liens and encumbrances, except an Underlying Mortgage.

(c)    Control of the Cooperative Corporation.  The Cooperative Corporation has been controlled by the shareholders (other than the sponsor/developer) for at least one year.

(d)    Recognition Agreement.

(i)    The Cooperative Corporation has the right to enter into the Recognition Agreement.

(ii)     The terms of the Recognition Agreement are valid and binding upon the Cooperative Corporation.

(e)     Servicer's Consent.

(i)     The Recognition Agreement, Proprietary Lease or other document require the Cooperative Corporation to obtain Servicer's consent to:

(A)     any assignments or pledge of the Borrower's membership in the Cooperative Corporation;

(B)     any contraction, expansion or termination of the Cooperative Project;

(C)     disbursement of insurance proceeds for a substantial loss to the Cooperative Project if the proceeds will not be used for repair of the Cooperative Project; and

(D)     any distribution of condemnation proceeds.

(ii)     With respect to Cooperative Share Mortgages secured by Cooperative Units in New York City, Seller is not required to make the warranties in Paragraph 5(e)(i)(B), (C) and (D) immediately above.

(f)     Notification of Servicer.

(i)     The Recognition Agreement, Proprietary Lease or other document require the Cooperative Corporation to notify Servicer of any of the following:

(A)     governance action requiring the consent of share loan lenders;

(B)     threatened condemnation or loss;

(C)     any reduction or cancellation of insurance covering the project which is required; and

(D)     any 60-day delinquency of the Borrower's payment of dues or Maintenance Fees and other default by the Borrower.

(ii)     With respect to Cooperative Share Mortgages secured by Cooperative Units in New York City, Seller is not required to make the warranties in Paragraph 5(f)(i)(A), (B) and (C) immediately above.

(g)     Right to Cure Borrower's Default.  In the event of a default by the Borrower, the Cooperative Corporation must permit Seller to cure the Borrower's default to the Cooperative Corporation.

(h)     Foreclosure Obligations.  In the event of the default and foreclosure, the Cooperative Corporation must:

    (i)     issue membership documents in the name of Seller or Seller's designee;

    (ii)    evict a Cooperative Unit owner and terminate the Borrower's lease at the request of Seller at Seller's expense;

    (iii)   permit the sublease of the Cooperative Unit to an occupant selected by Seller when the Cooperative Unit is unsold after 60 days and if the Cooperative Cooperation has the right to approve Seller's subleases, the approved standards and procedures must not be unreasonably restrictive on the action and must be completed no more than 30 days after the request for approval from the Cooperative Corporation; and

        (A)    not withhold, unreasonably or in violation of applicable law, its approval of the sale, including the purchaser and purchase price, or the sublease of the Cooperative Unit; and

        (B)    for all Cooperative Units other than those located in New York City, make such determination within 45 days.

6.     <u>Special Underwriting Provisions</u>.

(a)     Delinquency.  For Cooperative Share Mortgages, delinquency shall include nonpayment of Maintenance Fees.

(b)     Borrower Capacity.  The monthly housing expense must include the monthly Maintenance Fee.  Additional consideration of the Cooperative Unit's pro rata share of real estate taxes and insurance is not required.  Seller may subtract from the Maintenance Fee the amount equal to the utility charges if the Maintenance Fee includes the Cooperative Unit's water, electricity, heating or cooling expenses, and the adjustments and supporting documentation are contained in the Mortgage file.

(c)     Collateral Requirements.

    (i)     Either Fannie Mae Form 1075, or Freddie Mac Form 465 plus the appropriate attachment that includes the information contained on Fannie Mae Form 1075, must be used for Cooperative Share Mortgages.  The pro rata share of the Cooperative Project's underlying financing does not need to be completed.

(ii)    The appraisal for a Cooperative Unit must include the attachments (photographs of the subject, building sketch, location map and photographs of the comparable sales) required in Section 44.12 of the Guide.

(iii)    Cooperative Share Appraisal Reports must comply with Chapter 44 of the Guide.  Cooperative Share Mortgages are not eligible for Home Value Models, Form 2070, Form 2055 or the No-appraisal MAF.

7.    <u>Reciprocal Project Review</u>.  The provisions of Section 42.11 of the Guide regarding reciprocal project review applicable to Condominium Projects shall apply to Cooperative Projects that have obtained a Final Project Approval-Fannie Mae Form 1028.

8.    <u>Lien Requirements</u>:

(a)    Lien Position

(i)    Seller represents and warrants that the Cooperative Share Mortgage is secured by an enforceable first lien on the Borrower's ownership interest in the Cooperative Corporation and rights to occupy a specific Cooperative Unit; provided, however, that the Borrower's ownership interest and rights to occupy the property may be subject to the following:

(A)    for Cooperative Share Mortgages secured by Cooperative Units not located in New York City:

(I)    the Mortgage secured by the Cooperative Project; and

(II)    the portion of unpaid Maintenance Fee that is accrued after the Origination Date and is attributable to the Cooperative Unit's pro rata share of the Underlying Mortgage and the current year's real estate taxes plus special assessments that are attributable to the Cooperative Unit; and

(B)    for Cooperative Share Mortgages secured by Cooperative Units located in New York City:

(I)    the Mortgage secured by the Cooperative Project; and

(II)    the portion of the Maintenance Fee and special assessments that are accrued after the Origination Date and are attributable to the Cooperative Unit.

(ii)    for Cooperative Share Mortgages secured by Cooperative Units not located in New York City, the lien must not be subject to the Cooperative Corporation's attorney fees and costs of collection including late fees.

(b)   Lien Documentation.  In lieu of the requirements of Chapter 39 of the Guide, Seller/Servicer must document that the following minimum requirements are met:

    (i)   A public records search for judgment and UCC search in the name of the Borrower and property seller, if applicable, shows no adverse matters that would affect or take priority over the lien of the Cooperative Share Mortgage, other than the mortgage on the Cooperative Project and Maintenance Fees.  The Maintenance Fee must be paid and current at Origination Date.

    (ii)   The Cooperative Corporation has confirmed that the Borrower or property seller have not encumbered the Cooperative Unit with liens that will remain superior to the subject Cooperative Share Mortgage.

    (iii)   A land records search conducted in the name of the Cooperative Corporation shows that title to the Cooperative Project in the Cooperative Corporation.

(c)   Lien Warranty.  Seller represents and warrants that:

    (i)   the Borrower has the right to encumber his or her ownership interests and occupancy rights in the Cooperative Corporation;

    (ii)   the Borrower's right to occupy the Cooperative Unit pursuant to the Proprietary Lease extends through the term of the Cooperative Share Mortgage, either by its term or through renewals;

    (iii)   Seller has utilized documentation required under applicable state law to create a valid, enforceable first lien on the Borrower's ownership interest. Such documents may include, but shall not be limited to, the Recognition Agreement, Security Agreement, UCC financing statement, stock power and Assignment of Proprietary Lease; and

    (iv)   all UCC-1 and renewal statements, where applicable, are current and valid.

9.   <u>Insurance</u>.

(a)   Minimum rating of insurer.  Each of the insurance coverage's required in this Attachment must be provided by an insurer that is rated at least:

    (i)   A/V by A.M. Best Company; or

    (ii)   A by Standard & Poor's.

(b)     Minimum property insurance types and limits

(i)     The Cooperative Corporation must maintain insurance under a commercial package policy that covers, at a minimum, causes of loss identified in the Insurance Services Office's (ISO) *Commercial Property Causes of Loss-Special Form* endorsement for the following:

(A)     buildings and structures in the Cooperative Project;

(B)     Fixtures, machinery, equipment and supplies maintained for the service of the Cooperative Project; and

(C)     Fixtures, improvements, alterations and equipment within the individual Cooperative Units;

(ii)    Coverage must be for 100 percent of the insurable replacement cost of the buildings, structures or property described above and provide for loss settlement at replacement cost.

(iii)   The Cooperative Corporation must also obtain any additional coverage commonly required by private Mortgage investors for Cooperative Projects similar in construction, location and use, including the following where applicable and available:

(A)     agreed amount, replacement guarantee or extended replacement;

(B)     inflation guard;

(C)     ordinance or law; and

(D)     mechanical breakdown and equipment failure with an ordinance or law endorsement, with the insurance limit per covered mechanical breakdown or equipment failure equal to, at a minimum, the lesser of:

(I)     100 percent of the insurable replacement cost of the building housing the property which is susceptible to mechanical breakdown or equipment failure; or

(II)    $2 million;

provided, however, if a higher limit is required by private Mortgage investors for Cooperative Projects similar in construction, location and use, the Cooperative Corporation must maintain the higher insurance limit.

(iv)    Deductibles may be in any amount established by mutual agreement between the Cooperative Corporation and its insurer; provided, however, such deductible amount is fully prefunded by deductible-dedicated reserves or any other financing method which is documented in the Cooperative Corporation's bylaws and budget.

(v)    If the Mortgaged Premises are in a Cooperative Project of detached Cooperative Units and the Cooperative Corporation's bylaws so permit, Freddie Mac will accept insurance for the Mortgaged Premises that meets the requirements of Sections 58.1-58.9 of the Freddie Mac Single-Family Seller/Servicer Guide (the "Guide") as applicable to 1-4 unit properties. The Cooperative Corporation must then maintain all other applicable insurance coverage's required in this Attachment.

(c)    Flood insurance.

(i)    The Cooperative Corporation must maintain flood insurance on each insurable building or structure located in a Special Flood Hazard Area as mapped by the Federal Emergency Management Agency. Each such building or structure must be insured under the National Flood Insurance Program's ("NFIP") policy form for Cooperative Projects or any non-NFIP policy form which provides coverage at least equivalent in scope to that provided under the NFIP policy form for Cooperative Projects.

(ii)    The building insurance limit must, at a minimum, equal the lesser of:

    (A)    100 percent of the insurable replacement cost of the building or structure; or

    (B)    the maximum building insurance limit sold by the NFIP for a Cooperative Project building.

(iii)    The contents insurance limit must, at a minimum, equal the lesser of:

    (A)    100 percent of the insurable replacement cost of all contents owned by the Cooperative Corporation in the building or structure; or

    (B)    the maximum contents insurance limit coverage sold by the NFIP for a Cooperative Project building.

(iv)    A blanket policy of flood insurance covering more than one building or structure in the Cooperative Project is acceptable if each building or structure covered by the blanket policy is insured for at least the individual building and contents limits stated Paragraphs 9(c)(ii) and (iii) above.

       (v)     Deductibles may be in any amount established by mutual agreement between the Cooperative Corporation and its insurer, provided such deductible amount is fully prefunded by deductible-dedicated reserves or any other financing method that is documented in the Cooperative Corporation's bylaws and budget.

(d)     Liability insurance.

       (i)     The Cooperative Corporation must maintain commercial general liability ("CGL") insurance covering all common areas, commercial spaces and public ways in the Cooperative Project.  If not already included in the terms of the CGL coverage, there must be a "severability of interest" endorsement precluding the insurer's denial of a tenant-shareholder's claim because of negligent acts by the Cooperative Corporation or other tenant-shareholders.

       (ii)    The Cooperative Corporation must also maintain any additional coverage commonly required by private Mortgage investors for Cooperative Projects similar in construction, location and use, including the following where applicable and available:

          (A)    Comprehensive automobile liability;

          (B)    Bailee's liability;

          (C)    Elevator collision liability;

          (D)    Garage keeper's liability;

          (E)    Host liquor liability;

          (F)    Workers' compensation and employer's liability; and

          (G)    Contractual liability.

       (iii)   The insurer's limit of liability per occurrence for personal injury, bodily injury or property damage under the terms of the above coverage must be at least $1 million (at least $3 million for elevator buildings) and the coverage must provide for claim settlements on an occurrence basis.

(e)     Business income insurance.  The Cooperative Corporation must maintain business income insurance to cover 12 months of Cooperative Unit maintenance fees lost due to a cause of loss identified in ISO's *Commercial Property Causes of Loss-Special Form* endorsement.

(f)     Fidelity or employee dishonesty insurance.

    (i)     Fidelity or employee dishonesty insurance is required for all Cooperative Projects that consist of more than 20 Cooperative Units.  In lieu of the coverage required by Freddie Mac, Freddie Mac will accept coverage that meets a State's statutory requirements for fidelity or employee dishonesty insurance as applicable to Cooperative Corporations.

    (ii)     The Cooperative Corporation must carry fidelity or employee dishonesty insurance covering losses resulting from dishonest or fraudulent acts committed by the corporation's directors, managers, trustees, employees or volunteers who manage the funds collected and held for the benefit of the Cooperative Corporation.  A professional management firm must be insured to the same extent as a Cooperative Corporation that manages its own operation.  The management firm must submit evidence of such coverage to the Cooperative Corporation.

    (iii)     Fidelity or employee dishonesty insurance coverage must have all of the following characteristics:

        (A)     The policy must name the Cooperative Corporation as the insured, and premiums must be paid as a common expense by the Cooperative Corporation.

        (B)     The insurance limit must equal no less than the maximum amount of funds in the custody of the Cooperative Corporation or its management firm at any one time.  Freddie Mac will accept reduced fidelity insurance coverage if the bylaws require the Cooperative Corporation and any management firm to adhere to financial controls that include one of the controls listed in subparagraphs (I), (II) or (III) immediately below; provided, however, the insurance limit equals at least the sum of three months of Maintenance Fees on all Cooperative Units in the Cooperative Project.

            (I)     The Cooperative Corporation or its management firm maintains separate accounts for the operating budget and the reserve fund.  The depository institution in which funds are deposited sends copies of the monthly account statements directly to the Cooperative Corporation.

> (II)     Separate records and accounts are maintained for each Cooperative Corporation or other community association using the management company's services.  The management company does not have the authority to draw checks on or to transfer funds from the reserve fund of the Cooperative Corporation.
>
> (III)    Two or more members of the board of directors are required to sign any checks drafted against the reserve fund.

(g)     Mortgage clause.  When applicable, insurance policies obtained and maintained by the Cooperative Corporation in compliance with this Attachment must have the insurance industry's standard mortgage clause granting certain rights to each mortgagee of the Cooperative Project in order of precedence and as interests appear.  Each such Cooperative Project mortgagee must be named in the declarations of insurance.  The mortgage clause must also provide that the insurer will notify each named Cooperative Project mortgagee at least 30 days before any reduction in or cancellation of coverage.

(h)     Insurance charges.  Premiums for insurance obtained by the Cooperative Corporation will be paid by the Cooperative Corporation as a common expense apportioned to each tenant-shareholder.

10.     <u>Other Requirements</u>.

(a)     Document Custody.  In addition to meeting the requirements of Section 18.1 of the Guide, Seller must deliver the following to the Document Custodian:

> (i)     the Stock Certificate or Membership Certificate evidencing the Borrower's ownership interest in the Cooperative Corporation;
>
> (ii)    Stock Power, executed in blank,
>
> (iii)   the Proprietary Lease;
>
> (iv)    the Assignment of Proprietary Lease executed in the name of Seller or in blank; and
>
> (v)     an original executed, but unfiled, Form UCC-3.

(b)     Mortgage File.  The following documents must be kept either in the Mortgage file or held by the Document Custodian:

> (i)     a copy of recorded UCC-1 Financing Statements and renewal assignment statements, if applicable, with original filing stamp;

    (ii)     the Recognition Agreement; and

    (iii)    the Security Agreement.

(c)    Other File Documents.  Seller must maintain the following documentation on the Cooperative Corporation and the Cooperative Project:

    (i)      by-laws if Seller did not use a reciprocal project review;

    (ii)     the most recent two year's financial statements including income and expense statement and all footnotes;

    (iii)    the current fiscal year's operating budget; and

    (iv)    one of the following forms of evidence that the Cooperative Project meets the insurance requirements, stated in Paragraph 9 of this Attachment:

        (A)    An original policy (including a commercial package policy under which the required coverage's may be provided in whole or in part) and applicable endorsements;

        (B)    A copy of the original policy and applicable endorsements, if the copy meets the requirements of Chapter 52 of the Guide; or

        (C)    A certificate, evidence or declarations of insurance providing at least the following information:

            (I)      Name of insured Cooperative Corporation (the Cooperative Corporation must be named as "First Named Insured");

            (II)     Name and address of Cooperative Project mortgagee(s);

            (III)    Address of Cooperative Unit and name and address of Cooperative Unit mortgagee;

            (IV)    Address of insured Cooperative Project;

            (V)     Type, limit and effective dates of coverage;

            (VI)    Deductible amount and coverage to which each such deductible applies;

            (VII)   Any endorsement or optional coverage obtained and made part of the original policy;

(VIII)   Insurer's agreement to provide at least 30 days notice to the Cooperative Corporation, the Cooperative Project mortgagee and the Cooperative Unit mortgagee before any reduction in coverage or cancellation of the policy; and

(IX)   Signature of an authorized representative of the insurer;

provided, however, Servicer must maintain a specimen of each policy and endorsement for which a certificate, evidence or declarations of insurance is maintained in lieu of the policy and endorsements.

(d)   Freddie Mac's Post Funding Quality Control.  In addition to the requirements of Chapter 46 of the Guide, the Mortgage file for each Cooperative Share Mortgage selected for quality control review must include:

(i)   a copy of the documents originally submitted to the Document Custodian upon delivery;

(ii)   in lieu of the requirements of Section 46.5 of the Guide, documentation of the search of the public records in the name of the Borrower and property seller and the search of land records for Cooperative Corporation;

(iii)   in lieu of property insurance policies or other evidence of insurance for the Cooperative Unit, documentation that the property insurance policies or insurance certificates for the Cooperative Corporation meet the requirements of this Attachment;

(iv)   supporting documentation of any adjustments to the monthly housing expense.

11.   Delivery Restriction.

(a)   Cooperative Share Mortgages are not eligible for delivery in exchange for cash.

(b)   Freddie Mac reserves the right to limit the number and/or aggregate unpaid principal balance of Cooperative Share Mortgages that it will purchase from Seller either in total or in any one Cooperative Project.

12.   Servicing.  The terms of Volume 2 of the Guide as modified and supplemented by this Paragraph 12 shall apply to the servicing of Cooperative Share Mortgages.

(a)   Cooperative Share Mortgages must be serviced by Tier 1 or Tier 2 Servicers.

(b)     Without the prior written consent of Freddie Mac, Servicer must not approve or consent to any amendments to the Proprietary Lease if such amendment affects the rights of the mortgagee of the Cooperative Share Mortgage.

(c)     When a delinquent Cooperative Share Mortgage is modified, the Maintenance Fee attributable to the Cooperative Unit must be current.

(d)     If Freddie Mac approves a workout Mortgage assumption for a Cooperative Share Mortgage, then in addition to the requirements listed in Section B65.32 of the Guide, Servicer must:

    (i)     obtain the consent of the Cooperative Corporation to the assignment of the Proprietary Lease, if such consent is required by the Proprietary Lease and obtain new stock certificates, if applicable; and

    (ii)     ensure the transferee acquires the transferor's interest in stock or membership certificate and either obtain a new Proprietary Lease or assume the existing Proprietary Lease.

(e)     In addition to the requirements listed in Section B65.33 of the Guide, for a workout Mortgage assumption for a Cooperative Share Mortgage to be settled, Servicer must submit the following to Freddie Mac:

    (i)     a copy of the assignment of the Proprietary Lease;

    (ii)     the Proprietary Lease;

    (iii)     the stock certificate or membership certificate; and

    (iv)     the Recognition Agreement.

(f)     If Freddie Mac approves Servicer's recommendation to allow a deed-in-lieu of foreclosure for a Cooperative Share Mortgage, then in addition to the requirements listed in Section B65.47 of the Guide, Servicer must, required under the Proprietary Lease, obtain evidence of the consent of the Cooperative Cooperation and provide such evidence to Freddie Mac.

(g)     The steps required to be taken under Section B65.48 of the Guide to close a deed-in-lieu of foreclosure are to be taken for a Cooperative Share Mortgage after Servicer has received either the assignment of the Proprietary Lease or a new Proprietary Lease, and a new stock certificate.

(h)     When referring a Cooperative Share Mortgage to foreclosure or bankruptcy a Servicer must use on of Freddie Mac's designated counsel, if available.

(i)    During both the foreclosure process and pending the sale of the REO by Freddie Mac or the mortgage insurance company, Servicer must ensure that the Maintenance Fee is paid.

(j)    (i)    Servicer must have processes in place and must have given necessary notice to all applicable parties (including, but not limited to, insurers and Cooperative Corporations) so that, after the Freddie Mac Funding Date, Servicer is advised, in a timely manner, of any substantive lapse in compliance with any of the insurance requirements in Paragraph 9of this Attachment.

(ii)   When Servicer learns that any of the required insurance coverages is no longer in force, Servicer must contact the Cooperative Corporation to:

(A)   determine the reasons for the lapse in coverage and whether and when coverage will be reinstated; and

(B)   advise the Cooperative Corporation that the lack of insurance coverage will make future Cooperative Share Mortgages in the Cooperative Project ineligible for sale to Freddie Mac.

(iii)  If coverage is not be reinstated within 60 days after the lapse in coverage, Servicer must:

(A)   advise its loan origination staff, if any, that future Cooperative Share Mortgages in the Cooperative Project are not eligible for sale to Freddie Mac; and

(B)   via Form 105, Multipurpose Loan Transmittal, notify Freddie Mac's Disaster Unit at P.O. Box 5000, Vienna, VA 22182-5000, of the lapse in coverage

13.    <u>Special Delivery Requirements</u>.  In connection with the delivery of each Cooperative Share Mortgage, Seller must deliver all the Mortgage data required by Form 11 or Form 13SF, as applicable.  The Seller must complete certain fields of the Form 11/13SF as follows:

| Title of Field | Completion Instructions |
|---|---|
| Property Type | Enter "1" in the field titled "Property Type" |
| Condo/PUD Name | Enter "CP" [insert space, followed by Name of Cooperative Project] |
| Special Characteristics Code | "502" |

14.   <u>Pooling Requirements</u>.  All Cooperative Share Mortgages must be sold under the Guarantor program or the MultiLender Swap program.  The following pooling requirements apply to Cooperative Share Mortgages sold to Freddie Mac:

(a)   For fixed-rate Cooperative Share Mortgage sold under the fixed-rate Guarantor program either:

(i)   the aggregate unpaid principal balance of all fixed-rate Cooperative Share Mortgages must not exceed 10 percent of the aggregate unpaid principal balance of all Mortgages in the applicable PC Pool; and if the PC Pool also includes relocation Mortgages and/or Extended Buydown Mortgages, the aggregate unpaid principal balance of all fixed-rate Cooperative Share Mortgages and/or fixed-rate relocation Mortgage and/or fixed-rate Extended Buydown Mortgages must not exceed 15 percent of the aggregate unpaid principal balance of all Mortgages in the applicable PC Pool; or

(ii)   all of the fixed-rate Mortgages in the applicable PC Pool must be Cooperative Share Mortgages.

Twenty-year and 30-year fixed-rate Cooperative Share Mortgages must be pooled together as 30-year Mortgages.

(b)   For ARM and Balloon/Reset Cooperative Share Mortgages sold under the Guarantor program, the aggregate unpaid principal balance of all such Cooperative Share Mortgages, as applicable, must not exceed 10 percent of the aggregate unpaid principal balance of all Mortgages in the applicable PC Pool; and if the PC Pool also includes relocation Mortgages and/or Extended Buydown Mortgages, the aggregate unpaid principal balance of all Cooperative Share Mortgages and/or relocation Mortgages and/or Extended Buydown Mortgages must not exceed 15 percent of the aggregate unpaid principal balance of all Mortgages in the applicable PC Pool.

(c)   For fixed-rate, ARM and balloon/reset Cooperative Share Mortgages sold under the MultiLender Swap program, the aggregate unpaid principal balance of all such Cooperative Share Mortgages included in any delivery of Mortgages must not exceed 10 percent of the aggregate unpaid principal balance of all Mortgages in that delivery; and if the delivery also includes relocation Mortgages and/or Extended Buydown Mortgages, the aggregate unpaid principal balance of all such Cooperative Share Mortgages and/or relocation Mortgage and/or fixed-rate Extended Buydown Mortgages must not exceed 15 percent of the aggregate unpaid principal balance of all Mortgages in that delivery.

15.    <u>Guarantor Conversions of Fixed-rate Cooperative Share Mortgages</u>.  When Seller calls Freddie Mac for a Conversion under the fixed-rate Guarantor program of fixed-rate Cooperative Share Mortgages comprising 100 percent of the PC Pool, Seller must supply the Freddie Mac operator with the Master Commitment number and Seller must specify that the call is for a "30-year SFFR Co-op Guarantor-Optional under Offer Product and Program Numbers 429-002."  For 15-year fixed-rate Cooperative Share Mortgages comprising 100 percent of the PC Pool, Seller must specify that the call is for a "15-year SFFR Co-op Guarantor-Optional under Offer Product and Program Numbers 431-002".

16.    <u>Right to Amend</u>.  Freddie Mac reserves the right, upon 90 days prior written notice, to amend, supplement, revise or terminate, in whole or in part, the sale of Cooperative Share Mortgages under this Attachment.

**ATTACHMENT 22**
**Relocation and Employer-assisted Mortgages**

1.   **General Terms**

    (a)   **Eligible Mortgages**:  "Relocation Mortgages," as defined in paragraph (b)(i), and "Employer-assisted Mortgages," as defined in paragraph (b)(ii), shall be eligible for purchase under this Attachment.

    (b)   **Definitions**

        (i)   **Relocation Mortgages**:  "Relocation Mortgages" shall mean purchase money 15-, 20- and/or 30-year fixed-rate Mortgages, ARMs, and 5- and 7-year Balloon/Reset Mortgages that:

           (A)   satisfy all items in the four bullets comprising the definition of Relocation Mortgages set forth in Section 13.4(f)(5) of the Guide; and

           (B)   are not Loan Prospector Caution Mortgages delivered to Freddie Mac as A-minus Mortgages.

        Such Mortgages shall be referred to as "Fixed-rate Relocation Mortgages," "Adjustable-rate Relocation Mortgages," and "Balloon/Reset Relocation Mortgages" respectively, and collectively as "Relocation Mortgages."

        (ii)   **Employer-assisted Mortgages**:  "Employer-assisted Mortgages" shall mean purchase money 15-, 20- and 30-year fixed-rate Mortgages, ARMs, and 5- and 7-year Balloon/Reset Mortgages that are similar to Relocation Mortgages and that involve an employer contribution to Mortgage funding but do not meet all of the other criteria specified in Section 13.4(f)(5) of the Guide.  Such Mortgages may be made:

           (A)   to a transferred employee of a corporation to finance the purchase of a Primary Residence at a new job location ("Transfer Employer-Assisted Mortgages"); or

           (B)   to a Newly-hired Employee (defined below) of a corporation to induce the employee to accept an offer of employment with the corporation.

        Employer-assisted Mortgages may not be Loan Prospector Caution Mortgages delivered to Freddie Mac as A-minus Mortgages.

    (c)   **Eligible Property Types**:  Relocation Mortgages and Employer-assisted Mortgages are secured by 1-unit Primary Residences.

(d)      **Maximum LTV/TLTV Ratio**:  For Relocation and Employer-assisted Mortgages delivered under this Agreement, the maximum LTV/TLTV ratio shall be 95 percent.

(e)      **Borrower Funds**:  For Relocation and Employer-assisted Mortgages delivered under this Agreement, the Borrower shall make at least a three percent down payment from Borrower Funds.  The proceeds of an unsecured loan or equity advance provided by the Borrower's employer may be used for the remaining down payment, Closing Costs, Financing Costs, and Prepaid items.  Payments for the unsecured loan must be considered in qualifying the Borrower.

(f)      **Bridge Loan**:  For Relocation and Employer-assisted Mortgages, any Bridge Loan must satisfy the requirements of the Purchase Documents and may be provided either by a financial institution or the employer.

(g)      **Employer's Relocation Program**:  With respect to Relocation Mortgages and Employer-assisted Mortgages, the Employer's Relocation Program is a written document under which the employer relocates employees and includes a statement of relocation benefits detailing the employer's contribution to mortgage financing, such as closing costs, buydowns or other Mortgage financing costs, and may include other benefits such as payment of moving expenses and expenses incurred in selling the employee's former residence.

(h)      **File Requirements**:  With respect to Relocation Mortgages and Employer-assisted Mortgages, in addition to any other requirements of the Purchase Documents for the Mortgage file, Seller shall obtain and retain in a master file the following information:

  (i)      a complete copy of an Employer's Relocation Program and/or the employer's agreement with a Borrower detailing the terms of the relocation;

  (ii)      any other pertinent data Seller has with respect to the transfer or hire of an employee, as applicable; and

  (iii)      a complete copy of any applicable Corporate Buydown agreement.

  Seller agrees to provide information contained in the master file to Freddie Mac upon request.  If a Relocation or Employer-assisted Mortgage is selected for quality control review, a copy of the Employer's Relocation Program must be provided in (with) the Mortgage file delivered to Freddie Mac.

(i)      **Newly-hired Employee**:  "Newly-hired Employee" shall mean any employee who has been employed by the corporation for less than six months at the time of Mortgage origination.  Any Mortgage made to a Newly-hired Employee shall be considered a Mortgage made to induce or enable the employee to accept an offer of employment with the corporation.

(j)     **Trailing Co-Borrower**:  "Trailing Co-Borrower" shall mean a Borrower other than the relocating employee who resides with the relocating employee, was employed at the previous location, and intends to seek new employment at the new location.

(k)     **Trailing Co-Borrower Income**:  "Trailing Co-Borrower Income" shall mean the amount of income previously received by the Trailing Co-Borrower from employment at the previous location which is verified and documented in accordance with the requirements of the Purchase Documents.

2.      **Mortgage Delivery Requirements - Guarantor Program and Cash Program**

(a)     **Delivery of Balloon/Reset Mortgages and ARMs**:

(i)     Seller may sell 5-year and 7-year Balloon/Reset Relocation Mortgages and Employer-assisted Mortgages under the fixed-rate Guarantor program and under the Gold Cash program.

(ii)    Seller may sell Adjustable-rate Relocation Mortgages and Employer-assisted Mortgages under the WAC ARM Guarantor program and under the ARM Cash program.

(iii)   In connection with the delivery of Balloon/Reset Mortgage and ARMs, Seller must insert the following applicable code in one of the special characteristic code fields of the Form 11 or Form 13SF:

| Mortgage Type | Special Characteristic Code |
|---|---|
| Employer-assisted Mortgages | 558 |
| Relocation Mortgages | 013 |

(b)     **Delivery of Fixed-rate Mortgages**:

(i)     Seller may sell Fixed-rate Employer-assisted Mortgages under the Gold Cash program and the fixed-rate Guarantor program.

(ii)    For Fixed-rate Relocation Mortgages delivered under Gold Cash program, Seller must comply with the delivery limitations set forth in Section 17.19(d).

(iii)   For Fixed-rate Relocation Mortgages delivered under the fixed-rate Guarantor program, either:

(A)    Seller must comply with the pooling limitations set forth in Section 13.4(f)(5); or

(B)   the aggregate UPB of fixed-rate Relocation Mortgages must comprise 100 percent of the fixed-rate Mortgages in the applicable PC Pool, in which event Seller must comply with the terms and conditions set forth below in paragraphs 3, 4 and 5.

(iv)   In connection with the delivery of fixed-rate Mortgages, Seller must insert the following applicable code in one of the special characteristic code fields of the Form 11:

| Mortgage Type | Special Characteristic Code |
|---|---|
| Employer-assisted Mortgages | 558 |
| Relocation Mortgages | 013 |

3.   **Fixed-rate Relocation Mortgage Guarantor Program Conversions**

With each Guarantor program conversion for a fixed-rate Mortgage PC Pool containing 100 percent Fixed-rate Relocation Mortgages and/or Relocation Mortgages with Extended Buydowns, Seller must notify Freddie Mac's Commitment Operator that:

(a)   such Conversion includes 100 percent of fixed-rate Relocation Mortgages and requires an Additional Supplement (see paragraph 5 below); and

(b)   the offer product and program numbers for such Relocation Mortgages are as follows:

for 15-year Relocation Mortgages            427-002
for 20- and 30-year Relocation Mortgages    425-002

Guarantor program conversions for a fixed-rate Mortgage PC Pool containing 100 percent Fixed-rate Relocation Mortgages and/or Relocation Mortgages with Corporate Extended Buydowns must not include any Employer-assisted Mortgages.

4.   **Pooling Requirements**

Seller warrants that 20-year Fixed-rate Relocation Mortgages delivered pursuant to Master Commitments entered into under this Agreement shall be pooled with 30-year Fixed-rate Relocation Mortgages.

5.  **Disclosure Requirements**

For any PC Pool that contains 100 percent of Fixed-rate Relocation Mortgages, including Relocation Mortgages with Corporate Extended Buydowns, Seller must comply with the following provisions relating to Additional Supplements:

(a)  <u>Information to be Furnished for Disclosure</u>.  Seller must prepare and distribute an Additional Supplement as described in Section 11.20 of the Guide.  The Additional Supplement must be in the form attached as an Exhibit to this Attachment.  The form is not a final document; it must be reviewed carefully and completed by the Seller.  From time to time during the term of this Agreement, Freddie Mac may require Seller to use a different form of Additional Supplement.

(b)  <u>Disclosure Delivery</u>.  No fewer than two Business Days before the Settlement Date, Seller must deliver the completed Additional Supplement, together with the name and telephone number of the person responsible for the Additional Supplement, to Freddie Mac at the following email address: Additional_Supplement@FreddieMac.com.  If Seller is unable to deliver documents by email, the Additional Supplement must be sent to the attention of Mortgage Purchase at the following fax number:  571-382-4385.  Freddie Mac's timely receipt of the Additional Supplement is a condition to settlement.

(c)  <u>Information Dissemination</u>.  Seller consents to Freddie Mac's dissemination of information Freddie Mac deems appropriate concerning each PC pool that contains 100 percent fixed-rate Relocation Mortgages, including Relocation Mortgages with Corporate Extended Buydowns, through any information vendors or other distribution method that it may use for disclosure with respect to PCs.

6.  **Special Underwriting Provisions Applicable to Relocation Mortgages and Employer-assisted Mortgages**

(a)  **Section 37.13 - Trailing Co-Borrower Income**

100 percent of Trailing Co-Borrower Income may be considered as stable monthly income for Relocation Mortgages and Employer-assisted Mortgages delivered under this Agreement, provided that:

(i)  the amount of Trailing Co-Borrower income used does not exceed 40 percent of the total qualifying income for the Mortgage;

(ii)  the Trailing Co-Borrower has been employed continuously in the same occupation for the two years immediately preceding the relocation;

(iii)  the Trailing Co-Borrower provides a statement of intent to work in the new location and describes the occupation for which they intend to seek employment;

(iv)    based upon a review of the job market in the new location, Seller shall reasonably determine that the employment opportunities and earning potential for the Trailing Co-Borrower are comparable to the opportunities in the former location;

(v)     Mortgages subject to the temporary subsidy buydown plan the Seller must use the Note Coupon rate for qualification purposes;

(vi)    the income is not from self-employment; and

(vii)   Seller provides a written explanation as to how it arrived at the determination that employment opportunities and earning potential for the Trailing Co-Borrower are comparable or better than the opportunities at the former location.  This may be documented on Form 1077 or in a memo that is retained in the Mortgage file.

(b)    **Section 44.5 - Freddie Mac/Fannie Mae 2055 – Interior/Exterior Inspection or Exterior Inspection only – Mortgage secured by existing residence**

In lieu of the Uniform Residential Appraisal Report (Form 70), the Statement of Limiting Conditions and Appraiser's Certification (Form439) and the Appraisal Report – Individual Condo or PUD Unit (Form 465) required by Chapter 44 of the Guide, for a Relocation Mortgage or Employer-assisted Mortgage secured by an existing residence, Seller may use the Freddie Mac or Fannie Mae Summary Quantitative Analysis Appraisal Report ("Form 2055").  The appraisal analysis may be based on an interior/exterior inspection or exterior only inspection of the Mortgaged Premises.  For exterior only inspections, Seller is responsible for any condition or marketability representations and warranties, including all representations regarding the interior of the subject property, as stated in Chapter 44 of the Guide.  Seller shall not be required to be comply with Sections 44.16 (a), (c) and (d) of the Guide when using the Form 2055.

(c)    **Section 25.1 - Secondary Financing**

Payments on secondary financing secured by a lien junior to a Relocation Mortgage or Employer-assisted Mortgage delivered to Freddie Mac may be excluded in qualifying the Borrower when the following requirements are met:

(i)     the employer-sponsored financing provides for deferred payments for at least two years or forgiveness of a portion of the principal balance each year by the employer; and

(ii)    the secondary financing is part of the Borrower's relocation agreement with the employer.

7.   **Special Underwriting Provisions – Income/Employment and Asset Documentation for Relocation and Employer-assisted Mortgages**

    (a)   **Income/employment documentation**

        For verifying the relocating Borrower's income and employment, the Borrower's signature as certification on the Mortgage application shall be sufficient documentation, provided that the relocating Borrower's income as determined by Seller's underwriters is reasonable, based on Seller's previous experience with both the Borrower's employer and persons in the same general occupation, the Seller provides an explanation of how the income was determined either on the Form 1077 or in a memo retained in the Mortgage file; and

        (i)   Seller obtains a verbal Verification of Employment in accordance with the requirements of Section 37.21 of the Guide; or

        (ii)   Seller obtains the most recent salary voucher showing both year-to-date earnings and a minimum 30-day period with sufficient detail to determine base monthly earnings; or

        (iii)   Seller retains in the Mortgage file a copy of the offer letter from the employer stating the new income amount.

    (b)   **Asset Documentation**

        (i)   For purposes of verifying the source of Borrower Funds, the following alternative documentation is acceptable:

            (A)   a depository account statement for the most recent month or stock and /or securities account statement for the most recent month; or

            (B)   proceeds from sale of the Borrower's previous home, if applicable, must be evidenced by (I) a HUD-1 or other documents that comply with Section 37.23 of the Guide evidencing the sale or other equivalent closing statement; (II) an executed buyout agreement and the accompanying settlement statement that is part of an employer relocation plan where the employer/relocation company takes responsibility for the outstanding Mortgage; or (III) an executed non-contingent sales contract.  If the sale of the previous home is evidenced by any of this documentation, then the prior housing expense (and/or Bridge Loan) need not be included in the ratios for qualification.

8.   **Section 25.4 - Corporate Extended Buydown Mortgages - Fixed-rate, 7-year Balloon/Reset, and 7/1 and 10/1 Adjustable-rate Relocation and Employer-assisted Mortgages**

Fixed-rate Mortgages, 7-year Balloon/Reset Mortgages, and 7/1 and 10/1 Adjustable-rate Mortgages subject to Corporate Extended Buydowns (that is, temporary subsidies funded by the Borrower's employer as a part of an employer contribution toward the relocation of the Borrower) ("Corporate Extended Buydown Mortgages") shall be eligible for purchase, provided that:

(a)   for Mortgages with LTV ratios of 90 percent or less, the initial interest rate shall not be lower than 5 percentage points below the Note rate, and for Mortgages with LTV ratios greater than 90 percent, the initial interest rate shall not be lower than 3 percentage points below the Note rate;

(b)   except as set forth in subparagraph (c), the annual increase in principal and interest payments for such Mortgages cannot exceed one percentage point in the effective interest rate;

(c)   the annual increase in principal and interest payments for such Mortgages may exceed one percentage point but not two percentage points in the effective interest rate if the following conditions are met:

(i)   the temporary subsidy buydown plan may not be for more than one year;

(ii)   Seller qualifies the Borrower at no less than one percent below the Note Coupon Rate; and

(iii)   the maximum LTV ratio of the Mortgage is 90 percent;

(d)   the amount of the Borrower's principal and interest payment may be increased only once each year;

(e)   with respect to such Mortgages, either:

(i)   the buydowns are fully funded at origination; or

(ii)   the buydowns may be partially funded at origination if:

(A)   the Borrower's employer is a company with whom Seller has an executed formal relocation contract or agreement; and

(B)   there are provisions between Seller and the party providing buydown funds to fund each year's portion of the subsidy on an annual basis.  Each year's portion of the subsidy account must be funded in accordance with the terms of the subsidy agreement;

(f)     Seller warrants that sufficient funds will be available to service any corporate subsidy program;

(g)     notwithstanding the provisions of Section 25.4(j) of the Guide, for Mortgages with LTV ratios of 90 percent or less, the Borrower may be qualified at the Note Coupon Rate less a maximum of three percentage points, and for Mortgages with LTV ratios greater than 90 percent, the Borrower may be qualified at the Note Coupon Rate less a maximum of two percentage points;

(h)     the buydown agreement between the employee (Borrower) and the employer must provide that the buydown subsidy will not be canceled if the Borrower's employment is terminated;

(i)     Seller has complied with the provisions of Section 25.4 of the Guide, as modified herein;

(j)     each such Mortgage is delivered under the Guarantor Program only, and Seller complies with the pooling and supplemental disclosure requirements for Corporate Extended Buydown Mortgages described in detail in paragraph 5 above; and

(k)     in connection with each such Mortgage, Seller shall enter "014" in one of the special characteristics code fields of the Form 11, Mortgage Submission Schedule and shall follow the instructions set forth in Section 17.20 of the Guide.

EXHIBIT TO RELOCATION AND EMPLOYER-ASSISTED MORTGAGES ATTACHMENT

Additional Supplement for Mortgage Participation Certificates
**Relocation Mortgages and Relocation Mortgages with Extended Buydowns**

The following prototype additional disclosure form is not a final document; it must be reviewed carefully and completed by the Seller. All the fields enclosed by brackets are required to be completed.

To complete the Additional Supplement for Relocation Mortgages and Relocation Mortgages with Extended Buydowns, insert the Settlement Date in the field titled "Additional Supplement dated ___", and insert the PC Pool and CUSIP numbers of the PC Pool as well as Seller's name in the appropriate fields, just as you would typically complete other Additional Supplement forms.

Then, at the bottom of the form, please provide the percentage of aggregate UPB and the aggregate UPB amount of the relocation Mortgages with Extended Buydowns that comprise the PC Pool under the **Special Mortgage Characteristics** section of the Additional Supplement.  If none of the Mortgages are relocation Mortgages with Extended Buydowns, insert 0% and $0.00.

Freddie Mac
Additional Supplement for Mortgage Participation Certificates
Relocation Mortgages and Relocation Mortgages with Extended Buydowns

**ADDITIONAL SUPPLEMENT dated [          ], 200[__]**

**PC Pool Number: [_____]**          **Seller Name: Countrywide Home Loans, Inc.**

**CUSIP Number: [_____]**          4500 Park Granada
Calabasas, CA  91302

This Additional Supplement describes certain characteristics of the PCs and/or the Mortgages comprising the PC Pool that are not contained in the information and characteristics set forth in our Offering Circular for Mortgage Participation Certificates dated July 1, 2004, as it may be supplemented from time to time ("PC Offering Circular") or the related Pool Supplement.  This information is as of the PC issue date and supplements the information in the related Pool Supplement.  Information and representations in this Additional Supplement about the seller and the Mortgages are the information and representations only of the seller of the Mortgages; we make no representations or warranties concerning the accuracy or completeness of the information contained herein. You should purchase the PCs only after reading this Additional Supplement, the related Pool Supplement and the PC Offering Circular.  Capitalized terms used in this Additional Supplement (other than capitalized terms that are defined in this document) have the same meanings as in the PC Offering Circular.  The Additional Supplement incorporates by reference the PC Offering Circular and the related Pool Supplement.

We guarantee the payment of interest and principal on the Certificates as described in the PC Offering Circular.  Principal and interest payments on the Certificates are not guaranteed by and are not debts or obligations of the United States or any federal agency or instrumentality other than Freddie Mac.  The Certificates are not tax-exempt securities.  Because of applicable securities law exemptions, Freddie Mac has not registered the Certificates with any federal or state securities commission.  No securities commission has reviewed this Additional Supplement.

**MORTGAGES — Special Mortgage Characteristics**

This PC Pool consists entirely of Relocation Mortgages.

Mortgages representing [        ] percent or [$        ] of the original aggregate unpaid principal balance of this PC Pool are both Relocation Mortgages and Extended Buydown Mortgages.

AS-17                                                                                  July 2004

**ATTACHMENT 23**
**ADDITIONAL PROVISIONS/RESTRICTIONS**

1.      **Terms of Business Arrangement**

This paragraph sets for the provisions applicable to the Business Arrangement entered into between Freddie Mac and Seller.

(a)      <u>Business Arrangement</u>.  "Business Arrangement" refers to the agreements between Seller and Freddie Mac set forth in this paragraph effective between January 1, 2005 and December 31, 2005 (the "term of the Business Arrangement") pursuant to which Seller and/or its affiliates will sell to Freddie Mac a minimum market share of Mortgages as described in subparagraph (b) below (the "Minimum Market Share requirement"), and Freddie Mac will accommodate certain of Seller's pricing and business needs.

(b)      <u>Minimum Market Share</u>.  Seller agrees to deliver to Freddie Mac Mortgages constituting at least 25 percent of the aggregate unpaid principal balance of all "eligible Mortgages", as defined below, that are sold by Seller and any of its affiliates to Freddie Mac, Fannie Mae and any Federal Home Loan Bank each quarter during the term of the Business Arrangement; additionally, in no event will Seller deliver less than 20 percent of the aggregate unpaid principal balance of all eligible Mortgages that are sold by Seller and any of its affiliates to Freddie Mac, Fannie Mae or any Federal Home Loan Bank each month during the term of the Business Arrangement (such 25 percent quarterly minimum sales and 20 percent monthly minimum sales are collectively referred to as the "Minimum Market Share").

(c)      <u>Definition of Eligible Mortgages</u>.  For purposes of this paragraph only, "eligible Mortgages" means all conforming, conventional Mortgages eligible for sale to Freddie Mac under this Master Agreement, except for the following:

•      DU Mortgages that received an Expanded Approval/Eligible Level II, III or IV classification;

•      Alt A Initial Interest Mortgages and Alt A InterestFirst Mortgages, unless and until Freddie Mac provides Seller with, and Seller agrees to the terms of, a 90-day Master Commitment to purchase such Mortgages on a flow basis; on the date Freddie Mac provides Seller with such a Master Commitment, Alt A Initial Interest Mortgages and Alt A InterestFirst Mortgages will be included in the definition of eligible Mortgages; and

- Mortgages originated under Seller's My Community program, unless and until Freddie Mac amends this Master Agreement to permit the delivery of such Mortgages originated by Seller's Correspondent Lending Division; on the date Freddie Mac provides Seller with such an amendment to this Master Agreement, Mortgages originated under Seller's My Community program will be included in the definition of eligible Mortgages.

(d)   <u>Pricing Applicable to Eligible Mortgages</u>.  During the term of the Business Arrangement and for so long as the Minimum Market Share requirements are in full force and effect, the Required Spreads and Post-Settlement Delivery Fees set forth in Exhibit "A" attached hereto will apply to the sale of all eligible Mortgages.

(e)   <u>Commitment to Purchase Eligible Mortgages</u>.  During the term of the Business Arrangement, Freddie Mac will purchase all eligible Mortgages delivered to it by Seller, having an aggregate unpaid principal balance of up to the Master Agreement Amount, upon the terms and conditions specified in this Master Agreement.

(f)   <u>Representative Mix of Mortgages</u>.  Seller and Freddie Mac agree that it is the intention of the parties that the Mortgages sold to Freddie Mac during the term of the Business Arrangement will have loan characteristics that are similar to those of Mortgages sold to Fannie Mae and other investors during the same period of time, and that Seller will not determine where to sell a Mortgage on the basis of loan characteristics, except to the extent a particular loan characteristic renders the Mortgage ineligible for sale to Freddie Mac.  For purposes of this subparagraph, the phrase "loan characteristics" includes (i) Borrower's creditworthiness and capacity to repay (e.g., Borrower credit score), (ii) the Mortgaged Premises value and type (e.g., 2-4 unit properties, Investment Properties), (iii) property location (e.g., State), (iv) the characteristics of the Mortgage (e.g., the loan amount, the LTV ratio, and whether the loan is purchase transaction or refinance), and (v) product type (e.g., 30-year fixed-rate Mortgages, 5/1 Treasury-indexed ARMs).

If, at any time during the term of the Business Arrangement, there has been an adverse and material change in the loan characteristics mix of the Mortgages delivered by Seller as compared with the Mortgages delivered by Seller to Fannie Mae, Freddie Mac may, by 30 days prior written notice to Seller, adjust the Required Spreads applicable to Mortgages sold by Seller to Freddie Mac.  In connection with determining whether there has been an adverse and material change in loan characteristics mix that would justify an adjustment in the Required Spreads, Freddie Mac will not consider product type to be a "loan characteristic".

(g)   <u>Representative Mix of Mortgages that Satisfy HUD Affordable Goals</u>.  Seller and Freddie Mac agree that it is the intention of the parties that the Mortgages sold to Freddie Mac during the term of the Business Arrangement will have affordable housing characteristics that are similar to those of Mortgages sold to Fannie Mae and other investors during the same period of time, and that Seller will not determine where to sell a Mortgage on the basis of affordable housing characteristics, except to the extent a particular characteristic renders the Mortgage ineligible for sale to Freddie Mac.  For purposes of this subparagraph, the phrase "affordable housing characteristics" means Mortgages secured by single family housing units that would meet the "low- and moderate-income housing goal", the "special affordable housing goal" and the "central cities, rural areas and other under-served areas housing goal", as defined by the United States Department of Housing and Urban Development in establishing the annual housing goals for Freddie Mac and Fannie Mae.

If, at any time during the term of this Agreement, there has been an adverse and material change in the proportion of Mortgages having affordable housing characteristics delivered by Seller to Freddie Mac as compared with the Mortgages with affordable housing characteristics delivered by Seller to Fannie Mae, Freddie Mac may, by 30 days prior written notice to Seller, adjust the Required Spreads applicable to Mortgages sold by Seller to Freddie Mac.

(h)   <u>Increase in Market Share</u>.  Freddie Mac agrees that if Seller elects to substantially decrease the volume of eligible Mortgages sold to Fannie Mae or if Fannie Mae declines to purchase a substantial volume of eligible Mortgages from Seller, Freddie Mac will purchase eligible Mortgages that otherwise would have been sold to Fannie Mae under the terms of this Master Agreement, provided that if the volume of such eligible Mortgages exceeds the Master Agreement Amount specified in this Master Agreement, the purchase volume increase and the terms under which the Mortgages are sold may require the approval of Freddie Mac's Board of Directors, in which case, Freddie Mac's management will recommend the transaction for approval by the Board of Directors.

(i)   <u>Notice of Intention Not to Renew Pricing.</u>  If Freddie Mac determines that it will not be able to continue extending to Seller the pricing terms set forth in this Master Agreement after the term of this Business Arrangement, Freddie Mac will notify Seller of that determination by no later than October 1, 2005, and thereafter parties will meet and confer and use all reasonable efforts to address each other's concerns.  If the parties are unable to reach a mutual accommodation by November 1, 2005, then Freddie Mac will provide Seller with 60-days written notice that the pricing terms will not be extended or continued after the term of this Business Arrangement.

(j)     <u>Reduced Minimum Servicing Fee Proposal</u>.  In the event Fannie Mae introduces a mortgage-backed securities guarantor delivery path with a 12.5bp minimum servicing fee that is deemed "good delivery" / "TBA", Freddie Mac will have 90 days within which to introduce a comparable TBA security.  If Freddie Mac does not introduce a comparable TBA security within such timeframe, then the Minimum Market Share will be reduced by the aggregate unpaid principal balance of fixed-rate Mortgages that would have been eligible for sale, and that Seller would have sold, into such a TBA security.

(k)     <u>Seller's Retention of Excess Yield</u>.  Freddie Mac and Seller agree in principal that Seller will be permitted to characterize as excess yield, a portion of the interest-rate cash flows related to certain Mortgages sold under the Guarantor program. The parties agree that they will work diligently towards mutually agreeable documentation for these transactions.

(l)     <u>Reduced Servicing Spread for Fixed Rate Mortgages in Specified PC Pools</u>. Freddie Mac and Seller have agreed in principal that Seller will be permitted to reduce the servicing spread for fixed rate Mortgages sold under the Guarantor program into specified PC Pools.  The parties agree that they will work diligently towards mutually agreeable documentation for these transactions.

(m)     <u>Changes to Freddie Mac's Repurchase Policies</u>.  If, at any time during the term of this Master Agreement, Freddie Mac materially changes its Mortgage repurchase practices and policies, Freddie Mac will notify Seller's Senior Managing Director, Secondary Marketing, and thereupon Freddie Mac and Seller will have 30 days within which to meet, confer and use all reasonable efforts to resolve the concerns of Seller and of Freddie Mac; at the end of such 30-day period, if the parties are unable to resolve their concerns, Seller may, upon 60-days prior written notice, terminate this Master Agreement.

(n)     <u>Seller Numbers for Affiliates</u>.  Freddie Mac will work diligently with Seller to facilitate the issuance of Seller/Servicer numbers to affiliates of Seller when requested, including the issuance of Seller/Servicer numbers to wholly owned subsidiaries of Countrywide Financial Corporation that are formed for the purpose of providing financing for Mortgages prior to delivery to Freddie Mac.

(o)   <u>Confidentiality</u>.  Freddie Mac and Seller agree that the terms of the Business Arrangement are "confidential information" as defined in Section 2.16 of Guide and that the parties will not release or disclose nor permit the release or disclosure of such confidential information for any purpose at any time, except as provided in the Guide.  Notwithstanding the foregoing, in the event Seller seeks Freddie Mac's consent to the disclosure of the terms and conditions of the arrangements between Countrywide and Freddie Mac, including the terms and conditions of this Master Agreement and in particular the terms of this paragraph, to a third party in connection with the review by a third party of a potential merger or other business combination with, or acquisition of all or substantially all of the stock or assets of, Seller or its parent corporation, Freddie Mac will not unreasonably withhold such consent provided that the third party has signed a non-disclosure agreement for the benefit of both Seller or its parent corporation, as applicable, and Freddie Mac.

**2.**     **Transfers of Servicing from Seller to an Affiliated Servicer**

(a)   <u>Definitions.</u>  For purposes of this paragraph, the following terms have the meanings ascribed to them:

"Transfers" means any concurrent and subsequent transfers of servicing by Seller to Servicer of Mortgages that are sold to Freddie Mac by Seller during the term of this Master Agreement.

"Servicer" means Countrywide Home Loans Servicing, L.P., Seller/Servicer #125949, an affiliate of Seller.

"Guarantor" means Countrywide Financial Corporation, the parent corporation of Seller and the indirect parent corporation of Servicer.

(b)   <u>Approval of Transfers Required</u>.  Freddie Mac agrees that Seller may Transfer the Mortgages to Servicer and Servicer may service the Mortgages for Freddie Mac pursuant to the provisions of this paragraph.  Seller and Servicer must obtain Freddie Mac's approval of the Transfers pursuant to the Purchase Documents.

(c)   <u>Postponing Preparation of Intervening Assignments</u>.  For all Mortgages subject to the Transfers, which are not registered with MERS and are therefore subject to the provisions of Section 22.14(a) of the Guide, Seller may postpone preparing and recording Intervening Assignments from Seller to Servicer, subject to the terms and conditions of this subparagraph (c):

(i)      either (i) there must be on a continuous basis a reasonable number of officers of Seller who are also officers of Servicer and who are duly authorized to promptly prepare, execute and record Intervening Assignments from Seller to Servicer for all Mortgages subject to Transfers; or (ii) Seller must provide duly authorized and executed irrevocable limited powers of attorney to Servicer designating Servicer as its attorney-in-fact for the limited purposes of (A) preparing, executing and recording Intervening Assignments from Seller to Servicer for all such Mortgages; and (B) executing releases and carrying out all other necessary servicing duties and responsibilities under the Purchase Documents;

(ii)      Seller and Servicer agree that (i) Freddie Mac has the right, in its sole discretion, to prepare, execute and record Intervening Assignments from Seller to Servicer; (ii) Seller and Servicer will provide Freddie Mac with any limited powers of attorney or other documentation necessary to so execute and record the Intervening Assignments; and (iii) Seller and Servicer are jointly and severally responsible for paying all costs and expenses associated with having such assignments prepared, executed and recorded by Freddie Mac;

(iii)      Seller must promptly prepare, execute and record Intervening Assignments from Seller to Servicer for all such Mortgages and place the original recorded Intervening Assignments in the respective mortgage files or deliver the Intervening Assignments to the Custodian, as applicable, in the event that (i) Freddie Mac, in its sole discretion, requires such action to be taken to protect its interests or enforce its rights; or (ii) Servicer is no longer the wholly-owned direct or indirect subsidiary of Seller or is no longer the wholly-owned indirect subsidiary of Guarantor;

(iv)      if Servicer further transfers servicing of any of the Mortgages, Seller and Servicer must prepare and record any and all assignments necessary so that the chain of assignments for such Mortgages recorded in the applicable public land records is complete from the original mortgagee of record up to and including the servicing transferee; and

(v)      upon 30 days prior written notice to either Seller or Servicer, Freddie Mac, in its sole discretion to protect its interests or enforce its rights, may revoke the provisions of this subparagraph (c) relating to postponing preparation of Intervening Assignments.  In the event Freddie Mac so exercises its right to revoke, Seller and Servicer must promptly comply with Freddie Mac's instructions with respect to preparing and recording Intervening Assignments.

(d)  <u>Structure and Status of Servicer</u>.  Servicer must be and at all times must remain (i) a wholly-owned direct or indirect subsidiary of Seller; (ii) the a wholly-owned indirect subsidiary of Guarantor; (iii) an eligible Freddie Mac Servicer; and (iv) a MERS member.

(e)  <u>Obligations of Seller to Servicer</u>.  Seller, as mortgagee of record and nominal titleholder for the benefit of Servicer with respect to the Mortgages subject to Transfers, must promptly forward to Servicer all communications and matters it receives that relate to the Mortgages or the properties securing the Mortgages, time being of the essence, so Servicer may properly service the Mortgages in accordance with the requirements of the Guide.  Seller and Servicer hereby hold Freddie Mac harmless for any loss, damages, costs (including legal fees and court costs), fines or penalties that it may incur as a result of Seller's failure to promptly forward to Servicer all communications and matters related to the Mortgages or the properties securing the Mortgages.

(f)  <u>Applicability of other Provisions of in this Master Agreement</u>.  All provisions of this Master Agreement relating to Seller in its capacity as servicer are applicable to Servicer as fully as if each reference to "Seller" in each such provision was a reference instead to "Servicer".

(g)  <u>Guaranty of Servicer's Obligations</u>.  The terms and conditions of this paragraph are conditioned upon Guarantor executing a Guaranty in favor of Freddie Mac in the form set forth at Exhibit "A" attached hereto.

(h)  <u>Confidential Information</u>.  The terms of this paragraph are "confidential information" as described in Section 2.16 of the Guide.  Seller, Servicer and Guarantor must comply with the confidentiality requirements set forth therein, provided however, that if Servicer uses a Custodian other than Freddie Mac's Document Control Custodial Services, Servicer must provide a copy of the pertinent provisions of this paragraph to the Custodian holding Freddie Mac's Mortgage loan documents.  The Custodian must agree to treat the terms of this paragraph as "confidential information" and to comply with the confidentiality requirements set forth in the Guide.

**3.     Using an Investment Account to hold Principal and Interest Payments**

Instead of establishing a Principal and Interest Custodial Account in a Demand Deposit Account in which to maintain principal and interest funds ("P & I Funds") collected by Seller on behalf of Freddie Mac with respect to Mortgages serviced by Seller pending remittance to Freddie Mac of the P & I Funds, Seller may establish and maintain certain custodial accounts with Bank One (the "Custodian"), who shall invest the P & I Funds in specified investments pending remittance to Freddie Mac, provided that:

(a)    the custodial accounts shall be governed by and subject to the terms of that certain Custodial Account Agreement (the "Agreement") dated 10/14/1994, by and between Seller and Custodian;

(b)    the Agreement is not amended without the prior written approval of Freddie Mac;

(c)    Freddie Mac may amend the Investment Requirements, as described in the Agreement, at any time and from time to time by written notice delivered to Seller and Custodian;

(d)    except as modified by the Agreement, P & I Funds shall be subject to the terms of the Guide; and

(e)    Freddie Mac may withdraw and cancel its approval of the Agreement at any time by written notice delivered to Seller and Custodian, and Seller represents and warrants that upon withdrawal and cancellation of Freddie Mac's approval, the Agreement shall immediately terminate.

**4.    Quality Control of Non-Performing Loans**

Freddie Mac will request loan files for non-performing loans only when these loans are in REO status, provided that:

(a)    Seller maintains a NPL Servicing Tier rating of 1; and

(b)    if Seller's defect rate, as made available from time to time by Freddie Mac, exceeds 5 percent for two consecutive quarters, the provisions of this paragraph may be modified, supplemented, or terminated by Freddie Mac upon 45 days prior written notice to Seller.

**5.    Reverification of Source of Funds for Mortgages Selected by Seller for Post-funding Quality Control Review**

For Mortgages selected by Seller for in-house quality control review, Seller is not required to reverify the verifications of sources of funds used in the original underwriting process if the entity from which the reverification is requested is a depository institution that charges fees for reverifications, provided that:

(a)    the Mortgage file indicates there were no misrepresentations in connection with the Borrower's application for and the underwriting of the Mortgage, and the Mortgage file, when considered as a whole, raises no issues that would lead to questions or concerns about the Borrower or the Mortgage;

(b)    Seller obtains and maintains in the Mortgage file evidence that the depository institution from which the reverification would have been requested, charges fees for reverifications; and

(c)     Freddie Mac, at its sole discretion at any time, may terminate the provisions of this paragraph and Seller, within 15 Business Days after receipt of written notice from Freddie Mac terminating Seller's rights hereunder, shall obtain reverifications of verifications of sources of funds as required by the Guide.

## 6.     Credit Reports Obtained in Quality Control Review

For Wholesale Home Mortgages with respect to which Seller obtained a new in-file credit report as part of its prefunding quality control procedures (the "prefunding in-file credit report"), Seller need not obtain a new residential mortgage credit report on one out of ten Mortgages selected for quality control review nor new in-file credit reports on the remaining Wholesale Home Mortgages in Seller's quality control sample, provided that:

(a)     all such prefunding in-file credit reports are based on and include credit information compiled, recorded and updated by at least three national credit repositories that report both credit and public records information for each locality in which Borrower lived during the two years immediately preceding the origination date of such Mortgage;

(b)     either the Mortgage file contains all the prefunding in-file credit reports, or if the prefunding in-file credit reports are consolidated into a single report (a "merged report"), the following conditions are met:

(i)     the prefunding in-file credit reports are electronically combined into a merged report by a consumer reporting agency not affiliated in any way with Seller (and/or third party source, if applicable);

(ii)    the merged report includes all the information from each prefunding in-file credit report obtained;

(iii)   duplicate information contained in the prefunding in-file credit reports need be stated only once in the merged report; however, if information differs in any way, either the information must be repeated or the most derogatory information must be reported; and

(iv)    the merged report clearly indicates it does not meet the requirements for residential mortgage credit reports;

(c)     each prefunding in-file credit report has all the characteristics of a Residential Mortgage Credit Report as set forth in Section 37.10 of the Guide, except as otherwise provided in subparagraphs (a) and (b) above, and except that notwithstanding the provisions of Section 37.10(f) of the Guide, such as an in-file credit report need not contain an interview of any of the subjects; and

(d)     Freddie Mac may at any time during the term of this Agreement or any Master Commitment entered into under this Agreement, upon written notice to Seller, revoke Seller's right to perform its quality control functions as specified in this paragraph with respect to all Mortgages that, from and after the date of Seller's receipt of the notice, are subject to Seller's quality control review.

**7.      No New Credit Reports Required for Quality Control Review**

Seller is not required to obtain a new Residential Mortgage Credit Report or a 3 repository merged in-file credit report on one out of ten Mortgages selected for quality control review nor to obtain a new in-file credit report on the remaining Mortgages in Seller's quality control sample, provided that the credit report used when the Mortgage was originated was obtained from Landsafe Credit, a consumer reporting agency or bureau which is a wholly-owned-subsidiary of Seller and which meets all the requirements set forth in the Purchase Documents for a credit bureau wholly-owned by Seller.

**8.      Extension of Appeal Process**

Seller may submit to Freddie Mac a written appeal to a repurchase request at any time up to, but no later than, 60 days after the date of Freddie Mac's letter requiring repurchase. Freddie Mac may amend, supplement, revise or terminate the provisions of this paragraph, in whole or in part, upon 10-days prior written notice to Seller during the term of this Master Agreement, in which case, the period of time during which Seller may appeal a repurchase request will be as provided in the Guide.

**Exhibit "A"**
Guaranty

**This Guaranty** is made by Countrywide Financial Corporation ("Guarantor") in favor of Federal Home Loan Mortgage Corporation ("Freddie Mac") as of the 31st day of December 2004.

## Background Information

Countrywide Home Loans, Inc., the wholly-owned subsidiary of Guarantor and Freddie Mac Seller/Servicer #204305 ("Seller") requested that Freddie Mac approve its wholly-owned direct or indirect subsidiary, Countrywide Home Loans Servicing, L.P., as a Freddie Mac Servicer ("Servicer").

Seller also requested that Freddie Mac permit (a) the subsequent transfer to Servicer of the servicing of all Mortgages owned by Freddie Mac that are currently serviced by Seller, and (b) the concurrent transfer of servicing to Servicer of all Mortgages that are sold to Freddie Mac by Seller in the future (the "Transfers").

Seller additionally requested that, with respect to the certain Mortgages subject to the Transfers, Freddie Mac (A) permit Seller to postpone preparing and recording Intervening Assignments from Seller to Servicer; (B) permit Servicer to assume Seller's special servicing obligations; and (C) permit Servicer to have the benefit of certain provisions of the Master Agreement between Freddie Mac and Seller.

As a condition to Freddie Mac's approval of Seller's requests, Freddie Mac requires that Guarantor absolutely and unconditionally guarantee all Servicer's duties and requirements as a Freddie Mac Servicer.

## Terms of Agreement

In consideration of the mutual promises set forth herein, the parties agree as follows:

1.      <u>Definitions</u>.  As an approved servicer, the Servicer is subject to the provisions of the *Freddie Mac Sellers' & Servicers' Guide* (the "Guide") applicable to servicers, to the terms and conditions of the master commitments and agreements between Freddie Mac and the Seller, to all mortgage servicing agreements between Freddie Mac and the Servicer or the Seller by which the Servicer is bound, and to all other agreements and documents comprising the Purchase Documents, as defined in the Guide, as such agreements and documents may hereafter be modified from time to time (all such agreements and documents and any modifications thereto are collectively, the "Purchase Documents").  All payments, performances, duties and requirements of Servicer as a Freddie Mac Servicer, set forth in the Purchase Documents, are hereinafter referred to as the "Obligations".

2.     <u>Guarantee of Obligations</u>.  Guarantor hereby absolutely and unconditionally guarantees to Freddie Mac the payment and performance by Servicer of each and every Obligation of Servicer as a Freddie Mac Servicer.  If Servicer defaults in the performance of any of these Obligation, Guarantor shall be, upon demand by Freddie Mac, responsible for performing, causing to be preformed or ensuring the performance of such duties and requirements, and shall pay to Freddie Mac all amounts owed to Freddie Mac by Servicer, including any damages, costs and/or expenses (including reasonable attorney's fees) that Freddie Mac may incur by reason of Servicer's default.

3.     <u>Claims and Performance</u>.  Claims made by Freddie Mac against Servicer in accordance with the provisions of the Purchase Documents shall be deemed to have been made against Guarantor.  Guarantor's guarantee hereunder is a guarantee of payment and performance and not of collection.  If the Obligations are partially paid or performed by Servicer, this Guaranty shall remain in full force and effect and Guarantor shall remain liable for that portion of the Obligations not paid or performed.

4.     <u>Guarantee Absolute</u>.  Guarantor guarantees that the Obligations will be performed strictly in accordance with the terms of the Purchase Documents regardless of any law, regulations or order now or hereafter in effect in any jurisdiction affecting any such terms or the rights of Freddie Mac with respect thereto.  The liability of Guarantor under this Guaranty shall be absolute and unconditional irrespective of:

(a)     any lack of validity or enforceability of the Purchase Documents or any agreement or instrument relating thereto;

(b)     any change in the time, manner or place of performance of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to departure from the terms of the Purchase Documents; and/or

(c)     any other circumstances that might otherwise constitute a defense to, or a discharge of (except for a release by Freddie Mac or a discharge arising as a result of Servicer's full performance of the Obligations), Servicer concerning any of the Obligations in respect of this Guaranty.

5.     <u>Waiver of Notice</u>.  Guarantor hereby waives promptness, diligence, notice of acceptance and any other notice with respect to any of the Obligations and the guarantee and any requirement that Freddie Mac exhaust any right or take any action against Servicer or any other person or entity or any collateral.

6.     <u>Exercise of Rights and Remedies</u>.  No failure on the part of Freddie Mac to exercise, and no delay in exercising, any right hereunder operates as a waiver thereof; nor does any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

7.     <u>Term of Guarantee</u>.  This Guaranty is a continuing guarantee and remains in full force and effect until Freddie Mac determines and notifies Guarantor that the Servicer is capable of discharging all of the Obligations to Freddie Mac.  This Guaranty shall be binding upon Guarantor, its successors and assigns, and inure to the benefit of and be enforceable by Freddie Mac and its successors, transferees and assigns.

8.     <u>Representations and Warranties</u>.  Guarantor hereby represents and warrants as follows:

   (a)     Guarantor is a corporation duly incorporated, validly existing and in good standing.

   (b)     Servicer is an indirect wholly-owned subsidiary of Guarantor.

   (c)     The execution, delivery and performance by Guarantor of this Guaranty are within Guarantor's corporate powers, have been duly authorized by all necessary corporate action and do not contravene (i) Guarantor's certificate of incorporation or by-laws or (ii) any law or any contractual restriction binding on or affecting Guarantor.

   (d)     No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by Guarantor of this Guaranty.

   (e)     This Guaranty is the legal, valid and binding obligation of Guarantor enforceable against Guarantor in accordance with its terms, subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar law affecting creditors' rights generally and subject to the availability of equitable remedies, including specific performance.

9.     <u>Financial Statements</u>.  On an annual basis, the Guarantor must provide Freddie Mac with copies of the annual audited financial statements of the Guarantor.

10.    <u>Amendments</u>.  No amendments of this Guaranty are effective unless the same are in writing and signed by Freddie Mac and expressly state that it constitutes an amendment to this Guaranty.

11. <u>Notices</u>. All notices and other communications provided for hereunder shall be in writing delivered by personal service, or by overnight delivery service, or by facsimile transmission, or by registered or certified mail, postage prepaid, return receipt requested, to the following address:

if to the Guarantor:
Countrywide Financial Corporation
4500 Park Granada
Calabasas, California 91302
Attention: General Counsel

if to Freddie Mac:
at the address specified in the Purchase Documents

Either party may change its address for notice by written notice given to the other at least five (5) days before the effective date of such change in the manner provided in this Section. Any such notice shall be deemed delivered as follows:

(a)     if personally delivered or if sent by overnight delivery service, the date of delivery to the address of the person to receive such notice;

(b)     if sent by facsimile transmission, the date transmitted to the person to receive such notice if sent by 5:00 p.m. Los Angeles time, and the next business day if sent after 5:00 p.m. Los Angeles time; or

(c)     if mailed, three (3) days after depositing the same in the mail.

Any notice sent by facsimile transmission must be confirmed by personally delivery or mailing a copy of the notice sent by facsimile transmission.

12. <u>Governing Law</u>. This Guaranty is be governed by and construed in accordance with the laws as provided by the Guide.

The Guarantor has caused this Guaranty to be duly executed and delivered by its authorized officer as of the date first above written.

"Guarantor"
Countrywide Financial Corporation

By: _(signature)_
    Gregory M. Tonner
Title: _Sr. Vice President_

**ATTACHMENT 24**
**Document Custodial Waivers**

1.      **Missing Original Notes.**

Mortgages for which an original Note was inadvertently lost or destroyed are eligible for purchase, provided that:

(a)      on the Delivery Date of each such Mortgage, Seller must deliver to Freddie Mac the following:

(i)      a lost note certificate, appropriately completed and executed, substantially in the form set forth at Exhibit A attached hereto; and

(ii)      a photocopy of the front of the Note and, if available, a photocopy of the back of the Note showing all endorsements from the original lender to Seller;

(b)      Seller represents and warrants that the copy of the Note together with the lost note certificate constitute, and will continue to constitute, a valid and enforceable obligation of the Borrower secured by the Mortgaged Premises;

(c)      in the event that (I) the Mortgage is referred to foreclosure or any other action is commenced to enforce Freddie Mac's rights in connection with the Note and the Security Instrument, and (II) the jurisdiction in which the Mortgaged Premises are located requires that the lost note certificate be notarized in order to effectuate the foreclosure or other action, Seller must promptly replace the lost note certificate, which was provided to Freddie Mac in connection with delivery of the Mortgage, with a new lost note affidavit that complies with the requirements of subparagraph (a) above, except that:

(i)      the title of the document must be changed to Lost Note Affidavit;

(ii)      the first paragraph must be revised to read as follows:

The undersigned, _____, a duly authorized representative of Countrywide Home Loans, Inc. ("Seller"), on behalf of Seller, upon being duly sworn, deposes and states:

(iii)      the new lost note affidavit must be appropriately notarized;

(d)     Seller, at any time and from time to time upon written request of Freddie Mac, must promptly and duly execute and deliver to Freddie Mac any and all additional certifications or instruments and take any further action that Freddie Mac deems necessary or appropriate to exercise Freddie Mac's rights in connection with such Mortgages;

(e)     if after delivery of any such Mortgage, the original Note is located, Seller must deliver the original Note to Freddie Mac or the Custodian, as the case may be;

(f)     Seller agrees to indemnify, defend and hold Freddie Mac harmless from and against the failure to collect amounts established to be due and owing under any of the missing, lost or destroyed legal documents as a result of Seller's inability to produce or failure to obtain the required legal documents and from and against any and all losses, damages, expenses, claims, demands, actions, suits or liabilities of any kind or nature whatsoever, joint or several, to which Freddie Mac may become subject to as a result of Seller's inability to produce required legal documents;

(g)     in the event Seller transfers the servicing of any such mortgage, Seller and the servicing transferee will both be bound by the terms of the indemnification obligation contained herein;

(h)     Freddie Mac hereby identifies and Seller hereby agrees to treat the special provisions set forth herein as "confidential information" as that term is defined in Section 2.16 of the Guide;

(i)     if Seller uses a Custodian other than Freddie Mac's Document Control Custodial Services, Seller must provide a copy of the waiver to the Custodian; and

(j)     the aggregate number of Mortgages delivered under this paragraph, along with the Mortgages delivered under the paragraphs titled "Power of Attorney Provisions", "Incomplete or Missing Endorsements", and "Use of Outdated NYCEMA", must not exceed three percent of the total number of Mortgages delivered to Freddie Mac under this Master Agreement.

## 2.    Loan Numbers on Notes

Seller is not required to place the Freddie Mac loan number on the face of the Note, provided that:

(a)     all Mortgages are endorsed "in blank";

(b)     at delivery, Seller identifies each Mortgage by its Freddie Mac loan number and its Seller/Servicer loan number on the Form 11, Mortgage Submission Schedule and Form 13SF, Mortgage Submission Voucher, as applicable;

(c)     for any Mortgage delivered under this provision, Freddie Mac is not the Custodian;

(d)     such Mortgages otherwise comply with Section 52 of the Guide;

(e)     Seller and Custodian each have computer and other tracking systems that cross-reference the Freddie Mac loan number and the Seller's loan number assigned to each Mortgage;

(f)     Seller must provide screen prints of its Note tracking system to Freddie Mac's Collateral Instrument Program Administration upon request;

(g)     upon a transfer of servicing, Seller, as servicing transferor, must place the Freddie Mac loan number in the upper right-hand corner of the face of each Note;

(h)     Seller must promptly place loan numbers on the Notes upon Freddie Mac's request;

(i)     Freddie Mac hereby identifies and Seller hereby agrees to treat the special provisions set forth herein as "confidential information' as that term is defined in Section 2.16 of the Guide;

(j)     if Seller uses a Custodian other than Freddie Mac's Document Custodial Services, Seller must provide a copy of this paragraph to the Custodian; and

(k)     Freddie Mac, at its sole discretion at any time, reserves the right to rescind the provisions of this paragraph and to require that Seller comply as soon as possible after receipt of written notice with the requirements of Section 16.4(e) of the Guide.

## 3.     Power of Attorney Provisions

Mortgages where the Mortgage Note is not signed personally by the Borrower but by another person pursuant to authority granted by the Borrower under a written power of attorney ("POA") are eligible for purchase as described in Section 16.5 of the Guide, even though (i) the power of attorney is missing and is not attached to and delivered to the Custodian with the Mortgage Note; (ii) the words "Attorney in Fact" are typed above and not below the Borrower's signature line (so the typed name of the Borrower underneath the signature line contains just the Borrower's name); (iii) Seller determines that the POA contains minor errors or inconsistencies; (iv) the typed name is incomplete, (v) the signature is incomplete and/or (vi) the POA is executed after the date of the Note but on or before the date the related Mortgage has been executed; provided that:

(a)     the aggregate number of Mortgages delivered under this paragraph, along with the number of Mortgages delivered under the paragraphs titled "Use of Outdated NYCEMA", "Incomplete or Missing Endorsements" and "Missing Original Notes", must not exceed three percent of the total number of Mortgages delivered to Freddie Mac under this Master Agreement; and

(b)     with respect to any such Mortgage, Seller agrees to indemnify, defend and hold Freddie Mac harmless from and against delays in enforcement of any such Mortgage, any failure or inability to collect amounts due under any such Mortgage, and/or any costs, claims, actions, damages, liabilities, judgments, counterclaims or defenses to which Freddie Mac may become subject, which arise out or occur in connection with Seller's failure to provide an enforceable POA.

**4.       Incorrect Zip Code on Note**

Mortgages are eligible for sale to Freddie Mac even though the Notes have incorrect zip codes, provided that Seller's electronic records contain the correct zip codes.

**5.       Allonge to Note**

Seller may use an allonge to endorse a Note even though the Note does not reference the attached allonge, provided that the Note and the allonge otherwise comply with the requirements of Section 16.4(f) of the Guide.

**6.       Incomplete or Missing Endorsements**

Mortgages are eligible for sale to Freddie Mac even though the chain of endorsements on the Note is incomplete, provided that:

(a)     Seller endorses each Note "in blank" in accordance with Section 16.4 of the Guide;

(b)     Seller maintains all of the Intervening Assignments for the Mortgages in the respective Mortgage files or delivers the Intervening Assignments to the Custodian, as applicable;

(c)     Seller warrants and represents that it has duly obtained all right, title and interest to all such Mortgages prior to delivery to Freddie Mac;

(d)    with respect to each such Mortgage, Seller agrees to indemnify, defend and hold Freddie Mac harmless from and against delays in enforcement of any such Mortgage, any failure or inability to collect amounts due under any such Mortgage, and any costs, claims, actions, damages, liabilities, judgments, counterclaims or defenses to which Freddie Mac may become subject, which arise out or occur in connection with Seller's failure to provide a complete chain of endorsements on the Notes; and

(e)    the aggregate number of Mortgages delivered under this paragraph, along with the Mortgages delivered under the paragraphs titled "Power of Attorney Provisions", "Missing Original Notes", and "Use of Outdated NYCEMA", must not exceed three percent of the total number of Mortgages delivered to Freddie Mac under this Master Agreement.

## 7.    Endorsements to Countrywide Document Custody Services

Mortgages purchased by Seller for which the Notes have been endorsed to Countrywide Document Custody Services (a division of Treasury Bank, which is an affiliate of Seller), instead of being endorsed directly to Seller, are eligible for sale to Freddie Mac, provided the Notes and endorsements otherwise comply with the requirements of the Guide and the Purchase Documents.

## 8.    Unrecorded Intervening Assignments

For Mortgages secured by Mortgaged Premises located in jurisdictions that do not accept assignments for recordation, Seller is not required to maintain, with the unrecorded intervening assignment(s), an affidavit indicating that the particular jurisdiction does not record assignments, provided that:

(a)    Freddie Mac hereby identifies and Seller hereby agrees to treat the special provisions set forth herein as "confidential information" as that term is defined in section 2.16 of the Guide; and

(b)    if Seller uses a Custodian other than Freddie Mac's Document Control Custodian Services, Seller must provide a copy of this waiver to the Custodian.

**9.      Custody and Maintenance of Intervening Assignments**

With respect to Mortgages sold to Freddie Mac by Seller and for Mortgages owned by Freddie Mac for which Seller acquires servicing, Seller will not be required to deliver to its Custodian the chain of recorded assignments from the original mortgagee on the Security Instrument to Seller (the "Intervening Assignments"), provided that:

(a)      Seller warrants that the Intervening Assignments will be stored and maintained in accordance with document storage and maintenance requirements set forth in this paragraph and in Chapter 52 of the Guide;

(b)      the Intervening Assignments, complete with recordation notation, will be stored and maintained in the mortgage file for each Mortgage which also contains the original recorded Security Instrument or, in the event a jurisdiction does not accept Intervening Assignments for recordation, Seller must so indicate in an affidavit which must be placed in the Mortgage file with the original, unrecorded Intervening Assignment and original, recorded Security Instrument;

(c)      Seller agrees to track the status of Intervening Assignments which have been sent out for recordation and to maintain a certified copy of any original Intervening Assignment that has been sent for recordation until the recorder's office has returned a recorded Intervening Assignment.  Seller agrees to place the original, recorded Intervening Assignment in the mortgage file immediately after it is received back from the recorder's office;

(d)      with respect to any such Mortgage, Seller agrees to indemnify, defend and hold Freddie Mac harmless from and against delays in enforcement of any such Mortgage, any failure or inability to collect amounts due under any such Mortgage, and any costs, claims, actions, damages, liabilities, judgments, counterclaims or defenses to which Freddie Mac may become subject, which arise out or occur in connection with Seller's failure to properly maintain the Intervening Assignments for the benefit of Freddie Mac;

(e)      in any event, upon a transfer of servicing, the Intervening Assignments must be delivered to the servicing transferee's Custodian;

(f)      Seller further represents and warrants that in accordance with Sections 22.14 and 56.7 of the Guide, Seller has determined that the chain of assignments is complete from the original mortgagee on the Security Instrument to Seller, and all Intervening Assignments have been duly completed, executed and recorded;

(g)      Freddie Mac may revoke the provisions of this paragraph at any time upon 30 days written notice;

(h)    Freddie Mac hereby identifies and Seller agrees to treat the special provisions set forth herein as "confidential information" as that term is defined in Section 2.16 of the Guide; and

(i)    if Seller uses other than Freddie Mac's Document Custodial Services, Seller must supply a copy of this waiver to the Seller's Custodian.

## 10.    Use of Outdated Uniform Instruments

For Mortgages with Origination Dates on and after January 1, 2001, Seller may sell Mortgages to Freddie Mac that were originated on the immediately prior version, rather than the most current version, of the Uniform Instruments, provided that:

(a)    all such Mortgages must have been originated (i) by Seller's correspondents and acquired by Seller through its correspondent lending division or (ii) by other lenders and acquired by Seller through its acquisition division. Mortgages closed in Seller's name are not eligible under the provisions of this paragraph;

(b)    Seller represents and warrants that all such Mortgage will be serviced according to the Guide;

(c)    the provisions of this paragraph permitting the use of the immediately prior version of the Uniform Instruments does not apply to Mortgages originated using the New York Consolidation, Extension and Modification Agreement; and

(d)    the aggregate number of Mortgages delivered under this paragraph must not exceed three percent of the total number of Mortgages delivered to Freddie Mac under this Master Agreement.

## 11.    Use of Non Uniform Instruments for Fixed Rate Mortgages

Fixed-rate Mortgages that were not originated on the Uniform Instruments or that are documented by a Note, Security Instrument, rider and/or other addenda other than the Uniform Instruments specified in Section 6.7 of the Guide are eligible for purchase, provided that Seller represents and warrants that the terms of the Note and Security Instrument:

(a)    grant default and foreclosure rights that are substantially equivalent to those contained in the Fannie Mae/Freddie Mac Uniform Instruments;

(b)    contain a special waiver of homestead, dower, or similar marital rights and of redemption rights after foreclosure in those jurisdictions where such waivers are necessary to protect the lender's interest;

(c)     contain no provision for a grace period following a partial prepayment;

(d)     contain an enforceable due-on-sale clause;

(e)     except as provided herein, such Mortgages comply with the Purchase Documents;

(f)     allow for servicing in full compliance with the Guide;

(g)     Freddie Mac hereby identifies and Seller hereby agrees to treat the provisions set forth herein as "confidential information" as that term is defined in Section 2.16 of the Guide; and

(h)     Seller must provide a copy of this waiver to the Custodian, unless Seller uses Freddie Mac's Document Custodial Services.

**12.     Delivery of Mortgages Originated Using a New York Consolidation, Extension and Modification Agreement (NYCEMA)**

(a)     <u>Delivery Package and Mortgage file requirements for Mortgages originated using NY CEMA Form 3172, 1/01 or 3172, 1/01 (rev. 5/01).</u>

(i)     <u>Delivery Package</u>.  The delivery package delivered to Freddie Mac's Document Custodial Services Department or an eligible document Custodian for Mortgages originated using the New York Consolidation, Extension and Modification Agreement (NY CEMA) Form 3172, (1/01) or Form 3172,1/01 (rev. 5/01) (referred to as a NY CEMA Mortgage) may consist of the following documents in lieu of the documents comprising the delivery package required by Freddie Mac's Industry Letter dated April 5, 2002:

(A)     NY CEMA – this may be a certified copy, as the original must be submitted for recordation.  If a certified copy is delivered, the Seller warrants the copy is a true and correct copy of the original delivered for recordation;

(B)     complete set of NY CEMA Exhibits – that is, Exhibit A (a list or copy of a list of the obligations being consolidated, modified and extended); Exhibit B (the property description of the Mortgaged Premises); Exhibit C (a copy of the Consolidated Note (including any addenda) with the required language inserted at the top of the first page – Borrower signatures are not required); and Exhibit D (the most current version of the NY Single-Family Fannie Mae/Freddie Mac Uniform Security Instrument – Borrower signatures are not required)(Exhibits A through D are referred to collectively as "the Exhibits"); and

(C)     separate, originally executed Consolidated Note – original Consolidated Note with live Borrower signatures, endorsed in blank.  The Consolidated Note must be the most current version of the applicable Single-Family Fannie Mae/Freddie Mac Uniform Note with all blanks completed and any applicable addendum or addenda.

(ii)    <u>Mortgage File Requirements</u>.  With respect to NY CEMA Mortgages for which the NY CEMA delivery package consists of the documents listed above, Seller represents and warrants that:

(A)     if the most recent prior Mortgage was originated as a consolidated Mortgage using NY CEMA Form 3172, 1/01 or Form 3172, 1/01 (rev. 5/01), the Mortgage file contains (A) the NY CEMA with the Exhibits attached from the prior consolidation, (B) the original Consolidated Note from the prior consolidation, (C) the Original Old Money Note(s), and (D) the Original New Money (Gap) Note if new funds were advanced to the Borrower at the time of the current consolidation;

(B)     if the most recent prior Mortgage was originated as a consolidated Mortgage using the NY CEMA Form 3172, 7/86, the Mortgage file contains (A) the Original Old Money Note(s), (B) the NY CEMA with the Exhibits attached from the prior consolidation, and (C) the Original New Money (Gap) Note if new funds were advanced to the Borrower at the time of the current consolidation; and

(C)     if the most recent prior Mortgage was not originated using a NY CEMA Form 3172, 1/01, Form 3172, 1/01 (rev/ 5/01) or Form 3172, 7/86 (that is, the most recent prior Mortgage was not a consolidated Mortgage), the Mortgage file contains (A) the Original Old Money Note, and (B) the Original New Money (Gap) Note if new funds were advanced to the Borrower at the time of the current consolidation.

(b)   <u>Execution and Endorsement Requirements for Notes.</u>

All Old Money Notes and Original New Money (Gap) Notes and, if applicable, Consolidated Notes, must be original Notes, with live signatures by the Borrower, and must be endorsed in blank, whether the Notes are delivered to the Seller's Custodian or are permitted to be retained in the Mortgage file. If any of the Notes for a particular Mortgage that are required to be retained in the Mortgage file are copies and not original Notes, Seller may deliver such a Mortgage under the terms and provisions of the paragraph in this Attachment that is titled "Missing Original Notes," provided that the conditions of that paragraph are satisfied with respect to the particular Mortgage, and provided further that any such Mortgage documented by a NY CEMA with a missing original Note and delivered under this paragraph is counted in calculating the three percent unpaid principal balance limitation described in subparagraph (H) of that paragraph. If any of the original Notes required to be in the Mortgage file are missing and there is no copy, Seller must contact its Freddie Mac Account Manager to request an exception permitting purchase of the Mortgage.

(c)   <u>Documentation Requirements for Mortgages originated using NY CEMA Form 3172, 7/86.</u>

For Mortgages originated prior to January 1, 2001, using the NY CEMA Form 3172, 7/86, Seller must continue to deliver all of the documents required by Freddie Mac in its Industry Letter dated April 5, 2002.

## 13.   Use of Outdated NYCEMA

Freddie Mac will purchase Mortgages originated using an outdated version of the New York Consolidation, Extension and Modification Agreement (NYCEMA) (that is, using the 7/86 NYCEMA when the 1/01 NYCEMA or 1/01 (rev. 5/01) NYCEMA should have been used and using the 1/01 NYCEMA when the 1/01 (rev. 5/01) NYCEMA should have been used), provided that:

(a)   Seller represents and warrants that the Mortgages were originated correctly (that is, in accordance with the NYCEMA instructions) and all the requirements of the Uniform Instruments for exhibits, attachments, etc. were met, so that with respect to each such Mortgage, the documentation delivered including the NYCEMA, constitutes a valid and enforceable obligation of the Borrower secured by a first lien on the Mortgaged Premises; and

(b)   the aggregate number of Mortgages delivered under this paragraph, along with the Mortgages delivered under the paragraphs titled "Incomplete or Missing Endorsements", "Power of Attorney Provisions", and "Missing Original Notes", must not exceed three percent of the total number of Mortgages delivered to Freddie Mac under this Master Agreement.

**14.     Uncertified Copies of Documents**

Notwithstanding any provision or implication to the contrary set forth in Chapter 3 of Freddie Mac's Document Custody Handbook, if the original of any of the documents described below is not available, Seller may submit a photocopy of the document to the Custodian without certifying or obtaining a certification of the photocopied document, provided that:

(a)     the documents consist of the following:

·     an assumption agreement,
·     a Consolidation, Extension and Modification Agreement (commonly referred to as a "CEMA"),
·     a modification,
·     a power of attorney, and/or
·     a security instrument assignment;

(b)     Seller represents and warrants that the photocopy is a true, complete, correct and accurate copy of the original document;

(c)     Freddie Mac hereby identifies and Seller hereby agrees to treat the provisions set forth in this paragraph as "confidential information" as that term is defined in Section 2.16 of the Guide; and

(d)     if Seller uses a Custodian other than Freddie Mac's Document Control Custodial Services, Seller must provide a copy of this paragraph to the Custodian.

**Exhibit A**
Lost Note Certification

The undersigned hereby certifies as follows:

1.      The undersigned is the Assistant Vice President of Countrywide Home Loans, Inc. (the "Seller"), and in that capacity either has independent knowledge of acts set forth in this Certification or has made appropriate inquiry of those individuals having knowledge of the facts set forth in this Certification.

2.      Seller has reviewed its records relating to the following mortgage loan:

      (a)     Borrowers(s): _____

      (b)     Date of Note: _____

      (c)     Secured by Deed of Trust: recorded [date], [county], [state], _____ doc, _____ book, _____ page.

      (d)     Loan Number: _____

3.      On the Origination Date, the Note was duly executed and delivered to the lender. Thereafter, the original Note was misplaced, lost or destroyed and after a thorough and diligent search no one has been able to locate the original Note.  In the event the original Note is located at any time hereafter, Seller shall immediately notify Freddie Mac and deliver the original Note to Freddie Mac.

4.      Attached are true and correct photocopies of the front of the original Note showing execution by the Borrower and, if available, the back of the original Note showing all endorsements from lender to Seller.

5.      The mortgage loan was sold by Seller to Freddie Mac pursuant to Master Commitment (_____) dated (_____).

Countrywide Home Loans, Inc.

_____
By: [TYPE NAME]
Title: [TYPE TITLE]

## ATTACHMENT 25
## Mortgages with Delayed Note Certification

Seller may sell fixed-rate Mortgages and ARMs with respect to which the Custodian delays certification for up to 60 calendar days after the Freddie Mac Funding Date or Settlement Date, as the case may be (the "Delayed Certification Mortgages") and Seller may receive funding/settlement before certification of the related Notes by the Custodian, provided that:

(a)     on the Delivery Date, in lieu of a Custodian Certification Schedule – Form 1034S or a Custodian Certification Schedule Summary for Multiple Purchase Contracts – Form 1034SM (the "Form 1034S/SM"), Seller must deliver to Freddie Mac a Bill of Sale for either single contracts or multiple contracts, as appropriate, forms of which are attached hereto as Exhibits A, respectively, modified and completed as necessary and appropriate, and executed by an officer of Seller authorized to convey the Mortgages as set forth herein.  The Bill of Sale is deemed to be delivered to Freddie Mac when Freddie Mac receives the Bill of Sale by email or facsimile transmission as follows:

(i)     The Bill of Sale must be submitted to Freddie Mac by email transmission, unless email is not operable at the time of submission, in which case, the Bill of Sale must be submitted to Freddie Mac by facsimile transmission;

(ii)    for each Bill of Sale that is submitted to Freddie Mac by email transmission, the Seller must comply with the following provisions:

(A)    the Bill of Sale must be submitted as a Portable Document Format ("PDF") file and the Bill of Sale used to create the PDF file must have been executed by an officer of Seller authorized to convey the Mortgages as set forth herein;

(B)    the Bill of Sale must include the following verbiage immediately above the signature line for Seller's authorized officer:

I, as the authorized representative of Seller, hereby agree that by signing my name below:  (i) Seller has consented to conduct an electronic transaction with Freddie Mac by transmitting this Bill of Sale to Freddie Mac as a Portable Document Form ("PDF") file attached to an email as an Electronic Record together with the representation or image of my written signature attached to or logically associated with the PDF file as an Electronic Signature; (ii) Section 1.3 of the Guide applies to and governs this electronic transaction; (iii) I have signed and intended to sign this Bill of Sale; and (iv) Seller is bound by the electronic Bill of Sale in the same manner as Seller would be bound if the original executed Bill of Sale had been delivered to Freddie Mac;

    (C)  the email transmitting the Bill of Sale must be sent to Freddie Mac's Collateral Instrument Program Administration Department at email address fmmdm@freddiemac.com;

  (iii)  for each Bill of Sale that is submitted to Freddie Mac by facsimile transmission, the Seller must comply with the following provisions:

    (A)  the Bill of Sale that is transmitted to Freddie Mac by facsimile must have been executed by an officer of Seller authorized to convey the Mortgages as set forth herein;

    (B)  the Bill of Sale must include the following verbiage immediately above the signature line for Seller's authorized officer:

      I, as the authorized representative of Seller, hereby agree that by signing my name below:  (i) Seller has consented to conduct a transaction with Freddie Mac by transmitting a facsimile of this Bill of Sale to Freddie Mac together with a representation or image of my written signature affixed or attached to the facsimile of the Bill of Sale; (ii) Section 1.3 of the Guide applies to and governs this transaction; (iii) I have signed and intended to sign this Bill of Sale; and (iv) Seller is bound by the Bill of Sale sent by facsimile transmission in the same manner as Seller would be bound if the original executed Bill of Sale had been delivered to Freddie Mac.

    (C)  the facsimile of the Bill of Sale, together with a cover sheet identifying the name and business contact telephone number of the person sending the facsimile and stating the number of pages included in the facsimile, must be sent to Freddie Mac's Collateral Instrument Program Administration Department at facsimile number 703/738-2141.  To inform Freddie Mac that the Bill of Sale has been sent by facsimile, Seller must either email the Collateral Instrument Program Administration Department at fmmdm@freddiemac.com or contact Seller' Freddie Mac customer relations representative;

 (b)  no later than 6:00 p.m. east coast time on the 60th calendar day following the Funding or Settlement Date, as applicable, the following must have occurred:

  (i)  Seller must send the Notes, together with the Mortgage file documents and such other documentation not previously delivered, as required by Section 16.8(a), to the Custodian; and

(ii)    the completed and certified Form 1034S/SM, including any corrections to the data submitted to Freddie Mac, indicating the Custodian has certified the Notes in accordance with the Guide and the Document Custody Handbook, must be sent to Freddie Mac's Document Custodial Services Department by facsimile to facsimile number 703/738-2141 or electronically to email address fmmdm@freddiemac.com;

(c)    on the Funding or Settlement Date, as applicable, all right title and interest of Seller in and risk of loss with respect to the Delayed Certification Mortgages will pass to Freddie Mac.  From and after the Funding or Settlement Date, as applicable, until the Delayed Certification Mortgages are received by the Custodian:

(i)    Seller must, on behalf of Freddie Mac, maintain custody of all Notes and related documents in a vault under Seller's control;

(ii)    Seller must identify, on its computerized loan origination tracking system or other electronic systems, each Delayed Certification Mortgage as being owned by Freddie Mac;

(iii)    the Notes and related document must be retained by Seller solely for the purpose of servicing the Delayed Certification Mortgages and not as an indication of ownership; and

(iv)    no Delayed Certification Mortgage may be or may have been subject to any security interest, claims or encumbrances of any third party, including any warehouse lender;

(d)    all fixed-rate Mortgages must be sold under the Gold Cash or the fixed-rate Guarantor programs and all ARMs must be delivered under the ARM Cash or WAC ARM Guarantor programs; additionally, all Mortgages delivered to Freddie Mac in a single commitment or conversion must be Delayed Certification Mortgages;

(e)    Seller may concurrently transfer servicing of Delayed Certification Mortgages to its affiliate Countrywide Home Loans Servicing, L.P., Seller/Servicer #125949. Seller may not otherwise transfer servicing or custody of any Delayed Certification Mortgages until all Notes and related documents are delivered to the Custodian and Freddie Mac has received the completed and certified Form 1034S/SM;

(f)    If Seller has a warehouse lender for the Delayed Certification Mortgages, then either:

(i)     if Seller's warehouse lender for such Mortgages is not the same entity as its document custodian for the Mortgages, the warehouse lender must attach an addendum to the Warehouse Lender Release of Security Interest (Form 996), that states:

For Notes that are related to the Mortgages sold under Conversion Confirmation contract number _____ and that are in the possession of, or come into the possession of the warehouse lender, from the time the warehouse lender releases its warehouse lien on such Notes, the warehouse lender shall segregate such Notes from other notes in its possession and maintain continuous custody and control of such Notes on behalf of Freddie Mac.  The warehouse lender shall release Notes held on behalf of Freddie Mac to Seller solely for the purpose of Seller endorsing the Notes as required by Section 16.4 of the Guide.

(ii)    if Seller's warehouse lender for such Mortgages is the same entity as its document custodian for the Mortgages, the terms and conditions of the Custodial Agreement by and amongst Freddie Mac, Seller and the document custodian must be and is hereby modified by adding to Section 3 of the Custodial Agreement a new paragraph (e) that states:

(e)     Custodian as Warehouse Lender for Delayed Certification Mortgages.  In connection with Delayed Certification Mortgages sold to Freddie Mac under the terms of the Master Agreement, from the time Custodian, in its capacity as the Seller's warehouse lender, releases its warehouse lien on Notes in its possession, Custodian shall segregate such Notes from other notes in its possession, maintain continuous custody and control of such Notes on behalf of Freddie Mac and hold the Notes in secure and fire-resistive facilities, in accordance with customary standards for such storage.  Custodian shall release such Notes to the Seller solely for the purpose of the Seller endorsing the Notes with one of the endorsements in Section 2(d)(2) of this Agreement.  From and after the time the Notes have been endorsed by Seller, all duties and responsibilities of Custodian set forth in this Agreement shall appertain.

If this Agreement terminates under Section 6, or if the Seller uses a different document custodian for Mortgages sold to Freddie Mac, the provisions of this paragraph (e) shall continue to full force and effect for so long as Custodian is the Seller's warehouse lender;

    (g)     Seller represents and warrants that:

          (i)     in lieu of the Custodian performing a complete verification and certification of the Notes, the assignments (if applicable) and the delivery data before Freddie Mac purchases the Mortgages as required by Section 18.6(b) of the Guide, the Seller has developed and implemented processes and controls to verify that (A) the information on each Note matches the corresponding information contained in the delivery data submitted to Freddie Mac in connection with each Delayed Certification Mortgage, and (B) the assignments (if applicable) are prepared, executed and recorded where required (such processes and controls, "Verification Process"); and

          (ii)    by the Delivery Date, all Delayed Certification Mortgages have been processed through Seller's Verification Process;

    (h)     if Seller is unable to resolve certification issues with respect to any particular Note, Seller or its Custodian may request that Freddie Mac grant a single loan exception for the applicable Mortgage, and upon Freddie Mac's receipt of such a request, Freddie Mac may at its sole discretion issue a single loan exception (subject to such conditions as may be imposed by Freddie Mac) that permits certification of the Mortgage even though certain specified data fields may be incomplete, inconsistent or inaccurate. Mortgages that are certified pursuant to such single loan exceptions will be deemed to have been fully and completely certified as required by the Guide and this paragraph. If Seller is unable to resolve issues with respect to any Notes (and the applicable Mortgage is not subject to a single loan exception) by the 50th calendar day following the Funding or Settlement Date, as applicable, the Seller or its Custodian must notify Freddie Mac's Collateral Instrument Program Administration Department with the following information:

          (i)     the Freddie Mac contract conversion number and the Funding or Settlement Date, as applicable, of the uncertified Mortgages;

          (ii)    with respect to each uncertified Mortgage, the Freddie Mac loan number, the loan amount, status of certification, a description of any issues preventing or delaying certification, proposals for resolving the certification problems, the date on which the resolution is expected to be accomplished; and

          (iii)   the notification must be in a format approved by Freddie Mac and must be transmitted to Freddie Mac by electronic mail to Freddie Mac's Collateral Instrument Program Administration Department at fmmdm@freddiemac.com;

(i)    if Seller has not provided Freddie Mac with a certification for all Delayed Certification Mortgages within the timeframe and in the manner required by this paragraph, the following provisions will apply:

    (i)    if on the 90th calendar day following the Funding or Settlement Date, as applicable, any of the Mortgages have not yet been certified, Freddie Mac may assess Seller with a fee of $25,000.00, in addition to pursuing any other remedies it has under the terms of this paragraph and the Purchase Documents; and

    (ii)    any such fee will be assessed in accordance with the process described in Section 17.2 of the Guide;

(j)    at any point in time, the aggregate unpaid principal balance of all Delayed Certification Mortgages with respect to which the Notes and related documents have not been certified may not exceed $10 billion;

(k)    if, upon final certification by the Custodian or upon review by Freddie Mac, it is discovered that the data delivered to Freddie Mac by Seller on Delayed Certification Mortgages was incorrect in such a manner as to affect the PC Pool disclosure information provided to investors or potential investors ("Data Defects"), Seller agrees:

    (i)    to pay to Freddie Mac a data correction fee to correct security level Data Defects;

    (ii)    to hold Freddie Mac harmless and indemnify Freddie Mac and/or a third party purchaser of a PC containing Delayed Certification Mortgages that is found to be defective due to Data Defects from and against any and all losses, damages, claims, demands, actions, suits or liabilities, joint or several, to which Freddie Mac or the third party purchaser may become subject, and to reimburse Freddie Mac for any legal or other expenses reasonably incurred by Freddie Mac in connections with investigating or defending any such losses that are based upon Data Defects; and

    (iii)    in addition to any remedies described in this paragraph, Freddie Mac reserves its rights to any other remedies available to Freddie Mac in the Guide;

(l)     Freddie Mac will require that Seller meet certain performance standards for the quality of the loan data delivered to Freddie Mac by Seller in connection with Delayed Certification Mortgages.  To create the performance standards for loan data quality, Freddie Mac will measure Seller's performance against an index (the "Index") that will include, but not be limited to, comparisons to industry standards, certain Freddie Mac imposed benchmarks, and the performance of other Freddie Mac sellers that deliver Mortgage under the Mortgage certification process described in the Guide.  Freddie Mac may create a separate Index for various products, such as fixed-rate Mortgages or ARMs.  Using the Index, Freddie Mac will establish an acceptable level of performance of loan data quality for Seller under this Master Agreement (the "Minimum Performance Standard").  If either (i) Seller's loan data quality, as measured periodically by Freddie Mac, is less than the Minimum Performance Standard; or (ii) Seller fails to comply with any requirement of this paragraph, Freddie Mac may at its option impose additional conditions and/or requirements on Seller's continued ability to deliver Delayed Certification Mortgages, which could include terminating the provisions of this paragraph, in whole or in part, upon written notice to Seller.  Notwithstanding the provisions herein, Seller understands and agrees that, pursuant to the requirements of Section 6.1 of the Guide, all data delivered by Seller must be true, complete and accurate;

(m)     Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, upon written notice to Seller during the term of this Agreement;

(n)     the terms and conditions contained herein shall be deemed to be an amendment to the Custodial Agreement by and among the Seller, the Custodian and Freddie Mac.  Seller must provide a copy of this paragraph to the Custodian; and

(o)     Freddie Mac hereby identifies and Seller agrees to treat the special provisions set forth herein as "confidential information" as that term is defined in Section 2.16 of the Guide.

**Exhibit A**

**BILL OF SALE FOR "ONE" CONTRACT**
# DELAYED CERTIFICATION

**Seller Name and Address**:                    **Master Commitment Number**:_____
_____
_____                    **Conversion Confirmation Number**:_____

**CONTRACT NUMBER**_____
                                        **Number of Loans delivered under the**
**Seller/Servicer Number**:                 **Conversion Confirmation:** _____
_____
                                        **Freddie Mac loan number listed in the**
                                        **Conversion Confirmation:**
                                            **First FM loan number:**_____
                                            **Last FM loan number:**_____

 ("Seller") hereby sells, conveys, assigns and transfers to Federal Home Loan Mortgage
Corporation ("Freddie Mac"), its successors and assigns, the mortgages (including evidences of
indebtedness secured thereby, along with rights, title and interests therein, and any property, real
or personal, received or acquired in substitution or realization thereof) identified in the
Conversion Confirmation number indicated above (the "Mortgages").
This Bill of Sale is conveyed to Freddie Mac pursuant to the above referenced Master
Commitment and Conversion Confirmation by and between Freddie Mac and Seller.  The rights
and obligations of the parties to this Bill of Sale shall be governed by the Purchase Documents,
as defined in the *Freddie Mac Single-Family Seller/Servicer Guide*, in effect on the date hereof,
all of which are fully incorporated herein by reference.

In Witness Whereof, the Seller sets its hand and seal, this ____day of _____, 200____.

**Seller Name**:_____

**By**: _____

**Type Name and Title**: _____

Person to whom Freddie Mac may direct questions regarding this Bill of Sale:

**Name:**_____   **Title:**_____

**Telephone Number:**_____

**Exhibit B**

# BILL OF SALE FOR MULTIPLE DELIVERIES
### DELAYED CERTIFICATION

**(BILL OF SALE MUST INCLUDE SIGNATURE PAGE TO BE VALID)**

Seller Name:
_____

Seller/Servicer Number:_____

-

Address:_____

Master Commitment #:

Seller Phone Number:_____      _____

Custodian Number:_____   Delayed Certification Due Date:_____

| # | Contract NUMBER | Loan Count | Beginning Loan# | Ending Loan# | UPB | DCS Initials |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | | | |
| 13 | | | | | | |
| 14 | | | | | | |
| 15 | | | | | | |
| 16 | | | | | | |
| 17 | | | | | | |
| 18 | | | | | | |
| 23 | | | | | | |

**TOTAL UPB**  $0.00

**TOTAL NUMBER OF CONTRACTS**

**TOTAL NUMBER OF PAGES**

# BILL OF SALE FOR MULTIPLE DELIVERIES

*Delayed Certification  Yes  X*          | *MC #_____* |

The Seller identified on Page l of this Bill of Sale, for value received
($_____ ), hereby sells, conveys, assigns and transfers to the
Federal Home Loan Mortgage Corporation ("Freddie Mac"), its successors and assigns
the mortgages (including evidences of indebtedness secured thereby, along with
rights, title interests therein, and any property, real or personal, received or
acquired in substitution or realization thereof) identified in the Contract number(s) indicated above.

This Bill of Sale is conveyed to Freddie Mac pursuant to the above-referenced Master
Commitment between Freddie Mac and Seller.  The rights and obligations of the parties to this
Bill of Sale are governed by the Purchase Documents, as defined in the Freddie Mac
Single-Family Seller/Servicer Guide, in effect on the date hereof, all of which are fully
incorporated herein by reference.

In Witness Whereof, the Seller executes this Bill of Sale this ____day of _____, 200__.

The Seller identified above, for value received
**S/S Name** _____

**By** _____
**(Signature)**

_____
**(Name)**

_____
**(Title)**

Operational contact to whom Freddie Mac may direct questions regarding this Bill of Sale:
Preparer's Name:_____
Telephone Number: (       )_____-_____

**ATTACHMENT 26**
**No A-minus Fees for Manually Underwritten Mortgages - Exhibit 19**

In connection with the delivery of Manually Underwritten Mortgages, Seller will not be assessed CS/LTV (A-minus) delivery fees even if the Mortgages have the characteristics that would otherwise subject them to such fees under Exhibit 19, provided that:

(a)     in connection with the delivery of each Manually Underwritten Mortgage, Seller must insert "944" (indicating Non-AUS Mortgage with no CS/LTV fee) in one of the special characteristic code fields on the Form 11 or Form 13SF, as applicable;

(b)     the proportion of Manually Underwritten Mortgages sold by Seller to Freddie Mac each quarter during the term of this Agreement must not be greater than the proportion of Manually Underwritten Mortgages sold to Fannie Mae during the same period of time; and

(c)     Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, upon 60 days written notice to Seller during the term of this Master Agreement.

**ATTACHMENT 27**
**Provisions Relating to Alt A Mortgages**


Under the terms of this Agreement, Seller may deliver Mortgages that were originated pursuant to underwriting guidelines providing for nonstandard verification and documentation requirements (such Mortgages, "Alt A Mortgages"), provided the Mortgages comply with the provisions of this Attachment and, except as specifically provided otherwise herein, satisfy the requirements of the Guide and this Agreement ("Alt A Mortgages").

1.    Definition of Seller's Loan Programs.  For purposes of this Attachment, the phrase "Seller's Loan Programs" means the following sections of Seller's Loan Program Guide, last revision dated 10/29/2004:

| Section Number | Section Title |
| --- | --- |
| 13.10 | Non-Conforming Fixed Rate Expanded Criteria – Owner-Occupied, Second Homes, and Investment Property and 80/20 Option |
| 19.30 | Non-Conforming Fixed Period ARMs – Fixed Period LIBOR ARM - Countrywide Fast and Easy (sm) Interest Only Program - Owner Occupied and Second Home |
| 19.60 | Non-Conforming Fixed Period ARMs – Interest Only Fixed Period LIBOR ARM - Owner Occupied and Second Home |
| 21.10 | Non-Conforming Expanded Criteria Fixed Period ARMs – 3/1, 5/1,7/1 and 10/1 Fixed Period ARM and 3/1, 5/1,7/1 and 10/1 Interest Only Fixed Period ARM – Full/Alternative and Reduced Documentation and 80/20 Option |
| 21.20 | Non-Conforming Expanded Criteria Fixed Period ARMs – 3/1, 5/1,7/1 and 10/1 Fixed Period ARM and 3/1, 5/1,7/1 and 10/1 Interest Only Fixed Period ARM – No Ratio/NINA (No Income No Asset) |
| 21.30 | Non-Conforming Expanded Criteria Fixed Period ARMs – 3/1, 5/1,7/1 and 10/1 Fixed Period ARM and 3/1, 5/1,7/1 and 10/1 Interest Only Fixed Period ARM – Stated Income and Stated Assets (SISA) |

Copies of the Seller's Loan Programs are attached hereto as Exhibit A-1 through A-6 and made a part hereof.

2.    Origination Criteria.  The Alt A Mortgages were originated pursuant to (a) the underwriting provisions of Seller's Loan Programs, and (b) the provisions of Volumes I and IA of the Guide that were in effect on the date of the origination of the Mortgages. To the extent of an inconsistency between Seller's Loan Programs and the Guide, the Seller's Loan Programs will prevail.

3.   <u>Mortgage Documentation and Verification Requirements</u>.  Seller acknowledges that Freddie Mac makes an assessment about how Mortgages were verified and documented during the origination and underwriting process based on the Seller's Loan Programs and certain other information provided by Seller to Freddie Mac.  The following chart sets forth (a) the Freddie Mac code abbreviation of the types of documentation and verification requirements applicable to the Mortgages sold hereunder, (b) a summary description of the documentation and verification requirements applicable to the particular Freddie Mac code, (c) the corresponding alpha or numeric code delivered by Seller, and (d) a description of the applicable portion of Seller's Loan Programs.  Seller agrees that the following classifications by Freddie Mac are an accurate interpolation of Seller's codes and Seller's Loan Programs:

| Freddie Mac's Code | Freddie Mac's Summary of Documentation Requirements | Seller's Code | Applicable Seller's Loan Program |
|---|---|---|---|
| FULL | Full and alternative documentation as required by the Guide | Full/Alt | 13.10 19.60 21.10 |
| ALT | Streamlined refinanced mortgages documented in accordance with Seller's Loan Program Guide | Streamline | 13.10 19.60 21.10 |
| Reduced | One year income verified: (a) a copy of W-2 for the most recent tax year from all employers; and (b) a copy of pay stub for the most recent pay period reflecting year-to-date earnings or the most recent year's tax return submitted to the IRS. | N/A | N/A |
| SIVA | Stated income and assets verified; a signed IRS Form 4506 may be required for some borrowers | Reduced | 13.10 19.60 21.10 |
| SISA | Employment, income, and assets must be fully disclosed on the loan application, but are not verified; an IRS Form 4506 may, or may not be obtained | Fast & Easy | 19.30 21.30 |
| No Ratio | Income is neither disclosed nor verified; assets are disclosed and verified; typically a verbal VOE is obtained | No Ratio | 21.20 |
| NINA | Income and assets are neither disclosure nor verification, but employment is verified | NINA | 21.20 |
| No Doc | Employment/income and assets –are neither stated nor verified | N/A | N/A |

4.     Delivery Under Separate Master Commitment.  Alt A Mortgage must be delivered under Master Commitments that specifically provide for the sale of Alt A Mortgages.  The form of the Alt A Master Commitment is attached hereto as Exhibit B.

5.     Credit Enhancement of Certain Mortgages.  Certain of the Alt A Mortgages as specified in the Master Commitment must be sold to Freddie Mac subject to a credit enhancement arrangement, which the parties have agreed will consist of a mortgage pool insurance policy (the "MPI Policy") issued by a mortgage insurer (the "Insurer") and obtained by Freddie Mac.  The Master Commitment will provide, among other things, that:

(a)     Seller agrees to undertake on behalf of Freddie Mac certain obligations with regard to the Mortgages imposed by the MPI Policy;

(b)     Seller is obligated, among other things, to (i) provide information requested by the Insurer in connection with periodic quality control reviews of Mortgages, (ii) promptly respond to the Insurer's requests for loan information and documentation, and (iii) perform certain default reporting and claims filing; and

(c)     if the Insurer determines at any time for reasons specified in the MPI Policy that a Mortgage is not eligible for coverage by the MPI Policy, Seller is obligated to repurchase such Mortgage or to provide recourse or indemnification to Freddie Mac with respect to such Mortgage, as required by Freddie Mac.

6.     Seller's Indemnification.  If at the time of delivery of the Alt A Mortgages under the terms of this Attachment, Freddie Mac is unable to obtain an MPI Policy or other adequate credit enhancement for the Alt A Mortgages, Seller will provide indemnification to Freddie Mac with respect to such Mortgages.

7.     Special Characteristic Codes for Documentation Type.  In connection with the delivery of any Mortgage that was originated using the following described documentation and verification procedures pursuant to Seller's Loan Programs, Seller must enter in the special characteristics code fields of the *Mortgage Submission Schedule* – Form 11 or *Mortgage Submission Voucher* – Form 13SF, as appropriate, the following codes identifying the type of documentation used in underwriting the applicable Mortgage:

| Documentation Type | FICO Score | TLTV ratios | SCC Code |
|---|---|---|---|
| Full/Alt | >680 | All TLTV ratios | G09 |
| Full/Alt | <680 | All TLTV ratios | G10 |
| Low Doc | >700 | <90% | G10 |
| No Doc | >720 | <75% | G10 |
| Low Doc | <700 | <90% | G11 |
| No Doc | >720 | <90% and >75% | G11 |
| Low Doc | >90% | All TLTV ratios | G12 |
| No Doc | <720 | All TLTV ratios | G12 |
| No Doc | All FICO scores | >90% | G12 |

| Seller's Code | Freddie Mac Code | SCC Code |
|---|---|---|
| Reduced | SIVA | D06 |
| Fast & Easy | SISA | D07 |
| No Ratio | No Ratio | D08 |
| NINA | NINA | D09 |

All Mortgages delivered with an SCC that begins with "G" (except for Mortgages originated using Full/Alt documentation) must also be delivered with an SCC that begins with "D".

8.  <u>Data Delivery Instructions Regarding Seller Loan Programs.</u>  In connection with the delivery of Mortgages originated under the following Seller's Loan Programs that did not require Borrower to state income, Seller is not required to complete the field of the Form 11 or 13SF, as applicable, titled "monthly debt payment", nor the field titled "monthly income":

| Seller Loan Program | Freddie Mac Code and SCC |
|---|---|
| 21.20 | No Ratio – D08 |
| 21.20 | NINA – D09 |

For Mortgages originated under the following Seller's Loan Programs, Seller must enter "Y" in the "reduced documentation" field of the Form 11 or 13 SF, as applicable:

| Seller Loan Program | Freddie Mac Code and SCC |
|---|---|
| 13.10, 19.60, 21.10 | SIVA – D06 |
| 19.30, 21.30 | SISA – D07 |
| 21.20 | No Ratio – D08 |
| 21.20 | NINA – D09 |

**Exhibit A**
*Pool Insurance Attachment*

This Pool Insurance Attachment sets forth the provisions applicable to certain Mortgages purchased under this Master Commitment, that are subject to a credit enhancement, which the parties hereto agree consists of a mortgage pool insurance policy obtained by Freddie Mac.

**Section I.  Definitions**

1.      Capitalized terms used in and not defined in this Pool Insurance Attachment have the meanings assigned them in the Purchase Documents (as that term is defined in the Master Commitment).

2.      Whenever used in this Pool Insurance Attachment, the following words and phrases will have the following meanings, unless the context requires otherwise:

      (a)      "Delinquent Mortgage" means an Insured Mortgage:

            (i)      that is thirty (30) or more calendar days delinquent;

            (ii)      for which Freddie Mac is holding any REO Property; or

            (iii)      for which REO Property has been sold or otherwise disposed of but for which Freddie Mac has not been reimbursed losses covered under the MPI Policy.

      (b)      "Insured Mortgages" means Mortgages having loan-to-value ratios greater than 51 percent that are sold under the Master Commitment and for which pool mortgage insurance is obtained under an MPI Policy as required by the Master Commitment.

      (c)      "Insurer" means [XX] or any successor insurance company approved by Freddie Mac that provides an MPI Policy.

      (d)      "Loss Mitigation Activities" means any modification of loan documents or other concessions to the borrower with respect to a Mortgage, including without limitation, any incentive or below-market financing, or any sale of the REO Property, including a sale for a price less than the indebtedness approved by Insurer.

(e)     "Mortgage Cure" means the occurrence of one of the following conditions:

(i)     the final sale or other disposition of any property relating to a Delinquent Mortgage and the real property encumbered by any such Mortgage (including, without limitation, with the approval of Freddie Mac and/or Insurer, as applicable, delivery of the property to Seller or retention of the property by the Borrower pursuant to Freddie Mac's Loss Mitigation Activities), and payment of all amounts due Freddie Mac with respect to any claim, and reimbursement of any Uncovered Losses, arising from such activity;

(ii)     the Delinquent Mortgage becoming current through payment of all outstanding delinquent amounts;

(iii)     the payment in full of the Delinquent Mortgage; or

(iv)     the repurchase of the Delinquent Mortgage by Seller according to the repurchase procedures in the Guide.

(f)     "MPI Policy" means a mortgage pool insurance policy or mortgage trust supplemental policy, substantially identical to the specimen policy attached hereto and in a form otherwise acceptable to Freddie Mac, by which Insurer agrees to provide pool insurance coverage with respect to each Insured Mortgage.

(g)     "Policy Termination Date" means [XX].

(h)     "REO Property" means any real property and personal property that is or was: (a) encumbered by a Mortgage, and (b) acquired through foreclosure or deed-in-lieu of foreclosure.

(i)     "Uncovered Losses" means losses resulting from a Borrower's default under an Insured Mortgage that (a) are attributable to Seller's or the designated servicer's breach of its representations and warranties made to Freddie Mac or the violation of other provisions of the Purchase Documents relating to the origination, delivery and servicing of the Insured Mortgages, (b) are not approved by Freddie Mac in accordance with Chapter 71 of the Guide and (c) Insurer determines not to cover due to a material misrepresentation made by Seller or the designated servicer, or by the Borrower.

**Section II.  General Terms**

1.      The MPI Policy contains the following terms:

     (a)      The Named Insured is Freddie Mac and such insurance is solely for the benefit of Freddie Mac.

     (b)      The MPI Policy is effective as of the first Business Day of the month in which the Insured Mortgages are purchased by Freddie Mac.

     (c)      The term of the MPI Policy will continue until the Policy Termination Date, except that the MPI Policy will not terminate as to any Delinquent Mortgage until a Mortgage Cure has occurred with respect to each such Delinquent Mortgage.

2.      Except as otherwise specified herein, all references in the Guide (other than in Section 27.1 and Chapter 61) to:

     (a)      a mortgage insurer (MI) are deemed to include Insurer <u>and</u> any primary mortgage insurer; and

     (b)      mortgage insurance are deemed to include pool insurance as evidenced by the MPI Policy and any primary mortgage insurance policy.

**Section III.  General Obligations of Freddie Mac**

1.      For each Insured Mortgage, Freddie Mac will deliver all basic loan data required by the Insurer to determine that the Insured Mortgages will be covered under the MPI Policy and to calculate the applicable premiums.  The basic loan data will be derived from information provided to Freddie Mac by Seller.

2.      The aggregate unpaid balance of the Insured Mortgages will be verified and reconciled by Freddie Mac at the time the MPI Policy is issued.

3.      Freddie Mac shall pay the initial premiums and all renewal premiums as required by the MPI Policy for Insured Mortgages eligible for coverage to become and remain Insured Mortgages.

4.      Freddie Mac will file all claims under the MPI Policy, with Freddie Mac indicated as the "payee".

**Section IV.  General Obligations of Seller**

1.      With respect to the loan numbers:

- that are assigned to the Insured Mortgage by either Seller, the originator or any predecessor in interest of the Insured Mortgages, or the Servicer or any Servicing Agent of the Insured Mortgages ("Seller/Servicer loan number"), and that are assigned to the Insured Mortgages by Freddie Mac in connection with the purchase of the Mortgages (the "Freddie Mac loan number"); and
- that are provided to the Insurer by Freddie Mac pursuant to Section III above,

Seller, no later than the Settlement Date, must forward to the Insurer a cross-reference list or a cross-referencing tool or key to ensure that each individual Insured Mortgage can be accurately and consistently identified using either the Freddie Mac loan number or the Seller/Servicer loan number.  If after the Settlement Date, the Seller/Servicer loan number of any Mortgage changes, Seller must notify the Insurer of the change by no later than the 30th day after the Settlement Date.

2.      During the term of the MPI Policy, the Seller must notify the Insurer of the name and contact person of any Servicing Agent of the Insured Mortgages.

3.      Seller is responsible for the accuracy of the information provided to Freddie Mac which Freddie Mac provides to the Insurer pursuant to III, above.  Seller must promptly update this information for Insurer if any Insured Mortgages are repurchased by Seller.

4.      Seller must provide Insurer with all reports and information relating to the Insured Mortgages requested by the Insurer or required by the MPI Policy in the manner proscribed by the MPI Policy, including monthly default reporting.  Seller must also provide Insurer with all assumption and delinquency information requested by the Insurer or required by the MPI Policy relating to the Insured Mortgages.

5.      If Seller at any time determines that the current unpaid principal balance of an Insured Mortgage as reflected on the records of the Insurer or Freddie Mac is different than the actual unpaid principal balance of such Insured Mortgage, Seller must notify Freddie Mac in writing and must provide Freddie Mac with the actual unpaid principal balance of all such Insured Mortgages.

6.      Seller must promptly execute and/or deliver all documents and take all other actions necessary to comply with the requirements of the MPI Policy and must perform all of the obligations of Freddie Mac as named insured thereunder except for those obligations specifically undertaken by Freddie Mac under Section III, above.  In particular and without limitation, upon request by the Insurer, Seller must provide the Insurer with complete mortgage files for any Insured Mortgages selected by the Insurer for quality control or other review.

7.     Seller agrees to implement any procedural changes necessary to perform its obligations under this Pool Insurance Attachment, provided that such changes do not materially alter Seller's obligations under this Pool Insurance Attachment.

8.     Seller's obligations to comply with the terms of the MPI Policy and this Pool Insurance Attachment are in addition to, and not in lieu of, its obligations to comply with the terms of the primary mortgage insurance policy, and the provisions of the other Purchase Documents, applicable to the Insured Mortgages.

9.     At the time of the Policy Termination Date, Seller must identify any Insured Mortgage for which coverage does not terminate and must continue to monitor and take all appropriate actions with regard to those Insured Mortgages until such time as coverage actually terminates.

## Section V.  Servicing Obligations of Seller

1.     Seller must service each and every Insured Mortgage in accordance with the MPI Policy, this Pool Insurance Attachment and the Purchase Documents.

2.     Freddie Mac must receive the final Form 104, Statement of Loan and Real Estate Owned Expenses and Income, within 30 days of the settlement date relating to the sale of the REO Property.

3.     Seller must undertake all actions necessary or appropriate to perfect any claim under the MPI Policy.  If Seller fails to take all steps necessary to perfect a claim with the primary mortgage insurer or Insurer for a loss covered by the primary mortgage insurance policy or the MPI Policy, as applicable, and such failure results in the primary insurer or Insurer, as applicable, not covering all or a portion of such loss, then Freddie Mac may require Seller to reimburse Freddie Mac for such loss in the amount that would have been covered under the primary mortgage insurance policy and/or the MPI Policy, as applicable, or exercise any other remedies available under the Guide.

4.     If applicable, when completing Freddie Mac Form 1076, Notification of Foreclosure Sale and Acquisition of Title, and/or Freddie Mac Form 1098, Worksheet for Notification of Mortgages Approved for Foreclosure, Seller must complete all information relating to mortgage insurance by referencing the applicable primary mortgage insurance policy.  In addition, the line titled "Mortgage Insurance Information" must be completed by referencing the applicable primary mortgage insurance policy.

5.      If applicable, when completing Freddie Mac Form 1126, Workout Fact Sheet, in addition to providing required information relating to the primary mortgage insurance coverage, Seller must provide the name of the Insurer, the applicable policy number for the MPI Policy, and the certificate number for the applicable Insured Mortgage.  In addition, Seller must type or stamp "Pool Insurance" across the top of the Form 1126.

## Section VI.    Transfer of Coverage to Successor Insurer

If Freddie Mac transfers the coverage to a successor insurer, Seller agrees to cooperate and assist in finding a new insurer and in transferring the coverage.  Such cooperation and assistance will include, but not be limited to, providing all reasonable loan records, data and mortgage files necessary for review by the successor insurer.  In the event the coverage is transferred to a successor insurer, Seller will remain responsible for all obligations described in this Pool Insurance Attachment for maintaining the coverage.

## Section VII.  Termination of Provisions of Pool Insurance Attachment

1.      Subject to the provisions of Section VII, paragraph 2, below, the provisions of this Pool Insurance Attachment and the obligations and responsibilities of the parties set forth herein will terminate with respect to each individual Insured Mortgage on the earlier of:

    (a)     the date on which the Insured Mortgage is not longer covered by the MPI Policy; or

    (b)     the Policy Termination Date of the MPI Policy.

2.      The MPI Policy will not terminate with respect to any individual Delinquent Mortgage until a Mortgage Cure has occurred as to such Mortgage, and the provisions of this Pool Insurance Attachment will not terminate with respect to such Mortgage until the Mortgage Cure. Termination of the provisions of this Pool Insurance Attachment will not release Seller from any obligations or responsibilities to the extent of (a) any action or omission by Seller prior to termination which, if properly undertaken, would have resulted in reimbursement to Freddie Mac under the terms of the MPI Policy or this Pool Insurance Attachment, or (b) any claim which may be filed or is pending at the time of such termination, which Seller must diligently pursue until final resolution.

**Section VIII.  Notice Instructions**

All notices, requests and other communications pursuant to this Pool Insurance Attachment must be in writing with return receipt required, and must be delivered either by hand, by letter, or by facsimile, addressed as follows:

If to Seller,

> Countrywide Home Loans, Inc.
> Attention:  [XX]
> [XX]
> Facsimile No.: [XX]
> Telephone No.: [XX]

If to Freddie Mac,

> Federal Home Loan Mortgage Corporation
> 8200 Jones Branch Drive, MS 124
> McLean, VA  22102
> Attention:  Cash Management Operations/ Fees & Claims – Pool Insurance
> Facsimile No.: 703/903-2737
> Telephone No.: 703/903-2612

or to such other address as the party to receive any such communication or notice may have designated by written notice to the other party at the above address.  All periods of notice will be measured from the date of hand delivery, or from the date of receipt thereof, if sent by letter or by telecopy.

**Section IX.  Repurchase of Mortgages**

In the event that coverage under the MPI Policy has been denied by the Insurer with respect to any Insured Mortgage or the MPI Policy has not been obtained within 30 calendar days following the last Business Day of the month the Mortgages were purchased by Freddie Mac, Freddie Mac will (a) require that Seller repurchase such Mortgage(s) in accordance with the procedures set forth in accordance with Chapter 72 of the Guide or provide recourse or indemnification to Freddie Mac with respect to such Mortgage(s), and/or (b) exercise any other remedies available under the Purchase Documents.  Seller must immediately undertake such action with respect to such Mortgages as required by Freddie Mac.

With respect to any Mortgage subject to Uncovered Losses, Freddie Mac is entitled to exercise any remedies provided in the Purchase Documents or at law or in equity, including, without limitation, requiring Seller to repurchase such Mortgage.

If any Mortgage is subject to repurchase by Seller, the repurchase price will be determined in accordance with the Guide.  Nothing contained in this Pool Insurance Attachment will in any way limit or affect any repurchase, recourse, indemnification or other obligation of Seller under the Guide or any other Purchase Document.

## Section X.  Transfer of Servicing

1.      Seller may concurrently transfer servicing of the Insured Mortgages to its affiliate, Countrywide Home Loan Servicing, L.P.

2.      Subsequent Transfers of Servicing of any Insured Mortgages will be considered by Freddie Mac only after a written request has been submitted to Freddie Mac in accordance with the requirements set forth in the Guide.  When submitting a request for a subsequent Transfer of Servicing on Freddie Mac Form 981, Agreement for Subsequent Transfer of Servicing, Seller must check "yes" in Part A.6 and enter "pool insurance".  Approval of such request will be in Freddie Mac's sole discretion.  The terms and conditions of any subsequent Transfer of Servicing will be determined by Freddie Mac at the time of approval of the request.

3.      In the event the servicing for any Insured Mortgage is transferred with the approval of Freddie Mac, notwithstanding any provisions of Form 981 or any other transfer documentation, Seller will not be released from its obligations set forth in this Pool Insurance Attachment without the express written consent of Freddie Mac.  Freddie Mac will not provide such consent unless the new Servicer agrees to assume Seller's obligations under this Pool Insurance Attachment.

## Section XI.  Assignment

Freddie Mac may assign any of its obligations under this Pool Insurance Attachment to a third party with the consent of Seller, which consent will not be withheld unreasonably.  Subject to the consent of Freddie Mac, which consent will not be unreasonably withheld, Seller may assign its obligations under this Pool Insurance Attachment to the surviving entity of any merger, acquisition or other reorganization involving Seller.  Seller may not otherwise assign its obligations under this Pool Insurance Attachment except as set forth in this Section XI or Section X, above.

**Exhibit B to Provisions Relating to Alt A Mortgages**
**Form of Master Commitment**

**MASTER COMMITMENT**
**#T[XX]**

This Master Commitment, dated as of [XX], 2004 (the "Master Commitment"), is by and between Freddie Mac and Countrywide Home Loans, Inc., Seller/Servicer #204305 ("Seller").

This Master Commitment sets forth the terms and conditions of Seller's sale to Freddie Mac of the Mortgages described herein.  The provisions Master Agreement #MA[XX], in particular the provisions of the Attachment to the Master Agreement titled "Provisions Relating to Alt A Mortgages", apply to and are incorporated into this Master Commitment.

**Section I.  General Terms**

1.  <u>Master Commitment Amount</u>.  The Master Commitment Amount is $[XX], less a purchase tolerance of 10 percent of such amount.

2.  <u>Required Delivery Date</u>. The Required Delivery Date is [XX].

3.  <u>Optional Delivery</u>.  Delivery under the terms of this Master Commitment is optional.  There is no pair-off fee.

4.  <u>Eligible Mortgages</u>.  The Mortgages sold hereunder are:

    - [XX]
    - [XX]

5.  <u>Delivery Program</u>.  The Mortgages may be sold under the Guarantor Program only.

**Section II.  Financial Terms of Sale and Servicing**

1.  <u>Required Spread</u>.  The Required Spread for the Mortgages is [XX].

2.  <u>Remittance Cycle.</u>  Seller must use the [XX] remittance cycle for the Mortgages.  The Required Spread specified above is based upon Seller's use of such remittance cycle.

3.  <u>Buyups and Buydowns</u>.  Seller may elect to use the buyup or buydown option for fixed-rate Mortgages.  Seller may not elect to use the buyup or buydown option for ARMs. The maximum buyup is [XX] basis points.

4.  <u>Minimum Servicing Spread.</u>  The Minimum Servicing Spread for all fixed-rate Mortgages is 25.0 basis points.

5.     <u>No Delivery Fees.</u>  No delivery fees are due upon delivery of any of the Mortgages.

6.     <u>Credit Enhancement of Certain Mortgages</u>.  All Mortgages having loan-to-value ratios greater than 51 percent are subject to a credit enhancement arrangement, which the parties have agreed consists of a mortgage pool insurance policy or mortgage trust supplemental policy (the "MPI Policy") issued by a mortgage insurer (the "Insurer") and obtained by Freddie Mac.  Seller agrees to undertake the obligations set forth in the Pool Insurance Attachment, attached hereto as Exhibit "A".

## Section III.  Mortgage Eligibility Criteria

1.     <u>Additional Mortgage Characteristics</u>.  Notwithstanding any provisions to the contrary set forth in the Master Agreement or Seller's Loan Programs, Seller represents and warrants that the Mortgages delivered hereunder must comply with the following provisions:

    (a)     the Mortgages must be secured by Mortgaged Premises that have flood insurance coverage as required by the Guide;

    (b)     each Mortgage must be serviced in accordance with Volume II of the Guide;

    (c)     [Insert Insurer's Exclusions]

In the event Seller delivers a Mortgage that do not comply with the characteristics described in this paragraph, Seller must, at Freddie Mac's option, either (i) repurchase Freddie Mac's interest in such Mortgage, (ii) provide recourse with respect to the Mortgage, (iii) indemnify Freddie Mac from any loss or expense Freddie Mac may sustain with respect to such Mortgage, or (iv) undertake any other remedy provided for in the Guide.

2.     <u>Minimum Mortgage Insurance Requirements</u>.  Notwithstanding any provisions to the contrary set forth in Seller's Loan Programs, with respect to mortgage insurance coverage:

    (a)     each Mortgage with an original LTV ratio greater than 80 percent up to but not greater than 95 percent must have mortgage insurance coverage that meets the coverage levels specified in Section 27.1(a) of the Guide and that otherwise satisfies the requirements (including the cancellation restrictions) of the Guide as of the Origination Date; and

    (b)     each Mortgage with an original LTV ratio greater than 95 percent must have mortgage insurance coverage of at least 35 percent and must otherwise satisfy the requirements of the Guide as of the Origination Date.

**Section IV.  Data Integrity**

1.  <u>Accuracy of Loan Data</u>.  Seller has delivered to Freddie Mac certain loan and servicing data with respect to the Mortgages that Freddie Mac relied upon in negotiating the terms of purchase of the Mortgages with Seller.  Seller acknowledges and agrees that the loan and servicing data provided by Seller determines, among other things, the appropriate product and program codes that are used in connection with delivery of the Mortgages. Seller represents and warrants that:

    (a)   all loan origination information provided to Freddie Mac is true, complete and accurate as of the Origination Date of such Mortgage; and

    (b)   all loan and servicing data provided to Freddie Mac in connection with its evaluation of the Mortgages purchased under this Master Commitment is true, complete and accurate.

2.  <u>Remedies Relating to Data Integrity</u>.  If (a) the due diligence information contained on the loan data reports is not accurate, true or complete, (b) Seller fails to provide such additional information or documentation as may be required with respect to any specific Mortgage or group of Mortgages, or (c) notwithstanding such information or documentation, Seller breaches any representation or warranty applicable to such Mortgage, Freddie Mac may require Seller to repurchase a Mortgage.  Seller agrees that any loan data relating to the validity of the Mortgage documents (including, for example, the fact that an altered note or security instrument may not have the required Borrower initials) in no manner limits or negates any of Seller's warranties under the Purchase Documents.

**Section V.  Portfolio Provisions**

1.  <u>Borrower Creditworthiness</u>.  Seller must make the following representations and warranties regarding Borrower creditworthiness:

    (a)   the Borrower demonstrated acceptable credit and capacity as required by the Purchase Documents in effect on the Origination Date; and

    (b)   as of the Delivery Date, the Borrower's current credit and capacity was acceptable as required by the Purchase Documents in effect on the Delivery Date.

2.  <u>Property Value</u>.  Seller must make the following representations and warranties regarding the Mortgaged Premises:

    (a)   the appraisal relied on at time of origination demonstrated the eligibility, value and marketability of the Mortgaged Premises as of the Origination Date; and

(b)   the Mortgaged Premises met the requirements for eligibility, value and marketability under the applicable provisions of the Purchase Documents in effect on the Delivery Date.

## Section VI.  Delivery Restrictions and Instructions

1.   <u>Delivery Limitations of Certain Types of Mortgages</u>.  Mortgages having the following characteristics must not exceed the following delivery limitations:

| Type of Mortgage | Percentage of Deliveries (aggregate UPB) |
|---|---|
| "Cash-out" refinance Mortgages | |
| Investment Property Mortgages | |
| Mortgages secured by 2-4 unit properties | |
| Mortgages secured by Second Homes | |
| Mortgages secured by units in Condominium Projects | |
| Mortgages with LTV ratios >80% <=90% | |
| Mortgages with LTV ratios >90% <=95% | |
| Mortgages with LTV ratios >95% <=100% | |
| Mortgages originated under Seller's Loan Programs 13.10, 19.60, 21.10 (SIVA – SCC code D06) | |
| Mortgages originated under Seller's Loan Programs 19.30, 21.30 (SISA – SCC code D07) | |
| Mortgages originated under Seller's Loan Programs 21.20 (No Ratio – SCC code D08) | |
| Mortgages originated under Seller's Loan Programs 21.20 (NINA – SCC code D09) | |

2.   <u>California Condominium Unit Mortgages</u>.  For any Mortgages delivered under this Master Commitment that are California Condominium Unit Mortgages, Seller must enter "263" (indicating that the delivery fee is included in the Required Spread) in one of the special characteristics code fields of the Form 11 or Form 13SF, as applicable.

IN WITNESS WHEREOF, Seller and Freddie Mac have caused this Master Commitment to be duly executed by their respective authorized representatives as of the date first set forth above.

**FEDERAL HOME LOAN MORTGAGE CORPORATION**

**COUNTRYWIDE HOME LOANS, INC.**

By: _____    By: _____

Name: _____    Name: _____

Title: _____    Title: _____

Date: _____

**ATTACHMENT 28**
**Provisions Applicable to Mortgages Originated by Seller's Builder Partners**

**Section I.   Provisions Applicable to Mortgages Originated by any of Seller's Builder Partners.**

The following provisions and waivers are applicable to Mortgages originated by any of Seller's builder partners through Seller's Correspondent Lending Division.

1.   Mortgages Secured by Properties Used as Model Homes – Section 22.16.  Mortgages secured by residences that are purchased by Borrowers who, after the loan closing lease the Mortgaged Premises back to the builder/property sellers to be used as model homes will be eligible to be sold as Mortgages secured by Primary Residences, provided that:

   (a)   the lease agreement between the Borrower and the builder/property seller must:

      (i)   have a term of no more than 12 months; and

      (ii)   provide that, prior to the end of the lease term, the builder/property seller must convert the Mortgaged Premises to a typical residence; for example, if the garage was used as a sales office during the term of the lease, it must be converted back into a garage before the end of the lease; and

   (b)   Seller must indemnify and hold Freddie Mac harmless from and against any loss, claim, damage, default or delay in enforcement that may arise with respect to the Mortgage until the date Borrower occupies the Mortgaged Premises as a Primary Residence.

2.   Age of Credit and Verification Documentation – Sections 23.6(d), 37.10(i) and 37.20(d).  Mortgages (including construction to permanent Mortgages) with respect to which the credit and employment documentation is dated more than 120 days or 180 days, as applicable, before the Note Date (or with respect to construction to permanent Mortgages, before the date of conversion to the permanent Mortgage) are eligible for purchase, provided that:

   (a)   credit and employment documentation must be dated no more than 270 days before the Note Date (or with respect to construction to permanent Mortgages, before conversion to the permanent Mortgage);

   (b)   each Mortgage is a purchase money Mortgage secured by a newly-constructed 1-unit Primary Residence;

   (c)   each Mortgage has LTV and TLTV ratios not exceeding 90 percent;

(d)      upon closing of the Mortgage, the Borrower has reserves, as defined in Section 26.5 of the Guide, of not less than six monthly payments of principal, interest and tax and insurance;

(e)      each Mortgage is a Loan Prospector Accept Mortgage or a DU Approve/Eligible Mortgage;

(f)      before the Note Date (or with respect to construction to permanent Mortgages, before the final disbursement of construction funds), Seller must telephonically reverify the Borrower's employment and must obtain an in-file credit report for the Borrower and:

    (i)      if the new verification of employment or the new in-file credit report indicates there is a change in the Borrower's employment status, Seller must obtain a new verification of income;

    (ii)     if the new verification of income indicates Borrower's income has decreased significantly, Seller must requalify Borrower based on the income reflected in the new verification of income; and

    (iii)    if the new in-file credit report contains information that shows a significant negative change in Borrower's credit history or that indicates Borrower's income has decreased significantly, Seller must obtain a new verification of income and requalify the Borrower.

3.      <u>Streamlined Refinance Mortgages – Section 24.3</u>.  Streamlined refinance Mortgages that have junior liens representing either a prior or a new loan, and that have maximum LTV and/or TLTV ratios that differ from those specified in Section 23.4 are eligible for purchase, provided that:

(a)      the LTV and TLTV ratios of each Mortgage must not exceed the following:

| Property type | LTV ratio | TLTV ratio |
|---|---|---|
| Primary Residence | | |
|   1-unit | 95% | 100% |
|   2 unit | 90% | 90% |
|   3-4 unit | 80% | 80% |
| Second Home | 70% | 70% |

(b)      the Borrower must have an Indicator Score of not less than 680; and

(c)      Seller must obtain and maintain in the Mortgage file a new appraisal at least as comprehensive as a Form 2055 with an interior and exterior inspection.

4. <u>Financing Concessions to Cover Closing Costs – Section 25.3(b)</u>.  Mortgages that have LTV ratios greater than 90 percent and that are originated with financing concessions exceeding three percent of value (as defined in Section 23.1, the "Value") are eligible for purchase, provided that:

(a) the amount of the financing concessions must not exceed four percent of the Value;

(b) the party making the financing concessions must be the home builder;

(c) the financing concessions must be used to make contributions related only to Prepaid/Escrow items, Closing Costs and Financing Costs;

(d) the financing concessions must not have resulted in an increase in the Note Rate;

(e) each Mortgage is a purchase money Mortgage and has an LTV ratio (calculated in accordance with Section 23.2 of the Guide) not greater than 95 percent when including, in the principal balance of the Mortgage, the amount of that portion of the financing concessions that exceeds three percent;

(f) the value, condition and marketability of the Mortgaged Premises was not determined through an alternative valuation model ("AVM");

(g) the appraiser must indicate on the appraisal or inspection report that the appraised value of the Mortgaged Premises does not include the amount of the financing concessions; and

(h) the aggregate unpaid principal balance of Mortgages with financing concessions described in this paragraph must not exceed five percent of the aggregate unpaid principal balance of all Mortgages originated under the provisions of this Attachment and sold to Freddie Mac; compliance with this delivery limitation will be determined on the basis of Mortgage sales each quarter during the term of this Agreement.

5. <u>Financing Concessions to Cover Sales Commission on Prior Residence – Section 25.3(b)</u>.  Mortgages with respect to which the property seller contributes funds to pay the sales commission on the Borrower's previous residence are considered to be Mortgages with "financing concessions" (rather than "sales concessions") and are eligible for purchase subject to the provisions of Section 25.3(b) of the Guide, provided that:

(a) the Mortgages are secured by 1-unit Primary Residences;

(b) such Mortgages must not be secured by units located in a condominium or cooperative project or Manufactured Homes;

(c) the LTV and TLTV ratios of the Mortgages must not exceed 95 percent;

(d)    the financing concessions must not exceed the maximum financing concession allowed under Section 25.3(b) of the Guide;

(e)    the entire minimum down payment must be from Borrower Funds and no portion of the financing concession may be applied toward the minimum down payment;

(f)    the value, condition and marketability of the Mortgaged Premises was not determined through an alternative valuation model ("AVM");

(g)    the appraiser must indicate on the appraisal or inspection report that the appraised value of the Mortgaged Premises does not include the amount of the financing concessions; and

(h)    the aggregate unpaid principal balance of Mortgages with financing concessions described in this paragraph must not exceed five percent of the aggregate unpaid principal balance of all Mortgages originated under the provisions of this Attachment and sold to Freddie Mac; compliance with this delivery limitation will be determined on the basis of Mortgage sales each quarter during the term of this Agreement.

6.    <u>Mortgages with Compressed Buydowns – Section 25.4</u>.  Mortgages that are subject to temporary buydown plans that adjust twice each year ("Compressed Buydowns") are eligible for purchase, provided that:

(a)    each Mortgage is a purchase money or "no cash-out" refinance Mortgage;

(b)    each Mortgage is secured by a 1-unit Primary Residence and has an LTV ratio not exceeding 90 percent;

(c)    the buydown plan is financed by either the originator of the Mortgage or the Borrower;

(d)    the initial interest rate is not more than 2 percent below the Note Rate;

(e)    the first interest adjustment is at least six months after the Note Date;

(f)    the interest rate adjustment does not increase the Note Rate by more than 1 percent at each adjustment;

(g)    the Mortgaged Premises securing the Mortgage is not located in an area over six months marketing time, declining values, or an oversupply of housing; Mortgages located in areas with any of those characteristics are not eligible for purchase under the provisions of this paragraph;

(h)     the Borrower is qualified as follows:

    (i)     for Mortgages with LTV ratios not exceeding 75 percent, at an interest rate no more than two percent below the Note Rate; and

    (ii)    for Mortgages with LTV ratios greater than 75 percent, at an interest rate no more than one percent below the Note Rate;

(i)     the monthly housing expense-to-income ratios and the monthly debt payment-to-income ratios do not exceed 28 percent and 33 percent, respectively; and

(j)     the aggregate unpaid principal balance of Mortgages with Compressed Buydowns which are secured by units in a condominium project or PUD must not exceed ten percent of the aggregate unpaid principal balance of all Mortgages with Compressed Buydowns sold to Freddie Mac during the term of this Agreement.

7.    <u>Limited Project Review – Section 42.10</u>.  Condominium Unit Mortgages that meet the requirements of this paragraph are eligible for streamlined project review and must comply with only the warranties specified in the last five bullets of Section 42.10 instead of all the warranties applicable to Class I, II and III Condominium Projects set forth in Chapter 42.  The requirements for such Condominium Unit Mortgages are as follows:

(a)     each Condominium Unit Mortgage must be:

    (i)     a purchase transaction or "no cash-out" refinance Mortgage;

    (ii)    a fixed-rate Mortgage (excluding Balloon/Reset Mortgages), or a 3/1, 5/1, 7/1 or 10/1 ARM;

    (iii)   secured by a 1-unit Primary Residence and have an LTV ratio not exceeding 95 percent, or secured by a second home and have an LTV ratio not exceeding 90 percent;

    (iv)    secured by a unit located in a newly constructed Condominium Project; Mortgages secured by structures that have been converted for use as Condominium Units are not eligible for purchase under the provisions of this paragraph;

    (iv)    a Loan Prospector Accept Mortgage or a DU Approve/Eligible Mortgage;

(b)     at least 70 percent of the units sold in the legal phase of the Condominium Project in which the Mortgaged Premises is located must be sold to individuals for use as their Primary Residences, and no more than 10 percent of the units so sold may be Investment Properties;

(c)     Seller must review the appraisal and:

    (i)     determine that marketability has been established for both the Condominium Unit and the Condominium Project;

    (ii)    determine that the Condominium Project is not located in an area with over six months marketing time, declining values, an oversupply of housing or that is less than 25 percent developed; Condominium Unit Mortgages located in areas with any of those characteristics are not eligible for purchase under the provisions of this paragraph; and

    (iii)   if the appraisal indicates the Condominium Project has deferred maintenance, Seller must review the Condominium Project budget to determine there is an adequate reserve fund to cover repairs and replacements;

(d)     if the Condominium Project has a lease on recreational areas, Seller must determine that the lease is not in default and the lease agreement is subordinate to the lien of the Condominium Unit Mortgage; and

(e)     the aggregate unpaid principal balance of Condominium Unit Mortgages subject to streamlined project review as described in this paragraph must not exceed five percent of the aggregate unpaid principal balance of all Condominium Unit Mortgages sold to Freddie Mac during the term of this Agreement.

8.     <u>Reciprocal Project Review Based on Fannie Mae Conditional Project Acceptance – Form 1027 – Section 42.11.</u>  Condominium Unit Mortgages secured by Condominium Units located in Condominium Projects that have obtained a Conditional Project Approval – Fannie Mae Form 1027, but that are not yet eligible for a Final Project Approval – Fannie Mae Form 1028, are eligible for purchase, provided that:

(a)     each such Mortgage is a Loan Prospector Accept Mortgage or a DU Approve/Eligible Mortgage;

(b)     the Condominium Unit must be located in a Class I Condominium Project; and

(c)     until half of the Condominium Units located in the phase or project covered by the Fannie Mae Form 1027 are sold to bona fide purchasers who have closed or are obligated to close, Seller may deliver to Freddie Mac no more than 5 percent of the Condominium Units in such phase or project; after half of the Condominium Units located in the phase or project covered by the Fannie Mae Form 1027 are so sold, there are no restrictions on the number of Condominium Units from the particular phase or project that may be delivered to Freddie Mac.

9.     <u>Use of Master Appraisals – Section 44.7</u>.  Mortgages with respect to which the reports evidencing that the Mortgaged Premises are acceptable for the transactions consist of a DU Master Appraisal Report – Fannie Mae Form 2045, a DU Master Appraisal Pilot Worksheet, and a Form 2055 with an interior and exterior inspection of a model home comparable to the residence to be constructed on the Mortgaged Premises (such documents are collectively referred to as the "Master Appraisal") are eligible for purchase, provided that:

    (a)    each such Mortgage is secured by a 1-unit Primary Residence or Second Home;

    (b)    the Mortgage is a purchase transaction of new construction;

    (c)    the Master Appraisal is effective for 180 days; if construction of the residence is not completed within such period of time, the Master Appraisal may be updated and extended by a Value Certification – Fannie Mae Form 2045A signed by either an appraiser or an employee of the lender who has appropriate qualifications and construction knowledge to confirm that the as-built Mortgaged Premises match the applicable plans and specifications.  The Value Certification updating and extending the Master Appraisal is effective for 120 days.  New Value Certifications may be issued from time to time sequentially as necessary to update and extend the Master Appraisal; and

    (d)    upon completion of construction of the new residence, Seller may obtain and maintain in the Mortgage file, in lieu of a Satisfactory Completion Certificate as required by Section 44.14, documentation indicating that an appraiser or a knowledgeable employee of the lender (as described above) has performed a final property inspection to confirm construction completion.

10.     <u>Final Property Inspection – Section 44.14</u>.  For appraisal reports made subject to repairs, alterations or conditions or subject to completion in accordance with plans and specifications, the Seller may include in the Mortgage file, in lieu of a Satisfactory Completion Certificate as required by Section 44.14, either:

    (a)    a final certificate of occupancy issued by the appropriate local authority; or

    (b)    a warranty of substantial completion of construction signed by the builder/property seller and the lender, indicating construction is complete.

**Section II.  Provisions Applicable to Mortgages Originated by NVR, Inc. Only**.

The following provisions and waivers are applicable to Mortgages originated only by Seller's builder partner, NVR, Inc.

1.  Age of Verification Documentation for Two-Closing Construction-Permanent Mortgages – Section 23.6(d).  Two-closing construction to permanent Mortgages with respect to which the credit and employment documentation is dated more than 180 days before the conversion to, or the Note Date of, the permanent loan, are eligible for purchase, provided that:

  (a)  credit and employment documentation must be dated not more than 300 days before the conversion to, or the Note Date of, the permanent loan;

  (b)  each Mortgage is a Loan Prospector Accept Mortgage; additionally, once the credit report for any Mortgage is more than 180 days old, the Mortgage must be resubmitted to Loan Prospector and must again be classified as an Accept Mortgage; and

  (c)  before the final disbursement of construction funds, Seller must telephonically reverify the Borrower's employment and must obtain an new credit report for the Borrower and:

    (i)  if the new verification of employment or the new credit report indicates there is a change in the Borrower's employment status, Seller must obtain a new verification of income;

    (ii)  if the new verification of income indicates Borrower's income has decreased significantly, Seller must requalify Borrower based on the income reflected in the new verification of income;

    (iii)  if the new credit report contains information that shows a significant negative change in Borrower's credit history or that indicates Borrower's income has decreased significantly, Seller must obtain a new verification of income and requalify the Borrower; and

    (iv)  if the new credit report shows the Borrower has initiated any new loans, Seller must obtain documentation verifying the source of Borrower's funds to close the Mortgage.

2.  Financing Concessions from Interested Party Affiliates –Section 25.3(b).  Mortgages that are originated with financing concessions exceeding the maximum amounts specified in the last three bullet points of Section 25.3 are eligible for purchase, provided that:

  (a)  each Mortgage is a purchase transaction relating to a newly constructed 1-unit Primary Residence;

(b)    the parties making the financing concessions must be the Mortgage originator, NVR Mortgage, and one of its affiliated home builders; but no more than two interested parties to the transaction may contribute towards the financing concessions;

(c)    the financing concessions contributed by each interested party must not exceed the maximum financing concession allowed under Section 25.3(b) of the Guide;

(d)    the maximum amounts of the financing concessions, based on value (as defined in Section 23.1, the "Value"), are:

- 18 percent of Value for Mortgages with LTV ratios less than or equal to 75 percent

- 12 percent of Value for Mortgages with LTV ratios greater than 75 percent up to and including 90 percent

- 6 percent of Value for Mortgages with LTV ratios greater than 90

(e)    the value, condition and marketability of the Mortgaged Premises was not determined through an alternative valuation model ("AVM"); and

(f)    the appraiser must indicate on the appraisal or inspection report that the appraised value of the Mortgaged Premises does not include the amount of the financing concessions.

3.    <u>Financing Concessions Exceeding 3 Percent – Section 25.3(b)</u>.  Mortgages with LTV ratios greater than 90 percent and with respect to which interested party contributions exceed 3 percent of value (as defined in Section 23.1, the "Value") are eligible for purchase as Mortgages with a financing concession (rather than a sales concession), provided that:

(a)    the financing concession must not exceed 3.5 percent of Value;

(b)    the entire minimum down payment must be from Borrower Funds and no portion of the financing concession may be applied toward the minimum down payment;

(c)    the portion of the financing concessions that exceeds 3 percent of Value must be applied only to Closing Costs;

(d)    the value, condition and marketability of the Mortgaged Premises was not determined through an alternative valuation model ("AVM");

(e)    the appraiser must indicate on the appraisal or inspection report that the appraised value of the Mortgaged Premises does not include the amount of the financing concessions;

(f)     Seller represents and warrants that the sales price was not affected in any way by the financing concessions;

(g)     at Freddie Mac's request, Seller must prepare and forward Freddie Mac a report in the form specified by Freddie Mac that identifies the Mortgages originated and sold to Freddie Mac under this paragraph; and

(h)     if the LTV ratio of the Mortgage plus the percentage amount of interested party contributions exceeds 100 percent or if the Mortgage has an LTV ratio (calculated in accordance with Section 23.2 of the Guide) of greater than 100 percent when including in the principal balance of the Mortgage the amount of the financing concessions, the Mortgage is not eligible for sale to Freddie Mac.

4.    <u>Mortgages with Buydowns Plans Secured by Investment Properties that are Model Homes – Section 25.4.</u>  Mortgages that are secured by Investment Properties and that are subject to temporary buydown plans are eligible for purchase, provided that:

(a)     each Mortgage is a fixed-rate, purchase transaction Mortgage that has an LTV ratio not exceeding 90 percent;

(b)     the Investment Property securing the Mortgage is a newly-constructed, detached 1-unit property that is purchased by a Borrower who after the loan closing enters into a lease agreement to lease the property back to the builder/property seller to be used as a model home;

(c)     the builder/property seller is an affiliate of the lender;

(d)     the lease agreement between the Borrower and the builder/property seller must provide that prior to the end of the lease term, the builder/property seller must convert the Mortgaged Premises to a typical residence; for example, if the garage was used as a sales office during the term of the lease, it must be converted back into a garage before the end of the lease;

(e)     rental income from the Investment Property may be used to qualify the Borrower as provided in Section 37.14(c) except that:

    (i)     Borrower need not demonstrate at least a two-year history of managing Investment Properties; and

    (ii)    Borrower must be qualified using the lower of the amount of rent specified in the lease agreement or the fair market rent as determined on the Operating Income Statement - Form 998; and

(f)     such Mortgages may be subject to a temporary interest rate buydown provided that:

    (i)     initial interest is no more than 2 percent below the Note Rate;

        (ii)     the interest rate adjustments do not occur more frequently than once each 6 months, and the interest rate adjustment does not increase by more than (A) 1 percent at each semi-annual adjustment or (B) 2 percent upon the annual adjustment;

        (iii)    the Mortgage is a Loan Prospector Accept Mortgage; and

        (iv)    the Borrower is qualified at no less than the Note Rate.

5.      <u>Gift Funds as Downpayment – Section 26.2</u>.  In connection with Mortgages having LTV ratios greater than 80 percent, Borrower may use a gift from a Related Person of the Borrower for all of the required down payment (without making a down payment of 5 percent from other sources of cash or other Equity), provided that:

        (a)     the gift funds do not have to be repaid and are documented according to Section 37.20d;

        (b)     the Borrower has assets (such as stocks, retirement accounts or mutual fund accounts) that, if liquidated, would be sufficient to pay the entire down payment, and the gift funds are provided to avert liquidation of such assets prior to origination of the Mortgage; and

        (c)     the Mortgage is a Loan Prospector Accept Mortgage.

6.      <u>Verification of Source of Earnest Deposits – Section 26.7</u>.  Mortgages with respect to which the source of Borrower's earnest deposit was not verified are eligible for purchase, provided that:

        (a)     the documentation in the Mortgage file verifies that Borrower has liquid assets in an amount sufficient to pay the required down payment (excluding the earnest deposit), Prepaids/ items, Closing Costs, and Financing Costs; and

        (b)     the Mortgage is a Loan Prospector Accept Mortgage.

7.      <u>Financed Mortgage Insurance Premiums – Section 27.1.1</u>.  Mortgages with financed premiums with respect to which the Gross LTV ratio (that is, the LTV ratio calculated using the Mortgage amount which includes the financed mortgage insurance premium) exceeds 95 percent are eligible for purchase, provided that:

        (a)     (i)     the Base TLV ratio (that is, the LTV ratio calculated using the Mortgage amount without the financed mortgage insurance premium) does not exceed 95 percent; and

                (ii)    the Gross LTV ratio does not exceed 97.65 percent;

        (b)     the Mortgage is a fixed-rate Mortgage (excluding Balloon/Reset Mortgages);

(c)     except as otherwise provided in this paragraph, the Mortgage complies with the provisions of Section 27.1.1(a)(1), as well as the last two full paragraphs of Section 27.1.1(a);

(d)     in connection with the delivery of each such Mortgage, Seller must insert in one of the special characteristic code fields on the Form 11, the code specified below:

| Code | Type of Mortgage |
|------|------------------|
| 681 | Financed MI – 81% Base LTV ratio (that is, the LTV ratio calculated without the mortgage insurance premium) |
| 682 | Financed MI – 82% Base LTV ratio |
| 683 | Financed MI – 83% Base LTV ratio |
| 684 | Financed MI – 84% Base LTV ratio |
| 685 | Financed MI – 85% Base LTV ratio |
| 686 | Financed MI – 86% Base LTV ratio |
| 687 | Financed MI – 87% Base LTV ratio |
| 688 | Financed MI – 88% Base LTV ratio |
| 689 | Financed MI – 89% Base LTV ratio |
| 690 | Financed MI – 90% Base LTV ratio |
| 691 | Financed MI – 91% Base LTV ratio |
| 692 | Financed MI – 92% Base LTV ratio |
| 693 | Financed MI – 93% Base LTV ratio |
| 694 | Financed MI – 94% Base LTV ratio |
| 695 | Financed MI – 95% Base LTV ratio |

8.     <u>Payments on Bridge Loans – Section 37.16(2)</u>.  Mortgages with respect to which principal and/or interest payments on an advance of the equity in the Borrower's former Primary Residence ("bridge loan") are excluded from the calculation of the Borrower's debt payment-to-income ratio are eligible for purchase, provided that:

(a)     the bridge loan is not a lien against the Mortgaged Premises securing the Mortgage delivered to Freddie Mac; and

(b)     the terms of the bridge loan must not require payment until the Borrower's former Primary Residence is sold and the bridge loan must be satisfied from the proceeds of such sale.

**Section III.  Provisions Applicable to Mortgages Originated by K. Hovnanian Mortgage Only.**

The following provisions and waivers are applicable to Mortgages originated only by K. Hovnanian Mortgage.

1.  <u>Verification of Source of Earnest Deposits – 26.7</u>.  Mortgages with respect to which the source of Borrower's earnest deposit was not verified are eligible for purchase, provided that:

    (a)  each Mortgage is a purchase money Mortgage secured by a 1-unit Primary Residence and has an LTV ratio not exceeding 95 percent;

    (b)  Mortgages secured by a Manufactured Home, Affordable Gold Mortgages and Mortgages originated under a Special Housing Initiative as described in Chapter 35 may not be originated under this paragraph;

    (c)  Borrower must have an Indicator Score of not less than 720;

    (d)  the Mortgage must be a Loan Prospector Accept Mortgage or a CLUES Accept Mortgage (including a CLUES Accept Mortgage originated under Seller's Fast & Easy program);

    (e)  Borrower's earnest deposit must not exceed 3 percent of the required down payment; and

    (f)  the documentation in the Mortgage file must verify that Borrower has liquid assets in an amount sufficient to pay the required down payment (excluding the earnest deposit), Prepaids/Escrow items, Closing Costs and Financing Costs.

**Section IV.  Termination of the Provisions of this Attachment**.

Freddie Mac may amend, supplement, revise or terminate any of the provisions of this Attachment, in whole or in part, upon 60-days prior written notice to Seller during the term of this Master Agreement.

**ATTACHMENT 29**
**ARMs with Nonstandard Caps**

Under the terms of this Agreement, Seller may deliver nonconvertible ARMs with nonstandard Caps, which ARMs are (i) documented by mortgage instruments other than the Uniform Instruments specified in Section 30.12 of the Guide and/or (ii) are not currently mortgage products eligible for purchase under the Guide, provided such ARMs otherwise satisfy the requirements of the Guide ("Nonstandard ARMs").

A.      General Requirements.  The general terms and conditions under which Seller may sell Nonstandard ARMs to Freddie Mac in exchange for WAC ARM PCs are as follows:

1.      Attached hereto is Exhibit 17 – Addenda titled *Offer Product and Offer Program Numbers for ARMs Eligible under the WAC ARM Guarantor Program*, which supplements Exhibit 17 of the Guide.  Nonstandard ARMs delivered by Seller must have the loan characteristics and comply with the requirements of Exhibit 17 - Addenda.

2.      Except as otherwise specified in this Attachment, Nonstandard ARMs must be underwritten and originated in accordance with the terms and conditions applicable to ARMs set forth in the Guide and this Agreement.

3.      Except as otherwise specified in this Attachment, Nonstandard ARMs must be sold to Freddie Mac in accordance with the terms and conditions governing the sale of ARMs to Freddie Mac in exchange for WAC ARM PCs specified in the Guide and this Agreement.

4.      Seller must make specimens of the mortgage instruments relating to the Nonstandard ARMs, such as the Note and Security Instrument and any riders and/or addenda to the Note and Security Instrument (collectively, the "Nonstandard Instruments") available to Freddie Mac upon request. Seller must review the Nonstandard Instruments and, based on such a review and upon such further inquiry and review as Seller deems necessary or appropriate, Seller makes the warranties and representations set forth in the following paragraphs.

B.      Warranties relating to Nonstandard Instruments.  Seller makes the following representations and warranties about the Nonstandard Instruments:

1.      The Nonstandard ARMs were originated on the Note and Rider forms that are identified at Exhibit 17 - Addenda, and on a Security Instrument form that is the applicable jurisdiction's Fannie Mae/Freddie Mac Uniform Instrument in effect as of the Note Date.

2.      The Nonstandard Instruments, including the assumability provisions, allow for servicing in full compliance with the Guide and applicable law.

3.      The Initial Period, the subsequent adjustment period, the Initial Cap, the Periodic Cap and the Life Cap of the Nonstandard ARMs are as set forth in Exhibit 17 - Addenda.

C.      <u>Delivery and Pooling Requirements</u>.  All Nonstandard ARMs must be delivered under the WAC ARM Guarantor program only.  The offer product/program numbers and the index source codes for the Nonstandard ARMs are as set forth in Exhibit 17 - Addenda. Nonstandard ARMs must be pooled in the manner described in Chapter A13 of the Guide for ARMs delivered under the WAC ARM Guarantor program.

D.      <u>Additional Disclosure</u>.  Seller must prepare and distribute an Additional Supplement as described in Section 11.20 of the Guide for any PC Pool comprising the Nonstandard ARMs identified in Exhibit 17 – Addenda.  The Additional Supplement form applicable to the Nonstandard ARMs is attached at Exhibit A.

**Exhibit 17 – Addenda**
**Eligible Nonstandard ARM Programs under the WAC ARM Guarantor Program - Offer Product and Offer Program Numbers**

| Offer Product Number | Offer Program Number | ARM Product | Index Description | ARM Index Source Code | Lookback Period | Initial Period (months) | Subsequent Adjustment period (months) | Initial Cap % | Periodic Cap % | Life Cap % # | Assumability | WAC ARM PC Prefix | Additional Supplement Required (Yes or No) | Note and Rider- | Note and Rider –Fannie Mae Form |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 192 | 017 | 3/1 | 1-Year Weekly CMT | 04 | 45 days | 36 | 12 | 3 | 2 | 6 | After initial period | 78 | Yes (Form at Exhibit A) | | Form 5531 and 5131 |

**Legend:**
\# Life Cap may be less than or equal to 6%

**Exhibit A**

**Additional Supplement for Mortgage Participation Certificates (PCs)**
**3/1 ARMs that are Assumable After Initial Period**

The following prototype Additional Supplement form is not a final document; it must be reviewed carefully and completed by the Seller. All the fields enclosed by brackets are required to be completed.

To complete the Additional Supplement for 3/1 ARMs that are Assumable After Initial Period, insert the Settlement Date in the field titled "*Additional Supplement dated ___*", and insert the PC Pool and CUSIP numbers of the PC Pool, as well as Seller's name in the appropriate fields.

**Freddie Mac**

**Additional Supplement for Mortgage Participation Certificates (PCs)**
**3/1 ARMs Assumable After Initial Period**

**ADDITIONAL SUPPLEMENT dated [          ], 200[          ]**

| | |
|---|---|
| **PC Pool Number:** [          ] | **Seller Name: Countrywide Home Loans, Inc.** |
| **CUSIP Number:** [          ] | 4500 Park Granada MS CH-58 |
| | Calabasas, CA  91302 |

This Additional Supplement describes certain characteristics of the PCs and/or the Mortgages comprising the PC Pool that are not contained in the information and characteristics set forth in our Offering Circular for Mortgage Participation Certificates dated July 1, 2004, as is may be supplemented from time to time ("PC Offering Circular") or the related Pool Supplement. This information is as of the PC issue date and supplements the information in the related Pool Supplement.  Information and representations in this Additional Supplement about the seller and the Mortgages are the information and representations only of the seller of the Mortgages; we make no representations or warranties concerning the accuracy or completeness of the information contained herein. You should purchase the PCs only after reading this Additional Supplement, the Pool Supplement and the PC Offering Circular.  Capitalized terms used in this Additional Supplement (other than capitalized terms that are defined in this document) have the same meanings as in the PC Offering Circular.  The Additional Supplement incorporates by reference the PC Offering Circular and the related Pool Supplement.

We guarantee the payment of interest and principal on the PCs as described in the PC Offering Circular.  Principal and interest payments on the PCs are not guaranteed by and are not debts or obligations of the United States or any federal agency or instrumentality other than Freddie Mac. The PCs are not tax-exempt securities.  Because of applicable securities law exemptions, Freddie Mac has not registered the PCs with any federal or state securities commission.  No securities commission has reviewed this Additional Supplement.

**MORTGAGES -- Special Mortgage Characteristics**

*Assumability*

The ARMs in this PC pool are assumable after the initial period.



Last Revision Date:    10/29/2004

## SECTION 13:  NON-CONFORMING FIXED RATE EXPANDED CRITERIA

## 13.10:  Owner-Occupied, Second Homes, and Investment Property and 80/20 Option

This section of the **Loan Program Guide** includes guidelines for expanded loan-to-value, combined loan-to-value ratios, and loan amounts, as well as enhancements not available under Countrywide's standard criteria.

Additionally, this section includes the **80/20 Option** that allows **100% financing** for eligible Borrowers with **No downpayment required** on purchase transactions.  This option allows for a 80% first mortgage and a 20% second mortgage, allowing qualified Borrowers to purchase a property without the expense for mortgage insurance.  There is also 100% financing allowed for rate and term refinances.  The secondary financing may be a Home Equity Line of Credit (HELOC) or a closed end second from CHL or another institutional lender.  Existing secondary financing may be subordinated on refinance transactions.  Special Requirements and Restrictions pertaining to the **80/20 Option** are identified at the end of this loan program.

| Name | Program ID |
|------|-----------|
| NonConf Fixed 30 Expanded Criteria | 293 |
| NonConf Fixed 30 Expanded Criteria Prepay | 396 |
| NonConf Fixed 15 Expanded Criteria | 294 |

**Eligible Divisions:** All

**Special Requirements:**  Countrywide's Loan Underwriting Expert System, CLUES, should be used whenever possible.  This program is supported by CLUES.

For additional information on underwriting using CLUES , see CTM 1.10.2: Underwriting with CLUES .

**Pricing:** Add-ons apply.

**Program Limitations:**  Refer to the individual sections below for restrictions and special documentation requirements such as Borrower eligibility or Reduced documentation guidelines.

| Limitation | Owner-Occupied | Second Home | Investment |
|-----------|---------------|-------------|-----------|
| Occupancy Inspections | Refinance of 2-4 Unit properties: <br>● Prefunding occupancy inspection required<br>● The homeowners' policy must show that the mailing and property address are the same. | Occupancy inspections are not applicable. | Occupancy inspections are not applicable. |

| | Purchase of 3-4 Unit properties: Post funding occupancy inspection within 30 days of funding required. | | |
|---|---|---|---|
| Number of CHL Loans Per Borrower | To view the guidelines for determining the maximum number of CHL loans per borrower, see CTM 1.4: Maximum Number of Loans 📄. | | |
| Number of Properties Owned | To view the guidelines for determining the maximum number of financed properties, see CTM 1.4: Maximum Number of Loans 📄. | | |

**Term:**  10, 15, 20, 25, and 30 years.

**Minimum Loan Amount:**  None.

**Maximum Loan Amount:**

| Loan Amount | Owner-Occupied | | Second Home | | Investment | |
|---|---|---|---|---|---|---|
| | Full/Alt Doc | Reduced Doc | Full/Alt Doc | Reduced Doc | Full/Alt Doc | Reduced Doc |
| Maximum | $3,000,000 | $1,500,000 | $1,500,000 | $1,500,000 | $1,500,000 | $1,000,000 |

**Eligible Finance Types:**

| Finance Type | Owner-Occupied | Second Home | Investment |
|---|---|---|---|
| Purchase and Rate and Term | Allowed | Allowed | Allowed |
| Cash-Out | Allowed | Allowed | Allowed |

**Maximum LTV/CLTV Purchase and Rate and Term:**

| | Owner Occupied | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Purchase and Rate and Term | | | | | | | |
| | Attached/Detached SFRs, Attached /Detached PUDs, Low-Rise Condos | | | | High-Rise Condos/2-4 Units | | | |
| | Full/Alt Doc | | Reduced Doc | | Full/Alt Doc | | Reduced Doc | |
| | LTV/CLTV | Credit Score | LTV/CLTV | Credit Score | LTV/CLTV | Credit Score | LTV/CLTV | Credit Score |
| $400,000 | 95/95 | 620 | 95/95 | 680 | 95/95 [2] | 620 | 90/90 | 660 |
| | 90 | 580 | 90/90 | 660 | 90 | 580 | | |
| | | | 90 | 580 [1] | | | | |
| $500,000 | 95/95 | 620 | 90/90 | 660 | 95/95 [2] | 620 | 85/85 | 660 |
| | 80 | 580 | 80 | 580 [1] | 80 | 580 | | |
| $650,000 | 90/95 | 620 | 85/85 | 660 | 90/95 [2] | 620 | 85/85 | 660 |
| | 75 | 580 | 75 | 580 [1] | 75 | 580 | | |
| $1,000,000 | 80/95 | 620 | 70/90 | 660 | 80/95 [3] | 620 | 70/90 | 660 |
| $1,500,000 | 75/75 | 620 | 65/70 | 660 | 70/75 | 620 | 65/70 | 660 |
| $3,000,000 | 70/70 | 700 | Not Allowed | | Not Allowed | | Not Allowed | |

Restrictions:
- **[1] WLD**:  Minimum credit score for reduced doc:  620
- **[2] 3-4 Units**:  Max LTV/CLTV 90/90
- **[3] 3-4 Units**:  Max LTV/CLTV 80/90

| Second Home | |
|---|---|
| Purchase and Rate and Term | |
| Attached/Detached SFRs, Attached /Detached PUDs, Low-Rise Condos | High-Rise Condos |

| | Full/Alt Doc | | Reduced Doc | | Full/Alt Doc | | Reduced Doc | |
|---|---|---|---|---|---|---|---|---|
| | LTV/CLTV | Credit Score | LTV/CLTV | Credit Score | LTV/CLTV | Credit Score | LTV/CLTV | Credit Score |
| **$400,000** | 95/95 90/95 | 680 620 | 90/90 | 660 | 90/95 | 620 | 90/90 | 660 |
| | 70 | 580 | 70 | 580 [1] | 70 | 580 | | |
| **$500,000** | 80/95 | 620 | 65/80 | 620 | 80/95 | 620 | 65/80 | 660 |
| | 60 | 580 | 65 | 580 [1] | 60 | 580 | | |
| **$650,000** | 80/95 | 620 | 65/80 | 660 | 80/95 | 620 | 65/80 | 660 |
| | 55 | 580 | 55/60 | 620 | 55 | 580 | | |
| | | | 55 | 580 [1] | | | | |
| **$1,000,000** | 60/95 | 620 | 60/80 | 660 | 60/95 | 620 | 60/80 | 660 |
| **$1,500,000** | 60/65 | 620 | 55/65 | 660 | 60/65 | 620 | 55/60 | 660 |
| **$3,000,000** | Not Allowed | | Not Allowed | | Not Allowed | | Not Allowed | |

**Note:  [1] WLD:**  Minimum credit score for reduced doc:  620

| Investment | | | |
|---|---|---|---|
| **Purchase and Rate and Term** | | | |
| **Attached/Detached SFRs, Attached /Detached PUDs, Low-Rise Condos/High Rise Condos/2-4 Units** | | | |
| Full/Alt Doc | | Reduced Doc | |
| LTV/CLTV | Credit Score | LTV/CLTV | Credit Score |
| **$400,000** 90/90 [1] | 620 | 80/80 [2] | 680 |
| **$500,000** 85/90 [1] | 620 | 80/80 [2] | 680 |
| **$650,000** 85/90 [1] | 620 | 80/80 [2] | 680 |
| **$1,000,000** 60/65 | 620 | 55/60 | 680 |
| **$1,500,000** 60/65 | 620 | Not Allowed | |
| **$3,000,000** Not Allowed | | Not Allowed | |

Restrictions:
- **[1] High Rise and Low Rise Condos:** Max LTV/CLTV is 80/80
- **[1] 3-4 units:** Max 85/85 @ 660 or 70/90 @ 620
- **[2] 3-4 units:** Max LTV/CLTV 70/70

**Maximum LTV/CLTV Cash Out Guidelines:**

| Owner Occupied | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Cash Out** | | | | | | | |
| Attached/Detached SFRs, Attached /Detached PUDs, Low-Rise Condos | | | | High-Rise Condos/2-4 Units | | | |
| Full/Alt Doc | | Reduced Doc | | Full/Alt Doc | | Reduced Doc | |
| LTV/CLTV | Credit Score | LTV/CLTV | Credit Score | LTV/CLTV | Credit Score | LTV/CLTV | Credit Score |
| **$400,000** 90/95 | 620 | 90/90 | 660 | 90/95 [1] | 620 | 90/90 [3] | 660 |
| 80 | 580 | | | 80 | 580 | | |
| **$500,000** 90/90 | 620 | 80/90 | 660 | 90/90 [1] | 620 | 80/90 [4] | 660 |
| 75 | 580 | | | 75 | 580 | | |
| **$650,000** 85/95 | 620 | 80/90 | 660 | 85/95 [1] | 620 | 80/90 [4] | 660 |
| 55 | 580 | | | 55 | 580 | | |
| **$1,000,000** 70/95 | 620 | 55/80 | 660 | 70/95 [2] | 620 | 55/80 [5] | 660 |
| **$1,500,000** 65/70 | 620 | 55/60 | 660 | 65/70 | 620 | 55/60 | 660 |
| **$3,000,000** Not Allowed | | | | Not Allowed | | | |

Restrictions
- **[1] 2-Units:** Max LTV/CLTV 90/90
- **[1] 3-4 Units:** Max LTV/CLTV 80/80
- **[2] 2-Units:** Max LTV/CLTV 70/90
- **[2] 3-4 Units:** Max LTV/CLTV 70/80
- **[3] 2-4 Units:** Max LTV/CLTV 80/90 @ 660

- **[4] 2-4 Units:** Max LTV/CLTV 70/70 @ 680
- **[5] 2-4 Units:** Max LTV/CLTV 55/70 @ 680

| | Second Home | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Cash Out** | | | | | | |
| | **Attached/Detached SFRs, Attached /Detached PUDs, Low-Rise Condos** | | | | **High-Rise Condos** | | |
| | **Full/Alt Doc** | | **Reduced Doc** | | **Full/Alt Doc** | | **Reduced Doc** | |
| | **LTV/CLTV** | **Credit Score** | **LTV/CLTV** | **Credit Score** | **LTV/CLTV** | **Credit Score** | **LTV/CLTV** | **Credit Score** |
| **$400,000** | 90/90 | 620 | 80/80 | 660 | 80/90 | 620 | 80/80 | 660 |
| | 70 | 580 | 65/70 | 620 | 70 | 580 | | |
| **$500,000** | 75/90 | 620 | 65/80 | 660 | 75/90 | 620 | 65/80 | 660 |
| | 60 | 580 | 60/70 | 620 | 60 | 580 | | |
| **$650,000** | 75/90 | 620 | 65/80 | 660 | 75/90 | 620 | 65/80 | 660 |
| | 55 | 580 | | | 55 | 580 | | |
| **$1,000,000** | 60/90 | 620 | 55/60 | 660 | 60/90 | 620 | 55/60 | 660 |
| **$1,500,000** | 55/60 | 620 | 45/55 | 660 | 55/60 | 620 | 45/55 | 660 |
| **$3,000,000** | Not Allowed | | Not Allowed | | Not Allowed | | Not Allowed | |

| | Investment | | | |
|---|---|---|---|---|
| | **Attached/Detached SFRs, Attached /Detached PUDs, Low-Rise Condos, High-Rise Condos, 2-4 Units** | | | |
| | **Cash-Out** | | | |
| **Max Loan Amount** | **Full/Alt Doc** | | **Reduced Doc** | |
| | **LTV/CLTV** | **Credit Score** | **LTV/CLTV** | **Credit Score** |
| **$400,000** | 75/90 [1] | 620 | 75/75 [2] | 680 |
| **$500,000** | 70/90 [1] | 620 | 70/70 | 680 |
| **$650,000** | 70/90 [1] | 620 | 70/70 | 680 |
| **$1,000,000** | 55/60 | 620 | 45/65 | 680 |
| **$1,500,000** | 55/60 | 620 | Not Allowed | |
| **$3,000,000** | Not Allowed | | Not Allowed | |

Restrictions:
- **[1] Condos:** Max CLTV 80%.
- **[1] 2-4 Units:** Max LTV/CLTV 75/75 @ 660 or 65/90 @ 620
- **[2] 3-4 Units:** Max LTV/CLTV 70/70

| | Cash Out Restrictions | | | | |
|---|---|---|---|---|---|
| | **Owner Occupied and Second Home** | | **Investment** | | |
| **Doc Type** | **Full/Alt Doc** | **Reduced Doc** | **Doc Type** | **Full/Alt Doc** | **Reduced Doc** |
| | **Credit Score** | | | **Credit Score** | |
| **LTV** | **Equal to or greater than 620** | **As Per LTV Table** | **LTV** | **As Per LTV Table** | **As Per LTV Table** |
| **Greater than 75%** | $100,000 | $100,000 | **Greater than 70%** | $100,000 | $100,000 |
| **70.01 - 75%** | $200,000 | $100,000 | **60.01 - 70%** | $200,000 | $100,000 |
| **60.01-70%** | $250,000 | $100,000 | **Less than or equal to 60%** | $250,000 | $100,000 |
| **Less than or equal to 60%** | $400,000 | $100,000 | | | |
| **LTV** | **Less than 620** | **Not Allowed** | | | |
| **Greater or equal to 80%** | $100,000 | | | | |
| **Less than 80%** | $150,000 Second Home Max: $100,000 | | | | |

Occupancy:

| Doc Type | Owner-Occupied | Second Home | Investment |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **Full/Alt Doc** | Allowed | Allowed | Allowed |
| **Reduced Doc** | Allowed | Allowed | Allowed |

**Eligible Borrowers**:

| Borrower Types | Owner-Occupied | Second Home | Investment |
|---|---|---|---|
| **U.S. Citizen** | Valid Social Security number required.  For additional information, see CTM 2.1.1: Eligible/Ineligible Borrowers 📄. | | |
| **Permanent Resident Alien** | Allowed.  For documentation requirements, see CTM 2.1.2: Permanent and Non-Permanent Resident Aliens 📄. | | |
| **Non Permanent Resident Alien** | If **ALL** the Borrowers are Non-permanent resident aliens, the following restrictions apply:<br>● Purchase and Rate and Term Refinance only;<br>● Max LTV: 90%.<br>For employment, residency, and documentation requirements, see CTM 2.1.2: Permanent and Non-Permanent Resident Aliens 📄. | Not Allowed | Not Allowed |
| **Non-Occupant Co-Borrowers** | Allowed.  Income from non-occupant co-borrowers can be used to qualify provided:<br>● Full/Alt Doc only<br>● Immediate family member.<br>● Max LTV: 90%.<br>● Occupant ratios should not exceed guidelines by more than five (5) percent<br>● Occupant must provide five (5) percent of the down payment.<br><br>**Exception:**<br>If the loan is underwritten and committed to second home guidelines, income from non-occupant co-borrowers can be used to qualify without respect to the occupant's ratios and downpayment requirements provided:<br>● Occupant and non-occupant are immediate family members (parent, child, or sibling).<br>● Purchase & Rate & Term Only.<br>● Full/Alt or Reduced Doc. | Not Applicable | Not Applicable |
| **Inter Vivos Revocable Trusts** | Allowed.  For additional information, see CTM 2.1.4: Inter Vivos Revocable Trusts (Living Trusts) and Illinois Land Trusts 📄. | | |

**Ineligible Borrowers**:  For information regarding Ineligible Borrowers, see CTM 2.1.1: Eligible/Ineligible Borrowers 📄.

**Eligible/Ineligible Properties**:

| Item | Loan Amount less than or equal to $ 650,000 | Loan Amount greater than  $ 650,000 |
|---|---|---|
| **Eligible Properties** | ● Attached SFRs<br>● Detached SFRs [1]<br>● Attached PUDs<br>● Detached PUDs [1]<br>● Low-Rise Condos<br>● High-Rise Condos<br>● Non-Warrantable Condos [2]<br>● 2-4 Units<br>● Cooperatives [2]<br>● Condotels [2] | ● Attached SFRs<br>● Detached SFRs [1]<br>● Attached PUDs<br>● Detached PUDs [1]<br>● Low-Rise Condos<br>● High-Rise Condos<br>● 2-4 Units<br>● Cooperatives [2] |
| | **Note:**<br>● **[1] Detached SFRs/PUDs** include modular, panelized, and prefabricated homes.  For | |

|  | additional information, see CTM 3.6: Factory-Built Homes 📄. <br> • **[2] Restrictions apply. To view the guidelines for:** <br>   - **Non-Warrantable Condos,** see CTM 3.3.5: Non-Warrantable Condominiums 📄. <br>   - **Condotels,** see CTM 3.4: Condotel Requirements 📄. <br>   - **Cooperatives**, see CTM 3.5.2: Eligible Cooperative Share Loan Transactions 📄. <br> • **2-4 Units:** Not allowed for Second homes | |
|---|---|---|
| **Ineligible Properties** | • Manufactured homes <br> • Log Homes <br> • Rural Properties [3] | • Condotels <br> • Manufactured homes <br> • Log Homes <br> • Rural Properties [3] |
|  | **Note: [3] Rural Property** is defined as a property having a lot size greater than 10 acres. Restrictions apply if the property is equal to or less than 10 acres but the appraisal identifies the property as rural. To view the restrictions, see CTM 3.12.7: Neighborhood Analysis 📄. | |

**Prepayment Penalty Option**: Available for 30-year term in the following states:

| | | | |
|---|---|---|---|
| Arizona | Idaho | Nevada | South Carolina |
| California | Illinois | New Hampshire | South Dakota |
| Colorado | Indiana | North Carolina | Tennessee |
| Connecticut | Kentucky | North Dakota | Texas |
| Delaware | Louisiana | Oklahoma | Utah |
| Florida | Maine | Oregon | Washington |
| Georgia | Montana | Pennsylvania | Wyoming |
| Hawaii | Nebraska | | |

**Note:**
- State restrictions may apply. To view state/geographic restrictions, see CTM 3.10: Geographic Restrictions 📄.
- To view the guidelines for the prepayment penalty/reduced rate option, see CTM 1.7.1: Prepayment Penalty/Reduced Rate Option 📄.

**Temporary Buydowns:** Not Allowed.

**Secondary Financing:** Allowed with the following restrictions.

**Restrictions:**
- Refer to LTV/CLTV tables to determine when secondary financing is allowed.
- The maximum LTV allowed when there is secondary financing is 80%.
- To view the guidelines for loans with secondary financing/subordinate liens, see CTM 1.6.1: Secondary Financing/Subordinate Lien Requirements 📄.
- For eligible secondary financing programs available from CHL, see LPG 24.10: HELOCs and Fixed Equity 2nds 📄. The more restrictive of the guidelines apply.

**Seasoning Requirements**: For information regarding eligible mortgages and seasoning requirements, see CTM 1.6.2: Eligible Transaction Types 📄.

**Determining Value**: To view the guidelines for calculating the LTV, see CTM 1.11.2: Determining Loan-To-Value Ratios 📄.

**Mortgage Insurance:**



| | **Full/Alt Doc** | | | | | |
|---|---|---|---|---|---|---|
| | **Credit Scores Greater than or Equal to 620** | | | | | |
| | **Owner-Occupied** | | **Second Home** | | **Investment** | |
| **LTV** | 10, 15 and, | 25 and 30 | 10, 15 and 20 | 25 and 30 | 10, 15 and 20 | 25 and 30 |

| | 20 Years | Years | Years | Years | Years | Years |
|---|---|---|---|---|---|---|
| 90.01 - 95% | 25% | 30% | 25% | 30% | Not Allowed | Not Allowed |
| 85.01 - 90% | 12% | 25% | 20% | 25% | 20% | 25% |
| 80.01 - 85% | 6% | 12% | 12% | 20% | 12% | 20% |

Note:
- **CMI or TAMI:** Required.
- **Cash-Out Refinance:** Delegated manual MI required from RMIC or Triad Only.
- The Mortgage Insurers' requirements vary greatly with investment property loans.  The branch must determine early in the loan application process whether the Borrower qualifies for MI.
- For additional information regarding mortgage insurance for cooperatives, see CTM 3.5.2: Eligible Cooperative Share Loan Transactions 📄.
- For additional information regarding mortgage insurance, see CTM 1.12: Mortgage Insurance 📄.

| Full/Alt Doc | | |
|---|---|---|
| Credit Scores Less than 620 | | |
| Owner-Occupied | | |
| LTV | 10, 15, and 20 Years | 25 and 30 Years |
| 85.01 - 90% | 12% | 25% |
| 80.01 - 85% | 6% | 12% |
| Note: CMI or TAMI: Required. (Monthly BPMI and Monthly TAMI only).  A minus pricing is reflected. | | |

| Reduced Doc | | |
|---|---|---|
| Owner-Occupied | | |
| Credit Scores 680+ | | |
| LTV | Factor | Coverage for all Terms |
| 90.01 - 95% | .92 | 30% |
| Credit Scores 620+ | | |
| LTV | Factor | Coverage for all Terms |
| 85.01 - 90% | .72 | 25% |
| 80.01 - 85% | .52 | 12% |
| Credit Score 600 - 619 | | |
| LTV | Factor | Coverage for all Terms |
| 85.01% - 90% | 1.40 | 25% |
| 80.01 - 85% | .78 | 12% |
| Credit Score 580 - 599 | | |
| LTV | Factor | Coverage for all Terms |
| 85.01% - 90% | 1.72 | 25% |
| 80.01% - 85% | 1.22 | 12% |

Note:
**CMI or TAMI:** Not allowed.  Monthly (Borrower Paid) MI only.
- Delegated Manual Mortgage Insurance is required.  An MI certificate from PMI, TRIAD, RADIAN, GE**\*** or RMIC must be in the loan file prior to closing.  **Exceptions:**
    - **Louisiana, Maine, New Hampshire, and New York** : Ineligible for insuring with Triad.
    - **Alaska and Hawaii:** Ineligible for insuring with GE, TRIAD, or RMIC.
- If FICO is **620 and higher,** the branch must request Standard Rate with Reduced Documentation/NIV (No Income Verification).  **\*GE** will only insure loans with a minimum credit score of 660 or greater.
- If FICO is **580-619,** the branch must request A Minus Rates with Reduced Documentation/NIV (No Income Verification).
- The factors displayed are an estimation and should be used for disclosure purposes only.  Actual factors will be provided by the applicable mortgage insurance company.
- or additional information regarding mortgage insurance for cooperatives, see CTM 3.5.2: Eligible Cooperative Share Loan Transactions 📄.
- For additional information regarding mortgage insurance, see CTM 1.12: Mortgage Insurance 📄.

**Assumability:**  Not allowed.

**Credit:**  All Borrowers must meet the credit score requirements as shown in the LTV table; and the Borrower(s) may not be currently delinquent on their mortgage/housing payment; and

| Credit Issues | Credit Score less than or equal to 600 | Credit Score greater than 600 |
|---|---|---|
| Revolving and Installment | Late payments are considered in the credit score. | Late payments are considered in the credit score. |
| Mortgage Lates | Maximum mortgage lates permitted: 2 x 30 last 12 months | Maximum mortgage lates permitted: 1 x 30 last 12 months 0 x 60 last 24 months |
| Bankruptcy, Foreclosure, Deed-in-Lieu, Short Sale | Subject to individual evaluation.  To view the requirements, see CTM 2.2.5: Bankruptcy, Foreclosure, Deed-in-Lieu, or Short Sale 📄. | |
| History of Credit Counseling | • Active participant:  Not Allowed.<br>• Previous participant:  To view the requirements, see CTM 2.2.1: Acceptable Credit History 📄. | |
| Judgements, Collections, Charge-Offs | Subject to individual evaluation.  To view the requirements, see CTM 2.2.4: General Derogatory Credit Information 📄. | |
| **Note:** WLD Minimum credit score is 620 for reduced documentation loans. | | |

**Ratios:**  33/38%.

These ratios may be exceeded when using CLUES or if there are compensating factors such as:

- The borrower(s) reserves exceed the program guidelines.

- The LTV is lower than the maximum allowable at the loan amount.

- The borrower(s) credit score exceeds the minimum requirements.

**Documentation Requirements:**

**Appraisal** requirements are as follows:

| Loan Amount | Appraisal Requirement |
|---|---|
| Less than or equal to $1,000,000 | One (1) full appraisal. |
| Greater than $1,000,000 | One (1) full appraisal plus one (1) field review.  The field review must be completed by a CHL approved Review Appraiser. |
| **Note:**  For additional information regarding review appraisals and for a list of approved appraisers, see CTM 3.12.19: Review Appraisals 📄. | |

**Reduced Documentation** requirements are as follows:

| Item | Documentation Requirement |
|---|---|
| Employment | **Self-Employed Borrowers:**<br>Employment must be disclosed on the 1003 and verified.  The Borrower must have been in the same business, at the same location, for a minimum of two (2) years.<br><br>Self-employment must be verified:<br>- by obtaining a copy of a valid Business License; or<br>- through a neutral third party, such as a:<br>  • CPA<br>  • regulatory agency<br>  • professional organization.<br><br>**Salaried Borrowers (includes Borrowers receiving commissioned and bonus income):**<br>• Employment must be disclosed on the 1003 and verified.<br>• Must have a two (2) year history of employment with the same employer or in the same line of work.  Any employment change must be deemed to be a career advancement.<br>• A verbal verification of employment is required that includes:<br>  - current employment status;<br>  - job title;<br>  - term of employment;<br>  - probability of continued employment; and |

|  | - the name and title of the person providing the information on behalf of the employer.<br><br>**Note:**<br>● When verifying employment, no income may be disclosed.<br>● This verification should cover a full two (2) year period. |
|---|---|
| **Income** | Must be disclosed on the 1003, but is not verified. However, the stated income must be deemed reasonable and consistent with the Borrower's profession or occupation. |
| **Unearned or Passive Income** | The source of all unearned or passive income must be verified if it is the primary source of income; i.e. constitutes 50% or more of the qualifying income.  If the amount of passive income constitutes less than 50%, the source need only be stated and not verified.  However, in all cases, the amount of the passive income claimed must be reasonable based upon the profile of the borrower.  For additional information regarding sources of passive income and documentation requirements, see CTM section 1.5.4: Reduced and Stated Income/Stated Assets (SISA) Documentation (Document Type 3) 🗒. |
| **Assets** | Must be disclosed and verified using Full/Alt documentation.<br>● Must be verified by obtaining the two (2) month's most recent account statements or VOD.<br>● The assets must be the Borrower's own funds.<br>   - **Acceptable assets include:** checking and/or savings accounts, certificates of deposit (CDs), brokerage or mutual funds, publicly traded stocks.<br>   - **Unacceptable assets include:** accounts in the name of a corporation or partnership, or other party, stock in a closely held corporation. |
| **IRS Form 4506** | Not Required. |

**Documentation Type:** Standard loan purpose codes must be used, as follows:

| Doc Types | Full/Alt Doc | Reduced Doc |
|---|---|---|
| **Codes** | Use code:<br>● 1 for "Full Docs"; or<br>● 2 for "Alt Docs."<br><br>For additional information regarding Alternative Documentation, see CTM 1.5.3: Alternative Documentation (Documentation Type 2) 🗒. | Use code:<br>● 3 for "Reduced Docs."<br><br>For additional information, refer to the Required Documentation section above. |

**Down Payment/Source of Funds:** Gifts are allowed subject to the following restrictions:

| Item | Owner Occupied | | | |
|---|---|---|---|---|
| | **Full/Alt Doc** | | **Reduced Doc** | |
| | **Loan Amount less than or equal to $650,000** | **Loan Amount greater than $650,000** | **Loan Amount less than or equal to $650,000** | **Loan Amount greater than $650,000** |
| **Source** | Relatives, domestic partner, fiance, or fiancee only. | | Relatives, domestic partner, fiance, or fiancee only. | |
| **Percentage of Borrower's own Funds** | Five (5) percent<br>**Exception:**<br>If the LTV/CLTV is 80% or less, the entire down payment may be a gift. | 5% | 20% | 20% |

**Note:**
● Gifts are not allowed for Second Homes or Investment properties.
● For allowable sources of funds, see CTM 1.8.3: Sources of Funds 🗒.
● For documenting of funds, see CTM 1.8.4: Funds for the Down Payment, Closing Costs and Reserves 🗒.

**Reserves:**

| Document Type | Owner-Occupied | Second Home | Investment |
|---|---|---|---|
| Full/Alt Doc | Two (2) months | Two (2) months | Six (6) months |
| Reduced Doc | Six (6) months | Six (6) months | Six (6) months |
| **Note:** Reserves may not be required with a **CLUES** Accept. | | | |

<u>Financing Contributions and Sales Concessions</u>: Allowed subject to the following restrictions:

| LTV | Owner-Occupied | Second Home | Investment |
|---|---|---|---|
| Greater than 90% | 3% | Not Allowed | Not Allowed |
| Greater than 80% and less than or equal to 90% | 6% | 3% | 3% |
| Less than or equal to 80% | 6% | | |
| **Note:** For additional information, see CTM 1.8.2: Financing Contributions and Sales Concessions 📄. | | | |

<u>Spot Relocation</u>: Not Allowed.

<u>Project Warranty</u>: Standard Fannie Mae or Freddie Mac.  For project warranty requirements, see CTM 3.3: Condominium and PUD Projects.

> **Note:**  Condominium projects in which the Homeowner's Association is not incorporated are allowed for:
> - Owner-occupied only; and
> - Full/Alt Doc only.

<u>Geographic Restrictions</u>:

- For information on restrictions by state see CTM 3.10: Geographic Restrictions 📄.
- Loans exceeding $650,000 are restricted to major metropolitan areas only.  For the definition of major metropolitan areas, see CTM 4.1: Glossary 📄.

<u>Construction Modification</u>:  Allowed with Full/Alt doc only.

> **Note:**  For additional information and guidelines, see CTM 1.6.5: Construction Modification Enhancement 📄.

<u>One Time Close</u>:  Allowed. See LPG 13.10.1: One Time Close 📄.

<u>Energy Efficient Mortgages</u>:  Not allowed.

<u>80/20 Option</u>:  The following sections are special guidelines applicable only to the 80/20 Option.  For parameters not addressed, refer to the program guidelines above.

**Maximum Loan Amount**:

| Max Loan Amount 1st Lien | Max Loan Amount 2nd Lien | Max Combined Loan Amount |
|---|---|---|
| $520,000 | $130,000 | $650,000 |

**Maximum LTV/CLTV**:  The maximum LTV/CLTV restrictions are as follows:

| Purchase and Rate and Term | | | | | |
|---|---|---|---|---|---|
| Full/Alt Doc | | | | | |
| Max LTV | Max Loan Amount 1st Lien | Max CLTV | Max Loan Amount 2nd Lien | Max Combined Loan Amount | Min Credit Score |
| 80% | $400,000 | 100% | $100,000 | $500,000 | 660 |
| 80% | $520,000 | 100% | $130,000 | $650,000 | 700 |

| Reduced Doc | | | | | |
|---|---|---|---|---|---|
| 80% | $400,000 | 100% | $100,000 | $500,000 | 700 (CMD & FSL) 720 (WLD & CLD) |
| 80% | $520,000 | 100% | $130,000 | $650,000 | 700 (CMD & FSL) 720 (WLD & CLD) |

**Note: 1st Lien and 2nd Lien:** Cash-out: Not Allowed.

**Special Requirements and Restrictions** :

| Requirement | Guidelines |
|---|---|
| Program Limitations | • The <u>combined</u> loan amount <u>and</u> the (C)LTV must fall within the published guidelines. Refer to the Maximum Loan Amount and LTV and CLTV table above. <br> • Refer to the individual sections above for restrictions and any special documentation requirements. <br> • Secondary Financing must be from CHL or another institutional lender. <br> • To view the guidelines for see CTM 1.6.1: Secondary Financing/Subordinate Lien Requirements 🗎. <br> • For eligible secondary financing programs available from CHL, see LPG 24.10: HELOCs and Fixed Equity 2nds 🗎. The more restrictive of the guidelines apply. |
| Term | 15 and 30 Years |
| Minimum Loan Amount | None |
| Eligible Finance Types | • Purchase and Rate and Term Only <br> • Cash-Out: Not Allowed |
| Doc Type | Full/Alt Doc and Reduced Doc Only |
| Occupancy | Owner-Occupied Only |
| Ineligible Borrowers | • Non-permanent resident aliens <br> • Non-occupant Co-Borrowers |
| Eligible Properties | • Attached SFRs <br> • Detached SFRs [1] <br> • Attached PUDs <br> • Detached PUDs [1] <br> • Low-Rise Condos <br> • High-Rise Condos <br> **Note: [1] Detached SFRs/PUDs** include modular, panelized, and prefabricated homes. For additional information, see CTM 3.6: Factory-Built Homes 🗎. |
| Ineligible Properties | • Non-Warrantable Condos <br> • 2-4 Units <br> • Cooperatives <br> • Condotels <br> • Manufactured Housing <br> • Log Homes <br> • Rural Properties [1] <br> **Note: [1]** Rural Property is defined as a property having a lot size greater than 10 acres. Restrictions apply if the property is equal to or less than 10 acres but the appraisal identifies the property as rural. To view the restrictions, see CTM 3.12.7: Neighborhood Analysis 🗎. |
| Prepayment Penalty Option | Not Allowed. |
| Mortgage Insurance | Not Required. |
| Ratios | A maximum debt to income ratio of 45% is allowed. **No Exceptions.** There is no maximum housing payment to income ratio. |
| 4506 | • Full/Alt Doc: Not required. <br> • Reduced Doc: Required. |
| Reserves | • Full/Alt Doc: Two (2) months reserves are required. **No Exceptions.** <br> • Reduced Doc: Six (6) months reserves are required. **No Exceptions.** |
| Down Payment/Source of Funds | • <u>Purchase</u>: Closing costs and prepaids may be paid for by premium pricing, or paid by the Borrower in cash. All assets and any cash needed to close must be verified, from an acceptable source and be seasoned. <br> • <u>Rate and Term Refinance</u>: Reasonable and customary closing costs and prepaids may be financed in the loan amount, paid for by premium pricing, or paid by the Borrower in cash. All assets and any cash needed to close must be |

| | verified, from an acceptable source and be seasoned.<br>● Gifts:  Not Allowed<br>● No cash down payment is required. |
|---|---|
| **Sales and Financing Contributions** | Six (6) percent. |
| **Spot Relocation** | CMD only.<br>● Approved corporations only.<br>● The 80/20 Spot Relocation EasyMove Loan guidelines are located in the Special Program Enhancements section of the Conventional Technical Manual.  To view the guidelines, see CTM 1.7.10: 80/20 Spot Relocation Easy Move Loan . |
| **Construction Modification** | Not Allowed. |
| **One Time Close** | Not Allowed. |





Last Revision Date:      10/29/2004

## SECTION 19:  NON-CONFORMING FIXED PERIOD ARMS

### 19.30:  Fixed Period LIBOR ARM
### Countrywide Fast and Easy (sm) Interest Only Program
### Owner-Occupied and Second Home

This is a Non-Conforming loan program in which the Borrower pays the interest only for the first three, five, seven, or ten years of the loan.  The loan will then be fully amortized over the remaining term as an adjustable rate mortgage.  This section of the **Loan Program Guide** includes the guidelines for the Non-Conforming Countrywide Fast & Easy Interest Only  Fixed Period LIBOR ARM Loan.  For all divisions, this program allows expansion of E-Commerce by allowing Borrowers to use the Internet to apply for a no doc loan.

| Name | Program ID |
|------|-----------|
| NC ARM LIBOR 3/1 2-2-6 F&E IO | 672 |
| NC ARM LIBOR 5/1 5-2-5 F&E IO | 673 |
| NC ARM LIBOR 7/1 5-2-5 F&E IO | 674 |
| NC ARM LIBOR 10/1 5-2-5 F&E IO | 675 |

**Eligible Divisions**: All

**Special Requirements**:

| Loan Origination | | | | |
|------------------|--------|--------|--------|--------|
| | **CMD** | **WLD** | **CLD** | **FSL** |
| | May be originated via the Internet or local branches. | May be originated via the CWBC.com website or local branches. | Must be originated via the Platinum web site. | Must be originated via AdvantEdge. |
| | CLUES "ACCEPT" required.  **NO EXCEPTIONS.** | | | |
| **Repayment Terms** | • The interest only payments are fixed for a stated period of time; generally, for three (3), five (5) , seven (7)  or ten (10) years.  Following that period, the payment and interest will increase in accordance with the terms of the Note.<br>• After the completion of the interest only period, the unpaid balance is fully amortized over the remaining term of the loan.<br>• The Borrower may make voluntary principal payments during the interest only period. The required interest only payment will be reduced to reflect the decrease in the principal unpaid balance. | | | |
| **Pricing** | Add-ons may apply. | | | |
| **Reasonableness Requirement** | The stated income must be deemed reasonable and consistent with the Borrower's profession.  If there is any question regarding reasonableness or consistency, then the loan is not eligible for this product.  If the file happens to contain some incidental income documentation, so long as the income amount shown on the documentation does not | | | |

| | cause you to question reasonableness or consistency, the documentation should be ignored. |
|---|---|

**Program Limitations**:  Refer to the individual sections below for restrictions and any special documentation requirements.

| Limitation | Owner-Occupied | Second Home |
|---|---|---|
| Number of CHL Loans Per Borrower | To view the guidelines for determining the maximum Number of CHL Loans per Borrower, see CTM 1.4: Maximum Number of Loans 📄. | |
| Number of Properties Owned | To view the guidelines for determining the maximum number of financed properties, see CTM 1.4: Maximum Number of Loans 📄. | |
| Occupancy Inspections | **Refinance of 2-Unit properties:**<br>● Prefunding occupancy inspection required<br>● The homeowners' policy must show that the mailing and property address are the same. | Occupancy inspections are not applicable. |

**ARM Requirements**:

| Item | Requirement |
|---|---|
| Index | The average of interbank offered rates for one (1) year U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal.* |
| Margin | Set by CHL.  Refer to your Division's rate sheet.  There will be an automatic add-on by EDGE for loans utilizing TAMI. |
| Life Floor | Never lower than the margin. |
| Life Cap | ● **3/1 ARM:** Six (6) percent over the Note rate**.**<br>● **5/1, 7/1, and 10/1 ARM:** Five (5) percent over the Note rate. |
| Interest Rate Cap/Interest Rate Adjustment Date | ● **3/1 ARM:** The interest rate is fixed for the first 36 months.  The maximum adjustment at the first adjustment date is two (2) percent; thereafter, the interest rate will adjust annually, with a maximum interest rate change at any one adjustment date of two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent.<br>● **5/1 ARM:** The interest rate is fixed for the first 60 months.  The maximum adjustment at the first adjustment date is five (5) percent; thereafter, the interest rate will adjust annually, with a maximum interest rate change at any one adjustment date of two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent.<br>● **7/1 ARM:**  The interest rate is fixed for the first 84 months.  The maximum adjustment at the first adjustment date is five (5) percent; thereafter, the interest rate will change annually, with a maximum interest rate change at any one adjustment date of two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent.<br>● **10/1 ARM:**  The interest rate is fixed for the first 120 months.  The maximum adjustment at the first adjustment date is five (5) percent; thereafter, the interest rate will adjust annually, with a maximum interest rate change at any one adjustment date of two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent. |
| Payment Adjustment | ● **3/1 ARM:** The payment is fixed for the first 36 months; thereafter, the payment may change annually, one (1) month following the interest rate change date.<br>● **5/1 ARM:** The payment is fixed for the first 60 months; thereafter, the payment may change annually, one (1) month following the interest rate change date.<br>● **7/1 ARM:**  The payment is fixed for the first 84 months; thereafter, the payment may change annually, one (1) month following the interest rate change date.<br>● **10/1 ARM:**  The payment is fixed for the first 120 months; thereafter, the payment may change annually, one (1) month following the interest rate change date. |
| Conversion Option | Not allowed. |
| Restriction | **Owner Occupied:**  The Note rate may never be more than 300 basis points below the fully indexed rate.<br>**Second Home:**  The Note rate may never be more than 200 basis points below the fully indexed rate. |
| Borrower Qualification | The borrower is qualified at the Note rate using the interest-only payment. |

**Term**:  30 years.

**Minimum Loan Amount**:  None.

**Maximum Loan Amount**:  $2,000,000.

**Eligible Finance Types**:

| Finance Type | Owner-Occupied | Second Home | Investment |
|---|---|---|---|
| Purchase and Rate and Term | Allowed | Allowed | Not Allowed |
| Cash-Out | Allowed | Allowed | Not Allowed |

**Maximum LTV/CLTV**:  The maximum LTV/CLTV restrictions are as follows:

| Max Loan Amount | Owner-Occupied | | | | |
|---|---|---|---|---|---|
| | 1-Unit | | | | |
| | Purchase and Rate and Term | | Cash-Out | | |
| | Max LTV/CLTV | Min Credit Score [1] | Max LTV/CLTV | Min Credit Score [1] | Max Cash-Out |
| $400,000 | 95/95 [2] | 700 | 70/70 | 700 | $200,000 [3] |
| $650,000 | 80/90 | 700 | 70/70 | 700 | $200,000 [3] |
| $1,000,000 | 80/90 | 700 | Not Allowed | Not Allowed | Not Allowed |
| $2,000,000 [4] | 60 | 700 | Not Allowed | Not Allowed | Not Allowed |

Note:
- [1] Credit Scores between 700-729:  Allowed.  An additional add-on applies.
- [2] High-Rise Condos:  Max. LTV/CLTV: 90/90
- [3] High-Rise Condos:  Max. cash-out: $100,000
- [4] **Secondary Financing:**  Loan amounts greater than $1,000,000: Not allowed.
- The maximum LTV allowed when there is secondary financing is 80%.

| Max Loan Amount | Owner-Occupied | | | |
|---|---|---|---|---|
| | 2-Units | | | |
| | Purchase and Rate and Term LTV/CLTV | Cash-Out LTV/CLTV | Max Cash-Out | Min Credit Score |
| $400,000 | 90/90 | 70/70 | $200,000 | 730 |
| $650,000 | 80/80 | 70/70 | $200,000 | 730 |
| $1,000,000 | 80/80 | Not Allowed | Not Allowed | 730 |

Note:  The maximum LTV allowed when there is secondary financing is 80%.

| Max Loan Amount | Second Home | | | | |
|---|---|---|---|---|---|
| | Purchase and Rate and Term | | Cash-Out [3] | | |
| | Max LTV/CLTV | Min Credit Score [1] | Max LTV/CLTV | Min Credit Score [1] | Max Cash-Out |
| $400,000 | 90/90 | 700 | 70/70 | 700 | $200,000 |
| $650,000 | 80/90 [2] | 700 | 70/70 | 700 | $200,000 |
| $1,000,000 | Not Allowed | Not Allowed | Not Allowed | Not Allowed | Not Allowed |
| $1,500,000 | Not Allowed | Not Allowed | Not Allowed | Not Allowed | Not Allowed |

Note:
- [1] Credit Scores between 700-729:  Allowed.  An additional add-on applies.
- [2] High-Rise Condos:  Max. LTV/CLTV: 75/75
- [3] High-Rise Condos:  Cash-out not allowed.

● The maximum LTV allowed when there is secondary financing is 80%.

<u>Occupancy</u>:

| Owner-Occupied | Second Home | Investment |
|---|---|---|
| Allowed | Allowed | Not Allowed |

<u>Eligible Borrowers</u>:

| Borrower Types | Owner-Occupied | Second Home |
|---|---|---|
| U.S. Citizens | Valid Social Security number required.  For additional information, see CTM 2.1.1: Eligible/Ineligible Borrowers 📄. | |
| Permanent Resident Alien | Allowed.  For documentation requirements, see CTM 2.1.2: Permanent and Non-Permanent Resident Aliens 📄. | |
| Non Permanent Resident Alien | If **ALL** the Borrowers are non-permanent resident aliens, the following restrictions apply:<br>● Max. Loan Amount: $1,500,000.<br>● Purchase: Maximum LTV is 90%.<br>● Rate and Term Refinance: Maximum LTV is 75%.<br>● Cash-Out: Not Allowed.<br>For employment, residency, and documentation requirements, see CTM 2.1.2: Permanent and Non-Permanent Resident Aliens 📄. | Not Allowed |
| Inter Vivos Revocable Trusts | Allowed.  For additional information, see CTM 2.1.4: Inter Vivos Revocable Trusts (Living Trusts) and Illinois Land Trusts 📄. | |

<u>Ineligible Borrowers</u>:  Non-Occupant Co-Borrowers.

> **Note:** For additional information regarding Ineligible Borrowers, see CTM 2.1.1: Eligible/Ineligible Borrowers 📄.

<u>Eligible/Ineligible Properties</u>:  The following table identifies the property types that are eligible or ineligible for financing under this program:

| Property Type | |
|---|---|
| Eligible Properties: | ● Attached SFRs<br>● Detached SFRs [1]<br>● Attached PUDs<br>● Detached PUDs [1]<br>● Low-Rise Condos<br>● High-Rise Condos<br>● Rural Properties <= 20 acres [2] |
| | **Note:**<br>● **[1] Detached SFRs/PUDs** include modular, panelized, and prefabricated homes. For additional information, see CTM 3.6: Factory-Built Homes 📄.<br>● **[2]** For limitations, refer to CTM 3.12.7: Neighborhood Analysis 📄.<br>● Leasehold Condos in the State of Hawaii are not permitted.<br>● An additional add-on applies for Attached Condos and Attached PUDs.<br>● **50% condo-presale enhancement:**  Not Allowed. |
| Ineligible Properties: | ● 2-4 Units<br>● Condotels<br>● Cooperatives<br>● Manufactured homes<br>● Log Homes |

**Pre-Payment Penalty Option**:  Not allowed.

**Temporary Buydowns**:  Not allowed.

**Secondary Financing**:  Allowed with the following restrictions:

- The maximum LTV allowed when there is secondary financing is 80%.
- The maximum loan amount allowed when there is secondary financing is $1,000,000.
- To view the guidelines for Loans with Secondary Financing/Subordinate Liens, see CTM 1.6.1: Secondary Financing/Subordinate Lien Requirements 📄.
- For eligible secondary financing programs available from CHL, click here 📄.  The more restrictive of the guidelines apply.

**Seasoning Requirements**:  For information regarding Eligible Mortgages and Seasoning Requirements, see CTM 1.6.2: Eligible Transaction Types 📄.

**Determining Value**:  To view the guidelines for calculating the LTV, see CTM 1.11.2: Determining Loan-To-Value Ratios 📄.

**Mortgage Insurance**:  **CMI or TAMI Required**.

| LTV | Owner-Occupied | Second Home |
|---|---|---|
| 90.01 - 95% | 30% | Not Allowed |
| 85.01 - 90% | 25% | 25% |
| 80.01 - 85% | 12% | 12% |

Note:
- **3/1 ARM:** ARM coverage is required.
- **5/1, 7/1, and 10/1 ARM:** Fixed rate coverage is required.
- For additional information regarding Mortgage Insurance, see CTM 1.12: Mortgage Insurance 📄.

**Assumability:**  Assumable during the ARM period only.  Subject to credit approval.

**Credit:**  All Borrowers must meet the credit score requirements shown in the LTV tables and

| Credit Issues | Credit Requirements |
|---|---|
| Revolving and Installment | Late payments are considered in the credit score. |
| Mortgage Lates | Maximum mortgage lates permitted:<br>1 x 30 last 12 months<br>0 x 60 last 24 months |
| Bankruptcy, Foreclosure, Deed-in-Lieu, Short Sale | Subject to individual evaluation.  To view the requirements, see CTM 2.2.5: Credit, Bankruptcy, Foreclosure, Deed-in-Lieu, or Short Sale 📄. |
| History of Credit Counseling | Active participant:  Not allowed.<br>Previous participant:  To view the requirements, see CTM 2.2.1: Acceptable Credit History 📄. |
| Judgements, Collections, Charge-Offs | Subject to individual evaluation.  To view the requirements, see CTM 2.2.4: General Derogatory Credit Information 📄. |

**Ratios**:  Determined by CLUES using stated income, generally not to exceed total obligations-to-income ratio of 40%.

**Note:**  There is no maximum housing payment-to-income ratio.

Documentation Requirements:

| Item | Documentation Requirement |
|------|---------------------------|
| Application | CHL Form 2D486*US.<br>**Note:** The 1003 loan application (CHL Form #2021) is also acceptable. |
| Appraisal | <table><tr><td>**Loan Amount**</td><td>**Appraisal Requirement**</td></tr><tr><td>**Loan Amount less than or equal to $1,000,000**</td><td>One (1) full appraisal or Form 2055 Interior and Exterior is required.</td></tr><tr><td>**Loan Amount greater than $1,000,000**</td><td>One (1) full appraisal plus one (1) field review.  The field review must be completed by a CHL approved Review Appraiser.</td></tr></table>For additional information regarding Review Appraisals and for a list of approved appraisers, see CTM 3.12.19: Review Appraisals 📄. |
| Income | Must be stated on the application, but is not verified.<br>**Note:** The income disclosed must be deemed reasonable and consistent with the Borrower's occupation. |
| Employment | • **Salaried:**  Must be stated on the application and a Verbal VOE verifying a two (2) year history is required.<br>• **Self-Employed:**  Must be stated on the application and the Borrower must have been in the same business, at the same location, for a minimum of two (2) years.  Independent verification of existence of the business is required (e.g., telephone listing, licensing bureau, etc.) |
| Assets | Must be stated on the application, but are not verified.<br>**Note:** The assets disclosed must be deemed reasonable and consistent with the Borrower's income. |
| IRS Form 4506 (CHL Form 29045) | Required for all Borrowers. |

Documentation Type:

| Doc Type Code | Use code:<br>• 3 for "Reduced Docs"<br>**Note:** For additional information, refer to the Required Documentation section above. |
|---------------|-----------------------------------------------------------------------------------------------------------------------------------|

**Down Payment/Source of Funds**:  From Stated Assets.

> **Note:**  Gifts are not allowed for second homes.

**Reserves**:  Not required.

**Financing Contributions and Sales Concessions** :  Allowed subject to the following restrictions:

| LTV | Owner-Occupied | Second Home |
|-----|----------------|-------------|
| Greater than 90% | 3% | Not Allowed |
| Less than or equal to 90% | 6% | 3% |
| **Note:**  For additional information, see CTM 1.8.2: Financing Contributions and Sales Concessions 📄. | | |

**Spot Relocation**:  Not allowed.

**Project Warranty**:  Standard Fannie Mae or Freddie Mac.  For Project Warranty requirements see CTM 3.3: Condominium and PUD Projects.

<u>**Geographic Restrictions**</u>:

- For information on restrictions by state see CTM 3.10: Geographic Restrictions .
- Loans exceeding $650,000 are restricted to major metropolitan areas only.  For the definition of major metropolitan areas, see CTM 4.1: Glossary .

<u>**Construction Modification**</u>:  Not allowed.

<u>**One Time Close**</u>:  Not allowed.

<u>**Energy Efficient Mortgages**</u>:  Not allowed.





Last Revision Date:    10/29/2004

### SECTION 19:  NON-CONFORMING FIXED PERIOD ARMS

### 19.60:  Interest Only Fixed Period LIBOR ARM
### Owner-Occupied and Second Home

This is a Non-Conforming loan in which the Borrower pays the interest only for the first three, five, seven, or ten years of the loan.  The loan will then be fully amortized over the remaining term as an adjustable rate mortgage.  This section includes the guidelines for an Owner-Occupied Primary Residence and Second Home with Full and Alternative Documentation and Reduced Documentation.

| Description | LPID |
|---|---|
| NC 5/1 LIBR ARM InterestOnly | 657 |
| NC 7/1 LIBR ARM InterestOnly | 658 |
| NC 10/1 LIBR ARM InterestOnly | 659 |
| NC 3/1 LIBR ARM Interest Only | 664 |

Special Requirements:

| CLUES | Countrywide's Loan Underwriting Expert System, CLUES, should be used whenever possible.  This program is supported by CLUES.<br><br>**Note:**  For additional information on underwriting using CLUES, see CTM 1.10.2: Underwriting with CLUES 📄. |
|---|---|
| Repayment Terms | • The interest only payments are fixed for a stated period of time; generally, for three (3), five (5) , seven (7)  or ten (10) years.  Following that period, the payment and interest will increase in accordance with the terms of the Note.<br>• After the completion of the interest only period, the unpaid balance is fully amortized over the remaining term of the loan.<br>• The Borrower may make voluntary principal payments during the interest only period. The required interest only payment will be reduced to reflect the decrease in the principal unpaid balance. |

Pricing:  Add-ons apply.

Program Names and Program IDs:

| Name | Program ID |
|---|---|
| NonConf 3/1 LIBR ARM InterestOnly | 664 |
| NonConf 5/1 LIBR ARM InterestOnly | 657 |
| NonConf 7/1 LIBR ARM InterestOnly | 658 |
| NonConf 10/1 LIBR ARM InterestOnly | 659 |

Program Limitations:  Refer to the individual sections below for restrictions and special documentation requirements such as Borrower eligibility or Reduced documentation guidelines.

| Limitation | Owner-Occupied | Second Home |
|---|---|---|
| Occupancy Inspections | **Refinance of 2-4 Unit properties:**<br>• Prefunding occupancy inspection required<br>• The homeowners' policy must show that the mailing and property address are the same.<br><br>**Purchase of 3-4 Unit properties:**<br>Post funding occupancy inspection within 30 days of funding required. | Occupancy inspections are not applicable. |
| Number of CHL Loans Per Borrower | To view the guidelines for determining the maximum Number of CHL Loans per Borrower, see CTM 1.4: Maximum Number of Loans 🗎. | |
| Number of Properties Owned | To view the guidelines for determining the maximum number of financed properties, see CTM 1.4: Maximum Number of Loans 🗎. | |

**ARM Requirements:**

| Item | Requirement |
|---|---|
| Index | The average of interbank offered rates for one (1) year U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal.* |
| Margin | Set by CHL.  Refer to your Division's rate sheet.  There will be an automatic add-on by EDGE for loans utilizing TAMI. |
| Life Floor | Never lower than the margin. |
| Life Cap | • **3/1 ARM:** Six (6) percent over the Note rate.<br>• **5/1, 7/1, 10/1 ARM:** Five (5) percent over the Note rate. |
| Interest Rate Cap/Interest Rate Adjustment Date | • **3/1 ARM:**  The interest rate is fixed for the first 36 months.  The maximum adjustment at the first adjustment date is two (2) percent; thereafter, the interest rate will adjust annually with a maximum interest rate change at any one adjustment date of two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent.<br>• **5/1 ARM:**  The interest rate is fixed for the first 60 months.  The maximum adjustment at the first adjustment date is five (5) percent; thereafter, the interest rate will adjust annually with a maximum interest rate change at any one adjustment date of two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent.<br>• **7/1 ARM:**  The interest rate is fixed for the first 84 months.  The maximum adjustment at the first adjustment date is five (5) percent; thereafter, the interest rate will adjust annually with a maximum interest rate change at any one adjustment date of two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent.<br>• **10/1 ARM:**  The interest rate is fixed for the first 120 months.  The maximum adjustment at the first adjustment date is five (5) percent; thereafter, the interest rate will adjust annually with a maximum interest rate change at any one adjustment date of two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent. |
| Payment Adjustment | • **3/1 ARM:**  The payment is fixed for the first 36 months; thereafter, the payment may change annually, one (1) month following the interest rate change date.<br>• **5/1 ARM:**  The payment is fixed for the first 60 months; thereafter, the payment may change annually, one (1) month following the interest rate change date.<br>• **7/1 ARM:**  The payment is fixed for the first 84 months; thereafter, the payment may change annually, one (1) month following the interest rate change date.<br>• **10/1 ARM:**  The payment is fixed for the first 120 months; thereafter, the payment may change annually, one (1) month following the interest rate change date. |
| Conversion Option | Not allowed. |
| Note Rate Restrictions | • **Owner-Occupied:**  The Note rate may never be more than 300 basis points below the fully indexed rate.<br>• **Second Home:**  The Note rate may never be more than 200 basis points below the fully indexed rate. |
| Borrower Qualification | The borrower is qualified at the Note rate using the interest-only payment. |

**Term:** 30 years.

**Minimum Loan Amount:** None.

**Maximum Loan Amount:**

| Loan Amount | Owner-Occupied | | Second Home | |
|---|---|---|---|---|
| | Full/Alt Doc | Reduced Doc | Full/Alt Doc | Reduced Doc |
| Maximum | $2,000,000 | $1,000,000 | $650,000 | $650,000 |

**Eligible Finance Types:**

| Finance Type | Owner-Occupied | Second Home | Investment |
|---|---|---|---|
| Purchase and Rate and Term | Allowed | Allowed | Not Allowed |
| Cash-Out | Allowed | Allowed | Not Allowed |

**Maximum LTV/CLTV:**

| Max Loan Amount | Owner-Occupied | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Attached/Detached SFRs/Attached/Detached PUDs/Low-Rise Condos/High-Rise Condos/2-Unit | | | | | | | |
| | Purchase and Rate and Term | | | | Cash-Out | | | |
| | Full/Alt Doc | | Reduced Doc | | Full/Alt Doc | | Reduced Doc | | Max. Cash-Out |
| | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min. Credit Score | Max LTV/CLTV | Min. Credit Score | |

| Max Loan Amount | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min. Credit Score | Max LTV/CLTV | Min. Credit Score | Max. Cash-Out |
|---|---|---|---|---|---|---|---|---|---|
| $400,000 | 95/95** | 620 | 75/75 | 620 | 75/75 | 620 | 70/70 | 620 | $200,000 |
| $500,000 | 95/95**** | 680 | 70/70 | 620 | 75/75 | 620 | 70/70 | 620 | $200,000 |
| | 90/90 | 660 | | | | | | | |
| | 80/80 | 620 | | | | | | | |
| $1,000,000 | 80/90 | 660 | 70/70 | 660 | 65/65 | 620 | Not Allowed | | $200,000 |
| $1,500,000 | 65/65 | 680 | Not Allowed | | Not Allowed | | | | |
| $2,000,000* | 60%*** | 680 | Not Allowed | | Not Allowed | | | | |

Restrictions:
- *Secondary Financing: Loan amounts greater than $1,500,000: Not Allowed.
- **3/1 Max. 95/95 @ 680 or 90/90 @ 620.
- ***3/1 Not allowed.
- ****2-Units: 90/90 to 660 or 80/80 to 620.
- The maximum LTV allowed when there is secondary financing is 80%.

| Max Loan Amount | Owner-Occupied | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3-4 Units | | | | | | | |
| | Purchase and Rate and Term | | | | Cash-Out | | | |
| | Full/Alt Doc | | Reduced Doc | | Full/Alt Doc | | Reduced Doc | | Max Cash-Out |

| Max Loan Amount | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min Credit Score | Max Cash-Out |
|---|---|---|---|---|---|---|---|---|---|
| $400,000 | 90/90 | 680 | 75/75 | 680 | 75/75 | 620 | Not Allowed | | $100,000 |
| | 75/75 | 620 | 70/70 | 620 | | | | | |
| $650,000 | 80/90 | 680 | 75/75 | 680 | 70/70 | 620 | Not Allowed | | $100,000 |
| | | | 65/65 | 620 | | | | | |

Restriction: The maximum LTV allowed when there is secondary financing is 80%.

| Second Home | | |
|---|---|---|
| | | |

| Max. Loan Amount | Purchase and Rate and Term | | | | Cash-Out | | | | | |
| | Full/Alt Doc | | Reduced Doc | | Full/Alt Doc | | | Reduced Doc | | |
| | Max LTV/ CLTV | Min. Credit Score | Max LTV/ CLTV | Min. Credit Score | Max LTV/ CLTV | Min. Credit Score | Max. Cash-Out | Max LTV/ CLTV | Min. Credit Score | Max. Cash-Out |
| $400,000 | 90/90 | 620 | 70/70 | 660 | 70/70 | 620 | $150,000 | 60/60 | 660 | $100,000 |
| $650,000 | 80/80 | 620 | 65/65 | 660 | 65/65 | 620 | $150,000 | Not Allowed | | |

**Restrictions:**
- **2-4 Units:** Not allowed.
- The maximum LTV allowed when there is secondary financing is 80%.

## Occupancy Requirements:

| Doc Type | Owner-Occupied | Second Home | Investment |
|---|---|---|---|
| Full/Alt Doc | Allowed | Allowed | Not Allowed |
| Reduced Doc | Allowed | Allowed | Not Allowed |

## Eligible Borrowers:

| Borrower Types | Owner-Occupied | Second Home |
|---|---|---|
| U.S. Citizen | Valid Social Security number required. For additional information, see CTM 2.1.1: Eligible/Ineligible Borrowers  | |
| Permanent Resident Alien | Allowed.  For documentation requirements, see CTM 2.1.2: Permanent and Non-Permanent Resident Aliens  | |
| Non Permanent Resident Alien | If ALL the Borrowers are Non-Permanent Resident Aliens, the following restrictions apply:<br>- Max. Loan Amount:  $1,500,000;<br>- Full/Alt Doc only;<br>- Purchase and Rate and Term Refinance only; and<br>- Max LTV: 90%.<br>For employment, residency, and documentation requirements, see CTM 2.1.2: Permanent and Non-Permanent Resident Aliens . | Not Allowed |
| Non-Occupant Co-Borrowers | Allowed.  Income from Non-Occupant Co-Borrowers can be used to qualify provided:<br>- Full/Alt Doc only;<br>- Immediate family member;<br>- Max LTV: 90%; and<br>- Occupant ratios should not exceed guidelines by more than five (5) percent and must provide five (5) percent of the down payment.<br><br>**Exception:**<br>If the loan is underwritten and committed to second home guidelines, income from non-occupant co-borrowers can be used to qualify without respect to the occupant's ratios and downpayment requirements provided:<br>- Occupant and non-occupant are immediate family members (parent, child, or sibling).<br>- Purchase & Rate & Term Only.<br>- Full/Alt or Reduced Doc. | Not Applicable |
| Inter Vivos Revocable Trusts | Allowed.  For additional information, see CTM 2.1.4: Inter Vivos Revocable Trusts (Living Trusts) and Illinois Land Trusts . | |

**Ineligible Borrowers:**  For information regarding Ineligible Borrowers, see CTM 2.1.1: Eligible/Ineligible Borrowers .

**Eligible/Ineligible Properties**:  The following table identifies the property types that are eligible or ineligible for

financing under this program:

| Item | Loan Amount less than or equal to $650,000 | Loan Amount greater than $650,000 |
|---|---|---|
| Eligible Properties | <ul><li>Attached SFRs</li><li>Detached SFRs [1]</li><li>Attached PUDs</li><li>Detached PUDs [1]</li><li>Low-Rise Condos</li><li>High-Rise Condos</li><li>2-4 Units [2]</li><li>Rural Properties <= 20 acres [3]</li></ul> | <ul><li>Attached SFRs</li><li>Detached SFRs [1]</li><li>Attached PUDs</li><li>Detached PUDs [1]</li><li>Low-Rise Condos</li><li>2-Units [2]</li><li>Rural Properties <= 20 acres [3]</li></ul> |
| | Note:<br><ul><li>**[1] Detached SFRs/PUDs** include modular, panelized, and prefabricated homes.  For additional information, see CTM 3.6: Factory-Built Homes 📄.</li><li>**[2] 2-4 Units:** 3/1 ARM and Second Homes: Not allowed.</li><li>**[3]** For limitations, refer to CTM 3.12.7: Neighborhood Analysis 📄.</li></ul> | |
| Ineligible Properties | <ul><li>Condotels</li><li>Cooperatives</li><li>Manufactured homes</li><li>Log Homes</li></ul> | <ul><li>3-4 Units</li><li>Condotels</li><li>Cooperatives</li><li>Manufactured homes</li><li>High-Rise Condos</li><li>Log Homes</li></ul> |
| | Note:<br><ul><li>50% condo presale enhancement not allowed.</li><li>Leasehold Condos in the State of Hawaii are not permitted.</li></ul> | |

**Pre-Payment Penalty Option**:  Not allowed.

**Temporary Buydowns**:  Not allowed.

**Secondary Financing**:  Allowed with the following restrictions.
- The maximum LTV allowed when there is secondary financing is 80%.
- The maximum loan amount allowed when there is secondary financing is $1,500,000.
- To view the guidelines for Loans with Secondary Financing/Subordinate Liens, see CTM 1.6.1: Secondary Financing/Subordinate Lien Requirements 📄.
- For eligible secondary financing programs available from CHL, click here 📄.  The more restrictive of the guidelines apply.

**Seasoning Requirements**:  For information regarding Eligible Mortgages and Seasoning Requirements, see CTM 1.6.2: Eligible Transaction Types 📄.

**Determining Value**:  To view the guidelines for calculating the LTV, see CTM 1.11.2: Determining Loan-To-Value Ratios 📄.

**Mortgage Insurance**:  CMI or TAMI: Required.

| LTV | Owner-Occupied | Second Home |
|---|---|---|
| 90.01 - 95% | 30% | Not Allowed |
| 85.01 - 90% | 25% | 25% |
| 80.01 - 85% | 12% | 12% |

Note:
- **3/1 ARM:** ARM coverage is required.
- **5/1, 7/1, and 10/1 ARM:** Fixed Rate coverage is required.
- For additional information regarding Mortgage Insurance, see CTM 1.12: Mortgage Insurance 📄.

**Assumability**:  Assumable during the ARM period only. Subject to credit approval.

**Credit**:  All Borrowers must meet the credit score requirements shown in the LTV tables and:

| Credit Issues | Credit Requirements |
|---|---|
| Revolving and Installment | Late payments are considered in the credit score. |
| Mortgage Lates | Maximum mortgage lates permitted:<br>1 x 30 last 12 months<br>0 x 60 last 24 months |
| Bankruptcy, Foreclosure, Deed-in-Lieu, Short Sale | Subject to individual evaluation.  To view the requirements, see CTM 2.2.5: Credit, Bankruptcy, Foreclosure, Deed-in-Lieu, or Short Sale 🗒. |
| History of Credit Counseling | Active participant:  Not Allowed.<br>Previous participant:  To view the requirements, see CTM 2.2.1: Acceptable Credit History 🗒. |
| Judgements, Collections, Charge-Offs | Subject to individual evaluation.  To view the requirements, see CTM 2.2.4: General Derogatory Credit Information 🗒. |

**Ratios**:  Maximum: 33/38%.  These ratios may be exceeded when using CLUES or if there are compensating factors such as:

- The Borrower(s) reserves exceed the program guidelines.
- The LTV is lower than the maximum allowable at the loan amount.
- The Borrower(s) credit score exceeds the minimum requirements.

Documentation Requirements:  Appraisal requirements are as follows:

| Loan Amount | Appraisal Requirement |
|---|---|
| Loan Amount less than or equal to $1,000,000 | One (1) full appraisal. |
| Loan Amount greater than $1,000,000 | One (1) full appraisal plus one (1) field review.  The field review must be completed by a CHL approved Review Appraiser. |
| **Note:**  For additional information regarding Review Appraisals and for a list of approved appraisers, see CTM 3.12.19: Review Appraisals 🗒. | |

Reduced Documentation Requirements:

| Item | Documentation Requirement |
|---|---|
| Employment | **Self-Employed Borrowers only.**<br>- Employment must be disclosed on the 1003 and verified.  The Borrower must have been in the same business, at the same location, for a minimum of two (2) years.<br>- Self-employment must be verified:<br>  - by obtaining a copy of a valid Business License; or<br>  - through a neutral third party, such as a:<br>    - CPA<br>    - regulatory agency<br>    - professional organization.<br>**Note:**<br>- When verifying employment, no income may be disclosed.<br>- This verification should cover a full two (2) year period. |
| Income | Must be disclosed on the 1003, but is not verified.  However, the stated income must be deemed reasonable and consistent with the Borrower's profession or occupation. |
| Unearned or Passive Income | The source of all unearned or passive income must be verified if it is the primary source of income; i.e. constitutes 50% or more of the qualifying income.  If the amount of passive income constitutes less than 50%, the source need only be stated and not verified. However, in all cases, the amount of the passive income claimed must be reasonable based upon the profile of the borrower.  For additional information regarding sources of passive income and documentation requirements, see CTM section 1.5.4: Reduced and Stated Income/Stated Assets (SISA) Documentation (Document Type 3) 🗒 |
| Assets | Must be disclosed and verified using Full/Alt documentation.<br>- Must be verified by obtaining the two (2) month's most recent account statements or VOD.<br>- The assets must be the Borrower's own funds.<br>  - **Acceptable assets include:**  checking and/or savings accounts, certificates of |

| | deposit (CDs), brokerage or mutual funds, publicly traded stocks. <br> - **Unacceptable assets include:** accounts in the name of a corporation or partnership, or other party, stock in a closely held corporation. |
|---|---|
| IRS Form 4506 | Required for all Borrowers. |
| Salaried Co-Borrowers | If their income is used for qualifying purposes, the income and employment must be verified using Full/Alt Doc. |

**Documentation Type**:  Standard loan purpose codes must be used, as follows:

| Doc Types | Full/Alt Doc | Reduced Doc |
|---|---|---|
| Codes | Use code: <br> ● 1 for "Full Docs"; or <br> ● 2 for "Alt Docs." <br><br> For additional information regarding Alternative Documentation, see CTM 1.5.3: Alternative Documentation 📄 | Use code: <br> ● 3 for "Reduced Docs." <br><br><br> For additional information, refer to the Required Documentation section above. |

**Down Payment/Source of Funds**:  Gifts are allowed subject to the following restrictions:

| Owner Occupied | | |
|---|---|---|
| **Item** | **Full/Alt Doc** | **Reduced Doc** |
| Source | Relatives, domestic partner, fiance, or fiancee only. | Relatives, domestic partner, fiance, or fiancee only. |
| Maximum LTV | 90% | 70% |
| Maximum Loan Amount | $1,000,000 | $650,000 |
| Percentage of Borrower's Funds | Five (5) percent of the down payment must be from the Borrower's own funds. <br><br> **Exception**:  If the LTV/CLTV is 80% or less, the entire down payment may be a gift. | Twenty (20) percent of the down payment must be from the Borrower's own funds. |
| Note: <br> ● Gifts are not allowed for Second Homes. <br> ● For allowable sources of funds, see CTM 1.8.3: Sources of Funds 📄. <br> ● For documenting of funds, see CTM 1.8.4: Funds for the Down Payment, Closing Costs, and Reserves 📄. | | |

**Reserve Requirements**:

| Document Type | Owner-Occupied | Second Home |
|---|---|---|
| Full/Alt Doc | Two (2) months | Six (6) months |
| Reduced Doc | Six (6) months | Six (6) months |
| **Note**:  Reserves may not be required with a CLUES Accept. | | |

**Financing Contributions and Sales Concessions** :  Allowed subject to the following restrictions:

| LTV | Owner-Occupied | Second Home |
|---|---|---|
| Greater than 90% | 3% | Not Allowed |
| Less than or equal to 90% | 6% | 3% |
| **Note:**  For additional information, see CTM 1.8.2: Financing Contributions and Sales Concessions 📄. | | |

**Spot Relocation**:  Allowed.  For additional information and guidelines, see CTM 1.7.9: Spot Relocation Mortgages 📄.

**Project Warranty**:  Fannie Mae or Freddie Mac.  For Project Warranty requirements see CTM 3.3: Condominium and PUD Projects.

**Geographic Restrictions** :

- For information on restrictions by state see CTM 3.10: Geographic Restrictions 📄.

- Loans exceeding $650,000 are restricted to major metropolitan areas only. For the definition of major metropolitan areas, see CTM 4.1: Glossary .

<u>**Construction Modification**</u> : Allowed with the following restrictions:

- Owner-Occupied primary residence.
- Full/Alt Doc only.
- Maximum Loan Amount: $1,000,000.

For additional information and guidelines, see CTM 1.6.5: Construction Modification Enhancement .

<u>**One Time Close**</u> :  Not allowed.

<u>**Energy Efficient Mortgages**</u> :  Not allowed.

, 



Last Revision Date:     10/29/2004

## SECTION 21:  NON-CONFORMING EXPANDED CRITERIA FIXED PERIOD ARMS

### 21.10:  3/1, 5/1, 7/1, and 10/1 Fixed Period ARM
### and
### 3/1, 5/1, 7/1 and 10/1 Interest Only Fixed Period ARM
### Full/Alternative and Reduced Documentation and 80/20 Option

This section of the **Loan Program Guide** contains the guidelines for the Non-Conforming Expanded Criteria Fixed Period ARM for Owner-Occupied Primary Residences, Second Homes, and Investment, with Full/Alternative and Reduced Documentation that allows for an initial fixed rate period of three, five, seven, or ten years.  This section includes guidelines for expanded loan-to-value, combined loan-to-value ratios, and loan amounts, as well as enhancements not available under Countrywide's standard criteria.

Additionally, this section includes the **80/20 Option** that allows **100% financing** for eligible Borrowers with **no downpayment required** on purchase transactions.  This option allows for an 80% first mortgage and a 20% second mortgage, allowing qualified Borrowers to purchase a property or transact a rate and term refinance without the expense for mortgage insurance.  The secondary financing may be a Home Equity Line of Credit (HELOC) or a closed end second from CHL or another institutional lender.  Special requirements and restrictions pertaining to the **80/20 Option** are identified at the end of this loan program.

| Name | Program ID | Name | Program ID |
|---|---|---|---|
| NonConf ARM Treas 3/1 Expanded NonConf ARM Treas 3/1 EC Buydn | 441 | NonConf ARM LIBOR 5/1 EC PP NonConf ARM LIBOR 5/1 EC PP Buy | 569 |
| NonConf ARM Treas 5/1 Expanded NonConf ARM Treas 5/1 EC Buydn | 442 | NonConf ARM LIBOR 5/1 Expanded NonConf ARM LIBOR 5/1 EC Buydn | 570 |
| NonConf ARM Treas 7/1 Expanded NonConf ARM Treas 7/1 EC Buydn | 443 | NonConf ARM LIBOR 7/1 Expanded NonConf ARM LIBOR 7/1 EC Buydn | 574 |
| NonConf ARM Treas 10/1 Expanded NonConf ARM Treas 10/1 EC Buydn | 444 | NonConf ARM LIBOR 10/1 Expanded NonConf ARM LIBOR 10/1 EC Buydn | 577 |
| NonConf ARM Treas 3/1 EC PP NonConf ARM Treas 3/1 EC PP Buy | 477 | NonConf ARM LIBOR 3/1 EC IO | 750 |
| NonConf ARM Treas 5/1 EC PP NonConf ARM Treas 5/1 EC PP Buy | 478 | NonConf ARM LIBOR 5/1 EC IO | 752 |
| NonConf ARM LIBOR 3/1 EC PP NonConf ARM LIBOR 3/1 EC PP Buy | 565 | NonConf ARM LIBOR 7/1 EC IO | 754 |
| NonConf ARM LIBOR 3/1 Expanded NonConf ARM LIBOR 3/1 EC Buydn | 566 | NonConf ARM LIBOR 10/1 EC IO | 756 |

<u>Eligible Divisions</u>: All

<u>Special Requirements:</u>  Countrywide's Loan Underwriting Expert System, CLUES, should be used whenever

possible.  This program is supported by CLUES.

       For additional information on underwriting using CLUES, see CTM 1.10.2: Underwriting with CLUES 📄.

   **Pricing:**  Add-ons apply.

<u>Program Limitations</u>:  Refer to the individual sections below for restrictions and special documentation requirements such as Borrower eligibility or Reduced documentation guidelines.

| Limitation | Owner-Occupied | Second Home | Investment |
|---|---|---|---|
| Occupancy Inspections | **Refinance of 2-4 Unit properties:** <br>● Prefunding occupancy inspection required.<br>● The homeowners' policy must show that the mailing and property address are the same.<br><br>**Purchase of 3-4 Unit properties:**<br>Post funding occupancy inspection within 30 days of funding required. | Occupancy inspections are not applicable. | Occupancy inspections are not applicable. |
| Number of CHL Loans Per Borrower | To view the guidelines for determining the maximum Number of CHL Loans per Borrower, see CTM 1.4: Maximum Number of Loans 📄. | | |
| Number of Properties Owned | To view the guidelines for determining the maximum number of financed properties, see CTM 1.4: Maximum Number of Loans 📄. | | |

<u>ARM Requirements</u>:

| Item | Requirement |
|---|---|
| Index | ● **LIBOR**:  The average of interbank offered rates for one (1) year U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal.*<br>● **U.S. Treasury Securities**:  The weekly average yield of U.S. Treasury Securities adjusted to a constant maturity of one year, as published by the Federal Reserves Statistical Release H.15.  **Not Available for Interest Only loans** . |
| Margin | Set by CHL.  Refer to your Division's rate sheet.  There will be an automatic add-on by EDGE for loans utilizing TAMI. |
| Life Floor | Never lower than the margin. |
| Life Cap | ● **3/1 ARM:** Six (6) percent over the Note rate.<br>● **5/1, 7/1, and 10/1 ARM:**  Five (5) percent over the Note rate. |
| Interest Rate Cap/Interest Rate Adjustment Date | ● **3/1 ARM:**  The interest rate is fixed for the first 36 months. The maximum adjustment at the first adjustment date is two (2) percent. Thereafter, the interest rate will adjust annually.  The maximum interest rate adjustment at any one adjustment date is two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent.<br>● **5/1 ARM:**  The interest rate is fixed for the first 60 months.  The maximum adjustment at the first adjustment date is five (5) percent.  Thereafter, the interest rate will adjust annually.  The maximum interest rate adjustment at any one adjustment date is two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent.<br>● **7/1 ARM:**  The interest rate is fixed for the first 84 months.  The maximum adjustment at the first adjustment date is five (5) percent.  Thereafter, the interest rate will adjust annually.  The maximum interest rate change at any one adjustment date is two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent.<br>● **10/1 ARM:**  The interest rate is fixed for the first 120 months. The maximum adjustment at the first adjustment date is five (5) percent.  Thereafter, the interest rate will adjust annually.  The maximum interest rate change at any one adjustment date is two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent. |
| Payment Adjustment | ● **3/1 ARM:**  The payment is fixed for the first 36 months.  Thereafter, the payment may adjust annually, one (1) month following the interest rate change date.<br>● **5/1 ARM:**  The payment is fixed for the first 60 months.  Thereafter, the payment may adjust annually, one (1) month following the interest rate change date.<br>● **7/1 ARM:**  The payment is fixed for the first 84 months.  Thereafter, the payment may adjust annually, one (1) month following the interest rate change date. |

| | |
|---|---|
| | • **10/1 ARM:**  The payment is fixed for the first 120 months.  Thereafter, the payment may adjust annually, one (1) month following the interest rate change date. |
| **Conversion Option** | None. |
| **Note Rate Restrictions** | The Note rate may never be more than 300 basis points below the fully indexed rate. |
| **Borrower Qualification** | Borrower qualifications are as follows:<br>• **3/1 ARM:**<br>  - LTV Greater than 75%:  Qualify at the Note rate plus two (2) percent.<br>  - LTV of 75% or less:  Qualify at the Note rate.<br>• **5/1, 7/1 and 10/1 ARM:**  Qualify at the Note rate.<br><br>**Interest Only Option:**<br>• **3/1 ARM:**<br>  - LTV Greater than 75%:  Qualify at the Note rate plus two (2) percent using the interest-only payment.<br>  - LTV of 75% or less:  Qualify at the Note rate using the interest-only payment.<br>• **5/1, 7/1 and 10/1 ARM:**  Qualify at the Note rate using the interest-only payment. |
| **Interest Only Option** | **Repayment Terms**<br>• The interest only payments are fixed for a stated period of time; generally, for three (3), five (5), seven (7) or ten (10) years.  Following that period, the payment and interest will increase in accordance with the terms of the Note.<br>• After the completion of the interest only period, the unpaid balance is fully amortized over the remaining term of the loan.<br>• The Borrower may make voluntary principal payments during the interest only period.  The required interest only payment will be reduced to reflect the decrease in the principal unpaid balance. |

**Term:**  30 years.

**Minimum Loan Amount:**  None.

**Maximum Loan Amount:**

| | Owner Occupied | Second Home | Investment |
|---|---|---|---|
| **Full/Alt** | $3,000,000 | $1,500,000 | $1,500,000 |
| **Reduced** | $1,500,000 | $1,500,000 | $1,000,000 |

**Eligible Finance Types:**

| Finance Type | Owner-Occupied | Second Home | Investment |
|---|---|---|---|
| **Purchase and Rate and Term** | Allowed | Allowed | Allowed |
| **Cash-Out** | Allowed | Allowed | Allowed |

**Maximum LTV/CLTV Purchase and Rate and Term:**

| Owner Occupied | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Purchase and Rate and Term** | | | | | | | | | | | | |
| | **Attached/Detached SFRs, Attached/Detached PUDs, Low-Rise Condos, and 2 Units** | | | | **High-Rise Condos** | | | | **3-4 Units** | | | |
| | **Full/Alt Doc** | | **Reduced Doc** | | **Full/Alt Doc** | | **Reduced Doc** | | **Full/Alt Doc** | | **Reduced Doc** | |
| **Max Loan Amount** | LTV/ CLTV | Credit Score | LTV/ CLTV | Credit Score | LTV/ CLTV | Credit Score | LTV/ CLTV | Credit Score | LTV/ CLTV | Credit Score | LTV/ CLTV | Credit Score |
| **$400,000** | 95/95 * | 620 | 95/95 *** | 680 | 90/90 | 620 | 80/80 | 680 | 90/90 | 660 | 75/90 | 680 |

|  |  |  | 90/90 | 660 |  |  |  |  | 75/90 | 620 |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  | 90**** | 620 |  |  |  |  |  |  |  |  |
| $500,000 | 95/95***** | 620 | 80/80 | 680 | 80/90 | 660 | 75/80 | 680 | 70/90 | 620 | 75/90 | 680 |
| $650,000 | 95/95 | 680 | 80/80 | 680 | 80/90 | 660 | 75/80 | 680 | 70/90 | 620 | 65/75 | 680 |
|  | 80/75 | 620 | 75/75 | 620 |  |  |  |  |  |  |  |  |
| $1,000,000 | 80/90 | 620 | 70/90 | 660 | 75/75 | 660 | 70/90 | 680 | 60/65 | 620 | 55/60 | 680 |
| $1,500,000 | 75/75 | 620** | 65/70 | 680 | 65/65 | 680 | 65/70 | 680 | 60/65 | 620 | Not Allowed | |
| $2,000,000 | 70/70*** | 700 | Not Allowed | | | Not Allowed | | | Not Allowed | | | |
| $3,000,000 | 70/70*** | 700 | Not Allowed | | | Not Allowed | | | Not Allowed | | | |

Restrictions:
- 3/1 ARM
  - *95/95 @ 680; or 90/90 @ 620
  - **75/75 @ 680
  - ***Not Allowed
  - ****80/80 @ 620
  - *****95/95 @ 680; or 90/90 @ 620
- 2 Units
  - *****90/95 @ 620

| Second Home | | | | |
|---|---|---|---|---|
| Attached/Detached SFRs/Attached/Detached PUDs/Low-Rise Condos/High-Rise Condos | | | | |
| Purchase and Rate and Term | | | | |
| | Full/Alt Doc | | Reduced Doc | |
| Max Loan Amount | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min Credit Score |
| $400,000 | 90/95** | 620* | 75/80 | 660 |
| $500,000 | 80/90*** | 620 | 65/80 | 660 |
| $650,000 | 80/90*** | 620 | 65/80 | 660 |
| $1,000,000 | 60/95 | 620 | 60/80 | 660 |
| $1,500,000 | 60/65 | 620 | 55/65 | 660 |

Restrictions
- *3/1 max 90/95 @ 680
- **High-Rise Condos 90/90
- ***High-Rise Condos 75/80
- The maximum LTV allowed when there is secondary financing is 80%.

| Investment | | | | |
|---|---|---|---|---|
| Attached/Detached SFRs/Attached/Detached PUDs/Low-Rise Condos/High-Rise Condos/2-4 Units | | | | |
| Purchase and Rate and Term | | | | |
| | Full/Alt Doc | | Reduced Doc | |
| Max Loan Amount | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min Credit Score |
| $400,000 | 90/90 | 660 | 75/90 | 680 |
|  | 75/90 | 620 |  |  |
| $650,000 | 70/90 | 620 | 65/75 | 680 |
| $1,000,000 | 60/65 | 620 | 55/60 | 680 |
| $1,500,000 | 60/65 | 620 | Not Allowed | |

Restrictions:
- **Condos:** Max LTV/CLTV 80/80.
- The maximum LTV allowed when there is secondary financing is 80%.

**Maximum LTV/CLTV Cash Out Guidelines:**

| Owner-Occupied |
|---|
| Cash-Out |

| Max Loan Amount | Attached/Detached SFRs/Attached/Detached PUDs/Low-Rise Condos/High-Rise Condos/2-Units | | | | 3-4 Units | | | |
|---|---|---|---|---|---|---|---|---|
| | Full/Alt Doc | | Reduced Doc | | Full/Alt Doc | | Reduced Doc | |
| | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min Credit Score |
| $400,000 | 80/80* | 680 | 80/80 | 660 | 75/90**** | 620 | 75/75 | 680 |
| $650,000 | 80/90**  80/80 | 720  680 | 80/80*** | 680*** | 65/90 | 620 | 55/65 | 680 |
| $1,000,000 | 75/80 | 680 | 55/80 | 660 | 55/60 | 620 | 45/65 | 680 |
| $1,500,000 | 70/75 | 680 | 55/60 | 660 | 55/60 | 620 | Not Allowed | |

Restrictions:
- *3/1 max 80/80 @ 680
- **3/1 & 5/1 not allowed
- ***3/1 and 5/1 max 80/80 @ 720 and High-Rise Condo max 75/75 @ 680 for 3/1, 5/1, 7/1 and 10/1
- ****3/1 max 75/85 @ 620

| Second Home | | | |
|---|---|---|---|
| Attached/Detached SFRs/Detached/Attached PUDs/Low-Rise Condos/High Rise Condos | | | |
| Cash-Out | | | |
| Max Loan Amount | Full/Alt Doc | | Reduced Doc | |
| | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min Credit Score |
| $400,000 | 80/90* | 680* | 70/70 | 660 |
| $500,000 | 80/80 | 680 | 65/80 | 660 |
| $650,000 | 80/80 | 680 | 65/80 | 660 |
| $1,000,000 | 70/80 | 680 | 55/60 | 660 |
| $1,500,000 | 70/75 | 680 | 45/55 | 660 |

Restrictions: *3/1 Max 80/80 @ 720

| Investment | | | | |
|---|---|---|---|---|
| Attached/Detached SFRs/Attached/Detached PUDs/Low-Rise Condos/High-Rise Condos/2-4 Units | | | | |
| Cash-Out | | | | |
| Max Loan Amount | Full/Alt Doc | | Reduced Doc | |
| | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min Credit Score |
| $400,000 | 75/90* | 620 | 75/75 | 680 |
| $650,000 | 65/90 | 620 | 55/65 | 680 |
| $1,000,000 | 55/60 | 620 | 45/65 | 680 |
| $1,500,000 | 55/60 | 620 | Not Allowed | |

Restrictions:
- *3/1 max 75/85 @ 620
- **Condos:** Cash-out: Max CLTV 80%.

| Cash-Out Restrictions | | | | | | |
|---|---|---|---|---|---|---|
| | Full/Alt Doc | | | | | Reduced Doc |
| LTV | Owner-Occupied and Second Home | Investment | Owner-Occupied | Owner Occupied | Investment | All Occupancy Types |
| | SFRs, PUDs, Condos | | 2 Units | 3-4 Units | 2-4 Units | All Property Types |
| LTV: > 75% | $100,000 | $100,000 | $100,000 | $100,000* | $100,000* | All LTVs: $100,000 |
| LTV: 70.01-75% | $200,000 | $100,000 | $200,000 | $100,000 | $100,000 | |

| | | | | |
|---|---|---|---|---|
| **LTV: 60.01 - 70%** | $250,000 | $200,000 | $250,000 | $200,000 | $200,000 |
| **LTV: ≤ 60%** | $400,000 | $250,000 | $400,000 | $250,000 | $250,000 |
| **Note:** *When allowed, as per the LTV tables | | | | | |

Occupancy:

| Doc Type | Owner-Occupied | Second Home | Investment |
|---|---|---|---|
| **Full/Alt Doc** | Allowed | Allowed | Allowed |
| **Reduced Doc** | Allowed | Allowed | Allowed |

Eligible Borrowers:

| Borrower Types | Owner-Occupied | Second Home | Investment |
|---|---|---|---|
| **U.S. Citizen** | Valid Social Security number required. For additional information, see CTM 2.1.1: Eligible/Ineligible Borrowers 📄. | | |
| **Permanent Resident Alien** | Allowed. For documentation requirements, see CTM 2.1.2: Permanent and Non-Permanent Resident Aliens 📄. | | |
| **Non-Permanent Resident Alien** | If **All** the Borrowers are Non-Permanent Resident Aliens, the following restrictions apply:<br>● Purchase and Rate and Term Refinance only; and<br>● Max LTV: 90%<br>For employment, residency, and documentation requirements, see CTM 2.1.2: Permanent and Non-Permanent Resident Aliens 📄. | Not Allowed | Not Allowed |
| **Non-Occupant Co-Borrowers** | Allowed. Income from non-occupant co-borrowers can be used to qualify provided:<br>● Full/Alt Doc only<br>● Immediate family member.<br>● Max LTV: 90%.<br>● Occupant ratios should not exceed guidelines by more than five (5) percent<br>● Occupant must provide five (5) percent of the down payment.<br>**Exception:**<br>If the loan is underwritten and committed to second home guidelines, income from non-occupant co-borrowers can be used to qualify without respect to the occupant's ratios and downpayment requirements provided:<br>● Occupant and non-occupant are immediate family members (parent, child, or sibling).<br>● Purchase & Rate & Term | Not Applicable | Not Applicable |

| | Only.<br>● Full/Alt or Reduced Doc. | | |
|---|---|---|---|
| Inter Vivos Revocable Trusts | Allowed.  For additional information,  see CTM 2.1.4: Inter Vivos Revocable Trusts (Living Trusts) and Illinois Land Trusts 📄. | | |

**Ineligible Borrowers**:  For information regarding Ineligible Borrowers, see CTM 2.1.1: Eligible/Ineligible Borrowers 📄.

**Eligible/Ineligible Properties**:

| Eligible Properties | ● Attached SFRs<br>● Detached SFRs [1]<br>● Attached PUDs<br>● Detached PUDs [1]<br>● Low-Rise Condos<br>● High-Rise Condos<br>● 2-4 Units [2]<br>● Cooperatives [3] |
|---|---|
| | **Restrictions:**<br>● **[1] Detached SFRs/PUDs** include modular, panelized, and prefabricated homes. For additional information, see CTM 3.6: Factory-Built Homes 📄.<br>● **[2] 2-4 Units**:  Second Home not allowed.<br>● **[3] Cooperatives:**  Restrictions apply, see CTM 3.5.2: Eligible Cooperative Share Loan Transactions 📄. |
| Ineligible Properties | ● Condotels<br>● Manufactured homes<br>● Log Homes<br>● Non-Warrantable Condos<br>● Rural Properties [4] |
| | **Note: [4] Rural Property** is defined as a property having a lot size greater than ten (10) acres.  Restrictions apply if the property is equal to or less than ten (10) acres but the appraisal identifies the property as rural.  To view the restrictions, refer to CTM 3.12.7: Neighborhood Analysis 📄. |

**Prepayment Penalty Option**:  Available in the following States:

| | | | |
|---|---|---|---|
| Arizona | Indiana | North Dakota | Texas |
| California | Kentucky | Oklahoma | Utah |
| Colorado | Montana | Oregon | Washington |
| Connecticut | Nebraska | Pennsylvania | Wyoming |
| Delaware | Nevada | South Carolina | |
| Florida | New Hampshire | South Dakota | |
| Hawaii | North Carolina | Tennessee | |
| Idaho | | | |

**Note**:
● Interest Only:  Not Allowed.
● 7/1 and 10/1:  Not Allowed.
● State restrictions may apply.  To view State/Geographic restrictions, see CTM 3.10: Geographic Restrictions 📄.
● To view the guidelines for the Prepayment Penalty/Reduced Rate Option, see CTM 1.7.1: Prepayment Penalty/Reduced Rate Option 📄.

**Temporary Buydowns:** Allowed with the following restrictions:

| Criteria | Owner-Occupied | Second Home |
|---|---|---|
| Maximum Loan Amount | $1,500,000 | $650,000 |
| Eligible Finance Types | Purchase and Rate and Term | |
| Documentation Type | Full/Alt Doc | |

| Eligible Properties | Detached/Attached SFRs, Detached/Attached PUDs, Condos, and 2-Units<br>**Restrictions:**<br>● **Detached SFRs/PUDs** include modular, panelized, and prefabricated homes.  For additional information, see CTM 3.6: Factory-Built Homes 📄.<br>● **2 Units**:  Second Home not allowed. |
|---|---|
| Max LTV | 90% |
| Eligible Plans | ● **3/1 ARM**: 2-1<br>● **5/1, 7/1, and 10/1 ARMs**:  3-2-1 or 2-1 |
| Qualifying Rate | To view the guidelines for qualifying the borrower, see CTM 1.2.3: Buydowns 📄. |
| Interest Only Option | Not available. |

**Secondary Financing**:  Allowed with the following restrictions.

> **Restrictions:**
> ● The maximum LTV allowed when there is secondary financing is 80%.
> ● To view the guidelines for Loans with Secondary Financing/Subordinate Liens,  see CTM 1.6.1: Secondary Financing/Subordinate Lien Requirements 📄.
> ● For eligible secondary financing programs available from CHL, click here [📄].  The more restrictive of the guidelines apply.

**Seasoning Requirements**:  For information regarding Eligible Mortgages and Seasoning Requirements, see CTM 1.6.2: Eligible Transaction Types 📄.

**Determining Value**:  To view the guidelines for calculating the LTV, see CTM 1.11.2: Determining Loan-To-Value Ratios 📄.

**Mortgage Insurance**:

| Full/Alt Doc | | | |
|---|---|---|---|
| **LTV** | **Owner-Occupied** | **Second Home** | **Investment** |
| 90.01 - 95% | 30% | Not Applicable | Not Applicable |
| 85.01 - 90% | 25% | 25% | 25% |
| 80.01 - 85% | 12% | 20% | 20% |

Note:
● **CMI or TAMI:**  Required.
● **3/1 ARM:**  ARM coverage required.
● **5/1, 7/1, and 10/1 ARM:**  Fixed Rate coverage required.
● **Buydown 3/1, 5/1, 7/1, 10/1 ARM:**  ARM coverage is required
● The Mortgage Insurers' requirements vary greatly with investment property loans.  The branch must determine early in the loan application process whether the Borrower qualifies for MI.
● For additional information regarding Mortgage Insurance, see CTM 1.12: Mortgage Insurance 📄.

| Reduced Doc | | |
|---|---|---|
| Credit Scores 680+ | | |
| **LTV** | **Factor** | **Coverage for all Terms** |
| 90.01 - 95% 5/1, 7/1, 10/1 ARM | .92 | 30% |
| Credit Scores 660 + | | |
| **LTV** | **Factor** | **Coverage for all Terms** |
| 85.01 - 90% 5/1, 7/1, 10/1 ARM | .66 | 25% |
| 85.01 - 90% 3/1 ARM | .79 | 25% |
| 80.01 - 85% 5/1, 7/1, 10/1 ARM | .46 | 12% |
| 80.01 - 85% 3/1 ARM | .51 | 12% |

| Credit Scores 620 - 659 | | |
|---|---|---|
| **LTV** | **Factor** | **Coverage for all Terms** |
| 85.01 - 90% 5/1, 7/1, 10/1 ARM | .72 | 25% |
| 80.01 - 85% 5/1, 7/1, 10/1 ARM | .52 | 12% |

**Note:**
- **CMI or TAMI:** Not allowed.  Monthly (Borrower Paid) MI only.
- Delegated Manual Mortgage Insurance is required.  An MI certificate from PMI, TRIAD, RADIAN, GE* or RMIC must be in the loan file prior to closing.  **Exceptions:**
  - **Louisiana, Maine, New Hampshire, and New York** : Ineligible for insuring with Triad.
  - **Alaska and Hawaii:** Ineligible for insuring with GE, TRIAD, or RMIC.
- The branch must request Standard Rate with Reduced Documentation/NIV (No Income Verification).  *GE will only insure loans with a minimum credit score of 660 or greater.
- The factors displayed are an estimation and should be used for disclosure purposes only.  Actual factors will be provided by the applicable mortgage insurance company.
- **Special Requirements for Interest Only Loans** :  Delegated Manual Mortgage Insurance is required.  An MI certificate from PMI, TRIAD, GE* or MGIC must be in the loan file prior to closing.  **Exceptions:**
  - **Louisiana, Maine, New Hampshire and New York** :  Ineligible for insuring with Triad.
  - **Alaska and Hawaii:**  Ineligible for insuring with GE or Triad.
- For additional information regarding Mortgage Insurance, see CTM 1.12: Mortgage Insurance 📄.

**Assumability**  Assumable during the ARM period.  Subject to credit approval.

**Credit:**  All Borrowers must meet the credit score requirements shown in the LTV tables, and:

| Credit Issues | Credit Requirements |
|---|---|
| Revolving and Installment | Late payments are considered in the credit score. |
| Mortgage Lates | Maximum mortgage lates permitted: 1 x 30 last 12 months 0 x 60 last 24 months |
| Bankruptcy, Foreclosure, Deed-in-Lieu, Short Sale | Subject to individual evaluation.  To view the requirements, see CTM 2.2.5: Credit, Bankruptcy, Foreclosure, Deed-in-Lieu, or Short Sale 📄. |
| History of Credit Counseling | Active participant:  Not Allowed Previous participant:  To view the requirements, see CTM 2.2.1: Acceptable Credit History 📄. |
| Judgements, Collections, Charge-Offs | Subject to individual evaluation.  To view the requirements, see CTM 2.2.4: General Derogatory Credit Information 📄. |

**Ratios:**  33/38%.

These ratios may be exceeded when using CLUES or if there are compensating factors such as:
- The borrower(s) reserves exceed the property guidelines.
- The LTV is lower than the maximum allowable at the loan amount.
- The borrower(s) credit score exceeds the minimum requirements.

**Documentation Requirements** :

**Appraisal** requirements are as follows:

| Loan Amount | Appraisal Requirement |
|---|---|
| Less Than or Equal to $1,000,000 | One (1) full appraisal. |
| Greater Than $1,000,000 | One (1) full appraisal plus one (1) field review.  The field review must be completed by a CHL approved Review Appraiser. |
| **Note:**  For additional information regarding Review Appraisals and for a list of approved appraisers, see CTM 3.12.19: Review Appraisals 📄. | |

**Reduced Documentation** requirements are as follows:

| Item | Documentation Requirement |
|---|---|

| Employment | **Self-Employed Borrowers:** |
|---|---|
| | • Employment must be disclosed on the 1003 and verified. The Borrower must have been in the same business, at the same location, for a minimum of two (2) years. |
| | • Self-employment must be verified: |
| |    - by obtaining a copy of a valid Business License; or |
| |    - through a neutral third party, such as a: |
| |      • CPA |
| |      • regulatory agency |
| |      • professional organization. |
| | |
| | **Salaried Borrowers (includes Borrowers receiving commissioned and bonus income ):** |
| | • Employment must be disclosed on the 1003 and verified. |
| | • Must have a two (2) year history of employment with the same employer or in the same line of work. Any employment change must be deemed to be a career advancement. |
| | • A verbal verification of employment is required that includes: |
| |    - current employment status; |
| |    - job title; |
| |    - term of employment; |
| |    - probability of continued employment; and |
| |    - the name and title of the person providing the information on behalf of the employer. |
| | **Note:** |
| | • When verifying employment, no income may be disclosed. |
| | • This verification should cover a full two (2) year period. |
| Income | Must be disclosed on the 1003, but is not verified. However, the stated income must be deemed reasonable and consistent with the Borrower's profession or occupation. |
| Unearned or Passive Income | The source of all unearned or passive income must be verified if it is the primary source of income; i.e. constitutes 50% or more of the qualifying income. If the amount of passive income constitutes less than 50%, the source need only be stated and not verified. However, in all cases, the amount of the passive income claimed must be reasonable based upon the profile of the borrower. For additional information regarding sources of passive income and documentation requirements, see CTM section 1.5.4: Reduced and Stated Income/Stated Assets (SISA) Documentation (Document Type 3) 📄. |
| Assets | Must be disclosed and verified using Full/Alt documentation. |
| | • Must be verified by obtaining the two (2) month's most recent account statements or VOD. |
| | • The assets must be the Borrower's own funds. |
| |    - **Acceptable assets include:** checking and/or savings accounts, certificates of deposit (CDs), brokerage or mutual funds, publicly traded stocks. |
| |    - **Unacceptable assets include:** accounts in the name of a corporation or partnership, or other party, stock in a closely held corporation. |
| IRS Form 4506 | Not Required. |

**Documentation Type:** Standard loan purpose codes must be used, as follows:

| Doc Types | Full/Alt Doc | Reduced Doc |
|---|---|---|
| Codes | Use code:<br>• 1 for "Full Docs"; or<br>• 2 for "Alt Docs."<br><br>For additional information regarding Alternative Documentation, see CTM 1.5.3: Alternative Documentation 📄 | Use code:<br>• 3 for "Reduced Docs."<br><br>For additional information, refer to the Required Documentation section above. |

**Down Payment/Source of Funds:** Gifts are allowed subject to the following restrictions:

| Item | Owner Occupied | | | |
|---|---|---|---|---|
| | **Full/Alt Doc** | | **Reduced Doc** | |
| | Loan Amount less than or equal to | Loan Amount greater than $650,000 | Loan Amount less than or equal to | Loan Amount greater than $650,000 |

| | $650,000 | | $650,000 | |
|---|---|---|---|---|
| **Source** | Relatives, domestic partner, fiance, or fiancee only. | | Relatives, domestic partner, fiance, or fiancee only. | |
| **Percentage of Borrower's own Funds** | Five (5) percent **Exception:** If the LTV/CLTV is 80% or less, the entire down payment may be a gift. | 5% | 20% | 20% |

**Restrictions:**
- Gifts are not allowed for Second Homes or Investment properties.
- For allowable sources of funds, see CTM 1.8.3: Sources of Funds 📄.
- For documenting of funds, see CTM 1.8.4: Funds for the Down Payment, Closing Costs, and Reserves 📄.

**Reserves:**

| Document Type | Owner-Occupied | Second Home | Investment |
|---|---|---|---|
| **Full/Alt Doc** | Two (2) months | Two (2) months | Two (2) months |
| **Reduced Doc** | Six (6) months | Six (6) months | Six (6) months |
| **Note:** Reserves may not be required with a **CLUES** Accept. | | | |

**Financing Contributions and Sales Concessions :**  Allowed subject to the following restrictions:

| LTV | Owner-Occupied | Second Home | Investment |
|---|---|---|---|
| **Greater than 90%** | 3% | Not Allowed | Not Allowed |
| **Greater than 80% and less than or equal to 90%** | 6% | 3% | 3% |
| **Less than or equal to 80%** | 6% | | |
| **Note:** For additional information, see CTM 1.8.2: Financing Contributions and Sales Concessions 📄. | | | |

**Spot Relocation:**  Not Allowed.

**Project Warranty:**  Standard Fannie Mae or Freddie Mac.  For Project Warranty requirements see CTM 3.3: Condominium and PUD Projects.

**Geographic Restrictions:**

- For information on restrictions by state see CTM 3.10: Geographic Restrictions 📄.
- Loans exceeding $650,000 are restricted to major metropolitan areas only.  For the definition of major metropolitan areas, see CTM 4.1: Glossary 📄.

**Construction Modification:**  Owner Occupied Full/Alt Doc only.

   **Note:**  For additional information and guidelines, see CTM 1.6.5: Construction Modification Enhancement 📄.

**One Time Close:**  Not allowed.

**Energy Efficient Mortgages :**  Not allowed.

**80/20 Option**:

- Not allowed on 3/1 ARM.
- The following sections are special guidelines applicable only to the 80/20 Option.  For parameters not

addressed, refer to the program guidelines above.

**Maximum Loan Amount**:

| Max Loan Amount 1st Lien | Max Loan Amount 2nd Lien | Max Combined Loan Amount |
|---|---|---|
| $520,000 | $130,000 | $650,000 |

**Maximum LTV/CLTV**:  The maximum LTV/CLTV restrictions are as follows:

| | | Purchase and Rate and Term | | | |
|---|---|---|---|---|---|
| | | Full/Alt Doc | | | |
| Max. LTV | Max. Loan Amount 1st Lien | Max. CLTV | Max. Loan Amount 2nd Lien | Max. Combined Loan Amount | Min. Credit Score |
| 80% | $400,000 | 100% | $100,000 | $500,000 | 680 |
| 80% | $520,000 | 100% | $130,000 | $650,00 | 700 |
| | | Reduced Doc | | | |
| 80% | $400,000 | 100% | $100,000 | $500,000 | 700 (CMD & FSL) 720 (WLD & CLD) |
| 80% | $520,000 | 100% | $130,000 | $650,000 | 700 (CMD & FSL) 720 (WLD & CLD) |
| **Note:  1st Lien and 2nd Lien:**  Cash-out:  Not allowed. | | | | | |

**Special Requirements and Restrictions** :

| Requirement | Guidelines |
|---|---|
| Program Limitations | ● The underlined combined loan amount **and** the (C)LTV must fall within the published guidelines.  Refer to the Maximum Loan Amount and LTV and CLTV table above.<br>● Refer to the individual sections above for restrictions and any special documentation requirements.<br>● Secondary Financing must be from CHL or another institutional lender.<br>● To view the guidelines for Loans with Secondary Financing/Subordinate Liens, see CTM 1.6.1: Secondary Financing/Subordinate Lien Requirements 📄.<br>● For eligible secondary financing programs available from CHL, click here [📄]. The more restrictive of the guidelines apply. |
| Term | 30 Years |
| Minimum Loan Amount | None |
| Eligible Finance Types | ● Purchase and Rate and Term Only<br>● Cash-Out: Not allowed. |
| Doc Type | Full/Alt Doc and Reduced Doc Only |
| Occupancy | Owner-Occupied Only |
| Ineligible Borrowers | ● Non-permanent resident aliens<br>● Non-occupant co-borrowers |
| Eligible Properties | ● Attached SFRs<br>● Detached SFRs*<br>● Attached PUDs<br>● Detached PUDs*<br>● Low-Rise Condos<br>● High-Rise Condos<br>**Note:  *Detached SFRs/PUDs** include modular, panelized, and prefabricated homes. For additional information, see CTM 3.6: Factory-Built Homes 📄. |
| Ineligible Properties | ● Non-Warrantable Condos<br>● 2-4 Units<br>● Cooperatives<br>● Condotels<br>● Manufactured Housing<br>● Log Homes<br>● Rural Properties*<br>**Note:**<br>*Rural Property is defined as a property having a lot size greater than ten (10) acres. Restrictions apply if the property is equal to or less than ten (10) acres, but the |

| | |
|---|---|
| | appraisal identifies the property as rural.  To view the restrictions, refer to CTM 3.12.7: Neighborhood Analysis . |
| Prepayment Penalty Option | Not allowed. |
| Mortgage Insurance | Not required. |
| Ratios | A maximum debt to income ratio of 45% is allowed.  **No Exceptions.**  There is no maximum housing payment to income ratio. |
| 4506 | ● Full/Alt Doc: Not required.<br>● Reduced Doc: Required. |
| Reserves | ● Full/Alt Doc: Two (2) months reserves are required.  **No Exceptions.**<br>● Reduced Doc: Six (6) months reserves are required.  **No Exceptions.** |
| Down Payment/Source of Funds | ● <u>Purchase</u>:  Closing costs and prepaids may be paid for by premium pricing, or paid by the Borrower in cash.  All assets and any cash needed to close must be verified, from an acceptable source and be seasoned.<br>● <u>Rate and Term Refinance</u>:  Reasonable and customary closing costs and prepaids may be financed in the loan amount, paid for by premium pricing, or paid by the Borrower in cash.  All assets and any cash needed to close must be verified, from an acceptable source and be seasoned.<br>● Gifts:  Not allowed.<br>● No cash down payment is required. |
| Sales and Financing Contributions | Six (6) percent. |
| Spot Relocation | CMD only.<br>● Approved corporations only.<br>● The 80/20 Spot Relocation EasyMove Loan guidelines are located in the Special Program Enhancements section of the Conventional Technical Manual.  To view the guidelines, see CTM 1.7.10: 80/20 Spot Relocation EasyMove Loan . |
| Construction Modification | Not allowed. |
| One Time Close | Not allowed. |



Last Revision Date:     10/29/2004

## SECTION 21:  NON-CONFORMING EXPANDED CRITERIA FIXED PERIOD ARMS

### 21.20:  3/1, 5/1, 7/1, and 10/1 Fixed Period ARM
### and
### 3/1, 5/1, 7/1 and 10/1 Interest Only Fixed Period ARM
### No Ratio/NINA (No Income No Asset)

This section of the **Loan Program Guide** contains the guidelines for the Non-Conforming Expanded Criteria Fixed Period ARM with No Ratio or No Income No Asset (NINA) that allows for an initial fixed rate period of three, five, seven, or ten years.  This section includes guidelines for expanded loan-to-value, combined loan-to-value ratios, and loan amounts, as well as enhancements not available under Countrywide's standard criteria.

The Interest Only loans allow the borrower to pay interest only for the first three, five, seven or ten years of the loan.  The loan will then be fully-amortized over the remaining term as an adjustable rate mortgage.

Program Names and Program IDs :

| Loan Program Description | Program ID |
|---|---|
| NonConf ARM Treas 3/1 Expanded | 441 |
| NonConf ARM Treas 5/1 Expanded | 442 |
| NonConf ARM Treas 7/1 Expanded | 443 |
| NonConf ARM Treas 10/1 Expanded | 444 |
| NonConf ARM LIBOR 3/1 Expanded | 566 |
| NonConf ARM LIBOR 5/1 Expanded | 570 |
| NonConf ARM LIBOR 7/1 Expanded | 574 |
| NonConf ARM LIBOR 10/1 Expanded | 577 |
| NonConf ARM LIBOR 3/1 Exp I/O 2-2-6 | 750 |
| NonConf ARM LIBOR 5/1 Exp I/O 5-2-5 | 752 |
| NonConf ARM LIBOR 7/1 Exp I/O 5-2-5 | 754 |
| NonConf ARM LIBOR 10/1 Exp I/O 5-2-5 | 756 |

Eligible Divisions : All

Special Requirements:  Countrywide's Loan Underwriting Expert System, CLUES, should be used whenever possible.  This program is supported by CLUES.

For additional information on underwriting using CLUES, see CTM 1.10.2: Underwriting with CLUES 📄.

Pricing:  Add-ons apply.

Program Limitations:  Refer to the individual sections below for restrictions and special documentation requirements such as borrower eligibility, special documentation, and application requirements.

| Limitation | Owner-Occupied | Second Home |
|---|---|---|
| Occupancy Inspections | **Refinance of 2-4 Unit properties:**<br>• Prefunding occupancy inspection required.<br>• The homeowners' policy must show that the mailing and property address are the same.<br><br>**Purchase of 3-4 Unit properties:**<br>Post funding occupancy inspection within 30 days of funding required. | Occupancy Inspections are not applicable. |
| Number of CHL Loans Per Borrower | To view the guidelines for determining the maximum Number of CHL Loans per Borrower, see CTM 1.4: Maximum Number of Loans 📄. | |
| Number of Properties Owned | To view the guidelines for determining the maximum number of financed properties, see CTM 1.4: Maximum Number of Loans 📄. | |
| Guideline Exceptions on NINA | Not Allowed | |

**ARM Requirements:**

| Item | Requirement |
|---|---|
| Index | • **LIBOR:** The average of interbank offered rates for one (1) year U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*.<br>• **U.S. Treasury Securities:** The weekly average yield of U.S. Treasury Securities adjusted to a constant maturity of one year, as published by the Federal Reserves Statistical Release H.15. **Not Available for Interest Only loans .** |
| Margin | Set by CHL. Refer to your Division's rate sheet. There will be an automatic add-on by EDGE for loans utilizing TAMI. |
| Life Floor | Never lower than the margin. |
| Life Cap | • **3/1 ARM:** Six (6) percent over the Note rate.<br>• **5/1, 7/1, and 10/1 ARM:** Five (5) percent over the Note rate. |
| Interest Rate Cap/Interest Rate Adjustment Date | • **3/1 ARM:** The interest rate is fixed for the first 36 months. The maximum adjustment at the first adjustment date is two (2) percent. Thereafter, the interest rate will adjust annually. The maximum interest rate adjustment at any one adjustment date is two (2) percent. The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent.<br>• **5/1 ARM:** The interest rate is fixed for the first 60 months. The maximum adjustment at the first adjustment date is five (5) percent. Thereafter, the interest rate will adjust annually. The maximum interest rate adjustment at any one adjustment date is two (2) percent. The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent.<br>• **7/1 ARM:** The interest rate is fixed for the first 84 months. The maximum adjustment at the first adjustment date is five (5) percent. Thereafter, the interest rate will adjust annually. The maximum interest rate change at any one adjustment date is two (2) percent. The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent.<br>• **10/1 ARM:** The interest rate is fixed for the first 120 months. The maximum adjustment at the first adjustment date is five (5) percent. Thereafter, the interest rate will adjust annually. The maximum interest rate change at any one adjustment date is two (2) percent. The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent. |
| Payment Adjustment | • **3/1 ARM:** The payment is fixed for the first 36 months. Thereafter, the payment may adjust annually, one (1) month following the interest rate change date.<br>• **5/1 ARM:** The payment is fixed for the first 60 months. Thereafter, the payment may adjust annually, one (1) month following the interest rate change date.<br>• **7/1 ARM:** The payment is fixed for the first 84 months. Thereafter, the payment may adjust annually, one (1) month following the interest rate change date.<br>• **10/1 ARM:** The payment is fixed for the first 120 months. Thereafter, the payment may adjust annually, one (1) month following the interest rate change date. |
| Conversion Option | None. |
| Note Rate Restrictions | The Note rate may never be more than 300 basis points below the fully indexed rate. |
| Interest Only Option | **Repayment Terms**<br>• The interest only payments are fixed for a stated period of time; generally, for three (3), five |

|  | (5) , seven (7)  or ten (10) years.  Following that period, the payment and interest will increase in accordance with the terms of the Note.<br>● After the completion of the interest only period, the unpaid balance is fully amortized over the remaining term of the loan.<br>● The Borrower may make voluntary principal payments during the interest only period.  The required interest only payment will be reduced to reflect the decrease in the principal unpaid balance. |
|---|---|

**Term:**  30 years.

**Minimum Loan Amount:**  None.

**Maximum Loan Amount:**

| Maximum | Owner-Occupied | | Second Home | |
|---|---|---|---|---|
|  | No Ratio | NINA | No Ratio | NINA |
| Loan Amount | $1,500,000 | $1,000,000 | $1,500,000 | Not Allowed |

**Eligible Finance Types**:

| Finance Type | Owner-Occupied | | Second Home | | Investment | |
|---|---|---|---|---|---|---|
|  | No Ratio | NINA | No Ratio | NINA | No Ratio | NINA |
| Purchase and Rate and Term | Allowed | Allowed | Allowed | Not Allowed | Not Allowed | Not Allowed |
| Cash-Out | Allowed | Allowed | Allowed | Not Allowed | Not Allowed | Not Allowed |

**Maximum LTV/CLTV:**

| Owner-Occupied | | | | |
|---|---|---|---|---|
| Attached/Detached SFRs/Attached/Detached PUDs/Low-Rise Condos/High-Rise Condos/2-4 Units | | | | |
| Purchase and Rate and Term | | | | |
| | No Ratio | | NINA | |
| Max Loan Amount | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min Credit Score |
| $400,000 | 90/90 | 660 [1] | 90/90 | 700 [1] |
|  | 75/75 | 620 | 75/75 | 620 |
| $500,000 | 70/75 | 620 | 80/80 | 660 |
| $650,000 | 80/80 | 660 | 80/80 | 660 |
| $1,000,000 | 65/70 | 660 | 50/50 | 660 |
| $1,500,000 | 65/70 | 660 [2] | Not Allowed | |

Restrictions:
- [1] 3/1 max 90/90 @ 720
- [2] 3/1 65/70 @ 720
- 2-4 Units
  - **No Ratio** Max LTV 80%
  - **NINA:** Max LTV 70%.
- The maximum LTV allowed when there is secondary financing is 80%.

| Owner-Occupied | | | | |
|---|---|---|---|---|
| Attached/Detached SFRs/Attached/Detached PUDs/Low-Rise Condos/High-Rise Condos/2-4 Units | | | | |
| Cash-Out | | | | |
| | No Ratio | | NINA | |
| Max Loan Amount | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min Credit Score | Max Cash-Out |
| $400,000 | 75/75 | 620 | 75/75 | 620 | $100,000 |
| $500,000 | 70/70 | 620 | 70/70 | 660 | $100,000 |

| $650,000 | 70/80 | 660 | 50/50 | 660 | $150,000 |
| $1,000,000 | 60/80 | 660 | 40/40 | 660 | $250,000 |
| $1,500,000 | 55/60 | 660 | Not Allowed | | $200,000 |

Restrictions:
- 2-4 Units
  - No Ratio:
    - 2 Units: Max LTV/CLTV 70/70.
    - 3-4 Units: Ineligible for cash-out.
  - NINA: Max LTV 70%.
- The maximum LTV allowed when there is secondary financing is 80%.

| Second Home | | | | | |
|---|---|---|---|---|---|
| **Attached/Detached SFRs/Attached/Detached PUDs/Low-Rise Condos/High-Rise Condos** | | | | | |
| | **Purchase and Rate and Term** | | **Cash-Out** | | |
| | **No Ratio** | | **No Ratio** | | |
| **Max Loan Amount** | **Max LTV/CLTV** | **Min Credit Score** | **Max LTV/CLTV** | **Min Credit Score** | **Max Cash-Out** |
| $400,000 | 75/80 | 660 | 70/70 | 660 | $100,000 |
| | 70/70 | 620 | 65/70 | 620 | $100,000 |
| $500,000 | 65/80 | 620 | 60/70 | 620 | $100,000 |
| $650,000 | 65/80 | 660 | 55/70 | 660 | $150,000 |
| | 55/55 | 620 | | | |
| $1,000,000 | 55/60 | 660 | 45/50 | 660 | $250,000 |
| $1,500,000 | 55/60 | 660 | 45/50 | 660 | $200,000 |

Occupancy:

| Doc Type | Owner-Occupied | Second Home | Investment |
|---|---|---|---|
| No Ratio | Allowed | Allowed | Not Allowed |
| NINA | Allowed | Not Allowed | Not Allowed |

Eligible Borrowers:

| Borrower Types | Guidelines |
|---|---|
| U.S. Citizen | Valid Social Security number required.  For additional information, see CTM 2.1.1: Eligible/Ineligible Borrowers 📄. |
| Permanent Resident Alien | Allowed.  For documentation requirements, see CTM 2.1.2: Permanent and Non-Permanent Resident Aliens 📄. |
| Non-Permanent Resident Alien | If **All** the Borrowers are Non-Permanent Resident Aliens, the following restrictions apply:<br>• No Ratio only;<br>• Owner-Occupied only; and<br>• Purchase and Rate and Term Refinance only.<br>For employment, residency, and documentation requirements, see CTM 2.1.2: Permanent and Non-Permanent Resident Aliens 📄. |
| Inter Vivos Revocable Trusts | Allowed.  For additional information, see CTM 2.1.4: Inter Vivos Revocable Trusts (Living Trusts) and Illinois Land Trusts 📄. |

Ineligible Borrowers:

| No Ratio | • First time homebuyer or borrowers who do not have a mortgage payment history<br>• Non-occupant co-borrowers |
|---|---|
| NINA | • Non-permanent resident aliens<br>• Non-occupant co-borrowers |
| **Note:**  For additional information regarding Ineligible Borrowers, see CTM 2.1.1: Eligible/Ineligible Borrowers 📄. | |

Eligible/Ineligible Properties:

| Eligible Properties | • Attached SFRs<br>• Detached SFRs [1]<br>• Attached PUDs<br>• Detached PUDs [1]<br>• Low-Rise Condos<br>• High-Rise Condos<br>• 2-4 Units [2]<br>• Cooperatives [3] |
|---|---|
| | **Restrictions:**<br>• **[1] Detached SFRs/PUDs** include modular, panelized, and prefabricated homes.  For additional information, see CTM 3.6: Factory-Built Homes 📄.<br>• **[2] 2-4 Units:**  Second Home not allowed.<br>• **[3] Cooperatives:**  Restrictions apply, see CTM 3.5.2: Eligible Cooperative Share Loan Transactions 📄. |
| Ineligible Properties | • Condotels<br>• Manufactured homes<br>• Log Homes<br>• Non-Warrantable Condos<br>• Rural Properties [4] |
| | **Note: [4] Rural Property** is defined as a property having a lot size greater than ten (10) acres.  Restrictions apply if the property is equal to or less than ten (10) acres but the appraisal identifies the property as rural.  To view the restrictions, refer to CTM 3.12.7: Neighborhood Analysis 📄. |

**Prepayment Penalty Option**:  Not allowed.

**Temporary Buydowns:**  Not allowed.

**Secondary Financing:**  Allowed with the following restrictions.

    **Restrictions:**

- The maximum LTV allowed when there is secondary financing is 80%.

- To view the guidelines for Loans with Secondary Financing/Subordinate Liens, see CTM 1.6.1: Secondary Financing/Subordinate Lien Requirements 📄.

- Ineligible for secondary financing programs from CHL.  Any secondary financing must be from a source other than CHL.

**Seasoning Requirements**:  For information regarding Eligible Mortgages and Seasoning Requirements, see CTM 1.6.2: Eligible Transaction Types 📄.

**Determining Value**:  To view the guidelines for calculating the LTV, see CTM 1.11.2: Determining Loan-To-Value Ratios 📄.

**Mortgage Insurance:**

| LTV | MI Coverage |
|---|---|
| 85.01 - 90% | 25% |
| 80.01 - 85% | 12% |
| **Note:**<br>• **CMI or TAMI:**  Required.<br>• **3/1 ARM:**  ARM coverage required. | |

- **5/1, 7/1, and 10/1 ARM:** Fixed Rate coverage required.
- For additional information regarding Mortgage Insurance, see CTM 1.12: Mortgage Insurance 📄.

**Assumability:** Not allowed.

**Credit:**

- **NINA:**

All Borrowers must meet the credit score requirements shown in the LTV table; and

| Credit Issues | Credit Requirements |
|---|---|
| Revolving and Installment | Late payments are considered in the credit score. |
| Mortgage Lates | Maximum mortgage lates permitted:<br>0 x 30 last 12 months<br>0 x 60 last 24 months |
| Bankruptcy, Foreclosure, Deed-in-Lieu, Short Sale | Seven (7) years |
| History of Credit Counseling | Active participant:  Not Allowed.<br>Previous participant:  To view the requirements, see CTM 2.2.1: Acceptable Credit History 📄. |
| Judgements, Collections, Charge-Offs | None in the last 24 months. |

- **No Ratio**

All Borrowers must meet the credit score requirements shown in the LTV table; and

| Credit Issues | Credit Requirements |
|---|---|
| Revolving and Installment | Late payments are considered in the credit score. |
| Mortgage Lates | Maximum mortgage lates permitted:<br>1 x 30 last 12 months<br>0 x 60 last 24 months |
| Bankruptcy, Foreclosure, Deed-in-Lieu, Short Sale | Subject to individual evaluation.  To view the  requirements, see CTM 2.2.5: Credit, Bankruptcy, Foreclosure, Deed-in-Lieu, or Short Sale 📄. |
| History of Credit Counseling | Active participant:  Not Allowed.<br>Previous participant:  To view the requirements, see CTM 2.2.1: Acceptable Credit History 📄. |
| Judgements, Collections, Charge-Offs | Subject to individual evaluation.  To view the requirements, see CTM 2.2.4: General Derogatory Credit Information 📄. |

**Ratios:** Not calculated.

**Documentation Requirements:**

**Appraisal** requirements are as follows:

| | Loan Amount | Appraisal Requirement |
|---|---|---|
| No Ratio | Less Than or Equal to $1,000,000 | One (1) full appraisal. |
| | Greater Than $1,000,000 | One (1) full appraisal plus one (1) field review.  The field review must be completed by a CHL approved Review Appraiser. |
| NINA | All Loan Amounts | - **Purchase and Rate and Term:**<br>  One (1) full appraisal.<br>- **WLD only:**  In addition, all purchase and rate and term loans require a LandSafe Appraisal Risk Analysis (LARA) with a minimum score of three (3) or better. LARA scores of one (1) or two (2) require a field review utilizing the revised lower value for LTV.<br>- **Cash-Out:** |

| | | Two (2) full appraisals are required. One (1) appraisal must be completed by a CHL approved Review Appraiser. |
|---|---|---|
| **Note:**  For additional information regarding Review Appraisals and for a list of approved appraisers, see CTM 3.12.19: Review Appraisals 📄. | | |

**No Ratio Documentation** requirements are as follows:

| Item | Documentation Requirement |
|---|---|
| Employment | Disclosed and verified.<br>● **Salaried Borrowers (includes Borrowers receiving commissioned and bonus income ):**<br>A verbal verification of employment is required that covers a full two (2) years with the same employer or in the same line of work and must include:<br>- current employment;<br>- job title;<br>- term of employment;<br>- probability of continued employment;<br>- the name and title of the person providing the information on behalf of the employer; and<br>- the signature of and dated by the person performing the verification.<br>● **Self-Employed Borrowers:**<br>A two (2) year verification of self-employment must be verified by a:<br>- Business License; or<br>- Through a neutral third party, such as:<br>  ● A CPA<br>  ● Regulatory Agency<br>  ● Professional Organization<br>**Note:**<br>● The application must be completed fully without any reference to income.<br>● Loans submitted with any reference or documentation related to income will be considered only under Reduced, Alternative, or Full Documentation guidelines.<br>● This verification should cover a full two (2) year period and should be completed in the relevant sections of the "Quality Verification & Documentation Questionnaire" [CMD uses form CHL 2C293US (06/00)] [WLD uses form CHL 2D596US (06/00)].  This form does not replace the "Pre-Closing Employment Re-Verification Checklist," Form CHL 2C272US, which must also be completed. |
| Income | Not disclosed or verified. |
| Assets | Must be disclosed and verified using Full/Alt documentation.<br>● Must be verified by obtaining the two (2) months most recent account statements or VOD.<br>● The assets must be the Borrower's own funds.<br>● **Acceptable assets include** :  checking and/or savings accounts, certificates of deposit (CDs), brokerage or mutual funds, publicly traded stocks.<br>● **Unacceptable assets include** :  accounts in the name of a corporation or partnership or other party, or stock in a closely held corporation.<br>**Note:**<br>If bank statements are used, no reference to income may be shown (e.g., direct deposit of payroll checks). |
| IRS Form 4506 | Not required. |

**NINA Documentation** requirements are as follows:

| Item | Documentation Requirement |
|---|---|
| Income and Employment | **Income:** Not disclosed or verified.<br>**Employment:** Not disclosed or verified.<br>**Note:**<br>● The application must be completed fully without any reference to income or employment.<br>● Loans submitted with any reference or documentation related to income or employment will be considered only under Reduced, Alternative, or Full documentation guidelines. |
| Assets | Not disclosed or verified. |
| IRS Form 4506 | Not required. |

**Documentation Type:**  Standard loan purpose codes must be used, as follows:

| Doc Types | No Ratio / NINA |
|---|---|
| Codes | Use code: |
| | • 4 for "No Income/No Asset" |
| | • 5 for "No Ratio" |
| | For additional information, refer to the Required Documentation section above. |

**Down Payment/Source of Funds:**  Gifts are not allowed.

**Reserves:**

| Documentation Type | Owner-Occupied | Second Home |
|---|---|---|
| No Ratio | Three (3) months | Three (3) months |
| NINA | Not calculated | Not Applicable |
| **Note:**  Reserves may not be required with a **CLUES** Accept. | | |

**Financing Contributions and Sales Concessions:**  Maximum:  Six (6) percent.

> **Note:** For additional information, see CTM 1.8.2: Financing Contributions and Sales Concessions .

**Spot Relocation:**  Not Allowed.

**Project Warranty:**  Standard Fannie Mae or Freddie Mac.  For Project Warranty requirements, see CTM 3.3: Condominium and PUD Projects.

**Geographic Restrictions:**

- For information on restrictions by state see CTM 3.10: Geographic Restrictions .
- Loans exceeding $650,000 are restricted to major metropolitan areas only.  For the definition of major metropolitan areas, see CTM 4.1: Glossary .
- Not allowed in West Virginia

**Construction Modification:**  Not allowed.

**One Time Close:**  Not allowed.

**Energy Efficient Mortgages:**  Not allowed.



Last Revision Date:    10/29/2004

## SECTION 21:  NON-CONFORMING EXPANDED CRITERIA FIXED PERIOD ARMS

### 21.30:  3/1, 5/1, 7/1, and 10/1 Fixed Period ARM
### and
### 3/1, 5/1, 7/1 and 10/1 Interest Only Fixed Period ARM
### Stated Income and Stated Assets (SISA)

This section of the **Loan Program Guide** contains the guidelines for the Non-Conforming Expanded Criteria Fixed Period ARM for Owner-Occupied Primary Residences and Second Homes with Stated Income and Stated Assets (SISA) that allows for an initial fixed rate period of three, five, seven, or ten years.  This section includes guidelines for expanded loan-to-value, combined loan-to-value ratios, and loan amounts, as well as enhancements not available under Countrywide's standard criteria.

The Interest Only loans allow the borrower to pay interest only for the first three, five, seven or ten years of the loan.  The loan will then be fully-amortized over the remaining term as an adjustable rate mortgage.

Program Names and Program IDs :

| Loan Program Description | Program ID |
|---|---|
| NonConf ARM Treas 3/1 Expanded | 441 |
| NonConf ARM Treas 5/1 Expanded | 442 |
| NonConf ARM Treas 7/1 Expanded | 443 |
| NonConf ARM Treas 10/1 Expanded | 444 |
| NonConf ARM Treas 3/1 EC PP | 477 |
| NonConf ARM Treas 5/1 EC PP | 478 |
| NonConf ARM LIBOR 3/1 EC PP | 565 |
| NonConf ARM LIBOR 3/1 Expanded | 566 |
| NonConf ARM LIBOR 5/1 EC PP | 569 |
| NonConf ARM LIBOR 5/1 Expanded | 570 |
| NonConf ARM LIBOR 7/1 Expanded | 574 |
| NonConf ARM LIBOR 10/1 Expanded | 577 |
| NonConf ARM LIBOR 3/1 EC IO | 750 |
| NonConf ARM LIBOR 5/1 EC IO | 752 |
| NonConf ARM LIBOR 7/1 EC IO | 754 |
| NonConf ARM LIBOR 10/1 EC IO | 756 |

Eligible Divisions : All

Special Requirements :

| CLUES | ● Countrywide's Loan Underwriting Expert System, CLUES, should be used whenever possible.  This program is supported by CLUES. |
|---|---|
| | ● For additional information on underwriting using CLUES, see CTM 1.10.2: Underwriting with |

| | CLUES 📄.<br>● CLUES "ACCEPT" required.  **NO EXCEPTIONS.** | | | |
|---|---|---|---|---|
| **Loan Origination** | **CMD** | **WLD** | **CLD** | **FSL** |
| | May be originated via the Internet or local branches. | May be originated via the CWBC.com website or local branches. | Must be originated via the Platinum web site. | Must be originated via AdvantEdge |
| **Pricing** | Add-ons apply. | | | |
| **Income** | The stated income must be deemed reasonable and consistent with the Borrower's profession.  If there is any question regarding reasonableness or consistency, then the loan is not eligible for this product.  If the file happens to contain some incidental income documentation, so long as the income amount shown on the documentation does not cause you to question reasonableness or consistency, the documentation should be ignored. | | | |

**Program Limitations**:  Refer to the individual sections below for restrictions and special documentation requirements such as Borrower eligibility or SISA documentation guidelines.

| Limitation | Owner-Occupied | Second Home |
|---|---|---|
| **Occupancy Inspections** | **Refinance of 2-4 Unit properties:**<br>● Prefunding occupancy inspection required<br>● The homeowners' policy must show that the mailing and property address are the same.<br><br>**Purchase of 3-4 Unit properties:** Post funding occupancy inspection within 30 days of funding required. | Occupancy inspections are not applicable. |
| **Number of CHL Loans Per Borrower** | To view the guidelines for determining the maximum Number of CHL Loans per Borrower, see CTM 1.4: Maximum Number of Loans 📄. | |
| **Number of Properties Owned** | To view the guidelines for determining the maximum number of financed properties, see CTM 1.4: Maximum Number of Loans 📄. | |

**ARM Requirements**:

| Item | Requirement |
|---|---|
| **Index** | ● **LIBOR**:  The average of interbank offered rates for one (1) year U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*.<br>● **U.S. Treasury Securities**:  The weekly average yield of U.S. Treasury Securities adjusted to a constant maturity of one year, as published by the Federal Reserves Statistical Release H.15.  **Not Available for Interest Only loans** . |
| **Margin** | Set by CHL.  Refer to your Division's rate sheet.  There will be an automatic add-on by EDGE for loans utilizing TAMI. |
| **Life Floor** | Never lower than the margin. |
| **Life Cap** | ● **3/1 ARM:** Six (6) percent over the Note rate.<br>● **5/1, 7/1, and 10/1 ARM:**  Five (5) percent over the Note rate. |
| **Interest Rate Cap/Interest Rate Adjustment Date** | ● **3/1 ARM:**  The interest rate is fixed for the first 36 months.  The maximum adjustment at the first adjustment date is two (2) percent. Thereafter, the interest rate will adjust annually.  The maximum interest rate adjustment at any one adjustment date is two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent.<br>● **5/1 ARM:**  The interest rate is fixed for the first 60 months.  The maximum adjustment at the first adjustment date is five (5) percent.  Thereafter, the interest rate will adjust annually.  The maximum interest rate adjustment at any one adjustment date is two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent.<br>● **7/1 ARM:**  The interest rate is fixed for the first 84 months.  The maximum adjustment at the first adjustment date is five (5) percent.  Thereafter, the interest rate will adjust annually.  The maximum interest rate change at any one adjustment date is two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent.<br>● **10/1 ARM:**  The interest rate is fixed for the first 120 months. The maximum adjustment at the first adjustment date is five (5) percent.  Thereafter, the interest rate will adjust annually. |

| | The maximum interest rate change at any one adjustment date is two (2) percent.  The interest rate will be rounded to the nearest one-eighth (1/8) of one (1) percent. |
|---|---|
| **Payment Adjustment** | <ul><li>**3/1 ARM:**  The payment is fixed for the first 36 months.  Thereafter, the payment may adjust annually, one (1) month following the interest rate change date.</li><li>**5/1 ARM:**  The payment is fixed for the first 60 months.  Thereafter, the payment may adjust annually, one (1) month following the interest rate change date.</li><li>**7/1 ARM:**  The payment is fixed for the first 84 months.  Thereafter, the payment may adjust annually, one (1) month following the interest rate change date.</li><li>**10/1 ARM:**  The payment is fixed for the first 120 months.  Thereafter, the payment may adjust annually, one (1) month following the interest rate change date.</li></ul> |
| **Conversion Option** | None. |
| **Note Rate Restrictions** | The Note rate may never be more than 300 basis points below the fully indexed rate. |
| **Borrower Qualification** | Borrower qualifications are as follows:<br><ul><li>**3/1 ARM:**<br> - LTV Greater than 75%:  Qualify at the Note rate plus two (2) percent.<br> - LTV of 75% or less:  Qualify at the Note rate.</li><li>**5/1, 7/1 and 10/1 ARM:**  Qualify at the Note rate.</li></ul><br>**Interest Only Option:**<br><ul><li>**3/1 ARM:**<br> - LTV Greater than 75%:  Qualify at the Note rate plus two (2) percent using the interest-only payment.<br> - LTV of 75% or less:  Qualify at the Note rate using the interest-only payment.</li><li>**5/1, 7/1 and 10/1 ARM:**  Qualify at the Note rate using the interest-only payment.</li></ul> |
| **Interest Only Option** | **Repayment Terms**<br><ul><li>The interest only payments are fixed for a stated period of time; generally, for three (3), five (5) , seven (7)  or ten (10) years.  Following that period, the payment and interest will increase in accordance with the terms of the Note.</li><li>After the completion of the interest only period, the unpaid balance is fully amortized over the remaining term of the loan.</li><li>The Borrower may make voluntary principal payments during the interest only period.  The required interest only payment will be reduced to reflect the decrease in the principal unpaid balance.</li></ul> |

**Term:** 30 years.

**Minimum Loan Amount:** None.

**Maximum Loan Amount:**

| Owner Occupied | Second Home | Investment |
|---|---|---|
| $1,500,000 | $650,000 | Not Allowed |

**Eligible Finance Types:**

| Finance Type | Owner-Occupied | Second Home | Investment |
|---|---|---|---|
| **Purchase and Rate and Term** | Allowed | Allowed | Not Allowed |
| **Cash-Out** | Allowed | Not Allowed | Not Allowed |

**Maximum LTV/CLTV:**

| Owner-Occupied | | |
|---|---|---|
| **Attached/Detached SFRs/Attached/Detached PUDs/Low-Rise Condos/High-Rise Condos/2-4 Units** | | |
| | | |

| Max Loan Amount | Purchase and Rate and Term | | Cash-Out | | |
|---|---|---|---|---|---|
| | Max LTV/CLTV | Min Credit Score | Max LTV/CLTV | Min Credit Score | Max Cash-Out |
| $400,000 | 90/90* | 620* | 75/75 | 620 | $100,000 |
| $500,000 | 80/80 | 620 | 70/70 | 620 | $100,000 |
| $650,000 | 75/75 | 620 | Not Allowed | | |
| $1,000,000 | 65/70 | 660 | Not Allowed | | |
| $1,500,000 | 65/70 | 680** | Not Allowed | | |

Restrictions:
- *3/1 max 80/80 @ 620
- **3/1 65/70 @ 720
- The maximum LTV allowed when there is secondary financing is 80%.

| Second Home | | |
|---|---|---|
| Attached/Detached SFRs/Attached/Detached PUDs/Low-Rise Condos/High-Rise Condos | | |
| Purchase and Rate and Term | | |
| Max Loan Amount | Max LTV/CLTV | Min Credit Score |
| $400,000 | 90/90 | 620 |
| $500,000 | 80/80 | 620 |
| $650,000 | 75/75 | 620 |

Restrictions
- The maximum LTV allowed when there is secondary financing is 80%.
- Condos/PUDs: Max LTV 80%.

Occupancy:

| Owner-Occupied | Second Home | Investment |
|---|---|---|
| Allowed | Allowed | Not Allowed |

Eligible Borrowers:

| Borrower Types | Owner-Occupied | Second Home |
|---|---|---|
| U.S. Citizen | Valid Social Security number required.  For additional information, see CTM 2.1.1: Eligible/Ineligible Borrowers 📄. | |
| Permanent Resident Alien | Allowed.  For documentation requirements, see CTM 2.1.2: Permanent and Non-Permanent Resident Aliens 📄. | |
| Non-Permanent Resident Alien | If **All** the Borrowers are Non-Permanent Resident Aliens, the following restrictions apply:<br>- Purchase and Rate and Term Refinance only; and<br>- Rate and Term Refinance:  Max LTV is 75%.<br>For employment, residency, and documentation requirements, see CTM 2.1.2: Permanent and Non-Permanent Resident Aliens 📄. | Not Allowed |
| Inter Vivos Revocable Trusts | Allowed.  For additional information, see CTM 2.1.4: Inter Vivos Revocable Trusts (Living Trusts) and Illinois Land Trusts 📄. | |

**Ineligible Borrowers**:  Non-Occupant Co-Borrowers.  For additional information regarding Ineligible Borrowers, see CTM 2.1.1: Eligible/Ineligible Borrowers 📄.

Eligible/Ineligible Properties:

| Eligible Properties | • Attached SFRs<br>• Detached SFRs*<br>• Attached PUDs<br>• Detached PUDs*<br>• Low-Rise Condos<br>• High-Rise Condos<br>• 2-4 Units** |
|---|---|
| | **Restrictions:**<br>• ***Detached SFRs/PUDs** include modular, panelized, and prefabricated homes. For additional information, see CTM 3.6: Factory-Built Homes 📄.<br>• ****2-4 Units:**  Second Home not allowed.<br>• **Second Homes:** Condos/PUDs: Max LTV 80% |
| Ineligible Properties | • Condotels<br>• Cooperatives<br>• Log Homes<br>• Manufactured homes<br>• Non-Warrantable Condos<br>• Rural Properties** |
| | **Note: **Rural Property** is defined as a property having a lot size greater than ten (10) acres.  Restrictions apply if the property is equal to or less than ten (10) acres but the appraisal identifies the property as rural.  To view the restrictions,  refer to CTM 3.12.7: Neighborhood Analysis 📄. |

**Prepayment Penalty Option**:  Available in the following States:

| Arizona | Indiana | North Dakota | Texas |
|---|---|---|---|
| California | Kentucky | Oklahoma | Utah |
| Colorado | Montana | Oregon | Washington |
| Connecticut | Nebraska | Pennsylvania | Wyoming |
| Delaware | Nevada | South Carolina | |
| Florida | New Hampshire | South Dakota | |
| Hawaii | North Carolina | Tennessee | |
| Idaho | | | |

**Note:**
- Interest Only:  Not Allowed.
- 7/1 and 10/1:  Not Allowed.
- State restrictions may apply.  To view State/Geographic restrictions, see CTM 3.10: Geographic Restrictions 📄.
- To view the guidelines for the Prepayment Penalty/Reduced Rate Option, see CTM 1.7.1: Prepayment Penalty/Reduced Rate Option 📄.

**Temporary Buydowns:**  Not Allowed.

**Secondary Financing:**  Allowed with the following restrictions.

    **Restrictions:**
- The maximum LTV allowed when there is secondary financing is 80%.
- To view the guidelines for Loans with Secondary Financing/Subordinate Liens, see CTM 1.6.1: Secondary Financing/Subordinate Lien Requirements 📄.
- Ineligible for secondary financing programs from CHL.  Any secondary financing must be from a source other than CHL.

**Seasoning Requirements**:  For information regarding Eligible Mortgages and Seasoning Requirements, see CTM 1.6.2: Eligible Transaction Types 📄.

**Determining Value**:  To view the guidelines for calculating the LTV, see CTM 1.11.2: Determining Loan-To-Value Ratios 📄.

**Mortgage Insurance**:

| Credit Scores 660+ | | |
|---|---|---|
| **LTV** | **Factor** | **Coverage for all Terms** |
| **\*85.01 - 90% 5/1, 7/1, 10/1 ARM** | .66 | 25% |
| **\*85.01 - 90% 3/1 ARM** | .79 | 25% |
| **\*80.01 - 85% 5/1, 7/1, 10/1 ARM** | .46 | 12% |
| **\*80.01 - 85% 3/1 ARM** | .51 | 12% |
| **Credit Scores 620 - 659** | | |
| **LTV** | **Factor** | **Coverage for all Terms** |
| **85.01 - 90% 5/1, 7/1, 10/1 ARM** | .72 | 25% |
| **80.01 - 85% 5/1, 7/1, 10/1 ARM** | .52 | 12% |

**Note:**
**CMI or TAMI:** Not allowed.   Monthly (Borrower Paid) MI only.
- Delegated Manual Mortgage Insurance is required.  An MI certificate from PMI, TRIAD, RADIAN, or RMIC must be in the loan file prior to closing.  **Exceptions:**
  - **Louisiana, Maine, New Hampshire, and New York** : Ineligible for insuring with Triad.
  - **Alaska and Hawaii:** Ineligible for insuring with TRIAD or RMIC.
  - **Second Homes:** Ineligible for insuring with RMIC.
- **\*For Second Home, you must add .14 bps to the rate provided.  Minimum 720 FICO score required for 3/1 ARM.

- The branch must request Standard Rate with Reduced Documentation/NIV (No Income Verification).
- The factors displayed are an estimation and should be used for disclosure purposes only.  Actual factors will be provided by the applicable mortgage insurance company.
- **Special Requirements for Interest Only Loans** :  Delegated Manual Mortgage Insurance is required.  An MI certificate from PMI, TRIAD, GE\* or MGIC must be in the loan file prior to closing.  **Exceptions:**
  - **Louisiana, Maine, New Hampshire and New York** : Ineligible for insuring with Triad.
  - **Alaska and Hawaii:**  Ineligible for insuring with GE or Triad.
  - **\* GE** will generally only insure loans with a minimum credit score fo 660 or grater, but additional restrictions may apply.
- For additional information regarding Mortgage Insurance, see CTM 1.12: Mortgage Insurance 📄.

**Assumability:**  Not allowed.

**Credit:**  Determined by CLUES; and all Borrowers must meet the credit score requirements as shown in the LTV table; and the Borrower(s) may not be currently delinquent on their mortgage/housing payment; and

| Credit Issues | Credit Requirements |
|---|---|
| **Revolving and Installment** | Late payments are considered in the credit score. |
| **Mortgage Lates** | Maximum mortgage lates permitted:<br>0 x 30 last 12 months<br>0 x 60 last 24 months |
| **Bankruptcy, Foreclosure, Deed-in-Lieu, Short Sale** | Seven (7) Years |
| **History of Credit Counseling** | Active participant:  Not Allowed.<br>Previous participant:  To view the requirements, see CTM 2.2.1: Acceptable Credit History 📄. |
| **Judgements, Collections, Charge-Offs** | None allowed in the past 24 months. |

**Ratios:**  Determined by CLUES using stated income, generally not to exceed total obligations-to-income ratio of 55%. There is no maximum housing payment to income ratio.

**Documentation Requirements**:

**Appraisal** requirements are as follows:

| Loan Amount | Appraisal Requirement |
|---|---|
| Less Than or Equal to $1,000,000 | One (1) full appraisal. |
| Greater Than $1,000,000 | One (1) full appraisal plus one (1) field review.  The field review must be completed by a CHL approved Review Appraiser. |
| **Note:**  For additional information regarding Review Appraisals and for a list of approved appraisers, see CTM 3.12.19: Review Appraisals 🗋. | |

**SISA Documentation** requirements are as follows:

| Item | Documentation Requirement |
|---|---|
| Application | The 1003 loan application (CHL Form #2021) is required. |
| Employment | • **Salaried:**  Must be stated on the application and a Verbal VOE verifying a two (2)-year history is required. <br> • **Self-Employed:**  Must be stated on the application and the Borrower must have been in the same business, at the same location, for a minimum of two (2) years. Independent verification of existence of the business is required (e.g., telephone listing, licensing bureau, etc.) |
| Income | Must be stated on the application but is not verified. <br> **Note:** The income disclosed must be deemed reasonable and consistent with the Borrower's occupation. |
| Unearned or Passive Income | The source of all unearned or passive income must be verified if it is the primary source of income; i.e. constitutes 50% or more of the qualifying income.  If the amount of passive income constitutes less than 50%, the source need only be stated and not verified.  However, in all cases, the amount of the passive income claimed must be reasonable based upon the profile of the borrower.  For additional information regarding sources of passive income and documentation requirements, see CTM section 1.5.4: Reduced and Stated Income/Stated Assets (SISA) Documentation (Document Type 3) 🗋. |
| Assets | Must be stated on the application but are not verified. <br> **Note:** The assets disclosed must be deemed reasonable and consistent with the Borrower's income. |
| IRS Form 4506 (CHL Form 29045) | Not required. |

**Documentation Type:**  Standard loan purpose codes must be used, as follows:

| Doc Type Code | Use code: <br> • 3 for "Reduced Docs." <br><br> For additional information, refer to the Required Documentation section above. |
|---|---|

**Down Payment/Source of Funds:**  Gifts are not allowed.

**Reserves:**  Not required

**Financing Contributions and Sales Concessions:**  Allowed subject to the following restrictions:

| LTV | Owner-Occupied | Second Home |
|---|---|---|
| Greater than 80% and less than or equal to 90% | 6% | 3% |
| Less than or equal to 80% | 6% | |
| **Note:** For additional information, see CTM 1.8.2: Financing Contributions and Sales Concessions 🗋. | | |

**Spot Relocation:**  Not allowed.

**Project Warranty:**  Standard Fannie Mae or Freddie Mac.  For Project Warranty requirements see CTM 3.3: Condominium and PUD Projects.

**Geographic Restrictions:**

- For information on restrictions by state see CTM 3.10: Geographic Restrictions .
- Loans exceeding $650,000 are restricted to major metropolitan areas only.  For the definition of major metropolitan areas, see CTM 4.1: Glossary .

**Construction Modification:**  Not allowed.

**One Time Close:**  Not allowed.

**Energy Efficient Mortgages:**  Not allowed.



# EXHIBIT B

March 2, 2005

Ms. Michele Sjolander
Senior Vice President
Counrtywide Home Loans, Inc.
4500 Park Granada
Calabasas, CA  91302

RE:     Master Commitment #:  T05012783
        Seller/Servicer #:  204305

Dear Ms. Sjolander:

Enclosed are one original and one duplicate copy of a Master Commitment together with any applicable attachments.

In order to accept and confirm the terms of Freddie Mac's offer, you must sign the original Master Commitment in the space provided.  **Please fax the signature page by close of business tomorrow, March 3, 2005**.  Please send the signed copy to the address below by Friday, March 4, 2005.

>       Federal Home Loan Mortgage Corporation
>       Attn:  Ms. Cindy Abad, Contract Specialist
>       21700 Oxnard Street, Suite 1900
>       Woodland Hills, CA  91367
>       **Fax Number:  818-710-3045**

If you have any questions, please contact Mr. James Hunter, your National Account Manager at 703-981-5893 or Ms. Laurene Loo, your Senior Customer Relations Representative at 818-710-3056.

Sincerely,

David H. Stevens
Senior Vice President
Single Family Sourcing

Enclosures

cc:  Mr. Gregory Togneri
     Mr. George Lopez
     Mr. David Marusa

cka/204305_T05012783/LMLO-692QF2/JH/2005-7

### MASTER COMMITMENT
### #T05012783

This Master Commitment, dated as of February 1, 2005 (the "Master Commitment"), is by and between Freddie Mac and Countrywide Home Loans, Inc., Seller/Servicer #204305 ("Seller").

This Master Commitment sets forth the terms and conditions of Seller's sale to Freddie Mac of the Mortgages described herein.  The provisions Master Agreement MA04120883, in particular the provisions of the Attachment to the Master Agreement titled "Provisions Relating to Alt A Mortgages", apply to and are incorporated into this Master Commitment.

## Section I.  General Terms

1.      <u>Master Commitment Amount</u>.  The Master Commitment Amount is $6 billion.

2.      <u>Required Delivery Date</u>.  June 30, 2005.

3.      <u>Optional Delivery</u>.  Delivery under the terms of this Master Commitment is optional.  There is no pair-off fee.

4.      <u>Eligible Mortgages</u>.  The Mortgages sold hereunder are fixed-rate Mortgages and ARMs.  Initial Interest Mortgages are not eligible for sale under this Master Commitment.

5.      <u>Delivery Program</u>.  The Mortgages may be sold under the Guarantor Program only.

## Section II.  Financial Terms of Sale and Servicing

1.      <u>Required Spreads.</u>  The Required Spreads applicable Mortgages sold under this Master Commitment will be adjusted on a monthly basis as follows:  The Required Spreads applicable to Mortgages with Settlement Dates during February 2005 are:

| | |
|---|---|
| 20- and 30-year fixed-rate Mortgages | 31.8 basis points |
| 15-year fixed-rate Mortgages | 37.9 basis points |
| ARMs | 41.8 basis points |

The Required Spreads applicable to Mortgages with Settlement Dates during March, April, May and June 2005 will be determined as follows:

(a)      the Required Spreads for 20- and 30-year fixed-rate Mortgages, 15-year fixed rate Mortgages, and ARMs will be based upon Seller's estimate of certain loan characteristics of the Mortgages to be sold each month.  The loan characteristics are documentation type, FICO score and/or LTV ratio.  The loan characteristics are categorized into four "risk buckets" as follows:

| Risk Bucket # | Applicable SCC Code | Doc Type | Applicable FICO Score and/or TLV ratio |
|---|---|---|---|
| 1 | G9 | Full/Alt Doc | ≥680 FICO |
| 2 | G10 | Full/Alt Doc | <680 FICO |
| | | Low Doc | ≥700 FICO and <90% LTV |
| | | No Doc | ≥720 FICO and LTV <75% LTV |
| 3 | G11 | Low Doc | < 700 FICO and <90% LTV |
| | | No Doc | ≥720 FICO and <90% but ≥75% LTV |
| 4 | G12 | Low Doc | LTV ≥90% |
| | | No Doc | <720 FICO or ≥90% LTV |

(b)   During the months of February and March, the risk buckets will be assigned the following indication required spreads for 15-, 20- and 30-year fixed-rate Mortgages, and indication base required spreads (that is, the required spreads net of delivery fee values) for ARMs:

| Risk Bucket | Indication Required Spread for 20- and 30-year fixed-rate Mortgages | Indication Required Spread for 15-year fixed-rate Mortgages | Indication Base Required Spread for ARMs |
|---|---|---|---|
| 1 | 20 bps | 17 bps | 18 bps |
| 2 | 40 bps | 35 bps | 21 bps |
| 3 | 56 bps | 41 bps | 32 bps |
| 4 | 68 bps | 49 bps | 49 bps |

By no later than March 13, 2005, Freddie Mac will forward Seller the indication required spreads assigned to the various risk buckets that will be applicable to Mortgages with Settlement Dates during April, May and June 2005.

(c)   Prior to the first Delivery Date of each month, Seller must notify Freddie Mac of the aggregate unpaid principal balance of 20- and 30-year fixed rate Mortgages, 15-year fixed-rate Mortgages and ARMs to be delivered to Freddie Mac during the month, as well as the concentrations of each risk bucket of each such mortgage product. Additionally, prior to the first Delivery Dates in February and March 2005, Seller must provide Freddie Mac with the estimated delivery fees applicable to the ARMs.

(d)   Freddie Mac will determine the Required Spreads applicable to 20- and 30-year fixed rate Mortgages, 15-year fixed-rate Mortgages and ARMs based upon the concentration of mortgage products within each risk bucket and the indication required spread applicable to each risk bucket.

(e)     Two Business Days after Freddie Mac receives the information described in subparagraph (c) above, Freddie Mac will notify Seller electronically and by telephone (at an e-mail address and a telephone number provided by Seller to Freddie Mac) of the Required Spreads applicable to 20- and 30-year fixed rate Mortgages, 15-year fixed-rate Mortgages and ARMs having Settlement Dates within the month specified.  The Required Spread provided to Seller in the manner described in this paragraph will be deemed to amend and supplement this Master Commitment as fully as if the parties hereto had executed an amendment to this Master Commitment.

(f)     Seller agrees it will use it best efforts to fulfill each conversion and will not, after receiving the Required Spreads, take out conversions that (i) relate to Mortgages subject to previous conversions and (ii) that have Settlement Dates in the outside of the specified month, to take advantage of a change in the Required Spreads.  If Seller fails to fulfill its conversions, Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, upon notice to Seller during the term of this Master Commitment.

2.     <u>Remittance Cycle.</u>  Seller must use the Gold remittance cycle for fixed-rate Mortgages sold hereunder and the ARC remittance cycle for ARMs sold hereunder.  The Required Spreads specified above and provided to Seller during the term of this Master Commitment are and will be based upon Seller's use of such remittance cycles.

3.     <u>Buyups and Buydowns</u>.  Seller may elect to use the buyup or buydown option for the Mortgages sold hereunder.  The maximum Note level buyup for fixed-rate Mortgages is 25 basis points, and the maximum contract level buyup for ARMs is 12.5 basis points.

4.     <u>Minimum Servicing Spread.</u>  The Minimum Servicing Spread for the Mortgages is as specified in the Purchase Documents.

5.     <u>No Delivery Fees.</u>  No delivery fees are due upon delivery of any of the Mortgages.

6.     <u>Credit Enhancement of Certain Mortgages</u>.  All Mortgages having loan-to-value ratios greater than 51 percent are subject to a credit enhancement arrangement, which the parties have agreed consists of a mortgage pool insurance policy or mortgage trust supplemental policy (the "MPI Policy") issued by a mortgage insurer (the "Insurer") and obtained by Freddie Mac.  Seller agrees to undertake the obligations set forth in the Pool Insurance Attachment, attached hereto as Exhibit "A".

## Section III.  Mortgage Eligibility Criteria

1.     <u>Additional Mortgage Characteristics</u>.  Notwithstanding any provisions to the contrary set forth in the Master Agreement or Seller's Loan Programs, Seller represents and warrants that the Mortgages delivered hereunder must comply with the following provisions:

(a)     the Mortgages must be secured by Mortgaged Premises that have flood insurance coverage as required by the Guide;

(b)      each Mortgage must not be delinquent as of the Delivery Date and must not have been delinquent more than once during the 12 months preceding the Delivery Date;

(c)      each Mortgage must be serviced in accordance with Volume II of the Guide;

(d)      each Mortgage with an original LTV ratio greater than 80 percent must have mortgage insurance coverage that satisfies the requirements set forth in the Guide as of the Origination Date;

(e)      the LTV ratio and the TLTV ratio of each Mortgage may not exceed 100 percent;

(f)      each Mortgage must be a first lien and must be secured by only one property;

(g)      Mortgages may be secured by 1-4 unit residential properties only;

(h)      except as otherwise disclosed on the loan and servicing data with respect to the Mortgages, which Seller provided to Freddie Mac, the Borrower on any Mortgage delivered hereunder must own no more than one other Mortgaged Premises that is secured by a Mortgage sold under this Master Commitment, irrespective of other Borrowers on either such Mortgage;

(i)      except as otherwise disclosed on the loan and servicing data with respect to the Mortgages, which Seller provided to Freddie Mac, the Mortgages were not originated with  secondary financing; and

(j)      each Mortgage must have been closed no later than the last day of the month preceding the Delivery Date.

In the event Seller delivers a Mortgage that does not comply with any of the characteristics described in this paragraph, Seller must, at Freddie Mac's option, either (i) repurchase Freddie Mac's interest in such Mortgage, (ii) provide recourse with respect to the Mortgage, (iii) indemnify Freddie Mac from any loss or expense Freddie Mac may sustain with respect to such Mortgage, or (iv) undertake any other remedy provided for in the Guide.

2.      <u>Minimum Mortgage Insurance Requirements</u>.  Notwithstanding any provisions to the contrary set forth in Seller's Loan Programs, with respect to mortgage insurance coverage:

(a)      each Mortgage with an original LTV ratio greater than 80 percent up to but not greater than 95 percent must have mortgage insurance coverage that meets the coverage levels specified in Section 27.1(a) of the Guide and that otherwise satisfies the requirements (including the cancellation restrictions) of the Guide as of the Origination Date; and

(b)      each Mortgage with an original LTV ratio greater than 95 percent must have mortgage insurance coverage of at least 35 percent and must otherwise satisfy the requirements of the Guide as of the Origination Date.

## Section IV.  Data Integrity

1.    <u>Accuracy of Loan Data</u>.  Seller has delivered to Freddie Mac certain loan and servicing data with respect to the Mortgages that Freddie Mac relied upon in negotiating the terms of purchase of the Mortgages with Seller.  Seller acknowledges and agrees that the loan and servicing data provided by Seller determines, among other things, the appropriate product and program codes that are used in connection with delivery of the Mortgages.  Seller represents and warrants that:

(a)    all loan origination information provided to Freddie Mac is true, complete and accurate as of the Origination Date of such Mortgage; and

(b)    all loan and servicing data provided to Freddie Mac in connection with its evaluation of the Mortgages purchased under this Master Commitment is true, complete and accurate.

2.    <u>Remedies Relating to Data Integrity</u>.  If (a) the due diligence information contained on the loan data reports is not accurate, true or complete, (b) Seller fails to provide such additional information or documentation as may be required with respect to any specific Mortgage or group of Mortgages, or (c) notwithstanding such information or documentation, Seller breaches any representation or warranty applicable to such Mortgage, Freddie Mac may require Seller to repurchase a Mortgage.  Seller agrees that any loan data relating to the validity of the Mortgage documents (including, for example, the fact that an altered note or security instrument may not have the required Borrower initials) in no manner limits or negates any of Seller's warranties under the Purchase Documents.

## Section V.  Portfolio Provisions

1.    <u>Borrower Creditworthiness</u>.  Seller must make the following representations and warranties regarding Borrower creditworthiness:

(a)    the Borrower demonstrated acceptable credit and capacity as required by the Purchase Documents in effect on the Origination Date; and

(b)    as of the Delivery Date, the Borrower's current credit and capacity was acceptable as required by the Purchase Documents in effect on the Delivery Date.

2.    <u>Property Value</u>.  Seller must make the following representations and warranties regarding the Mortgaged Premises:

(a)    the appraisal relied on at time of origination demonstrated the eligibility, value and marketability of the Mortgaged Premises as of the Origination Date; and

(b)    the Mortgaged Premises met the requirements for eligibility, value and marketability under the applicable provisions of the Purchase Documents in effect on the Delivery Date.

## Section VI.  Delivery Restrictions and Instructions

1.    <u>Alternative Instructions for Delivering SCC Codes for Documentation Type</u>.  In addition to the requirements of paragraph 7 of the Attachment to the Master Agreement titled

"Provisions Relating to Alt A Mortgages" (the "Alt A Attachment"), the following provisions apply:

(a)     on the fourth to the last Business Day of the month in which the Mortgages were delivered, Seller must provide Freddie Mac with a data file that lists the Freddie Mac loan number for each Mortgage and the special characteristic codes (the "SCCs") set forth in paragraph 7 of the Alt A Attachment associated with each Mortgage;

(b)     Freddie Mac will compare the SCCs identified on the data file with the SCCs delivered on the Form 11 or Form 13SF, as applicable, and will notify Seller of any discrepancies between the data.  Seller must thereupon conduct such due diligence as it deems appropriate to resolve the data discrepancies and must notify Freddie Mac of its conclusions, and if Seller determined that the SCCs delivered on the Form 11 and/or 13SF were inaccurate, Seller must provide Freddie Mac with the correct SCCs by Freddie Mac loan number;

(c)     if and to the extent Seller has determined that any of the SCCs delivered on the Form 11 or 13SF are incorrect, Seller hereby requests Freddie Mac and Freddie Mac hereby agrees to undertake the administrative task on behalf of Seller of changing the delivery data to reflect the correct SCCs provided by Seller; and

(d)     Seller agrees that Freddie Mac's input of the special characteristic codes is an administrative task undertaken at Seller's behest and subject to Seller's instructions, and Seller agrees to indemnify and hold Freddie Mac harmless for undertaking such task.

2.     <u>California Condominium Unit Mortgages</u>.  For any Mortgages delivered under this Master Commitment that are California Condominium Unit Mortgages, Seller must enter "263" (indicating that the delivery fee is included in the Required Spread) in one of the special characteristics code fields of the Form 11 or Form 13SF, as applicable.

IN WITNESS WHEREOF, Seller and Freddie Mac have caused this Master Commitment to be duly executed by their respective authorized representatives as of the date first set forth above.

FEDERAL HOME LOAN MORTGAGE
CORPORATION

By: _____

David H. Stevens
Senior Vice President
Single Family Sourcing

COUNTRYWIDE HOME LOANS, INC.

By: _____

Name: _Michele Sjolander_____

Title: _EVP_____

Date: _3-2-2005_____

Reference:
cka/204305_T05012783/LMLO-692QF2/JH/2005-7

Countrywide Home Loans, Inc
Master Commitment # T05012783

**Exhibit A**
**Pool Insurance Attachment**

This Pool Insurance Attachment sets forth the provisions applicable to certain Mortgages purchased under this Master Commitment, that are subject to a credit enhancement, which the parties hereto agree consists of a mortgage pool insurance policy obtained by Freddie Mac.

**Section I.  Definitions**

1.      Capitalized terms used in and not defined in this Pool Insurance Attachment have the meanings assigned them in the Purchase Documents (as that term is defined in the Master Commitment).

2.      Whenever used in this Pool Insurance Attachment, the following words and phrases will have the following meanings, unless the context requires otherwise:

      (a)   "Delinquent Mortgage" means an Insured Mortgage:

            (i)      that is thirty (30) or more calendar days delinquent;

            (ii)     for which Freddie Mac is holding any REO Property; or

            (iii)    for which REO Property has been sold or otherwise disposed of but for which Freddie Mac has not been reimbursed losses covered under the MPI Policy.

      (b)     "Insured Mortgages" means Mortgages having loan-to-value ratios greater than 51 percent that are sold under the Master Commitment and for which pool mortgage insurance is obtained under an MPI Policy as required by the Master Commitment.

      (c)     "Insurer" means Triad Guaranty Insurance Corporation or any successor insurance company approved by Freddie Mac that provides an MPI Policy.

      (d)     "Loss Mitigation Activities" means any modification of loan documents or other concessions to the borrower with respect to a Mortgage, including without limitation, any incentive or below-market financing, or any sale of the REO Property, including a sale for a price less than the indebtedness approved by Insurer.

      (e)     "Mortgage Cure" means the occurrence of one of the following conditions:

(i)    the final sale or other disposition of any property relating to a Delinquent Mortgage and the real property encumbered by any such Mortgage (including, without limitation, with the approval of Freddie Mac and/or Insurer, as applicable, delivery of the property to Seller or retention of the property by the Borrower pursuant to Freddie Mac's Loss Mitigation Activities), and payment of all amounts due Freddie Mac with respect to any claim, and reimbursement of any Uncovered Losses, arising from such activity;

(ii)    the Delinquent Mortgage becoming current through payment of all outstanding delinquent amounts;

(iii)    the payment in full of the Delinquent Mortgage; or

(iv)    the repurchase of the Delinquent Mortgage by Seller according to the repurchase procedures in the Guide.

(f)    "MPI Policy" means a mortgage pool insurance policy or mortgage trust supplemental policy, substantially identical to the specimen policy attached hereto and in a form otherwise acceptable to Freddie Mac, by which Insurer agrees to provide pool insurance coverage with respect to each Insured Mortgage.

(g)    "Policy Termination Date" means, with respect to each Mortgage, the tenth anniversary of the Delivery Date of such Mortgage.

(h)    "REO Property" means any real property and personal property that is or was: (a) encumbered by a Mortgage, and (b) acquired through foreclosure or deed-in-lieu of foreclosure.

(i)    "Uncovered Losses" means losses resulting from a Borrower's default under an Insured Mortgage that (a) are attributable to Seller's or the designated servicer's breach of its representations and warranties made to Freddie Mac or the violation of other provisions of the Purchase Documents relating to the origination, delivery and servicing of the Insured Mortgages, (b) are not approved by Freddie Mac in accordance with Chapter 71 of the Guide and (c) Insurer determines not to cover due to a material misrepresentation made by Seller or the designated servicer, or by the Borrower.

## Section II.  General Terms

1.    The MPI Policy contains the following terms:

(a)    The Named Insured is Freddie Mac and such insurance is solely for the benefit of Freddie Mac.

(b)    The MPI Policy is effective as of the first Business Day of the month in which the Insured Mortgages are purchased by Freddie Mac.

(c)     The term of the MPI Policy will continue until the Policy Termination Date, except that the MPI Policy will not terminate as to any Delinquent Mortgage until a Mortgage Cure has occurred with respect to each such Delinquent Mortgage.

2.     Except as otherwise specified herein, all references in the Guide (other than in Section 27.1 and Chapter 61) to:

(a)     a mortgage insurer (MI) are deemed to include Insurer <u>and</u> any primary mortgage insurer; and

(b)     mortgage insurance are deemed to include pool insurance as evidenced by the MPI Policy and any primary mortgage insurance policy.

## Section III.  General Obligations of Freddie Mac

1.     For each Insured Mortgage, Freddie Mac will deliver all basic loan data required by the Insurer to determine that the Insured Mortgages will be covered under the MPI Policy and to calculate the applicable premiums.  The basic loan data will be derived from information provided to Freddie Mac by Seller.

2.     The aggregate unpaid balance of the Insured Mortgages will be verified and reconciled by Freddie Mac at the time the MPI Policy is issued.

3.     Freddie Mac shall pay the initial premiums and all renewal premiums as required by the MPI Policy for Insured Mortgages eligible for coverage to become and remain Insured Mortgages.

4.     Freddie Mac will file all claims under the MPI Policy, with Freddie Mac indicated as the "payee".

## Section IV.  General Obligations of Seller

1.     With respect to the loan numbers:

- that are assigned to the Insured Mortgage by either Seller, the originator or any predecessor in interest of the Insured Mortgages, or the Servicer or any Servicing Agent of the Insured Mortgages ("Seller/Servicer loan number"), and that are assigned to the Insured Mortgages by Freddie Mac in connection with the purchase of the Mortgages (the "Freddie Mac loan number"), and
- that are provided to the Insurer by Freddie Mac pursuant to Section III above,

Seller, no later than the Settlement Date, must forward to the Insurer a cross-reference list or a cross-referencing tool or key to ensure that each individual Insured Mortgage can be accurately and consistently identified using either the Freddie Mac loan number or the Seller/Servicer loan number.  If after the Settlement Date, the Seller/Servicer loan number of any Mortgage changes, Seller must notify the Insurer of the change by no later than the 30th day after the Settlement Date.

2.      During the term of the MPI Policy, the Seller must notify the Insurer of the name and contact person of any Servicing Agent of the Insured Mortgages.

3.      Seller is responsible for the accuracy of the information provided to Freddie Mac which Freddie Mac provides to the Insurer pursuant to III, above.  Seller must promptly update this information for Insurer if any Insured Mortgages are repurchased by Seller.

4.      Seller must provide Insurer with all reports and information relating to the Insured Mortgages requested by the Insurer or required by the MPI Policy in the manner proscribed by the MPI Policy, including monthly default reporting.  Seller must also provide Insurer with all assumption and delinquency information requested by the Insurer or required by the MPI Policy relating to the Insured Mortgages.

5.      If Seller at any time determines that the current unpaid principal balance of an Insured Mortgage as reflected on the records of the Insurer or Freddie Mac is different than the actual unpaid principal balance of such Insured Mortgage, Seller must notify Freddie Mac in writing and must provide Freddie Mac with the actual unpaid principal balance of all such Insured Mortgages.

6.      Seller must promptly execute and/or deliver all documents and take all other actions necessary to comply with the requirements of the MPI Policy and must perform all of the obligations of Freddie Mac as named insured thereunder except for those obligations specifically undertaken by Freddie Mac under Section III, above.  In particular and without limitation, upon request by the Insurer, Seller must provide the Insurer with complete mortgage files for any Insured Mortgages selected by the Insurer for quality control or other review.

7.      Seller agrees to implement any procedural changes necessary to perform its obligations under this Pool Insurance Attachment, provided that such changes do not materially alter Seller's obligations under this Pool Insurance Attachment.

8.      Seller's obligations to comply with the terms of the MPI Policy and this Pool Insurance Attachment are in addition to, and not in lieu of, its obligations to comply with the terms of the primary mortgage insurance policy, and the provisions of the other Purchase Documents, applicable to the Insured Mortgages.

9.     At the time of the Policy Termination Date, Seller must identify any Insured Mortgage for which coverage does not terminate and must continue to monitor and take all appropriate actions with regard to those Insured Mortgages until such time as coverage actually terminates.

**Section V.  Servicing Obligations of Seller**

1.     Seller must service each and every Insured Mortgage in accordance with the MPI Policy, this Pool Insurance Attachment and the Purchase Documents.

2.     Freddie Mac must receive the final Form 104, Statement of Loan and Real Estate Owned Expenses and Income, within 30 days of the settlement date relating to the sale of the REO Property.

3.     Seller must undertake all actions necessary or appropriate to perfect any claim under the MPI Policy.  If Seller fails to take all steps necessary to perfect a claim with the primary mortgage insurer or Insurer for a loss covered by the primary mortgage insurance policy or the MPI Policy, as applicable, and such failure results in the primary insurer or Insurer, as applicable, not covering all or a portion of such loss, then Freddie Mac may require Seller to reimburse Freddie Mac for such loss in the amount that would have been covered under the primary mortgage insurance policy and/or the MPI Policy, as applicable, or exercise any other remedies available under the Guide.

4.     If applicable, when completing Freddie Mac Form 1076, Notification of Foreclosure Sale and Acquisition of Title, and/or Freddie Mac Form 1098, Worksheet for Notification of Mortgages Approved for Foreclosure, Seller must complete all information relating to mortgage insurance by referencing the applicable primary mortgage insurance policy.  In addition, the line titled "Mortgage Insurance Information" must be completed by referencing the applicable primary mortgage insurance policy.

5.     If applicable, when completing Freddie Mac Form 1126, Workout Fact Sheet, in addition to providing required information relating to the primary mortgage insurance coverage, Seller must provide the name of the Insurer, the applicable policy number for the MPI Policy, and the certificate number for the applicable Insured Mortgage.  In addition, Seller must type or stamp "Pool Insurance" across the top of the Form 1126.

**Section VI.  Transfer of Coverage to Successor Insurer**

If Freddie Mac transfers the coverage to a successor insurer, Seller agrees to cooperate and assist in finding a new insurer and in transferring the coverage.  Such cooperation and assistance will include, but not be limited to, providing all reasonable loan records, data and mortgage files necessary for review by the successor insurer.  In the event the coverage is transferred to a successor insurer, Seller will remain responsible for all obligations described in this Pool Insurance Attachment for maintaining the coverage.

**Section VII.  Termination of Provisions of Pool Insurance Attachment**

1.      Subject to the provisions of Section VII, paragraph 2, below, the provisions of this Pool Insurance Attachment and the obligations and responsibilities of the parties set forth herein will terminate with respect to each individual Insured Mortgage on the earlier of:

(a)      the date on which the Insured Mortgage is not longer covered by the MPI Policy; or

(b)      the Policy Termination Date of the MPI Policy.

2.      The MPI Policy will not terminate with respect to any individual Delinquent Mortgage until a Mortgage Cure has occurred as to such Mortgage, and the provisions of this Pool Insurance Attachment will not terminate with respect to such Mortgage until the Mortgage Cure. Termination of the provisions of this Pool Insurance Attachment will not release Seller from any obligations or responsibilities to the extent of (a) any action or omission by Seller prior to termination which, if properly undertaken, would have resulted in reimbursement to Freddie Mac under the terms of the MPI Policy or this Pool Insurance Attachment, or (b) any claim which may be filed or is pending at the time of such termination, which Seller must diligently pursue until final resolution.

**Section VIII.  Notice Instructions**

All notices, requests and other communications pursuant to this Pool Insurance Attachment must be in writing with return receipt required, and must be delivered either by hand, by letter, or by facsimile, addressed as follows:

If to Seller,

        Countrywide Home Loans, Inc.
        Attention: Carol LaGarde
        Address: 450 American St., Simi Valley CA 93065
        Facsimile No.: 805-306-7039
        Telephone No.: 805-955-5000 ext 7413

If to Freddie Mac,

        Federal Home Loan Mortgage Corporation
        8200 Jones Branch Drive, MS 124
        McLean, VA  22102
        Attention:  Cash Management Operations/ Fees & Claims – Pool Insurance
        Facsimile No.: 703/903-2737
        Telephone No.: 703/903-2612

or to such other address as the party to receive any such communication or notice may have designated by written notice to the other party at the above address.  All periods of notice will be measured from the date of hand delivery, or from the date of receipt thereof, if sent by letter or by telecopy.

## Section IX.  Repurchase of Mortgages

In the event that coverage under the MPI Policy has been denied by the Insurer with respect to any Insured Mortgage or the MPI Policy has not been obtained within 30 calendar days following the last Business Day of the month the Mortgages were purchased by Freddie Mac, Freddie Mac will (a) require that Seller repurchase such Mortgage(s) in accordance with the procedures set forth in accordance with Chapter 72 of the Guide or provide recourse or indemnification to Freddie Mac with respect to such Mortgage(s), and/or (b) exercise any other remedies available under the Purchase Documents.  Seller must immediately undertake such action with respect to such Mortgages as required by Freddie Mac.

With respect to any Mortgage subject to Uncovered Losses, Freddie Mac is entitled to exercise any remedies provided in the Purchase Documents or at law or in equity, including, without limitation, requiring Seller to repurchase such Mortgage.

If any Mortgage is subject to repurchase by Seller, the repurchase price will be determined in accordance with the Guide.  Nothing contained in this Pool Insurance Attachment will in any way limit or affect any repurchase, recourse, indemnification or other obligation of Seller under the Guide or any other Purchase Document.

## Section X.  Transfer of Servicing

1.      Seller may concurrently transfer servicing of the Insured Mortgages to its affiliate, Countrywide Home Loan Servicing, L.P.

2.      Subsequent Transfers of Servicing of any Insured Mortgages will be considered by Freddie Mac only after a written request has been submitted to Freddie Mac in accordance with the requirements set forth in the Guide.  When submitting a request for a subsequent Transfer of Servicing on Freddie Mac Form 981, Agreement for Subsequent Transfer of Servicing, Seller must check "yes" in Part A.6 and enter "pool insurance". Approval of such request will be in Freddie Mac's sole discretion.  The terms and conditions of any subsequent Transfer of Servicing will be determined by Freddie Mac at the time of approval of the request.

3.      In the event the servicing for any Insured Mortgage is transferred with the approval of Freddie Mac, notwithstanding any provisions of Form 981 or any other transfer documentation, Seller will not be released from its obligations set forth in this Pool Insurance Attachment without the express written consent of Freddie Mac.  Freddie Mac will not provide such consent unless the new Servicer agrees to assume Seller's obligations under this Pool Insurance Attachment.

## Section XI.  Assignment

Freddie Mac may assign any of its obligations under this Pool Insurance Attachment to a third party with the consent of Seller, which consent will not be withheld unreasonably.  Subject to the consent of Freddie Mac, which consent will not be unreasonably withheld, Seller may assign its obligations under this Pool Insurance Attachment to the surviving entity of any merger, acquisition or other reorganization involving Seller.  Seller may not otherwise assign its obligations under this Pool Insurance Attachment except as set forth in this Section XI or Section X, above.



P.O. Box 2300
Winston-Salem, NC 27102

## Master Policy

Triad Guaranty Insurance Corporation (a stock insurance company hereinafter called the "Company") agrees to pay the below named Insured, in consideration of the premium or premiums to be paid as hereinafter specified and in reliance upon the Insured's representation and statements made in any Application or Transmittal for coverage under this Policy and in any documents and writings, including any data transferred by electronic media related thereto, any Loss due to the Default by a Borrower on a Loan, subject to the terms and conditions in this Policy and the Aggregate Loss Limit contained herein.

Insured's Name and Mailing Address:  XXXXXXXXXXXXXXXXXXXXXXXX
                                                              XXXXXXXXXXXXXXXXXXXXXXXX
                                                              XXXXXXXXXXXXXXXXXXXXXXXX

Policy No.:  XXXXXXXXXX

Effective Date of Policy:  XXXXXXXXXXXXXXXX

Security:     XXXX

Premiums:  .XX% per XXXXX

Total Initial Principal Balance and number of Loans:$XX,XXX,XXX.XX          Loans  XXXX

Aggregate Loss Percentage:  XX%

Aggregate Loss Limit:  $XX,XXX,XXX.XX

Per Loan Loss Percentage:  XXXXXXXXXXXXXXXXXXXXXXXXX

Deductible Amount:  $XXX,XXX.XX

Deductible Percentage:  XX%

Coverage Requirements:  XXXXXXXXXXXXXXXXXXXXXXXXXXXXX
                                          XXXXXXXXXXXXXXXXXXXXXXXXX
                                          XXXXXXXXXXXXXXXXXXXXXXXXX

Terms and Conditions of Policy:  XXXXXXXXXXXXXXXX

Endorsements:  XXXXXXXXXXXXXXXXXXXX

In Witness Whereof, the Company has caused its Corporate Seal to be hereto affixed and there presents to be signed by its duly authorized officers in facsimile to become effective as its original seal and signature and binding on the Company.

## TRIAD GUARANTY INSURANCE CORPORATION

President                                                           Secretary

_____
Authorized Signature

**TABLE OF CONTENTS**

I.   DEFINITIONS

    A.   Aggregate Loss                              1
    B.   Aggregate Loss Limit                        1
    C.   Aggregate Loss Percentage                   1
    D.   Application                                 1
    E.   Appropriate Proceedings                     1
    F.   Borrower                                    1
    G.   Borrower's Title to the Property            1
    H.   Certificate                                 1
    I.   Claim                                       2
    J.   Claim Amount                                2
    K.   Court Expenses                              2
    L.   Default                                     2
    M.   Effective Date                              2
    N.   Eligibility Criteria                        2
    O.   Environmental Condition                     2
    P.   Environmental Lien                          2
    Q.   Good and Merchantable Title                 2
    R.   Initial Principal Balance                   3
    S.   Insured                                     3
    T.   Loan                                        3
    U.   Loan File                                   3
    V.   Loss                                        3
    W.   Net Original LTV                            3
    X.   Original LTV                                3
    Y.   Per Loan Loss Percentage                    3
    Z.   Perfected Claim                             4
    AA.  Person                                      4
    BB.  Physical Damage                             4
    CC.  Policy                                      4
    DD.  Possession of the Property                  4
    EE.  Primary Policy                              4
    FF.  Property                                    4
    GG.  Residential                                 4
    HH.  Security                                    4
    II.  Servicer                                    4
    JJ.  Settlement Period                           4
    KK.  Total Initial Principal Balance             4
    LL.  Transmittal                                 4

II.  COVERAGE

    A.   Initial Premium and Term of
         Coverage                                    5
    B.   Loan Underwriting and Obtaining
         Coverage                                    5
    C.   Representations of the Insured              5
    D.   Company's Remedies for
         Misrepresentation                           5
    E.   Cancellation of the Policy                  6
         F.   Renewal of Certificate and
              Cancellation for Non-Payment
              of Renewal Premium                     6
    G.   Payment of Initial and Renewal
         Premiums                                    6

    H.   Cancellation by the Insured
         of a Certificate                            6
    I.   Loan Modifications                          7
    J.   Open End Provisions                         7
    K.   Assumptions                                 7
    L.   Change of Servicer                          7
    M.   Change of Insured                           7
    N.   Coordination and Duplication of
         Insurance Benefits                          8

III. EXCLUSIONS FROM COVERAGE

    A.   Balloon Payment                             8
    B.   Effective Date                              8
    C.   Incomplete Construction                     8
    D.   Fraud, Misrepresentation
         and Negligence
         8
    E.   Non-Approved Servicer                       9
    F.   Pre-Existing Environmental
         Conditions                                  9
    G.   Physical Damage (Other than
         Relating to Pre-Existing
         Environmental Conditions)                   9
    H.   Down Payment                                10
    I.   First Lien Status                           10
    J.   Breach of the Insured's
         Obligations or Failure to
         Comply with Terms                           10
    K.   Non-Eligible Loans                          10
    L.   Coverage Required Under
         Primary Policy                              10
    M.   Payment of the Full Benefit
         of the Primary Policy                       10

IV.  CONDITIONS PRECEDENT TO
     PAYMENT OF LOSS

    A.   Notice of Default                           11
    B.   Monthly Reports                             11
    C.   Company's Option to Accelerate
         Filing of a Claim                           11
    D.   Company's Options after
         Notice of Default                           11
    E.   Voluntary Conveyance                        12
    F.   Appropriate Proceedings                     12
    G.   Mitigation of Damages                       12
    H.   Advances                                    13
    I.   Claim Information and Other
         Requirements                                13
    J.   Acquisition of Borrower's Title
         Not Required                                13
    K.   Sale of Property by the Insured
         Before End of Settlement Period             13
    L.   Foreclosure Bidding Instructions
         Given by the Company                        14

## TABLE OF CONTENTS

M.  Effect of Unexpired Redemption
    Period on Payment of a Claim          15

N.  Collection Assistance                 15
O.  Coverage Required Under Primary
    Policy                                15


V.  LOSS PAYMENT PROCEDURE

A.  Filing of Claim                       15
B.  Calculation of Claim Amount           16
C.  Payment of Loss; Company's
    Options                               17
D.  Calculation of Settlement Period      18
E.  Payment by the Company After the
    Settlement Period                     18
F.  Discharge of Obligation              19

VI. ADDITIONAL CONDITIONS

A.  Proceedings of Eminent Domain         19
B.  Subrogation                           19
C.  Notice                                19
D.  Reports and Examinations              19
E.  Applicable Law and
    Conformity to Law                     20
F.  No Agency                             20
G.  Policy for Exclusive Benefit of
    the Insured and the Owner             20
H.  Effect of Borrower Insolvency or
    Bankruptcy on Principal Balance       20
I.  Arbitration of Disputes; Suits and
    Actions Brought by the Insured        20
J.  Release of Borrower; Defenses of
    Borrower                              21
K.  Amendments; No Waiver;
    Rights and Remedies; Use of
    Term "Including"                      21
L.  Successors and Assigns                21
M.  Electronic Media                      21
N.  Pursuit of Deficiencies               21

## I. DEFINITIONS

**A.** ***Aggregate Loss*** means, at any given time, the total of all Losses on Loans which are subject to this Policy, including advance payments of Loss and partial payments of Loss with respect to a Default, paid by the Company reduced by the net proceeds received by the Company upon disposal of Properties acquired by the Company in settlement of such Losses. For purposes hereof, the term "net proceeds" shall consist of the sale price received by the Company, reduced by any expenses, payments or costs incurred by the Company in the ownership, maintenance and disposition of a Property, including all expenses of the type which would have been includable in a Claim for Loss, brokerage commissions, title insurance expenses, recording fees, and other costs and expenses of closing the sale of the Property; and expenses regarding the physical condition of the Property in order to make it ready for sale.

**B.** ***Aggregate Loss Limit*** means the Total Initial Principal Balance (as shown on the face of this Policy) of Loans, multiplied by the Aggregate Loss Percentage, as in effect from time to time, or such other amount set forth on the face of this Policy, and as may be adjusted under Section II.D, and represents the maximum aggregate amount payable by the Company under this Policy at the applicable time the Aggregate Loss Limit is calculated. When the Aggregate Losses paid by the Company under this Policy are an amount equal to the Aggregate Loss Limit then in effect, the liability of the Company to pay any additional Losses ceases until the Aggregate Losses are reduced below the applicable Aggregate Loss Limit.

**C.** ***Aggregate Loss Percentage*** means that percentage identified on the face of this Policy.

**D.** ***Application*** means a request for coverage, including but not limited to assumption of coverage, under this Policy for a loan on a form or in a format provided by the Company, and all other statements, documents or information furnished to the Company by the Insured or any other Person in connection with the insuring of the Loan. An application will include information, if so furnished to the Company, contained in the Borrower's Loan application, appraisal, verifications of income and deposit, plans and specifications for the Property, and all other exhibits and documents, and will include all data and information so furnished by electronic means.

**E.** ***Appropriate Proceedings*** means any legal or administrative action by the Insured affecting either the Loan or the title to the Property, and include, but are not limited to:

1. Preserving and pursuing deficiency rights where appropriate and permissible and where directed by the Company;

2. Enforcing the terms of the Loan as allowed by the laws where the Property is located;

3. Acquiring all of the Borrower's right, title, and interest in the Property, but excluding any voluntary conveyance under Section IV.E.; or

4. Asserting the Insured's interest in the Property in a bankruptcy proceeding involving the Borrower.

**F.** ***Borrower*** means any Person required to repay the debt obligation created pursuant to the Loan, including any co-signer or guarantor of the Loan.

**G.** ***Borrower's Title to the Property*** means such title to a Property as was vested in the Borrower at the time of conveyance to the Insured arising out of or pursuant to a foreclosure of the Loan; provided, however, if the Insured so elects, the redemption period need not have expired. Borrower's Title in the Insured may be, but need not be the equivalent of Good and Merchantable Title, and the deed evidencing Borrower's Title need not be recorded unless required by applicable law.

**H.** ***Certificate*** means the document issued by the Company pursuant to this Policy and extending the indicated coverage option to a specified Loan.

**I.** ***Claim*** means the timely filed written or electronic request, made in a format approved by the Company, to receive the benefits of this Policy.

**J.** ***Claim Amount*** means the amount computed in accordance with Section V.B.

**K.** **_Court Expenses_** means the out-of-pocket cost of initiating and conducting Appropriate Proceedings or any eviction proceedings. These expenses include costs of filing or serving pleadings, conducting discovery, and the enforcing of a judgment. These expenses do not include reimbursement for any time spent by the Insured or the Insured's employees, officers or agents nor do these expenses include attorney's fees.

**L.** **_Default_** means the failure by a Borrower (1.) to pay when due an amount equal to or greater than one (1) regular periodic payment due under the terms of a Loan or (2.) to pay all amounts due on acceleration of the Loan by the Insured after breach by the Borrower of a due on sale provision in the Loan, granting the Insured the right to accelerate the Loan upon transfer of title to, or an interest in, the Property and to institute Appropriate Proceedings. Violation by the Borrower of any other term or condition of the Loan which is a basis for Appropriate Proceedings shall not be considered to be a Default.

A Loan is deemed to be in Default for any periodic payment as of the close of business on the installment due date for which a scheduled periodic payment has not been made or as of the close of business on the due date stated in the notice of acceleration given pursuant to the due-on-sale provision in the Loan. The Loan will be considered to remain in Default until filing of a Claim so long as such periodic payment has not been made or such basis for Appropriate Proceedings remains. For example, a Loan is "three (3) months in Default" if the monthly installments due on January 1 through March 1 remain unpaid as of the close of business on March 1 or if a basis for acceleration and Appropriate Proceedings exists for a continuous period of three (3) months.

**M.** **_Effective Date_** means, as specified in the Certificate and/or Policy, (1.) the closing date of a Loan; or (2.) the later date requested by the Insured and accepted by the Company.

**N.** **_Eligibility Criteria_** means the requirements established by the Company from time to time applicable to the origination of a Loan (including but not limited to approved mortgage loan programs, maximum loan-to-value ratios and original principal amounts, coverage limitations and underwriting requirements) and of which the Company notifies the Insured, as the same may be amended from time to time by the Company on prior written notice to the Insured.

**O.** **_Environmental Condition_** means the presence of environmental contamination, including nuclear reaction or radioactive waste, toxic waste, or poisoning, contamination or pollution of earth or water subjacent to the Property or of the atmosphere above the Property; or the presence, on or under a Property, of any "Hazardous Substance" as that term is defined by the federal Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. Sec. 9601 et. seq., as amended from time to time) or as defined by any similar state law, or of any "Hazardous Waste" or "Regulated Substance" as those terms are defined by the federal Resource Conservation and Recovery Act (42 U.S.C. sec. 6901, et seq., as amended from time to time) or as defined by any similar state law. Environmental Condition does not mean the presence of radon, lead paint, or asbestos.

**P.** **_Environmental Lien_** means any lien on Property pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act and all laws amendatory thereof or supplementary thereto, or any similar federal or state law providing for liens in connection with the cleanup of Environmental Conditions, or the commencement of legal or administrative proceedings that could result in such a lien.

**Q.** **_Good and Merchantable Title_** means title to a Property free and clear of all liens, encumbrances, covenants, conditions, restrictions, easements and rights of redemption, except for any of the following or as permitted in writing by the Company:

1. Any lien established by public bond, assessment or tax, when no installment, call or payment of or under such bond, assessment or tax is delinquent;

2. Any municipal and zoning ordinances and exceptions to title waived by the regulations of federal mortgage insurers and guarantors with respect to mortgages on one-to-four family residences in effect on the date on which the Loan was closed and all documents were executed; and

3. Any other impediments which will not have a materially adverse effect on either the transferability of the Property or the sale thereof to a bona fide purchaser.

Good and Merchantable Title will not exist if (a) there is any lien pursuant to the Comprehensive                    Environmental Response, Compensation, and Liability Act, or similar federal or state law, as in effect from time to time, providing for liens in connection with the removal and clean-up of environmental conditions, or if notice has been given of commencement of proceedings which could result in such a lien, or (b) there are limitations on ingress and egress to the Property or on use of utilities. Any action or proceeding after a foreclosure sale relating to establishing a deficiency judgment will not be considered in determining whether the Insured has acquired Good and Merchantable Title.

**R.**   **_Initial Principal Balance_** means the unpaid principal balance at the Effective Date of the Certificate of a Loan.

**S.**   **_Insured_** means:

1.   The Person designated on the face of the Policy; or

2.   Any Person to whom coverage has been assigned with the written approval of the Company as provided in Section II.M. resulting in a change in the Insured named on a Certificate in accordance with this Policy.

**T.**   **_Loan_** means any note, bond, or other evidence of indebtedness secured by a mortgage, deed of trust, or other instrument, which constitutes or is equivalent to a first lien or charge on the Property and to which the Company has approved for insurance, which secures or is represented by the Security to which coverage under this Policy has been extended, and which must be included on the face of this Policy.

**U.**   **_Loan File_** means, with respect to a Loan, copies of all documents (including, but not limited to all data and information in electronic format) created or received in connection with the origination and closing of the Loan, including the Borrower's loan application, purchase contract, appraisal, credit report, verifications of employment, income and deposit, and HUD-1 or other settlement statement.

**V.**   **_Loss_** means the liability of the Company with respect to a Loan for payment of a Perfected Claim which is calculated in accordance with Section V.B., but subject to the Aggregate Loss Limit.  A Loss will be deemed to have occurred when a Default on a Loan occurs, even though the amount of Loss is not then either presently ascertainable or due and payable.

**W.**   **_Net Original LTV_** means the ratio of the original balance of the Loan reported to the Company less  any Pledged Assets and existing primary mortgage insurance, if any, to the value of the Property, at origination date, as calculated according to the Company's standard procedures.

**X.**   **_Original LTV_** means the ratio of the principal balance of the Loan to the value of the Property at origination date, as calculated according to the Company's standard procedures.

**Y.**   **_Per Loan Loss Percentage_** means the indicated percentage as shown on the face of this Policy.

**Z.**   **_Perfected Claim_** means a Claim received by the Company and satisfying the requirements of Section IV.I.

**AA.**   **_Person_** means any individual, corporation, partnership, association or other entity.

**BB.**   **_Physical Damage_** means any tangible injury to the Property, whether caused by accident or otherwise, not including reasonable wear and tear.

**CC.**   **_Policy_** means this contract of insurance and all commitments, endorsements, schedules, and Certificates relating hereto, which are incorporated herein.

**DD.**   **_Possession of the Property_** means actual and physical occupancy and control of the Property.

**EE.**   **_Primary Policy_** means the policy or guarantee issued by a mortgage guaranty insurance company approved for insurance of mortgage loans sold to the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which provides the minimum coverage required by Section IV.O., and under a form of policy

approved by Fannie Mae or Freddie Mac and in general use for the mortgage loans sold to them.  At the Company's request, from time to time, the Insured shall provide to the Company a copy of the form of each Primary Policy under which it obtains coverage.

**FF.** **_Property_** means the Residential real property and all improvements and fixtures thereon which secure the Loan, together with all easements and appurtenances, all rights of access, all rights to use common areas, recreational and other facilities, and all replacements or additions thereto.

**GG.** **_Residential_** means:

1.   A type of building or a portion thereof which is designed for occupancy by not more than four (4) families; or

2.   A single family condominium or PUD unit.

**HH.** **_Security_** means the bond, certificate or other security instrument, or group of loans, designated or referred to on the face of this Policy.

**II.** **_Servicer_** means the Person designated by the Insured and approved by the Company to service a Loan pursuant to Section II.L.  The Insured shall be entitled to direct the Servicer to perform any action required of the Insured by the Policy, including without limitation, the filing of monthly reports.

**JJ.** **_Settlement Period_** means the period as determined under Section V.D., at the end of which a Loss is payable by the Company; provided that if the Company pays a Loss prior to expiration of such period, the Settlement Period ends with such payment.

**KK.** **_Total Initial Principal Balance_** means the sum of the Initial Principal Balances of all Loans  as shown on the face of this Policy.

**LL.** **_Transmittal_** means the Application and/or the information and format designated as such by the Company which requests or directs the Company to issue its Certificate with respect to the identified Loan, and which includes all data and information and all exhibits and documents furnished to the Company in connection with the identified Loan.  As the context requires, whenever the term "Application" is used in this Policy, the term "Transmittal" and its definition will be substituted.

Any pronouns, when used herein, shall mean the single or plural, masculine or feminine, as the case may be.

## II.    COVERAGE

**A.**   **_Initial Premium and Term of Coverage_** - Within fifteen (15) days from the Effective Date of the Certificate, or such other date as the Company and the Insured may agree to in writing, the Insured must forward to the Company the appropriate initial premium. Payment of the initial premium shall be a condition precedent to coverage being extended to the Loan.  Subject to cancellation by the Insured or the Company as provided in this Policy, coverage shall remain in full force and effect for the period covered by the initial premium. Tender of the initial premium will constitute a representation for purposes of Section II.C. by the Insured that any special conditions included by the Company in the related Certificate have been satisfied.

**B.**   **_Loan Underwriting and Obtaining Coverage_** - This Policy shall automatically extend to each Loan which the Insured submits for coverage under this Policy, provided that it is made in accordance with the terms and provisions of this Policy, including the Eligibility Criteria.

**C.**   **_Representations of the Insured_** - The Insured represents to the Company that:

1.   All statements made and information provided to the Company in a Transmittal or in a Certificate (including as such is related to continuation of coverage upon assumption of a Loan), whether by it, the Borrower, or any other Person, have been made and presented for and on behalf of the Insured, and are supported by statements and information in the Loan File;

2. All statements made and information provided to the Company in the Transmittal or in any Certificate when provided to the Company or contained in the Loan File when the Loan is closed are not false or misleading in any material respect as of such date(s) on which they are made or provided and do not omit any fact necessary in order to make such statements and information not false or misleading in any material respect as of such date(s), and

3. The Loan complies with the Eligibility Criteria in effect at the time the Transmittal is submitted to the Company.

The foregoing representations will apply to all statements and information provided to the Company in the Transmittal or Certificate or contained in the Loan File, whether made or submitted by the Insured, the Borrower or any other Person, and will be deemed to have been made and provided for and on behalf of the Insured.  The foregoing representations shall be effective whether or not they are made by the Insured or other Person with the intent to deceive or mislead, or with the knowledge that they are not true and correct.

It is understood and agreed that such statements and information in the Transmittal, Certificate, or Loan File in the aggregate are, and in certain instances individually may be, material to the Company's decision to offer, provide or to continue coverage of the related Loan; the Company issues the related Certificate or continues coverage in reliance on the accuracy and completeness of such statements and information submitted to it and without any obligation to independently verify the statements and information presented; and the Company's reliance on the representations in this Section II.C. survive the issuance of a Certificate or such continuation of coverage and any later request for and review of the Insured's Loan Files, whether held by the Insured or the Insured's Servicer, by the Company.  Without otherwise limiting the scope of this Section II.C, a breach of Section III.H. relating to down payment will be deemed a material misrepresentation for purposes of this Section II.C.

**D.  *Company's Remedies for Misrepresentation*** - If any of the Insured's representations as described in Section II.C. are materially false or misleading with respect to a Loan, the Company will have at its option, the right to defend against a Claim, or to the extent permitted by applicable law, to cancel or rescind coverage under any Certificate retroactively to commencement of coverage (or if the misrepresentation occurs with respect to continuation of coverage upon assumption of a Loan, to so defend, cancel or rescind retroactively to the date of such continuation).  In the case of such cancellation or rescission, the Company shall return at that time all paid premiums retroactively to such applicable date. In the case of rescission of coverage retroactively to the Effective Date of the Certificate, the Aggregate Loss Limit shall be adjusted as if such Loan had not been insured.  The Company acknowledges and agrees that the foregoing remedies shall be the sole and exclusive remedies available to the Company against the Insured for breach of representations and warranties under the Policy relating to the insurance provided hereunder.

**E.  *Cancellation of the Policy*** - Either the Insured or the Company may cancel this Policy by providing thirty (30) days [forty-five (45) days in Florida] written notice of cancellation of the Policy. After the effective date of cancellation, this Policy shall continue in full force and effect with respect to Certificates issued prior to the effective date of cancellation, subject to all of the terms and conditions of this Policy and the Certificates, but in all other respects this Policy shall be considered null and void.

If the Company should cease to be Qualified, the Insured may cancel this Policy upon thirty (30) days' written notice or in the event of such cancellation, all coverage will cease as of the date of cancellation and appropriate refund of premium issued, and Defaults occurring after that date will not be covered.  Qualified for purposes of this provision shall mean the Company is (i) duly qualified under applicable state law as a mortgage guaranty insurance company, (ii) is duly authorized to issue insurance provided by this Policy, and (iii) is approved as an eligible insurer by the Federal Home Loan Mortgage Corporation.  Unless it is cancelled as provided in this section, this Policy shall continue in force until the earlier of the (i) termination date indicated on the face hereof or (ii) each Loan insured hereunder has been paid in full or otherwise liquidated.  In the event of cancellation due to the Company ceasing to be Qualified, the Insured shall be entitled to a prorata refund of premium paid no later than thirty (30) days after the date of cancellation, and calculated retroactively to the date of cancellation.

**F.** ***Renewal of Certificate and Cancellation for Non-Payment of Renewal Premium*** - The entire renewal premium for a Certificate shall be due and payable within forty-five (45) days after the coverage date through which the prior premium on the Certificate had been paid.  Upon request, or in compliance with applicable law, the Company shall give the Servicer (or the Insured, if the Company's records do not indicate that a Servicer has been appointed) notice of the renewal premium due date of each Certificate. Upon payment of the entire renewal premium when due, the Certificate will be deemed renewed. If the Insured fails to make this payment within the forty-five (45) day period, the liability of the Company for any Default not then existing shall terminate as of 12:01 a.m. on the first day following the coverage date through which the prior premium had been paid, except that any Default occurring within the forty-five (45) day period which results in a Claim being filed will be covered and any due and unpaid renewal premium for the Certificate through the end of the applicable renewal period will be deducted from the Loss payment. In the event coverage hereunder for a Loan lapses due to non-payment of premium attributable to the transfer, seizure, or surrender of servicing rights with respect to such Loan, coverage shall automatically be reinstated, retroactive to the date coverage had lapsed, provided all past due premiums with respect to the Loan are paid to the Company within ninety (90) days after the lapse commenced.

**G.** ***Payment of Initial and Renewal Premiums*** - The Insured acknowledges that the Company deposits initial and renewal premiums immediately upon receipt and agrees that the receipt and deposit of such premiums by the Company after the time specified in this Policy for receipt, does not constitute a waiver of the requirements of this Policy for timely receipt or an acceptance of premium by the Company. The Company will have the right to return such late premium payment, but only within sixty (60) days after receipt, in which case coverage will be cancelled retroactively to the Effective Date of the Certificate for a late initial premium, or to the last day of the period covered by the previous premium payment for a late renewal premium. Receipt, deposit and retention of premiums will not constitute a waiver of any defenses with respect to any other matters which the Company may have under this Policy.

**H.** ***Cancellation by the Insured of a Certificate -*** Notwithstanding any provision to the contrary in this Policy, the Insured shall be obligated to maintain coverage of a Certificate for a Loan and to pay corresponding premiums for continuation of coverage except that:

1.    Additional coverage on a Loan may be cancelled by the Insured effective when:

   a.  the unpaid principal  balance of the Loan is less than the percentage (shown on the face of this Policy) of the value of the Property, provided that coverage of the Loan has been effective under this Policy for the number of years (shown on the face of this Policy) and the Loan has not been thirty (30) days or more delinquent more than once during the twelve (12) months preceding the effective date of cancellation; or

   b.  the indebtedness represented by such Loan is paid in full;

The Insured may obtain cancellation of coverage on a Loan by making a written request to the Company for cancellation. However, no refund on a cancellation of coverage on a Loan will be paid upon cancellation. Cancellation of coverage on a Loan will not cancel this Policy .

**I.** ***Loan Modifications*** - Unless advance written approval is obtained from the Company, the Insured shall not make any change in the terms of the Loan including, but not limited to, the borrowed amount, interest rate, term, or amortization schedule of the Loan, except as permitted by the terms of the Loan; nor any change in the Property or other collateral securing the Loan; nor release the Borrower from liability on the Loan. If any of the foregoing events occur without the Company's advance written approval, the Company may terminate coverage because of the substantial increase of risk to loss due to a material change by sending a proper notice of cancellation.  The Company's liability shall be limited to the return of a portion of the premium paid prior to the date of such event in accordance with the applicable cancellation schedule and all premiums paid after the date of such event.

**J.** ***Open End Provisions*** - The Insured may increase the principal balance of the Loan, provided that the approval of the Company has been obtained. The Insured shall pay the Company the additional premium due at the then prevailing premium rate.

**K.   *Assumptions*** - If a Loan is assumed with the prior approval of the Insured, the liability of the Company for coverage under its Certificate shall terminate as of the date of such assumption, unless the Company approves the assumption in writing. The Company shall not unreasonably withhold approval of an assumption.   Upon termination of coverage under this section, the Company's liability shall be limited to the return of a portion of the premium paid prior to the date of such termination in accordance with the applicable cancellation schedule and all premiums paid after the date of such termination. It is understood that coverage will continue, and that the restriction of this section shall not apply, if the Insured cannot exercise a "due-on-sale" clause under the Loan or applicable law.

**L.   *Change of Servicer*** - The Insured may transfer (by sale or otherwise) the right to service a Loan, subject to the Company's written approval. The Insured shall furnish written notice to the Company within thirty (30) days after the date the servicing is transferred. The Company may withdraw its approval of any approved Servicer by furnishing written notice to the Insured. The Insured shall replace a Servicer as to which approval is withdrawn within ninety (90) days after receipt of the Company's notice of withdrawal. The approved Servicer shall be considered the agent of the Insured with respect to all matters involving this Policy, including but not limited to the giving and receiving of notice of a Claim, the cancellation of a Certificate, the payment of premiums, and the receipt of any premium refunds that may become due under this Policy, and the Insured shall be bound by the acts and omissions of the Servicer as if they were the Insured's own acts and omissions.   Notwithstanding the requirements of the foregoing, the Company's approval of any Servicer shall be deemed given to any Servicer approved by the Insured, subject to the Company's right to withdraw approval of such Servicer as provided herein.

**M.   *Change of Insured*** - If coverage of a Loan is assigned or transferred by the Insured, to a new Insured, the Insured shall promptly notify the Company thereof and the Company shall, thereafter, change its records to identify the new Insured for such Loan.   Such change of Insured shall only be allowed if advance written approval is obtained from the Company, which approval shall be in the sole and absolute discretion of the Company.

**N. Coordination and Duplication of Insurance Benefits**

1. If any portion of the Loan is uninsured, all payments made by the Borrower under the terms of the Loan shall be allocated to the insured portion of the Loan in the same ratio as the insured principal amount bears to the total principal amount of the Loan. Any payment of a Loss hereunder shall be likewise allocated on the same pro-rata basis.

2. The Insured shall not carry duplicate mortgage guaranty insurance (other than mortgage guaranty pool insurance or supplemental mortgage guaranty insurance) on any Loan.

3. The coverage under this Policy shall be excess over any other insurance which may apply to the Loan except for mortgage guaranty pool insurance.

## III.   EXCLUSIONS FROM COVERAGE

The Company shall not be liable for, and the Policy shall not apply to, extend to, or cover the following:

**A.   *Balloon Payment*** - Any Claim arising out of or in connection with the failure of the Borrower to make any payment of principal and/or interest due under the Loan, which payment arises because the Insured exercises its right to call the Loan when not in Default or because the term of the Loan is shorter than the amortization period, and which payment is for an amount more than twice the regular periodic payments of principal and interest that are set forth in the Loan (commonly referred to as a "Balloon Payment"); provided, however, that such exclusion shall not apply if the Insured or its approved Servicer offers the Borrower a renewal or extension of the Loan or a new loan at market rates, otherwise subject to Section II.I., in an amount not less than the then outstanding principal balance with no decrease in the amortization period. The exclusion shall not apply if the Borrower is notified of the availability of a renewal or extension of the Loan or a new loan and does not seek such renewal, extension or new loan.

**B.   *Effective Date*** - Any Claim resulting from a Default occurring before the Effective Date of the Policy or Certificate or after its lapse or cancellation, unless coverage is renewed in accordance with Section II.F.

**C.   *Incomplete Construction*** - Any Claim when, as of the date of such Claim, construction of the Property is not completed in accordance with the construction plans and specifications upon which the appraisal of the Property at the origination of the Loan was based, other than construction of repairs for Physical Damage occurring after the Effective Date of the Certificate.

**D.   *Fraud, Misrepresentation and Negligence***

1. Any Claim not otherwise within the scope of Section II.D. where there was fraud or misrepresentation by the Insured with respect to the Loan, and the fraud or misrepresentation (a) materially contributed to the Default resulting in such Claim; or (b) increased the Loss, except that if the Company can reasonably determine the amount of such increase, such Claim will not be excluded, but the Loss will be reduced to the extent of such amount.

2. Any Claim where there was negligence by the Insured with respect to the Loan, which (a) was material to either the acceptance of the risk or the hazard assumed by the Company; (b) materially contributed to the Default resulting in such Claim; or (c) increased the Loss, except that if the Company can reasonably determine the amount of such increase, such Claim will not be excluded, but the Loss will be reduced to the extent of such amount.

3. Notwithstanding Sections III.D.1, and 2, no Claim for Loss will be denied or adjusted, nor will the Policy's coverage be rescinded or cancelled, by reason of any misrepresentations (whether by statements made or omitted) contained in an Application, provided that all of the following requirements, conditions and circumstances, to the extent not waived in writing at the option of the Company, are satisfied:

   a. The misrepresentation must not have been knowingly made, or knowingly participated in, by:

      1) The Insured or any other Person which originated the Loan; or

2)    Any other of the following Persons:

      i)    Correspondent lender, mortgage loan broker or other intermediary underwriting or processing the Loan on behalf of the Insured or any other Person which originated the Loan; or

      ii)    Escrow or closing agents, appraisers, or any other agent of, or broker for, the Insured or any other Person which originated the Loan acting with respect to the Loan or the related Property transaction.

b.    The Borrower must have made twelve (12) consecutive full installment payments of principal, interest and impound or escrow amounts in the amounts as called for by the Loan, and all of those payments must have been made from the Borrower's own funds.

**E.**    ***Non-Approved Servicer*** - Any Claim occurring when the Servicer, at time of Default or thereafter, was not approved by the Company, provided that if approval of the Servicer is withdrawn by the Company pursuant to Section II.L., the Servicer shall be deemed approved for purposes of this section until ninety (90) days after the Insured has received the Company's notice of disapproval.

**F.**    ***Pre-Existing Environmental Conditions*** - Any Claim where there is an Environmental Condition which existed on the Property (whether or not known by the Person submitting an Application for coverage of the Loan) as of the Effective Date of the Certificate, subject to the following provisions:

1.    This exclusion will not apply if the existence of such Environmental Condition, or the suspected existence of such Environmental Condition, was specifically disclosed to the Company in the Application relating to the Property.

2.    This exclusion will apply only if such Environmental Condition (a) was a principal cause of the Default, and (b) has made the principal Residential structure on the Property uninhabitable. A structure will be considered "uninhabitable" if generally recognized standards for residential occupancy are violated or if, in the absence of such standards, a fully informed and reasonable person would conclude that such structure was not safe to live in without fear of injury to health or safety.

3.    This exclusion will not apply if the Environmental Condition is removed or remedied in a timely and diligent manner in accordance with applicable governmental standards for safe residential occupancy.

**G.**    ***Physical Damage (Other than Relating to Pre-Existing Environmental Conditions)*** - Any Claim where, at any time after the Effective Date of the Certificate, there is Physical Damage to the Property of a type other than as described in Section III.F. and other than reasonable wear and tear, subject to the following provisions:

1.    This exclusion will not apply if the Company in good faith determines that the aggregate cost of restoring all such Physical Damage is less than fifteen hundred dollars ($1,500.00) or such higher amount as the Company may provide from time to time.

2.    This exclusion will not apply if such Physical Damage was specifically disclosed to the Company in the Application for coverage relating to the Property.

3.    This exclusion will apply if such Physical Damage occurred:

a.    prior to expiration of the Settlement Period described in Section V.D. if the Company elects to acquire the related Property in settlement of a Claim; or

b.    prior to the Default and was the principal cause of the Default and the Property was either uninsured for loss arising from such Physical Damage or was insured for an amount which, disregarding any deductibles up to fifteen hundred dollars ($1,500.00), was insufficient to restore the Property as provided in Section III.G.4.

4.    The exclusion resulting from Section III.G.3. will not apply if the Property is restored in a timely and diligent manner to its condition (except reasonable wear and tear) as of the Effective Date of the Certificate.  In lieu of requiring restoration of the Property, the

Company may, at its option, reduce the Claim Amount by an amount equal to the cost of such restoration.

5. For purposes of this Section III.G., the Property subject to restoration will consist only of the land, improvements or personal property deemed part of the real property under applicable law; and chattel items, affixed to the real property and identified in the appraisal of the Property at the time the Loan was made, whether or not they are deemed part of the real property.

6. Cost estimates relied upon by the Company in connection with this Section III.G. shall be provided in writing by an independent party selected by the Company.  The Company will furnish the Insured with any such written cost estimates, if requested by the Insured.

**H.** ***Down Payment*** - Any Claim involving a Loan which is for the purchase of the Property, and for which the Borrower did not make a down payment as described in the Transmittal or Loan File.

**I.** ***First Lien Status*** - Any Claim, if the mortgage, deed of trust or other similar instrument executed by the Borrower and Insured hereunder did not provide the Insured at origination with a first lien on the Property.

**J.** ***Breach of the Insured's Obligations or Failure to Comply with Terms*** - Any Claim involving or arising out of any breach by the Insured of its obligations under, or its failure to comply with the terms of this Policy, or of its obligations as imposed by operation of law, if the breach or failure:

1. Materially contributed to the Default resulting in such Claim; or

2. Increased Loss, except that if the Company can reasonably determine the amount of such increase, such Claim will not be excluded, but the related Loss will be reduced to the extent of such amount.

**K.** ***Non-Eligible Loans*** - Any Loan that did not meet the Eligibility Criteria in effect at the time the related Transmittal was submitted to the Company or any Loan as to which the Insured fails to submit a copy of its Loan File to the Company within thirty (30) days after the Company's written request.

**L.** ***Coverage Required Under Primary Policy*** - Any Claim if, for any reason other than as disclosed below, coverage under a Primary Policy described in Section IV.O. was not in effect at the time of conveyance of the Property as described in Section V.A. of this Policy.  Each Loan that has an Original LTV of more than eighty percent (80%), is required to have coverage under a Primary Policy that meets the requirements for mortgage guaranty insurance set forth in the Freddie Mac Seller/Servicer Guide for such loan ("Primary Coverage").  Such Primary Coverage must remain in force until the earlier of (i) the date on which the Borrower may terminate paying for Primary Coverage as required by the laws of the state where the Property is located or federal law, or (ii) upon compliance with the applicable requirements of the Freddie Mac Seller/Servicer Guide governing the discontinuation of Primary Coverage.  The Company acknowledges that upon the occurrence of one of the foregoing circumstances permitting discontinuation of Primary Coverage with respect to a Loan, the provisions of this Section and Section III.M making Primary Coverage and payment of the full benefit of the Primary Policy, conditions precedent to payment of a Claim for such Loan shall not apply and the Claim shall be calculated as if the Loan had not at any time required Primary Coverage hereunder.

**M.** ***Payment of the Full Benefit of the Primary Policy*** - Any portion of any Claim for Loss to the extent the Insured under the related Primary Policy has not received the amount of the full benefit of the percentage option claim payment under the Primary Policy, irrespective of the reason or cause, including insolvency of the Primary Policy insurer or failure of the Insured to comply with the terms and conditions of the Primary Policy.

## IV.    CONDITIONS PRECEDENT TO PAYMENT OF LOSS

It is a condition, precedent to the Company's obligation to pay a Loss, that the Insured comply with all of the following requirements:

**A.** ***Notice of Default*** -The Insured shall give the Company written notice:

1. Within forty-five (45) days of the Default, if it occurs when the first payment is due under the Loan; or

2. Within ten (10) days of the earlier of either:

    a. The date when the Borrower becomes four (4) months in Default on the Loan; or

    b. The date when any proceeding, including Appropriate Proceedings, which affects the Loan or the Property or the Insured's or Borrower's interest therein has been started.

**B.** ***Monthly Reports*** - Following a notice of Default on a Loan, the Insured shall give the Company monthly reports, in a format acceptable to the Company, on the status of the Loan and on the servicing efforts undertaken to remedy the Default. These monthly reports shall continue until the Borrower is no longer in Default, the Appropriate Proceedings terminate, or until the Insured has obtained Borrower's Title to the Property.

**C.** ***Company's Option to Accelerate Filing of a Claim*** - If the Company so directs, at any time after receiving the Insured's notice of Default, the Insured must file a Claim within twenty (20) days after notice from the Company. The Company will then make a payment of Loss in accordance with the percentage guaranty option in Section V.C.2. Thereafter, following the acquisition of Borrower's Title by the Insured, the Insured will be entitled to file a supplemental Claim at the time prescribed in Section V.A. in an amount equal to the sum of its advances, less the deductions, all as specified in Section V.B., to the extent not included in the payment of the initial Claim. Such supplemental Claim must be paid by the Company in accordance with Section V.C.2. No interest shall be includable in the Claim Amount under this Section IV.C. after the date that the accelerated Claim is filed. If a Loan for which the Company has paid a Claim is subsequently brought current by the Borrower, the Insured shall refund to the Company the Loss paid by the Company with respect to that Loan. If the Company exercises its option under this Section IV.C., the Company shall not have the right to direct or participate in a deficiency recovery under Section VI.N.

**D.** ***Company's Options after Notice of Default***

1. If the Company so requests, the Insured shall permit the Company to assist the Insured in the collection of monies due under the Loan, including but not limited to activities such as obtaining information from the Borrower, attempting to develop payment schedules acceptable to the Insured, conducting Property inspections, and requesting appraisals of the Property.

2. If the Company so directs, at any time after receiving the Insured's Notice of Default, the Insured shall file a Claim within twenty (20) days and the Company shall make a payment of Loss in accordance with Section V.C.2. Thereafter, following acquisition of Borrower's Title to the Property or either of the events described in Section V.A., the Insured shall be entitled to file a supplemental Claim in an amount equal to the sum of the advances, not included in the initial Claim, made by the Insured under Section IV.H., subject to the limitation of Section V.B.1.c., less the deductions specified in Section V.B.2., to the extent not deducted in the payment of the initial Claim, and such supplemental Claim shall be paid by the Company in accordance with Section V.C.2. For purposes of calculating the supplemental Claim, all amounts reimbursable to the Insured pursuant to Section VI.N.2. shall be reimbursed in full.

**E.** ***Voluntary Conveyance*** - The Insured may only accept a conveyance of the Property from the Borrower in lieu of foreclosure or other proceeding if the prior written approval of the Company has been obtained. Such approval shall not be considered as an acknowledgement of liability by the Company with respect to such Loan.

**F.** ***Appropriate Proceedings*** - The Insured MUST begin Appropriate Proceedings when the Loan becomes six (6) months in Default unless the Company provides written instructions that some other action be taken. The Company reserves the right to direct the Insured to institute Appropriate Proceedings at any time after Default. When either defending against or bringing Appropriate Proceedings, the Insured shall report the status of these proceedings to the Company as reasonably and expeditiously as possible.

In conducting Appropriate Proceedings, the Insured shall:

1.   Diligently pursue the Appropriate Proceedings once they have begun;

2.   Apply for the appointment of a receiver and assignment of rent, if permitted by law and requested by the Company;

3.   Furnish the Company with copies of all notices and pleadings filed or required in the Appropriate Proceedings;

4.   Act and bid at the foreclosure sale in accordance with Section IV.L. so that its ability to preserve, transfer and assign to the Company its rights against the Borrower are not impaired; and so that the rights of the Company under this Policy against the Borrower are fully protected. Such rights include any rights to obtain a deficiency judgment, subject to the Company's compliance with Sections VI.N. and VI.B. relating to establishing a deficiency;

5.   When requested by the Company, furnish the Company with a written statement indicating the estimated potential Loss, calculated in accordance with Section V.B., at least fifteen (15) days before the foreclosure sale; and

6.   Furnish the Company with a written statement indicating the foreclosure sale results within five (5) days of the foreclosure sale date.

**G.**   *Mitigation of Damages*

1.   The Insured must actively cooperate with and assist the Company to prevent and mitigate the Loss, including good faith efforts by the Insured to obtain a cure of the Default, collect amounts due under the Loan, inspect and appraise the Property and effectuate the early disposition of the Property. The Company must administer this Policy in good faith.

2.   Until such time as the Company waives its right to settle a Claim in accordance with Section V.C.1. or its right to elect such method of settlement has expired, the Insured shall not execute a binding contract to sell the Property without the Company's prior approval. Further, the Insured shall authorize its broker to release to the Company marketing information for the Property when requested by the Company, unless the Insured shall have notified the broker that the Company's right to elect to settle a Claim in accordance with Section V.C.1. has been waived or has expired. If the Insured wishes to obtain the Company's approval to execute a binding contract to sell the Property, it will submit to the Company information concerning the proposed Property sale, the expense items proposed by the Insured to be deducted from the gross proceeds of sale for purposes of Section V.C.3., and the Insured's then estimated amounts thereof. The Company will approve or reject the proposed settlement and will not require the Insured to make counteroffers. If the Company elects to settle the Claim in accordance with Section V.C.1., it will thereafter control the marketing of the Property.

**H.**   *Advances* - The Insured shall advance real estate property taxes and normal and customary hazard insurance premiums, reasonable foreclosure and eviction costs (including but not limited to Court Expenses and reasonable attorneys' fees), and necessary and reasonable expenses (as approved by the Company at the time the Company reviews the Claim) for the protection and preservation of the Property. The costs of repairing Physical Damage to the Property shall not be considered an approvable expense.

**I.**   *Claim Information and Other Requirements* - In order to make a Perfected Claim, the Insured must provide the Company with:

1.   All information reasonably requested by the Company;

2.   Information in a format acceptable to the Company for payment of a Claim;

3.   If the Property is not being acquired by the Company: a copy of an executed trustee's or sheriff's deed (which may be unrecorded) conveying Borrower's Title to the Property to the Insured (or satisfactory evidence that the foreclosure sale has been completed if the Borrower's right of redemption has not expired); or a deed from the Borrower (which may be unrecorded) if a voluntary conveyance has been approved by the Company, conveying to the Insured the title that was required by the Company in the approval of the conveyance.

In the event the most important cause of Default was a circumstance or event which would prevent the Insured from obtaining Good and Merchantable Title, the Insured shall instead provide the Company with evidence described in Section IV.I.4.b.

4. If the Property is being acquired by the Company:

    a. a recordable deed in normal and customary form containing the customary warranties and covenants conveying to the Company or its designee Good and Merchantable Title to the Property;

    b. a title insurance policy acceptable to the Company or an attorney's opinion of title acceptable to the Company, confirming that the Insured has and can convey to the Company Good and Merchantable Title to the Property; and

    c. Possession of the Property, but only if the Company has required such possession in writing.

5. Access to the Property, if requested by the Company under Section V.D.2.

6. A copy of the primary Claim and evidence of the payment of, and any adjustments to, the Claim under the Primary Policy, and other information related to such Primary Policy as the Company may reasonably request.

**J.**    ***Acquisition of Borrower's Title Not Required*** - The Insured will not be required to acquire Borrower's Title to a Property if (1.) the Company approves a sale of the Property prior to a foreclosure sale and such sale is closed; (2.) the Company requires an early Claim filing pursuant to Section IV.C., except that such acquisition will be required as a condition to the Insured's filing of a supplemental Claim; or (3.) the Property is acquired by someone other than the Insured at a foreclosure sale, as provided in Section IV.L., or thereafter pursuant to exercise of rights of redemption.

**K.**    ***Sale of a Property by the Insured Before End of Settlement Period***

1. The Insured must submit to the Company any offer to purchase a Property which it receives after the Company has notified the Insured that it will acquire the Property and before the end of the Settlement Period. The Company must then promptly notify the Insured that it will either (a) not approve of such offer, in which case the Company's notice to acquire the Property will remain in effect, or (b) approve such offer, in which case the Company's notice of acquisition will remain in effect, if the approved offer does not close as scheduled. The Insured shall promptly notify the Company if the approved offer does not close as scheduled.

2. If the Company has not notified the Insured that it will acquire the Property, and if the Company's right to acquire the Property has not expired pursuant to Section V.E. or has not been waived, the Insured must submit to the Company for approval any offer to purchase the Property which would be acceptable to the Insured. The Company shall then promptly either approve or not approve such offer. If the approved offer expires or is terminated, the Company shall be entitled to pay the Loss payable by (a) paying the percentage guaranty option as calculated under Section V.C.2., or (b) paying the property acquisition settlement option as calculated under Section V.C.1., and acquiring the Property; but if the Company's right to acquire the Property has expired pursuant to Section V.E., or been waived, then such acquisition shall be under the same terms and conditions as the expired or terminated offer, except for terms and conditions relating to the sale price and method of payment of the sale price, which shall instead be governed by Section V.C.

3. The following provisions shall apply to offers submitted to the Company under this Section IV.K.

    a. At the time it presents an offer, the Insured must also provide the Company with a good faith estimate of gross proceeds and expenses in sufficient detail for the Company to calculate the estimated net proceeds described below. The Company may not require any changes to the offer or direct the marketing of the Property or expenditures by the Insured for restoration of the Property as a condition to its approval.

    b. If the Company approves the offer submitted by the Insured, it must also advise the Insured of the estimated net proceeds which it has calculated. The estimated net proceeds calculated by the Company will be the estimated gross sales proceeds to be received by the Insured less all reasonable estimated expenses submitted by the Insured and approved by the Company in its approval of the offer which have been or

are expected to be paid by the Insured in obtaining and closing the sale of the Property. If the estimated net proceeds as calculated by the Company is acceptable to the Insured, the Loss payable shall be computed as determined below. If such calculation is not acceptable to the Insured, the offer shall be deemed to have not been approved by the Company.

c.   If the Company approves the offer, the Loss payable by the Company under this Section IV.K. will be the lesser of (aa) the actual net amount as calculated below, or (bb) the percentage guaranty option under Section V.C.2. without regard to a sale of the Property.

The actual net amount will be the Claim Amount calculated under Section V.B., except that (i) delinquent interest will be computed through the closing date for sale of the Property and (ii) the Claim Amount shall be reduced by the actual net proceeds realized by the Insured from the sale of the Property. The actual net proceeds will be determined in the same manner as the estimated net proceeds, but on the basis of the actual sales proceeds. For purposes of computing a Loss, such actual net proceeds shall not be less than the estimated net proceeds calculated by the Company under this subparagraph (3), or as otherwise approved by the Company.

d.   The Company shall not unreasonably withhold its approval of expenses submitted to it after its approval of an offer. Expenses paid to Persons employed or controlled by the Insured or the owner of the Loan or their internal costs will not be allowed in calculation of either the estimated or actual net proceeds.

e.   If requested by the Company, the Insured shall advise the Company of the name of the real estate broker or other Person marketing the Property and authorize such broker or other Person to release marketing information about the Property and provide access to the Property to the Company, if requested by the Company.

**L.   *Foreclosure Bidding Instructions Given by the Company*** - The Insured will be entitled to bid at the foreclosure sale held as part of the Appropriate Proceedings any amount which it determines necessary to obtain Borrower's Title to the Property, unless otherwise directed by the Company. The Company will be entitled to direct the Insured to bid an amount to be determined by the Insured within a minimum and maximum range, as follows:

1.   The minimum amount shall not be less than the fair market value of the Property or an amount required by law, but if there has been Physical Damage to the Property which affects its fair market value (as determined before such Physical Damage) by more than ten percent (10%), the fair market value of the Property shall be its fair market value after restoration of the Property.

2.   The maximum amount shall not exceed the greater of (a) the fair market value of the Property as determined under subparagraph (1) above, or (b) the estimated Claim Amount less the amount which the Company would pay as the percentage guaranty option under Section V.C.2.

3.   For purposes of this Section IV.L, fair market value shall be determined as of a date acceptable to the Company by an opinion of an independent real estate broker, or by an independent appraiser, in either case selected by or acceptable to the Company.

The Insured is not required to acquire Borrower's Title if it has bid in accordance with this Section IV.L, whether or not pursuant to directions from the Company.

**M.   *Effect of Unexpired Redemption Period on Payment of a Claim*** - If the Insured files a Claim prior to expiration of an applicable redemption period, the Loss payable shall only be computed through the date of filing of the Claim, and if the Company elects to acquire the Property, the Insured will remain responsible for management and control of the Property until the Company's acquisition thereof, which may be after expiration of the redemption period, but not later than as required by Section V.D.

If the Company has paid to the Insured a Claim under its percentage guaranty option in Section V.C.2, and the related Property is subsequently redeemed by the Borrower, the Insured shall promptly report such redemption to the Company and reimburse the Company for the amount

of the Company's Claim payment, to the extent that the sum of the Company's Claim payment and the amount realized by the Insured from the redemption exceeds the Claim Amount, as would have been calculated through the date of redemption.

**N.** *Collection Assistance* - If the Company so requests, the Insured shall permit the Company to cooperatively assist the Insured in the collection of monies due under the Loan, including obtaining information from the Borrower, attempting to develop payment schedules acceptable to the Insured, conducting Property inspections and requesting appraisals of the Property.

**O.** *Coverage Required Under Primary Policy* - Except as hereinafter provided, the Insured shall have coverage in full force and effect under a Primary Policy at the time of conveyance of the Property as described in Section V.A. of this Policy, which provides coverage against loss resulting from a Default by the Borrower.

Coverage of a Loan under a Primary Policy must remain in force until cancellation is required under applicable law or required or permitted earlier under either the Fannie Mae servicing guide or Freddie Mac servicing guide which would generally be applicable to loans serviced for Fannie Mae or Freddie Mac, as such guides were in effect on the closing of such Loan.

## V.  LOSS PAYMENT PROCEDURE

**A.** *Filing of Claim* – If there is a separate Primary Policy of such Loan, the Insured must submit and settle its claim under such Primary Policy before a Claim on such Loan may be filed under this Policy.  The Insured shall file a Claim after, but no later than sixty (60) days following, the conveyance to the Insured of Borrower's Title to the Property, or the settlement of the Claim under the Primary Policy, whichever is later. If the Insured is not required to have Borrower's Title to file a Claim for a reason described in Section IV.J., then, for purposes of the preceding requirements in which reference is made to a period of sixty (60) days following the conveyance to the Insured of Borrower's Title to the Property, in lieu of such reference shall be substituted, as applicable, (1.) sixty (60) days after the Property is conveyed in a foreclosure sale, at the foreclosure sale, or by exercise of the rights of redemption or (2.) the time specified by Section IV.C.  If the Insured fails to file a Claim within the applicable time, the Insured will not be entitled to, and the Company will not be obligated for, any payment under this Policy for amounts, including additional interest and expenses, which would otherwise be claimable, but which accrue or are incurred after the sixty (60) day period for filing of a Claim.

If the Insured fails to file a Perfected Claim within one hundred eighty (180) days after the filing of the Claim (or within such longer period of time as the Company may allow in writing), the Insured will no longer be entitled to payment of a Loss and the Company will not be obligated to make any payment under this Policy.

**B.** *Calculation of Claim Amount* - Subject to Section IV.D.2, the requirement of a Primary Policy, if any, and to the Aggregate Loss Limit then applicable, the Claim Amount will be equal to:

1.  The sum of:

    a.  The amount of unpaid principal balance due under the Loan as of the date of Default without capitalization of delinquent interest, penalties or advances; and

    b.  The amount of accrued and unpaid interest due on the Loan computed at the note rate stated in the Loan and approved by the Company at origination through the date that the Claim is filed with the Company, but excluding applicable late charges, penalty interest or other changes to the interest rate by reason of Default; and

    c.  The amount of advances incurred by the Insured under Section IV.H. prior to filing of the Claim (except to Persons employed or controlled by the Insured or the owner of the Loan or their other internal costs) provided that:

        i.  Attorney's fees advanced for completion of Appropriate Proceedings and obtaining Possession of the Property will not be allowed to the extent they exceed three percent (3%) of the sum of the unpaid principal balance and the accrued and accumulated interest due; and

    ii.   Such advances, other than attorney's fees, must have first become due and payable after the Default, and payment of such advances must be prorated through the date the Claim is filed with the Company.

2.   Minus the sum of:

    a.   The amount of all rents and other payments (excluding proceeds of a sale of the Property and the proceeds of fire and extended coverage insurance) collected or received by the Insured, which are derived from or in any way related to the Property; and

    b.   The amount of cash remaining in any escrow account as of the last payment date; and

    c.   The amount of cash or other collateral to which the Insured has retained the right of possession as security for the Loan; and

    d.   The amount paid under applicable fire and extended coverage policies which are in excess of the cost of restoring and repairing the Property, if the Property is damaged, and which has not been paid to the Borrower or applied to the payment of the Loan as required by the terms of the Loan; and

    e.   The estimated cost to repair Physical Damage to the Property, if more than fifteen hundred dollars ($1,500.00), but only if the Company elects to settle the Claim pursuant to Section V.C.1. and the Insured does not elect to perform such repairs; and

    f.   The amount expended by the Insured for advances not authorized by Section IV.H; and

    g.   The amount of any payments of Loss previously made by the Company on the Loan; and

    h.   If the coverage under this Policy was paid for in a single premium that was financed at origination and included in the original amount of the Loan, the amount of the single premium so financed; and

    i.   The greater of the amount of any claim payment pursuant to a Primary Policy which the Insured received, or which the Insured should have received in order for the exclusion under Section III.M. of this Policy not to have applied; and

    j.   Any other amounts claimed by the Insured to the extent they are excluded from the Claim Amount by reason of Section III.

**C.**   **Payment of Loss; Company's Options** - Within the Settlement Period, but only if the Insured has satisfied all requirements for a payment of Loss and if the Company has received a Perfected Claim, the Company shall at its sole option exercise its:

1.   Property Acquisition Settlement Option. Pay to the Insured as the Loss the Claim Amount calculated in accordance with Section V.B. for the Company's acquisition of the Property; or

2.   Per Loan Loss Percentage Option. In the event the Company does not acquire the Property, allow the Insured to retain all rights and title to the Property and pay to the Insured as the Loss the lesser of: (a) the difference between the Claim Amount calculated in accordance with Section V.B. and the amount realized by the Insured pursuant to its sale, if any, of the Property as provided in Section IV.K.; or (b) the Per Loan Loss Percentage option which shall be calculated by multiplying the  Per Loan Loss Percentage for such Loan based on its Net Original LTV (or the Per Loan Loss Percentage as otherwise shown on the face of this Policy) times the Claim Amount (without any reduction for the Primary Policy Claim payment) pursuant to Section V.B.2.(i).

However, if prior to the Company's payment of the Loss, a third party acquires title to the Property at the foreclosure sale or a Borrower redeems the Property (unless such acquisition or redemption occurs because the Insured failed to bid as provided in Section IV.L.), then the Company shall pay the lesser of: (a) the Per Loan Loss Percentage option amount described above; or (b) the difference between the Claim Amount and the amount realized by the Insured at the foreclosure sale or redemption; or

3. Pre-Claim Sale Option. Pay to the Insured as the Loss the amount calculated in accordance with Section IV.K, if the terms and conditions of Section IV.K. are met.

In addition to the sum due pursuant to the option described above which the Company selects, the Loss payable by the Company will include the other amounts provided for under Sections V.E. or IV.I. when such Sections are applicable. The Company will deduct from its payment of Loss such amounts as may be permitted by this Policy and the aggregate amounts of any payments of Loss which it had previously made. In the event of a Loss on a Loan with renewal premiums due monthly, which results from a Default covered under Section II.F., the Company shall deduct from the payment of Loss an amount equal to any unpaid renewal premiums for the subject Loan through the end of the monthly renewal period in which such Default occurred.

In addition to the sum due pursuant to the option described above which the Company selects, if the coverage under this Policy was paid for in a single premium that was financed at origination and included in the original amount of the Loan, the Loss payable by the Company will include the amount of the single premium so financed.

When the Aggregate Loss paid by the Company under this Policy is an amount equal to the Aggregate Loss Limit, the liability of the Company to pay any additional Claims for Losses ceases until the Aggregate Loss is reduced below the Aggregate Loss Limit, at which time this Section V.C. will again apply to any previously Perfected Claims.

Without limiting the requirements and conditions to filing and payment of a Claim contained in this Policy, if the Property has been acquired by the insurer under a Primary Policy, no Loss shall be payable under this Policy. For purposes of this Policy any references to "percentage guaranty option" shall be to the "Per Loan Loss Percentage guaranty option".

**D.** ***Calculation of Settlement Period*** -The Settlement Period will be a period after the Company's receipt of a Claim, calculated as follows:

1. No later than the twentieth (20th) day after filing of a Claim, the Company may notify the Insured of additional documents or information which it requires for processing the Claim. The sixty (60) day period will be suspended until the Company receives such additional documents and information. The Company may request additional documents and information after such twenty (20) day period, and the Insured must use reasonable efforts to satisfy such request.

2. No later than the sixtieth (60th) day after filing of a Claim, the Company may notify the Insured that it will require access to the Property sufficient to inspect, appraise and evaluate the Property. If the Company does not notify the Insured by that date, its right to such access will be deemed waived. If such notice is given, the Insured will use its best efforts to provide access to the Company and, if access is not then available, the sixty (60) day period will be suspended from the date such notice was given until the Company receives notice from the Insured that access is available to it. If access is in fact not available when sought by the Company after such notice from the Insured, the Company will promptly notify the Insured of such unavailability, and the passage of the sixty (60) day period will remain suspended as if the Insured's notice of availability had not been given to the Company.

3. If the Company has elected to acquire the Property in settlement of a Claim, the sixty (60) day period also will be suspended if necessary for there to be a period of ten (10) days after the date on which the Insured satisfies all conditions to acquisition, including any required restoration of the Property, for the Insured's delivery of a recordable deed and title policy or opinion evidencing Good and Merchantable Title (not subject to any rights of redemption, unless the Company waives such requirement) and, if applicable, delivery of Possession of Property.

4. If the sixty (60) day period is suspended for more than one reason, the resulting suspended periods will only be cumulative if in fact they occur at different times; to the extent they occur simultaneously, they will not be cumulative.

5. This period may be extended an additional one hundred twenty (120) days, upon written instructions to the Insured to pursue a sale of the Property at a price determined by the Company.  Should the Company elect this extension, the payment of Loss will be made in accordance with Section V.E.

E. **Payment by the Company After the Settlement Period** - If the Company has not paid a Loss during the period as defined in Section V.D., then (1.) the Company will include in its payment of Loss, if a Loss is ultimately payable, simple interest on the amount payable accruing sixty (60) days after receipt of a Perfected Claim for Loss to the date of payment of Loss at the applicable interest rate or rates which would have been payable on the Loan during such period, and (2.) the Company will no longer be entitled to acquire the Property as an option for payment of the Loss.

The Company must either pay the amount of applicable Loss (including any additional applicable interest as computed above) or deny the Claim in its entirety within one hundred eighty (180) days after filing a Perfected Claim. If at a later date it is finally determined by agreement between the Insured and the Company (or by completion of legal or other proceedings to which the Insured and the Company are parties) that the Company was not entitled to deny all or a portion of the Claim, the Company will include in any resulting subsequent payment of Loss interest as calculated above through the date of such payment on the amount of Loss which the Company was not entitled to deny.

F. **Discharge of Obligation** - Payment or settlement by the Company of the amount of Loss required to be paid in accordance with this Policy will be a full and final discharge of its obligation with respect to such Loss under this Policy.


VI.   **ADDITIONAL CONDITIONS**

A. **Proceedings of Eminent Domain** - In the event that part or all of the Property is taken by eminent domain, condemnation or by any other proceedings by a federal, state or local governmental unit or agency, the Insured shall require that the Borrower apply the maximum permissible amount of any compensation awarded in such proceedings to reduce the principal balance of the Loan, in accordance with the law of the jurisdiction where the Property is located.

B. **Subrogation**

1.   Subject to Section VI.N.1., and only to the extent that the Company is entitled under applicable law to pursue such deficiency rights, the Company will be subrogated, upon payment of the Loss, in the amount thereof and with an equal priority to all of the Insured's rights of recovery against a Borrower and any other Person relating to the Loan or to the Property. The Insured must execute and deliver at the request of the Company such instruments and papers and undertake such actions as may be necessary to transfer, assign and secure such rights. The Insured shall refrain from any action, either before or after payment of a Loss, that prejudices such rights.

2.   The execution by the Insured of a release or waiver of the right to collect the unpaid balance of a Loan shall release the Company from its obligation under its Certificate to the extent and amount of said release or waiver, anything in this Policy to the contrary notwithstanding.

3.   If the property consists of a single family dwelling occupied by the Borrower, the Company will waive any rights of recovery against the Borrower and the Borrower shall not be liable to the Company for any loss paid by or deficiency suffered by the Company.

C. **Notice** - All claims, premium payments, tenders, reports, other data and any other notices required to be submitted to the Company by the Insured must be sent to the Company at P.O. Box 2300, Winston-Salem, NC 27102. The Company may change this address by giving written notice to the Insured. Unless the Insured otherwise notifies the Company in writing, all notices to the Insured must be sent to the address on the face of this Policy or, if the Insured is not located at such address, to the last known address of the Insured.

All notices under this Policy, whether or not identified in this Policy as required to be in writing, will be effective only if in writing and only upon receipt thereof. Written notices may instead be given, if acceptable to the Company (for notices given to the Company) or to the Insured (for notices given to the Insured), in the form of facsimile, computer tape, computer-generated or any other electronic message. A facsimile or such tape or message shall be effective only when received. The Company and the Insured may mutually agree that notices will be sent to any additional Person. Except as expressly agreed to by the Company and

the Insured, no liability shall be incurred by the Company for the failure to give a notice to a Person other than the Insured.

**D.**   ***Reports and Examinations***  - The Company may request, and the Insured must provide or direct its Servicer to provide, such files, reports or information as the Company may deem necessary pertaining to any Loan, and the Company will be entitled to review  the files, books and records of the Insured  pertaining to such Loan, at mutually convenient times and places. In the event of regulatory review, such files, reports or information will be provided as soon as practically possible.

**E.**   ***Applicable Law and Conformity to Law*** - All matters under this Policy will be governed by and construed in accordance with the laws of the jurisdiction in which the office of the original Insured on a Certificate is located. Any provision of this Policy which is in conflict with any provision of the law of such jurisdiction is hereby amended to conform to the provisions required by that law.

**F.**   ***No Agency*** - Neither the Insured, any Servicer, or any of their employees or agents (including the Persons underwriting the Loan on behalf of the Insured) will be deemed for any reason to be agents of the Company. Neither the Company, or any of its employees or agents, will be deemed for any reason to be agents of any Insured or Servicer.

**G.**   ***Policy for Exclusive Benefit of the Insured and the Owner*** - A commitment and Certificate issued as the result of any Application submitted hereunder and the coverage provided under this Policy will be for the sole and exclusive benefit of the Insured and the owner of the related Loan, and in no event will any Borrower or other Person be deemed a party to, or an intended beneficiary of, this Policy or any Certificate.

**H.**   ***Effect of Borrower Insolvency or Bankruptcy on Principal Balance*** - If under applicable insolvency or bankruptcy law, a Loan's principal balance secured by a Property is reduced (after all appeals of such reduction are final or the time for such appeals has lapsed without appeal), the portion of such principal balance of the Loan not secured by the Property, and related interest, will be includable in the Claim Amount, as provided in this Section VI.H.

If a Default occurs on the Loan, the Insured has acquired Borrower's Title or Good and Merchantable Title to the Property as required by this Policy, and all other requirements for filing of a Claim are complied with, the Insured will be entitled to include in the Claim Amount (1.) the amount of the principal balance of the Loan which was deemed unsecured under applicable insolvency or bankruptcy law, less any collections or payments on such unsecured principal balance received by the Insured, and (2.) interest thereon at the rate and as computed in Section V.B., from the date of Default giving rise to the Claim (but for no prior period). In no event will any expenses or other amounts associated with the amount by which the principal balance of the Loan became unsecured be includable in the Claim Amount, directly or by an addition to the principal balance includable in the Claim Amount.

**I.**   ***Arbitration of  Disputes; Suits and Actions Brought by the Insured***

1.   Upon  mutual consent unless prohibited by applicable law, all controversies, disputes or other assertions of liability or rights arising out of or relating to this Policy, including the breach, interpretation or construction thereof, shall be settled by arbitration, provided however, that such consent of a party is in its sole discretion and the failure of a party to provide consent to arbitration shall not be a basis of complaint hereunder.  Notwithstanding the foregoing, the Company or the Insured both retain the right to seek a declaratory judgment from a court of competent jurisdiction on matters of interpretation of the Policy. Such arbitration shall be conducted in accordance with the Title Insurance Arbitration Rules of the American Arbitration Association in effect on the date the demand for arbitration is made, or if such Rules are not then in effect, such other Rules of the American Arbitration Association as the Company may designate as its replacement.

The arbitrator(s) shall be neutral person(s) selected from the American Arbitration Association's National Panel of Arbitrators familiar with the mortgage lending or mortgage guaranty insurance business. Any proposed arbitrator may be disqualified during the selection process, at the option of either party, if they are, or during the previous two (2) years have been, an employee, officer or director of any mortgage guaranty insurer, or of

any entity engaged in the origination, purchase, sale or servicing of mortgage loans or mortgage-backed securities.

2. No suit or action (including arbitration hereunder) brought by the Insured against the Company with respect to the Company's liability for a Claim under this Policy shall be sustained in any court of law or equity or by arbitration unless the Insured has substantially complied with the terms and conditions of this Policy, and unless the suit or action is commenced within three (3) years (four (4) years in Texas, five (5) years in Florida or Kansas) after the Insured has acquired Borrower's Title to the Property or sale of the Property approved by the Company is completed, whichever is applicable to a Loan. No such suit or action with respect to a Claim may be brought by the Insured against the Company until sixty (60) days after such acquisition of Borrower's Title or sale, as applicable to a Loan.

3. If a dispute arises concerning the Loan which involves either the Property or the Insured, the Company has the right to protect its interest by defending the suit, even if the allegations contained in such suit are groundless, false or fraudulent. The Company is not required to defend any lawsuit involving the Insured, the Property or the Loan.

**J.** *Release of Borrower; Defenses of Borrower* - The Insured's execution of a release or waiver of the right to collect any portion of the unpaid principal balance of a Loan or other amounts due under the Loan will release the Company from its obligation under its Certificate to the extent and amount of said release. If, under applicable law, the Borrower successfully asserts defenses which have the effect of releasing, in whole or in part, the Borrower's obligation to repay the Loan, or if for any other reason the Borrower is released from such obligation, the Company will be released to the same extent and amount from its liability under this Policy, except as provided by Section VI.H.

**K.** *Amendments; No Waiver; Rights and Remedies; Use of Term "Including"*

1. The Company reserves the right to amend the terms and conditions of this Policy from time to time; provided, however, that any such amendment will be effective only after the Company has given the Insured written notice thereof by endorsement setting forth the amendment.

2. No condition or requirement of this Policy will be deemed waived, modified or otherwise compromised unless that waiver, modification or compromise is stated in a writing properly executed on behalf of the Company. Each of the conditions and requirements of this Policy is severable, and a waiver, modification or compromise of one will not be construed as a waiver, modification or compromise of any other.

3. No right or remedy of the Company provided for by this Policy will be exclusive of, or limit, any other rights or remedies set forth in this Policy or otherwise available to the Company at law or equity.

4. As used in this Policy, the term "include" or "including" will mean "include or including, without limitation."

**L.** *Successors and Assigns -* This Policy will inure to the benefit of and shall be binding upon the Company and the Insured and their respective successors and permitted assigns*.*

**M.** *Electronic Media -* The Company and the Insured may, from time to time, deliver or transfer information, documents or other data between them by electronic media acceptable to them. In addition, the Company and the Insured may maintain information, documents or other data on electronic media or other media generally accepted for business records. Such electronic or other media will be as equally acceptable for all purposes between the Insured and the Company as information, documents or other data maintained in printed or written form.

**N.** *Pursuit of Deficiencies*

1. The Insured will be entitled to pursue Appropriate Proceedings, or shall at the direction of the Company pursue Appropriate Proceedings through the end of the Settlement Period, which may result in the Borrower becoming liable for a deficiency after completion of the Insured's acquisition of a Property.

2. The following provisions will apply if, in completing Appropriate Proceedings there are additional expenses advanced pursuant to Section IV.H. or additional interest accrued on the Loan, due to (a) an additional redemptive period or a delay in acquisition of Borrower's Title, which period or delay is directly related to establishing the deficiency judgment or (b) legal proceedings which are necessary to establish and pursue the deficiency judgment and which would not otherwise be the custom and practice used.

   i. If the deficiency judgment is to be established, in whole or in part, for the account of the Company, the Company must pay the Insured at the time of payment of the Claim, regardless of which settlement option the Company has selected, the full amount of:

      aa. such additional expenses advanced pursuant to Section IV.H. by the Insured; and

      bb. such additional interest accrued on the unpaid principal balance of the Loan at the note rate stated in the Loan, but excluding applicable late charges, penalty interest, or other changes to the interest rate by reason of Default.

   ii. If the deficiency judgment is not to be established, in whole or in part, for the account of the Company, none of the additional interest or expenses of the type described in subparagraph (i) above will be includable in the Claim Amount or payable at any time by the Company.

   iii. For purposes of determining the additional expenses described in subparagraph (i) above resulting from pursuing the deficiency judgment, the limitation on attorneys' fees in Section V.B. will not apply.

   iv. All of the additional interest, expenses, attorney's fees and court expenses described in subparagraph (i) above will be accrued or advanced only through acquisition of Borrower's Title, including any additional redemptive period.

3. The Company and the Insured may agree generally or with respect to a Loan to different terms and conditions than set forth in this Section VI.N. The Company and the Insured also may agree to the joint pursuit or other arrangements for the collection of deficiency judgments on mutually acceptable terms and conditions.

## DEDUCTIBLE ENDORSEMENT

This Endorsement applies to all Certificates issued under the Master Policy to which it is attached.

1. The first sentence of I. Definitions, A. Aggregate Loss is amended by adding after the phrase "paid by the Company" the following phrase:

   "and the deductible losses charged to the deductible amount under any endorsement to this Policy,"

2. A new provision is added to V. Loss Payment Procedure as follows.

   **G.     Deductible Losses**

   Notwithstanding any other provision of this Policy, the Company shall have no liability to pay any Loss until, and except to the extent that, the aggregate amount of the deductible losses (as calculated below) shall exceed the deductible amount set forth in this Policy.  The Insured shall remain responsible for all deductible losses up to the deductible amount.

   The deductible losses shall be calculated in the same manner as a Loss under V.C. Payment of Loss: Company's Options of this Policy.  A deductible loss shall only be charged to the deductible amount if a Claim for Loss would have been payable by the Company.  The Insured shall comply with all of the requirements of this Policy which would be applicable if the Company were paying a Claim for Loss, including, the requirements of IV.G. Mitigation of Damages relating to the mitigation of the Company's Loss. The Insured shall file a notice of deductible loss with the Company at the same time and in the same manner as it would file a Claim for Loss and the Company shall process the notice and determine the amount of the deductible loss as it would a Claim for Loss, and the deductible loss shall be charged to the deductible amount.  The Company shall advise the Insured of its calculation of the deductible loss within sixty (60) days after filing of the notice of deductible loss by the Insured.

To the extent of any inconsistency or conflict between the terms of the Policy and this Endorsement, this Endorsement will control and all terms capitalized in this Endorsement will have the meanings set forth in the Policy, except as otherwise defined herein.

Attaching to and forming part of Policy No._____ issued to
_____.

TRIAD·GUARANTY·INSURANCE·CORPORATION

President                              Secretary

_____
Authorized·Representative

July 12, 2005


Ms. Michelle Sjolander
Senior Vice President
Countrywide Home Loans, Inc.
4500 Park Granada Rd.
MS CH-58
Calabasas, CA  91302

RE:     Master Commitment #:  T05012783
        Seller/Servicer #:  204305, 979500, 127797, 125949, and 130839

Dear Ms. Sjolander:

Enclosed is an Amendment to the above-referenced Master Commitment (the "Agreement").

If you have any questions, please contact Mr. James Hunter, your Senior Account Manager at 703-908-5893 or Ms. Laurene Loo, your Senior Customer Relations Representative at 818-710-3056.


Sincerely,


Charles S. Coulter
Vice President National Lending
Single Family Sourcing


Enclosure

cc: Mr. David Marusa
    Mr. Gregory Togneri
    Mr. George Lopez

cka/204305_T05012783/SCFK-6DTRJN/JM/2005-20

**AMENDMENT TO**
**MASTER COMMITMENT #T05012783**

This Amendment, dated as of July 12, 2005, amends certain provisions of Master Commitment #T05012783 (the "Master Commitment") dated February 1, 2005, by and between Freddie Mac and Countrywide Home Loans, Inc., Seller/Servicer #204305 ("Seller").

I.      Section I, paragraph 2 titled "Required Delivery Date" is hereby deleted in its entirety and the following new language is inserted in lieu thereof:

      1.      <u>Required Delivery Date</u>.  July 31, 2005.

II.     Section II, paragraph 1 titled "Required Spreads" is hereby deleted in its entirety and the following new language is inserted in lieu thereof:

      1.      <u>Required Spreads</u>.  The Required Spreads applicable Mortgages sold under this Master Commitment will be adjusted on a monthly basis as follows:

            (a)     The Required Spreads applicable to Mortgages with Settlement Dates during February 2005 are:

| | |
|---|---|
| • 20- and 30-year fixed-rate Mortgages | 31.8 basis points |
| • 15-year fixed-rate Mortgages | 37.9 basis points |
| • ARMs | 41.8 basis points |

            (b)     The Required Spreads applicable to Mortgages with Settlement Dates during March, April, May and June 2005 will be determined as follows:

                  (i)     the Required Spreads for 20- and 30-year fixed-rate Mortgages, 15-year fixed rate Mortgages, and ARMs will be based upon Seller's estimate of certain loan characteristics of the Mortgages to be sold each month.  The loan characteristics are documentation type, FICO score and/or LTV ratio.  The loan characteristics are categorized into four "risk buckets" as follows:

| Risk Bucket # | Applicable SCC Code | Doc Type | Applicable FICO Score and/or TLV ratio |
|---|---|---|---|
| 1 | G9 | Full/Alt Doc | ≥680 FICO |
| 2 | G10 | Full/Alt Doc | <680 FICO |
| | | Low Doc | ≥700 FICO and <90% LTV |
| | | No Doc | ≥720 FICO and LTV <75% LTV |
| 3 | G11 | Low Doc | < 700 FICO and <90% LTV |
| | | No Doc | ≥720 FICO and <90% but ≥75% LTV |
| 4 | G12 | Low Doc | LTV ≥90% |
| | | No Doc | <720 FICO or ≥90% LTV |

(ii)     During the months of February and March, the risk buckets will be assigned the following indication required spreads for 15-, 20- and 30-year fixed-rate Mortgages, and indication base required spreads (that is, the required spreads net of delivery fee values) for ARMs:

| Risk Bucket | Indication Required Spread for 20- and 30-year fixed-rate Mortgages | Indication Required Spread for 15-year fixed-rate Mortgages | Indication Base Required Spread for ARMs |
|---|---|---|---|
| 1 | 20 bps | 17 bps | 18 bps |
| 2 | 40 bps | 35 bps | 21 bps |
| 3 | 56 bps | 41 bps | 32 bps |
| 4 | 68 bps | 49 bps | 49 bps |

By no later than March 13, 2005, Freddie Mac will forward Seller the indication required spreads assigned to the various risk buckets that will be applicable to Mortgages with Settlement Dates during April, May and June 2005.

(iii)    Prior to the first Delivery Date of each month, Seller must notify Freddie Mac of the aggregate unpaid principal balance of 20- and 30-year fixed rate Mortgages, 15-year fixed-rate Mortgages and ARMs to be delivered to Freddie Mac during the month, as well as the concentrations of each risk bucket of each such mortgage product.  Additionally, prior to the first Delivery Dates in February and March 2005, Seller must provide Freddie Mac with the estimated delivery fees applicable to the ARMs.

(iv)   Freddie Mac will determine the Required Spreads applicable to 20- and 30-year fixed rate Mortgages, 15-year fixed-rate Mortgages and ARMs based upon the concentration of mortgage products within each risk bucket and the indication required spread applicable to each risk bucket.

(v)   Two Business Days after Freddie Mac receives the information described in subparagraph 1(b)(iii) above, Freddie Mac will notify Seller electronically and by telephone (at an e-mail address and a telephone number provided by Seller to Freddie Mac) of the Required Spreads applicable to 20- and 30-year fixed rate Mortgages, 15-year fixed-rate Mortgages and ARMs having Settlement Dates within the month specified.  The Required Spread provided to Seller in the manner described in this paragraph will be deemed to amend and supplement this Master Commitment as fully as if the parties hereto had executed an amendment to this Master Commitment.

(vi)   Seller agrees it will use it best efforts to fulfill each conversion and will not, after receiving the Required Spreads, take out conversions that (A) relate to Mortgages subject to previous conversions and (B) that have Settlement Dates in the outside of the specified month, to take advantage of a change in the Required Spreads.  If Seller fails to fulfill its conversions, Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, upon notice to Seller during the term of this Master Commitment.

(c)   The Required Spreads applicable to Mortgages with Settlement Dates during July 2005 are:

- 20- and 30-year fixed-rate Mortgages       49.3 basis points
- 15-year fixed-rate Mortgages       28.4 basis points
- ARMs       37.5 basis points

The Required Spreads for July 2005 are based upon the concentration of mortgage products within each risk bucket as described in subparagraph 1(b)(i) above, and the indication required spread applicable to each risk bucket shown below:

| Risk Bucket | Indication Required Spread for 20- and 30-year fixed-rate Mortgages | Indication Required Spread for 15-year fixed-rate Mortgages | Indication Base Required Spread for ARMs |
|---|---|---|---|
| 1 | 38 bps | 17 bps | 26.6 bps |
| 2 | 45 bps | 35 bps | 36.5 bps |
| 3 | 56 bps | 43 bps | 48.7 bps |
| 4 | 65 bps | 49 bps | 49.9 bps |

Seller agrees it will use it best efforts to fulfill each conversion having a Settlement Date in July 2005 and will not take out conversions that (A) relate to Mortgages subject to previous conversions and (B) that have Settlement Dates in months other than July 2005, to take advantage of the change in the Required Spread

III.    Subparagraph 2(g) of Exhibit A of the Master Commitment titled "Pool Insurance Attachment", is hereby deleted in its entirety and the following new language is inserted in lieu thereof:

(g)    "Policy Termination Date" means July 31, 2015.

IV.    All other provisions of the Master Commitment remain in full force and effect.

August 25, 2005


Ms. Michele Sjolander
Senior Vice President
Counrtywide Home Loans, Inc.
4500 Park Granada
Calabasas, CA  91302

RE:     Master Commitment #:  T05012783
        Seller/Servicer #:  204305

Dear Ms. Sjolander:

Enclosed are one original and one duplicate copy of a Master Commitment Amendment together
with any applicable attachments.

In order to accept and confirm the terms of Freddie Mac's offer, you must sign the original Master
Commitment in the space provided.  **Please fax the signature page to the number below by 3:00
p.m., August 26, 2005**.  Please send the signed copy to the address below by Monday,
August 29, 2005.

        Federal Home Loan Mortgage Corporation
        Attn:  Ms. Cindy Abad, Contract Specialist
        21700 Oxnard Street, Suite 1900
        Woodland Hills, CA  91367
        **Fax Number:  818-710-3045**

If you have any questions, please contact Mr. James Hunter, your National Account Manager at
703-981-5893 or Ms. Laurene Loo, your Senior Customer Relations Representative at
818-710-3056.

Sincerely,

Charles S. Coulter
Vice President National Lending
Single Family Sourcing

Enclosures

cc:  Mr. Gregory Togneri
     Mr. George Lopez
     Mr. David Marusa

cka/204305_T05012783/SCFK-6ERV6W/JH/2005-27

## AMENDMENT TO
## MASTER COMMITMENT #T05012783

This Amendment, dated as of August 25, 2005, amends certain provisions of Master Commitment #T05012783 (the "Master Commitment") dated February 16, 2005, by and between Freddie Mac and Countrywide Home Loans, Inc., Seller/Servicer #204305 ("Seller"), and supercedes that certain Amendment to Master Commitment dated July 12, 2005.

I.      Section I, paragraph 2 titled "Required Delivery Date" is hereby deleted in its entirety and the following new language is inserted in lieu thereof:

      2.      <u>Required Delivery Date</u>.  August 31, 2005.

II.     Section II, paragraph 1 titled "Required Spreads" is hereby deleted in its entirety and the following new language is inserted in lieu thereof:

      1.      <u>Required Spreads.</u>  The Required Spreads applicable Mortgages sold under this Master Commitment will be adjusted on a monthly basis as follows:

          (a)     The Required Spreads applicable to Mortgages with Settlement Dates during February 2005 are:

- 20- and 30-year fixed-rate Mortgages          31.8 basis points
- 15-year fixed-rate Mortgages                  37.9 basis points
- ARMs                                          41.8 basis points

          (b)     The Required Spreads applicable to Mortgages with Settlement Dates during March, April, May and June 2005 will be determined as follows:

              (i)     the Required Spreads for 20- and 30-year fixed-rate Mortgages, 15-year fixed rate Mortgages, and ARMs will be based upon Seller's estimate of certain loan characteristics of the Mortgages to be sold each month.  The loan characteristics are documentation type, FICO score and/or LTV ratio.  The loan characteristics are categorized into four "risk buckets" as follows:

| Risk Bucket # | Doc Type | Applicable FICO Score and/or TLV ratio |
|---|---|---|
| 1 | Full/Alt Doc | $\geq$680 FICO |
| 2 | Full/Alt Doc | <680 FICO |
|   | Low Doc | $\geq$700 FICO and <90% LTV |
|   | No Doc | $\geq$720 FICO and LTV <75% LTV |
| 3 | Low Doc | < 700 FICO and <90% LTV |
|   | No Doc | $\geq$720 FICO and <90% but $\geq$75% LTV |
| 4 | Low Doc | LTV $\geq$90% |
|   | No Doc | <720 FICO or $\geq$90% LTV |

(ii)    During the months of February and March, the risk buckets will be assigned the following indication required spreads for 15-, 20- and 30-year fixed-rate Mortgages, and indication base required spreads (that is, the required spreads net of delivery fee values) for ARMs:

| Risk Bucket | Indication Required Spread for 20- and 30-year fixed-rate Mortgages | Indication Required Spread for 15-year fixed-rate Mortgages | Indication Base Required Spread for ARMs |
|---|---|---|---|
| 1 | 20 bps | 17 bps | 18 bps |
| 2 | 40 bps | 35 bps | 21 bps |
| 3 | 56 bps | 41 bps | 32 bps |
| 4 | 68 bps | 49 bps | 49 bps |

By no later than March 13, 2005, Freddie Mac will forward Seller the indication required spreads assigned to the various risk buckets that will be applicable to Mortgages with Settlement Dates during April, May and June 2005.

(iii)   Prior to the first Delivery Date of each month, Seller must notify Freddie Mac of the aggregate unpaid principal balance of 20- and 30-year fixed rate Mortgages, 15-year fixed-rate Mortgages and ARMs to be delivered to Freddie Mac during the month, as well as the concentrations of each risk bucket of each such mortgage product.  Additionally, prior to the first Delivery Dates in February and March 2005, Seller must provide Freddie Mac with the estimated delivery fees applicable to the ARMs.

(iv)    Freddie Mac will determine the Required Spreads applicable to 20- and 30-year fixed rate Mortgages, 15-year fixed-rate Mortgages and ARMs based upon the concentration of mortgage products

within each risk bucket and the indication required spread applicable to each risk bucket.

(v)     Two Business Days after Freddie Mac receives the information described in subparagraph 1(b)(iii) above, Freddie Mac will notify Seller electronically and by telephone (at an e-mail address and a telephone number provided by Seller to Freddie Mac) of the Required Spreads applicable to 20- and 30-year fixed rate Mortgages, 15-year fixed-rate Mortgages and ARMs having Settlement Dates within the month specified.  The Required Spread provided to Seller in the manner described in this paragraph will be deemed to amend and supplement this Master Commitment as fully as if the parties hereto had executed an amendment to this Master Commitment.

(c)     The Required Spread applicable to fixed-rate Mortgages and ARMs with Settlement Dates during July and August 2005 will be determined as follows:

(i)     the Required Spreads for fixed-rate Mortgages and ARMs will be based upon the concentration of mortgage products within each risk bucket as described in subparagraph 1(b)(i) above, and the indication Required Spread applicable to each risk bucket as follows;

| *Mortgages with Settlement Dates in July* | | | |
|---|---|---|---|
| *Risk Bucket* | *Indication Required Spread for 20- and 30-year fixed-rate Mortgages* | *Indication Required Spread for 15-year fixed-rate Mortgages* | *Indication Required Spread for ARMs* |
| 1 | 38 bps | 17 bps | 26.6 bps |
| 2 | 45 bps | 35 bps | 36.5 bps |
| 3 | 56 bps | 43 bps | 48.7 bps |
| 4 | 65 bps | 49 bps | 49.9 bps |
| *Mortgages with Settlement Dates in August* | | | |
| 1 | 38 bps | 17 bps | 22 bps |
| 2 | 45 bps | 37.5 bps | 42 bps |
| 3 | 56 bps | 43 bps | 44 bps |
| 4 | 65 bps | 49 bps | 45 bps |

(ii)    Seller estimates that, based on the concentration of mortgage products within each risk bucket, the weighted average Required Spreads for the Mortgages will be as follows:

| Type of Mortgage Product | Estimated Required Spread for Settlement Dates in July | Estimated Required Spread for Settlement Dates in August |
|---|---|---|
| 20- and 30-year fixed-rate Mortgages | 49.3 bps | 45.9 |
| 15-year fixed-rate Mortgages | 28.4 bps | 30.9 bps |
| ARMs | 37.5 bps | 40.9 bps |

    (d)    Seller agrees it will use it best efforts to fulfill each conversion and will not, after receiving the Required Spreads, take out conversions that (A) relate to Mortgages subject to previous conversions and (B) that have Settlement Dates in the outside of the specified month, to take advantage of a change in the Required Spreads.  If Seller fails to fulfill its conversions, Freddie Mac may amend, supplement, revise or terminate any of the provisions of this paragraph, in whole or in part, upon notice to Seller during the term of this Master Commitment.

III.    Subparagraph 2(g) of Exhibit A of the Master Commitment titled "Pool Insurance Attachment", is hereby deleted in its entirety and the following new language is inserted in lieu thereof:

    (a)    "Policy Termination Date" means July 31, 2015.

IV.    All other provisions of the Master Commitment remain in full force and effect.

IN WITNESS WHEREOF, Seller and Freddie Mac have caused this Master Commitment to be duly executed by their respective authorized representatives as of the date first set forth above.

**FEDERAL HOME LOAN MORTGAGE CORPORATION**

By:

Charles S. Coulter
Vice President National Lending
Single Family Sourcing

**COUNTRYWIDE HOME LOANS, INC.**

By:

Name: michele Sjolander

Title: EVP

Date: 8-30-05

**Reference:**
cka/204305_T05012783/SCFK-6ERV6W/JH/2005-27

## MASTER COMMITMENT AMENDMENTS
### #T05083183, T05012783, T05012883

This Master Commitment Amendment, dated as of October 23, 2006 (this "Amendment"), by and between Freddie Mac and Countrywide Home Loans, Inc., Seller/Servicer #204305 ("Seller"), amends the following Master Commitments:

- Master Commitment #T05083183, dated September 28, 2005 and having a Required Delivery Date of December 31, 2005,
- Master Commitment #T05012783, dated February 1, 2005 and having a Required Delivery Date of June 30, 2005, and
- Master Commitment #T05012883, dated February 1, 2005 and having a Required Delivery Date of June 30, 2005

(collectively, the "Master Commitments").  Terms not otherwise defined herein have the meanings ascribed to them in the Master Commitments.

### Background Information

Under the terms of the Master Commitments, Seller sold to Freddie Mac and Freddie Mac purchased from Seller Alt A Mortgages originated under the terms of the Master Agreement and the Master Commitments.  The Required Spreads applicable to the Alt A Mortgages were determined each month on the basis of certain characteristics of the Mortgages, consisting of documentation type, FICO score and LTV ratios.  Prior to the Settlement Date of the Mortgages, Seller was required to provide Freddie Mac with Seller's estimate of the concentrations of the loan characteristics of the Alt A Mortgages Seller expected to deliver; and based on such information, Freddie Mac provided Seller with the indication Required Spread for the Alt A Mortgages.

Freddie Mac and Seller acknowledge that Seller's estimate of the concentrations of the loan characteristics of the Alt A Mortgages Seller expected to deliver during any particular period was not always the same as the actual concentrations of loan characteristics of the Alt A Mortgage Seller actually delivered.  Accordingly, in some cases the indication Required Spread was higher and in some cases it was lower than the actual Required Spread should have been based on the concentrations of Alt A Mortgages actually sold to Freddie Mac by Seller.

**Terms of Amendment**

1.      Freddie Mac and Seller agree to waive reconciliation of the indication Required Spreads and the actual Required Spreads with respect to the Alt A Mortgages sold under the Master Commitments, and further agree that no settle-up of any discrepancies between the indication Required Spreads and the actual Required Spreads will be required.

2.      Freddie Mac and Seller agree that all other terms of the Master Commitments remain in full force and effect.

In order to accept and confirm the terms of Freddie Mac's offer, you must sign the original in the space provided and then fax the signature page by **12:00 P.M. Eastern Time Monday, October 30, 2006**, to:

> Federal Home Loan Mortgage Corporation
> Attn: Ms. Jennifer Lueth, contract Specialist
> **Fax Number: 312-407-7398**

If you have any questions, please contact Mr. James Hunter, your National Account Manager at 703-981-5893 or Ms. Laurene Loo, your Senior Customer Relations Representative at 818-710-3056.

IN WITNESS WHEREOF, Seller and Freddie Mac have caused this Amendment to be duly executed by their respective authorized representatives as of the date first set forth above.

**FEDERAL HOME LOAN MORTGAGE CORPORATION**

Paul Mullings
Senior Vice President
Single Family Sourcing

**COUNTRYWIDE HOME LOANS, INC.**

By: _Gregory M. Togneri_

Name: _Gregory M. Togneri_

Title: _Senior V. P._

Date: _10/26/06_

JL/204305_T05083183/LMLO-6UQUBR/204305_T05012783/KABZ-6UQV5M/204305_T05012883/KABZ-6UQV6D/JH/2006-24

OCT 2 6 2006

DEAL TRACKING